**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

|  |  |  |
|---|---|---|
| ALZAMEND NEURO, INC.,<br><br> Plaintiff,<br> -against-<br><br>BIORASI, LLC,<br><br> Defendant. | | **COMPLAINT**<br><br>Case No. _____ |

Plaintiff Alzamend Neuro, Inc. ("**Alzamend**"), by its undersigned attorneys and for its Complaint against defendant Biorasi, LLC ("**Biorasi**"), respectfully alleges, upon knowledge as to its own acts and upon information and belief as to the acts of others, as follows:

## Introduction

1.      Plaintiff Alzamend invested years of research and millions of dollars to develop two innovative new treatments for one of the most feared and costly diseases in the United States: Alzheimer's disease ("**Alzheimer's**").

2.      Alzamend's mission is the development of two treatments—potentially, even cures—for Alzheimer's disease: a next generation lithium treatment (aka "**AL001**"), and a novel immunotherapy treatment (aka "**ALZN002**"). Of the two, the furthest-developed treatment is AL001, a patented ionic cocrystal technology delivering lithium via a therapeutic combination of lithium, salicylate, and L-proline, for which Alzamend has completed Phase I and Phase IIA clinical trials and is now preparing for advanced Phase II trials.

3.      The newer treatment, which is the subject of this lawsuit, is ALZN002, an immunotherapy treatment using mutant peptide sensitized cells as a cell-based therapeutic "vaccine" which Alzamend hopes will restore the ability of the patient's immune systems to combat Alzheimer's, reducing or eliminating symptoms of the disease.

4. In February 2023, Alzamend retained defendant Biorasi, a contract research organization ("**CRO**" or "**Clinical Research Organization**"), to conduct a first-in-human, randomized, double-blind, placebo-controlled, parallel-group, Phase I/IIA clinical trial for ALZN002 in subjects with mild-to-moderate dementia of the Alzheimer's type. Preparation for the study began in April 2023, and Alzamend invested approximately $3.3 million in start-up costs.

5. The trials of ALZN002 were derailed, however, in January 2024, when Biorasi's failures led to the withdrawal of the clinical trial site, the primary medical investigator overseeing the trial ("**Primary Investigator**"), and two enrolled patients. Biorasi's mistaken instructions led to an "unblinding" incident, after which Biorasi made false claims about impropriety and threatened the Primary Investigator's medical license, leading the Primary Investigator to withdraw himself and his facility from the trial. Biorasi's allegations were later debunked by an independent auditor engaged by Alzamend. As a result of Biorasi's misconduct, Alzamend was forced to pause the study, rendering its $3.3 million investment worthless.

6. Biorasi withdrew from the trials in February 2024, leaving Alzamend with the wreckage of a now-unfeasible clinical trial. Biorasi's negligence and failure to perform its contractual obligations not only cost Alzamend its significant investment in setting up the trial and valuable results; it devalued the participation of the two enrolled patients in an invasive medical procedure to remove white blood cells, and set Alzamend back over a year in the development of a potentially lifesaving Alzheimer's treatment.

### The Parties

7. Plaintiff Alzamend is a corporation formed under the laws of the state of Delaware with its principal place of business in Atlanta, Georgia. Alzamend is a clinical-stage biopharmaceutical company focused on developing novel products for the treatment of

Alzheimer's disease, bipolar disorder, major depressive disorder, and post-traumatic stress disorder.

8.     Defendant Biorasi is a limited liability company formed under the laws of the state of Florida with its principal place of business in Aventura, Florida. Biorasi is a clinical research organization providing clinical research services and related services on a contract basis.

### Jurisdiction and Choice of Law

9.     This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(a)(2) because Plaintiff is a citizen of Delaware and Georgia, Defendant is a citizen of Florida, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the parties have contractually designated this District as the stipulated venue for adjudication of their disputes.

11.     Defendant has consented to this Court's personal jurisdiction pursuant to the Master Services Agreement for Clinical Research Organization Services, described in further detail below, which requires "all legal actions arising from or related to this Agreement shall be commenced in the applicable federal or state court within Miami-Dade County of the State of Florida." Defendant is also subject to this Court's personal jurisdiction because Defendant is a resident of Miami-Dade County.

### Factual Background

12.     Alzamend and Biorasi executed a Master Services Agreement for Clinical Research Organization Services (the "**MSA**"), effective February 17, 2023, pursuant to which Alzamend retained Biorasi to oversee a clinical trial for Alzamend's novel Alzheimer's treatment, ALZN002.

13.     Biorasi held itself out to be a skilled CRO with the experience and capability to execute the trial. According to its website, Biorasi "proudly claims to [be] the fastest, most responsive global CRO in the industry," and to have "rescu[ed] some of the most difficult to

execute clinical trials."  Biorasi specifically claims to have a specialty in neurological studies, including "neurodegenerative, neurodevelopmental, psychiatric, and movement disorders."

**Alzamend & Biorasi Contract for Biorasi to Provide Clinical Trial Services**

14.     Alzamend's new Alzheimer's treatment, ALZN002, is a cellular immunotherapy product using a mutant peptide-sensitized cell as a cell-based therapeutic vaccine to restore the ability of patients' immunological systems. The U.S. Food and Drug Administration ("**FDA**") authorized Alzamend to proceed with a combined Phase I/IIA clinical trial of ALZN002 on October 31, 2022.

15.     Alzamend and Biorasi first executed a Letter of Intent ("**LOI**"), effective January 2, 2023, pursuant to which Alzamend hired Biorasi to perform certain set-up services for the clinical trial, and Alzamend authorized payment to Biorasi of $437,466 against which invoices were issued and payments made.

16.     Alzamend then executed the MSA with Biorasi on February 17, 2023, for Biorasi to provide ongoing clinical research services and personnel to support the ALZN002 trial.

17.     Pursuant to Section 2.1 of the MSA, Biorasi promised to provide "a degree of skill, diligence and expertise consistent with industry standards."

18.     Under Section 3.1 of the MSA, Biorasi was required to "ensure its employees and Subcontractors performing Services [had] the level of skill necessary for BIORASI to meet its obligations under [the MSA]," and that all employees were "trained on BIORASI's Standard Operating Procedures and all Applicable Laws." Biorasi further agreed to "provide prompt written notice to [Alzamend] of any circumstances . . . [that] could adversely affect" the ALZN002 study, pursuant to Section 2.8(b).

19.     Also on February 17, 2023, Alzamend and Biorasi signed a Work Order under the MSA (the "**Work Order**") further detailing Biorasi's responsibility to manage the day-to-day operation of the trial. Among Biorasi's tasks as Clinical Research Contractor, Biorasi was responsible for:

- Developing communications-monitoring and data-management plans for the trial;
- Developing training materials for participants, including (as relevant here) covering treatment shipments and escalating queries;
- Providing protocol- and study-specific training;
- Escalating and communicating study-related issues to Alzamend; and
- Managing the participating clinics and laboratories.

20.     Each of the above tasks was essential to a proper and valid clinical trial. Crucially, Biorasi was also responsible for designing and implementing the protocols to maintain a double-blind (described further below) to ensure that the trial's results would be reliable and free of bias. Alzamend relied upon Biorasi to implement and maintain the double-blind, because Alzamend itself would remain "blind" to assignment of subjects within the trial.

21.     At the time the parties executed the Work Order, the contemplated date for the completion of the trial was June 2028.

**ALZN002 Trial Design**

22.     In collaboration with Biorasi, Alzamend designed the following protocol for the ALZN002 trials ("**ALZN002-01 Protocol**"):

- Study participants underwent screening to determine eligibility for the trial;
- Subjects who met the inclusion criteria were enrolled after providing informed consent;
- Baseline measurements were taken;
- Subjects were randomly assigned to undergo leukapheresis to obtain peripheral blood mononuclear cells (active) or sham leukapheresis (placebo);

- The first two subjects in each cohort were randomly assigned as "sentinel subjects"[1]—one to receive the active immunotherapy product, and the other to receive the placebo; and
- Following observation of the two sentinel subjects, the remaining eight subjects in the first cohort were to be screened and enrolled following the same format.

**Partnerships with Clinical Sites**

23. Biorasi was responsible for developing and implementing procedures for handling, shipping, and processing each subject's samples and treatments between three facilities participating in the study, as well as coordinating communications so as to maintain the double-blind nature of the trial and ensure reliable results. Biorasi was also responsible for paying these facilities with funds provided by Alzamend for this purpose.

24. The three facilities that participated in the trial were: IMIC Clinical Research Center ("**IMIC Leukapheresis Center**" or "**IMIC**") in Miami, Florida, where either (i) peripheral blood mononuclear cells (PBMCs) were extracted from subjects using leukapheresis (for the active-treatment subjects) or (ii) subjects were given saline intravenous ("IV") administrations as "sham" leukapheresis (for placebo subjects); the University of Miami in Miami, Florida, where the ALZN002 treatment was manufactured using the PBMCs from the patients; and First Excellent Research Group ("**First Excellent Clinic**"), which served as the clinical trial site in Doral, Florida where subjects were screened, enrolled, treated, and monitored. Biorasi was responsible for supervising the flow of materials and information between these facilities.

25. Alzamend chose Biorasi, in large part, because Biorasi's represented that it could secure a committed leukapheresis center where Alzamend's trial protocol would be prioritized. (Leukapheresis is most commonly used in the treatment of cancer, and many facilities that offer

---

[1] In clinical trials, "sentinel subjects" are the first in a group to be dosed, one with an active treatment and one with a placebo. The sentinel subjects are observed for adverse effects before the remainder of the cohort is dosed.

the procedure for cancer treatment will not prioritize Alzheimer's patients with longer life expectancies.) It soon became clear that Biorasi had misrepresented its relationship with leukapheresis sites, however, leaving Alzamend to find a site by other means. First Excellent Clinic offered to allow Alzamend to establish and perform the leukapheresis at its own site, in addition to its other trial responsibilities. Alzamend declined, however, and selected IMIC to establish a Leukapheresis Center because Alzamend believed that engaging a separate facility could provide additional security for the double blind. Alzamend contracted with IMIC Leukapheresis Center in March 2023, and Biorasi was responsible for training site personnel on the trial logistics.

**Biorasi's Incompetence and Histrionic Overreaction Caused an "Unintentional Unblinding Event" that Led the Principal Investigator and Clinical Trial Site to Withdraw from the Trial**

26.     Pursuant to the Work Order, Biorasi was responsible for "Query Resolution" for the participating facilities, and "[m]anag[ing] and respond[ing] to all site inquiries in a timely manner." In particular, Biorasi was responsible for managing and resolving questions regarding the transfer of samples and treatments between the IMIC Leukapheresis Center, the University of Miami, and First Excellent Clinic.

27.     On January 18, 2024, Biorasi's incompetence caused an "unblinding" event, in which an email containing unblinded information was sent to both the blinded and unblinded email distribution lists for study personnel. (For the sake of clarity, individuals who *were not* meant to know whether subjects were assigned to the treatment group or the placebo group are referred to as "**blinded**," while individuals who *were* permitted to know the subjects' assignment are referred to as "**unblinded**." Alzamend itself remained blinded to the subjects' group assignments during the trial.)

28.     At the time of the unblinding event, two subjects (1003 and 1005) were screened and enrolled in the study. Subjects 1003 and 1005 were randomly selected as sentinel subjects for

7

their cohort, with subject 1003 assigned to receive the active treatment, and subject 1005 to receive the placebo.

29.     On or about January 18, 2024, an unblinded study coordinator at IMIC was preparing a shipment of processed blood samples for subject 1005 for Biorasi to send to the University of Miami via "Cryoport" (a temperature-control device used to store and transport blood samples). The IMIC study coordinator did not know, however, that the blinding protocol called for her to ship one sample for the treatment-assigned subject, and an empty Cryoport shipping container for the placebo-assigned subject, as an additional safeguard to maintain the blind. This was important because blinded personnel at Biorasi would be ordering the shipments, and Alzamend (which also remained blinded) would receive records of shipments.

30.     The IMIC study coordinator, therefore, was confused when she did not receive any processed blood sample for sentinel subject 1005.[2] The IMIC study coordinator then called her contact at Biorasi, an unblinded clinical research associate ("**Biorasi Associate**"), to ask what to include in the transport for subject 1005. Although Biorasi was responsible for query resolution, the Biorasi Associate did not know the answer to the question because he had not been adequately trained by Biorasi on the blinding protocol. Failing to exercise due care, the Biorasi Associate gave a wrong answer that would turn out to be disastrous: He instructed her to send an email to the larger group, of both blinded and unblinded study personnel, requesting guidance. The study coordinator, in response to the Biorasi Associate's direction, sent an email to the distribution lists for both the blinded and unblinded study personnel. Her email "unblinded" the entire previously blinded personnel as to the treatment assignment of subject 1005.

---

[2]     Notably, the IMIC study coordinator had previously received and shipped via Cryoport the processed blood sample from sentinel subject 1003 post-leukapheresis in November 2023.

31.     The email distribution lists were created and maintained by Biorasi, without *any* controls or oversight to catch this most foreseeable of errors: a mistaken or accidental unblinding communication to the wrong list, which caused the study to become "unblinded."

32.     The Biorasi Associate also contacted the Vice President of Project Management at Biorasi ("**Biorasi VP**") to report his conversation with the IMIC study coordinator. The Biorasi VP, however, did not understand the protocols for this study. As a result, the Biorasi VP contacted the First Excellent Clinic by telephone and claimed that blood samples for *both* sentinel subjects had been "missing for some time," and that she could not confirm or deny that an active treatment, already delivered to First Excellent Clinic for subject 1003, was correctly identified. Subject 1003 was scheduled to receive the active treatment on or about January 22, 2024—four days after the unblinding incident.

33.     The Biorasi VP's statements to personnel at First Excellent Clinic that the sample for subject 1003 had been misplaced was baseless. (An independent auditor later confirmed that neither sample had been misplaced at any time.)

34.     The Biorasi VP simply did not understand fundamental aspects of the trial protocol.

35.     Over the course of several phone calls with First Excellent Clinic Personnel, the Biorasi VP amplified her mistaken theory that the active treatment for subject 1003 was misidentified—or worse, defective—out of all proportion. She went so far as to threaten the blinded Primary Investigator at First Excellent Clinic with the loss of his medical license if he continued with the treatment as scheduled. Because of the Biorasi VP's reckless threat, the Primary Investigator notified Biorasi that he was withdrawing himself and First Excellent Clinic from the study on or about January 24, 2024. His withdrawal had a catastrophic impact on the trial.

36.     The Biorasi VP's failure to report the allegation to Alzamend in the first instance, and to confirm her information before threatening the Primary Investigator with the loss of his license, was a clear breach of her contractual duty to escalate issues to Alzamend. It was also a breach of the standard of care expected of a CRO in like circumstances. In fact, the Biorasi VP *never* reported the allegation to Alzamend: Alzamend learned of the entire incident later, from the Primary Investigator when he withdrew from the trial. By that point, all of the time, money, and work that preceded the incident was for naught.

37.     Alzamend hosted a conference call on January 30, 2024, with Biorasi, the Primary Investigator, and the study coordinator at First Excellent Clinic ("**First Excellent Coordinator**") to discuss the Primary Investigator's withdrawal. During the call, Alzamend learned for the first time about the false accusation that one leukapheresis sample had been misplaced months earlier. Alzamend also learned that Biorasi had not paid First Excellence Clinic sums due under its contract, even though Biorasi still held funds paid by Alzamend for that purpose.

38.     The Primary Investigator and the First Excellent Coordinator expressed vehement frustration at the incompetence and overall mismanagement of the trial led by Biorasi.

**Biorasi Failed to Understand Protocols, Provide Adequate Training, and Commit Sufficient Resources to the Study**

39.     Two, systemic issues at Biorasi lead to the unblinding incident and the Primary Investigator's withdrawal: (1) a lack of protocol training and comprehension from both Biorasi employees and other study personnel under Biorasi's supervision; and (2) failure by the Biorasi Associate and the Biorasi VP to exercise due care.

40.     Pursuant to the Work Order, Biorasi was responsible for training and overseeing clinical personnel during the ALZN002 trial, including developing procedures and answering questions.

41.     Clinical personnel clearly were not trained, however, in critical aspects of the protocol designed to maintain the blind. Moreover, when the IMIC study coordinator raised a question about that protocol, the Biorasi Associate not only did not have an answer but, even worse, directed her in a manner that harmed the trial.

42.     Not only were clinic personnel and Biorasi's employees insufficiently trained on the protocols, Biorasi also failed to implement appropriate procedures to escalate questions—as was its obligation under the Work Order—while maintaining the blind. The Biorasi Associate told the study coordinator to send an email requesting guidance, and the study coordinator emailed the request to both the blinded and unblinded email lists. Whatever procedures Biorasi implemented to manage the flow of information to blinded personnel (if any) were insufficient to protect the valuable trial from this imminently foreseeable mistake.

43.     Throughout this incident, communications from Biorasi demonstrated on several occasions a lack of knowledge of, and careless disregard for, the clinical protocol that Biorasi itself had helped develop. During the January 30 conference call, the Primary Investigator and the First Excellent Coordinator were adamant that Biorasi's team did not have sufficient experience or capabilities. The First Excellent Coordinator called the management of the trial "incompetence, pure incompetence," and complained that "nobody knows what they're doing." "We're tired, this is not how you run trials," she explained.

44.     Through subsequent conversations, the First Excellent Coordinator also alerted Alzamend that the neuroimaging vendor retained by Biorasi had incorrectly screened eligible patients out of the trials, due to a similar lack training by Biorasi and lack of comprehension of the protocol and disease. The Primary Investigator and other personnel at First Excellent Clinic also opined that Biorasi did not appear equipped to handle this type of clinical trial.

**Biorasi's Resignation**

45.     On or about February 13, 2024, Biorasi resigned and terminated the MSA and Work Order with Alzamend. Alzamend had already paid Biorasi $1,857,108.78 by this time.

46.     At the urging of the Primary Investigator, and out of an abundance of caution, Alzamend then retained an independent clinical research organization, Linical Co., Ltd ("**Linical**"), to conduct an audit of the incident and facilities; ensure that the leukapheresis samples had never been misplaced; confirm the integrity of the manufacturing process; and ensure the patient safety. Linical performed the audit on March 20 and 21, 2024, and produced a report on May 1, 2024. The audit confirmed that the leukapheresis samples had not been misplaced, and subjects 1003 and 1005's safety was not compromised by the incident.

47.     Biorasi declined to provide documents to Linical as well as participate in the audit, despite their contractual obligation to do so, telling Alzamend to request the documents from IMIC instead.

**FIRST CAUSE OF ACTION**
**(Breach of Contract)**

48.     Plaintiff repeats and re-alleges the allegations set forth in the foregoing paragraphs.

49.     The MSA and Work Order are binding and enforceable contracts.

50.     Alzamend has fully performed its obligations under the MSA and Work Order.

51.     As set forth above, Biorasi breached the MSA and Work Order by, among other things, failing to train and oversee clinical trial personnel; failing to implement an effective system to escalate questions about clinical trial procedures; failing to implement effective controls to maintain the double blind; failing to provide prompt notice to Alzamend of circumstances that had a material adverse effect on the trial; and failing to train and manage personnel to respond appropriately to non-compliance incidents.

12

52.     As a direct, proximate and foreseeable result of Biorasi's breach, Alzamend has been damaged in an amount to be determined at trial but estimated to exceed $2,544,914.78, including: approximately $1,857,108.78 paid to Biorasi for professional services and pass through costs to set up the trial; approximately $1 million in startup costs paid directly to other contractor to recruit and screen patients, which must be paid again to resume the trial; approximately $437,000 in direct startup costs, which must be paid again to resume the trial; and approximately $3.7 million, representing the difference between the contract price quoted by Biorasi and the price quoted by alternate CROs to finish the trial.

53.     Under Section 9.13 of the MSA, Alzamend is also entitled to recover its attorneys' fees, costs, expenses and necessary disbursements.

**SECOND CAUSE OF ACTION**
**(Negligence)**

54.     Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through 47.

55.     Clinical Research Organizations, such as Biorasi, are expected to use reasonable care when conducting their business to ensure clinical trials are executed reliably and without bias, including by implementing, training, and overseeing protocols to maintain double-blind trials.

56.     As a direct and proximate result of Biorasi's failure to exercise due care in providing Clinical Research Contractor services, Biorasi: (1) performed acts that a person of ordinary prudence in the same or similar circumstances would not have done; or (2) failed to perform acts that a person of ordinary prudence would have done under the same or similar circumstances. For example, Biorasi persisted in spreading false information about the integrity of the leukapheresis samples to clinical staff, without investigating the truth of that information, and without informing Alzamend about its false suspicions.

13

57.     As a result of Biorasi's breach of its duty of care, Alzamend lost the money invested and value accumulated in setting up and conducting the preliminary stages of the ALZN002 clinical trial. Alzamend has been damaged in an amount to be determined at trial but estimated to exceed $1,600,000, including: approximately $160,498.93 pass through costs paid to Biorasi to pay expenses for setting up the trial; approximately $1 million in startup costs paid directly to other contractors to recruit and screen patients, which must be paid again to resume the trial; and approximately $437,000 in direct startup costs, which must be paid again to resume the trial.

## THIRD CAUSE OF ACTION
### (Gross Negligence)

58.     Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through 47.

59.     Clinical Research Organizations, such as Biorasi, are expected to use reasonable care when conducting their business to ensure clinical trials are executed reliably and without bias, including by implementing, training, and overseeing protocols to maintain double-blind trials.

60.     As a Clinical Research Organization, Biorasi was aware of rules, regulations, and scientific standards that required careful adhesion to the blinding protocol to protect the value of the trial. Biorasi knew that a failure to implement, protect, and oversee the blinding protocol was highly likely to result in the complete loss of the value of the trial.

61.     Despite this knowledge, Biorasi failed to train its employees, implement controls, or monitor the blinding protocol, and its employees made false threats that trial personnel could be subject to professional discipline for their work, all resulting in the complete loss of the value of the trial and Alzamend's investments.

62.     As a result of Biorasi's gross negligence, Alzamend lost the money invested and value accumulated in setting up and conducting the preliminary stages of the ALZN002 clinical trial. Alzamend has been damaged in an amount to be determined at trial but estimated to exceed

14

$1,600,000, including: approximately $160,498.93 pass through costs paid to Biorasi to pay expenses for setting up the trial; approximately $1 million in startup costs paid directly to other contractors to recruit and screen patients, which must be paid again to resume the trial; and approximately $437,000 in direct startup costs, which must be paid again to resume the trial.

63.     Alzamend is also entitled to punitive damages for Biorasi's gross negligence in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
### (Tortious Interference with Business Relationship)

64.     Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through 47.

65.     A mutually beneficial business relationship existed between Alzamend, on the one hand, and First Excellent Clinic and the Primary Investigator, on the other. Biorasi was aware of that relationship.

66.     Biorasi intentionally and unjustifiably interfered with that business relationship by falsely claiming that the treatments were defective, or worse, and further falsely threatening the Primary Investigator with the loss of his medical license if he continued to render clinical services for Alzamend's benefit.

67.     As a result of Biorasi's wrongful interference, Alzamend lost the Primary Investigator and First Excellent Clinic's participation in the study, and the value of their experience and expertise. Alzamend has been damaged in an amount to be determined at trial but estimated to exceed $100,000, including the cost of securing another clinical facility.

**WHEREFORE**, Plaintiff respectfully requests judgment as follows:

a.  On the first cause of action, awarding Plaintiff damages in an amount estimated to be at least $2,544,914.78, plus interest, attorneys' fees, costs, expenses and necessary disbursements.

15

b.  On the second cause of action, awarding Plaintiff damages in an amount estimated to be at least $1,600,000.

c.  On the third cause of action, awarding Plaintiff damages in an amount estimated to be at least $1,600,000, plus punitive damages to be determined at trial.

d.  On the fourth cause of action, awarding Plaintiff damages in an amount estimated to be at least $100,000.

e.  Granting such other and further relief as the Court deems just and proper.

Date:   January 31, 2024

RIVERO MESTRE LLP

By:      */s/ Andrés Rivero*
_____
Andrés Rivero
Fla. Bar No. 613819
Patricija Gegznaite
Fla. Bar No. 1031253
2525 Ponce De Leon Blvd., Ste. 1000
Miami, Florida 33134
Email: arivero@riveromestre.com
           pgegznaite@riveromestre.com
Phone: (305) 445-2500

*Attorneys for Plaintiff Alzamend Neuro, Inc.*

16