**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

|  |  |
|---|---|
| ALZAMEND NEURO, INC., <br><br> Plaintiff, <br><br> v. <br><br> BIORASI, LLC, <br><br> Defendant. | Case No.: 1:25-cv-20481-BB |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE**
**EXPERT TESTIMONY OF EMILY FRIEDRICH AND AIMON IFTIKHAR**

Table of Contents

Page

I.    INTRODUCTION ......................................................................................................1

II.   FACTUAL BACKGROUND ....................................................................................2

      A.     Procedural History ......................................................................................3

III.   LEGAL STANDARD ...............................................................................................5

IV.   ARGUMENT............................................................................................................6

      A.     Drs. Friedrich and Iftikhar Are Not Qualified to Opine on the Roles and Responsibilities of a CRO in a Double-Blinded Clinical Trial...............................6

             i.     Dr. Friedrich Has No Clinical Trial Experience..........................................6

             ii.     Dr. Iftikhar's Has Limited Clinical Trial Experience.................................9

      B.     Because Dr. Friedrich and Dr. Iftikhar Lack Qualifications in Double-Blinded Clinical Trials, Their Experience-Based "Industry Standards" Analyses Are Unreliable.................................................................................................11

      C.     Dr. Friedrich and Iftikhar Impermissibly Usurp the Role of the Fact Finder ........13

V.   CONCLUSION.......................................................................................................16

i

Table of Authorities

Page

CASES

*Arevalo v. Coloplast Corp.*,
2020 WL 3958505 (N.D. Fla. 2020)........................................................................................13

*Beaubrun v. GEICO Gen. Ins. Co.*,
2018 WL 11354150 (S.D. Fla. 2018) .......................................................................................15

*City of Tuscaloosa v. Harcros Chems., Inc.*,
158 F.3d 548 (11th Cir. 1998) ..................................................................................................5

*Companhia Energetica Potiguar v. Caterpillar Inc.*,
2016 WL 7507848 (S.D. Fla. 2018) ..........................................................................................8

*Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*,
402 F.3d 1092 (11th Cir. 2005) ..............................................................................................15

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)...................................................................................................................5

*Gomez v. Gen. Nutrition Corp.*,
323 F.Supp.3d 1368 (S.D. Fla. 2018) ..................................................................................8, 11

*In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*,
711 F.Supp.2d 1348 (M.D. Ga. 2010) ......................................................................................6

*In re Trasylol Prods. Liab. Litig.*,
709 F.Supp.2d 1323 (S.D. Fla. 2010) .....................................................................................13

*La Gorce Palace Condo. Ass'n, Inc. v. Blackboard Specialty Ins. Co.*,
586 F.Supp.3d 1300 (S.D. Fla. 2022) .....................................................................................11

*McCorvey v. Baxter Healthcare Corp.*,
298 F.3d 1253 (11th Cir. 2002) ................................................................................................5

*Moore v. Intuitive Surgical, Inc.*,
995 F.3d 839 (11th Cir. 2021) ..................................................................................................6

*Payne v. C.R. Bard, Inc.*,
2014 WL 988754 (M.D. Fla. 2014) ......................................................................................6, 11

*Payne v. C.R. Bard, Inc.*,
606 Fed.Appx. 940 (11th Cir. 2015)..........................................................................................6

Table of Authorities
(continued)

Page

*Prosper v. Martin*,
   989 F.3d 1242 (11th Cir. 2021) ........................................................................................16

*Ramjeawan v. Bank of Am. Corp.*,
   2010 WL 1645097 (S.D. Fla. 2010) ................................................................................15

*Rink v. Cheminova, Inc.*,
   400 F.3d 1286 (11th Cir. 2005) ........................................................................................5

*U.S. v. Frazier*,
   387 F.3d 1244 (11th Cir. 2004) ....................................................................................5, 11

*U.S. v. Wheat*,
   796 F.Supp.3d 1333 (N.D. Ga. 2025) ..............................................................................6

*Umana-Fowler v. NCL (Bahamas) Ltd.*,
   49 F.Supp.3d 1120 (S.D. Fla. 2014) ..............................................................................13

*Webb v. Carnival Corp.*,
   321 F.R.D. 420 (S.D. Fla. 2017) ......................................................................................8

OTHER AUTHORITIES

Federal Rule of Evidence 702 ................................................................................................1, 5

iii

Plaintiff Alzamend Neuro, Inc. ("Alzamend") moves to exclude Defendant Biorasi, LLC's ("Biorasi") rebuttal experts, Emily Friedrich and Aimon Iftikhar, under Federal Rule of Evidence 702.

## I.   INTRODUCTION

Biorasi has designated Drs. Emily Friedrich and Aimon Iftikhar as rebuttal experts, submitting a joint rebuttal report (the "Rebuttal Report") that purports to opine on industry standards for Clinical Research Organizations ("CROs") in randomized, double-blinded clinical trials. Yet neither expert has meaningful experience in the very industry on which they seek to testify. Dr. Friedrich has never worked at a CRO and has never been involved in a clinical trial of any kind—let alone a double-blinded one. Dr. Iftikhar's experience is only marginally better: across her entire career, she has worked on only a single double-blinded clinical trial, and her only CRO tenure lasted a mere seven months.

The mismatch between the opinions offered and the experience behind them is stark. Dr. Friedrich purports to opine on the sufficiency of Biorasi's blinding procedures—yet she has no experience implementing safeguards to prevent unblinding, let alone any experience with blinded clinical research more broadly. Dr. Iftikhar opines that Biorasi prepared "adequate trial plans" that were "consistent with industry practices"—yet she has never been responsible for drafting the very categories of plans on which she opines, including communications plans, monitoring plans, and unblinding plans. These are the witnesses Biorasi asks the Court to credit as authorities on CRO best practices in an especially complex, double-blinded trial.

The Rebuttal Report and any testimony of Dr. Friedrich and Dr. Iftikhar should be excluded for three independent reasons. First, neither Dr. Friedrich nor Dr. Iftikhar possesses the education, training, or experience necessary to offer expert opinions on industry standards for a CRO in a

1

randomized, double-blinded clinical trial. Second, because both witnesses lack these foundational qualifications, their experience-based analyses are not grounded in reliable principles and methods, nor are they reliably applied to the facts at issue. Third, both Drs. Friedrich and Iftikhar impermissibly usurp the role of the fact finder by making credibility determinations, weighing evidence, and rendering factual conclusions that are properly reserved for the fact finder.

## II.     FACTUAL BACKGROUND

Alzamend is a biopharmaceutical company that develops potential cures for Alzheimer's disease and other neurodegenerative diseases, including the novel immunotherapy treatment (a/k/a "ALZN002") that was the subject of the clinical trial at the center of this lawsuit. (Dkt. No. 40 ("Am. Compl.") ¶¶ 1, 3).  To develop ALZN002, Alzamend needed to conduct a Phase I/IIA clinical trial (the "ALZN002 Trial" or "Trial") that would evaluate the safety, tolerability, and preliminary efficacy of ALZN002. The Trial was to be randomized and double-blind placebo-controlled, with neither the patients nor the clinicians knowing who received the actual therapy or a placebo. (*Id*. ¶ 6).

Alzamend hired Biorasi, a CRO, to manage and oversee the Trial while Alzamend remained in its blinded position. CROs are companies that can be contracted to "design[], manage[] and execute[]" clinical trials. (*See* Ex. E, Expert Report of Dr. Hausheer at 3). The ALZN002 Trial was derailed, however, in January 2024, when Biorasi's failures led to disruption of the Trial and, consequently, the withdrawal of the clinical trial site ("FERG") and two enrolled patients. (Am. Compl. ¶ 7).  Specifically, Biorasi's failure to develop and follow proper protocol, mistaken instructions, and failure to train staff in proper procedure led to an incident in which an email was sent to an improper distribution list and unblinded the entire study team (the "Unblinding Event"), jeopardizing the viability of the Trial.  (Am. Compl. ¶ 7).

2

### A.      Procedural History

This action commenced on January 31, 2025. (Dkt. No. 1).  On May 5, 2025, Alzamend filed the operative Amended Complaint.  (Dkt. No. 40).  On June 13, 2025, Biorasi moved to dismiss the Amended Complaint (*see* Dkt. No. 49), which Alzamend opposed on July 18, 2025. (Dkt. No. 60).  Biorasi filed its Reply in support of its Motion to Dismiss on August 8, 2025 (Dkt. No. 62).  On January 30, 2026, the Court ruled on the Motion to Dismiss, denying Biorasi's Motion with respect to Count I (Breach of Contract), Count II (Breach of Implied Covenant of Good Faith and Fair Dealing), Count IV (Injurious Falsehood), Count V (Violation of Florida's Deceptive and Unfair Trade Practices Act), and Count VI (Fraudulent Inducement and Negligent Misrepresentation. (Dkt. No. 106).  The Court granted Birosi's Motion with respect to Count III (Negligence).  (*Id*.).  In total, fifteen depositions were taken – twelve fact witnesses and three expert witnesses.  The last deposition took place on March 18, 2026.

On February 4, 2026, Alzamend submitted an expert report from Dr. Fred Hausheer to opine on whether Biorasi performed its duties as a CRO in accordance with industry standards. (*See* Ex. E, Expert Report of Dr. Hausheer). Dr. Hausheer is a physician-scientist and biopharmaceutical research executive with over 37 years of experience in clinical drug development, including extensive Phase I-III clinical trial management.  (*See Id*. at 3). Dr. Hausheer has held senior executive leadership positions at both CROs and pharmaceutical companies that conduct clinical trials, including serving as the Global Chief Medical Officer for WuXi AppTec, one of the largest global CROs, which provides clinical trial CRO services for more than 1,200 active investigational clinical trials.  (*Id*. at 3-4).  In that role, Dr. Hausheer had executive leadership and oversight for clinical operations, project management, medical monitoring, safety and pharmacovigilance, regulatory affairs, and GCP compliance as it applies to clinical trial conduct, management, and execution.  (*Id*. at 4).

3

Dr. Hausheer's Report addresses Biorasi's conduct with respect to staff qualifications and training, protocol adherence, maintenance of the study blind, deviation management, escalation procedures, and sponsor-CRO communications.  (*Id*. at 5-6).  Dr. Hausheer concluded that Biorasi's performance fell significantly below industry standards for a CRO. (*Id*. at 28). Specifically, Dr. Hausheer found that (1) Biorasi lacked the qualification and resources to properly run the ALZN002 Trial; (2) Biorasi failed to train trial staff or implement proper plans and procedures in accordance with regulatory standards; (3) Biorasi's inadequate training and procedures were a direct contributing factor to the Unblinding Event; (4) Biorasi's mishandling of the IMIC Coordinator's inquiry was a significant contributing factor to the Unblinding Event; (5) the ALZN002 Trial could have continued had Biorasi acted in accordance with industry standards; (6) Biorasi acted outside the bounds of recognized regulatory and industry standards when raising breach of protocol concerns to the Principal Investigator; and (7) Alzamend was left with no visible path to continue the Trial after the Principal Investigator's withdrawal.  (*Id*. at 28-29).  Biorasi did not submit an opening expert report, but instead, designated Drs. Friedrich and Iftikhar to serve as rebuttal experts.  On February 18, 2026, Biorasi submitted the Rebuttal Report. (Ex. A, Rebuttal Report).

Drs. Friedrich and Iftikhar are both employed at Exponent, Inc., a consulting firm – not a CRO.  (*Id*. at 1-2).  Neither witness has ever been approved as an expert by any court, and this represents the first time either has submitted an expert report or testified as an expert in litigation. (Ex. B, Friedrich Tr. 11:3-13:2; Ex. C, Iftikhar Tr. 10:11-11:24).[1]  Dr. Friedrich has never worked at a CRO or on a clinical trial, and Dr. Iftikhar has only worked at a CRO for seven months, and

---

[1] The transcripts have been excerpted to the relevant portions for the Court's convenience.

has only ever worked on a single double-blinded clinical trial. (Ex. B, Friedrich Tr. 25:14-28:3, 38:16-19, 39:24-40:6, 44:20-45:5; Ex. C, Iftikhar Tr. 21:15-17, 121:15-21).

Drs. Friedrich and Iftikhar opine that Biorasi was not underqualified or under-resourced (*see* Ex. A, Rebuttal Report at 33-36), that its trial plans were adequate and consistent with industry practices (*id*. at 39-45), that Biorasi provided adequate training on blinding procedures with no systemic deficiencies (*id*. at 36-53), that Biorasi's procedures did not contribute to the unblinding event and that it adequately prepared for potential unblinding and adhered to the communication plan (*id*. at 53-62), that Biorasi did not mismanage the aftermath of the unblinding and instead followed proper procedures, including timely escalation to Alzamend, investigation and verification of the facts, and proper disclosure to the sponsor (*id*. at 62-69), and that the trial could have resumed because Biorasi acted in accordance with industry standards. (*Id*. at 69-73).

## III. LEGAL STANDARD

Expert testimony is admissible "only if it is both reliable and relevant." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). Under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), courts must act as "gatekeepers" to ensure that speculative, unreliable expert testimony does not reach the factfinder. *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). The court's gatekeeping function requires more than simply "taking the expert's word for it." *U.S. v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004). "[C]ourts must engage in a rigorous inquiry to determine whether: (1) the expert is qualified to testify competently regarding the matter he [or she] intends to address; (2) the methodology by which the expert reaches his [or her] conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to

5

determine a fact in issue." *Rink*, 400 F.3d at 1291-92 (citing *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)) (cleaned up).

The proponent of expert testimony must establish, "by a preponderance of the evidence, the expert's qualification, reliability, and helpfulness." *Payne v. C.R. Bard, Inc.*, 606 Fed.Appx. 940, 942 (11th Cir. 2015). Biorasi, as the proponent of Drs. Friedrich and Iftikhar, bears the burden here and cannot meet it. The record is unambiguous: these witnesses lack the foundational qualifications, reliable methodology, and probative helpfulness that Rule 702 demands.

## IV.     ARGUMENT

### A.     Drs. Friedrich and Iftikhar Are Not Qualified to Opine on the Roles and Responsibilities of a CRO in a Double-Blinded Clinical Trial

An expert's qualifications are "assessed in reference to the matter to which the expert seeks to testify – i.e., to the task at hand." *U.S. v. Wheat*, 796 F.Supp.3d 1333, 1340 (N.D. Ga. 2025) (quoting *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 854 (11th Cir. 2021)) (cleaned up). To determine whether a proffered expert is qualified, courts look to "evidence of the witness's education and experience and ask whether the subject matter of the witness's proposed testimony is sufficiently within the expert's expertise." *Payne v. C.R. Bard, Inc.*, 2014 WL 988754, at *6 (M.D. Fla. 2014), *aff'd*, 606 Fed. Appx. 940 (11th Cir. 2015) (quoting *In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*, 711 F.Supp.2d 1348, 1367 (M.D. Ga. 2010)).

#### i.     Dr. Friedrich Has No Clinical Trial Experience

Dr. Friedrich has *zero* experience conducting clinical trials. Her professional background consists entirely of preclinical and clinical *research* – none of which involves clinical *trial* experience. (Ex. B, Friedrich Tr. 27:24-28:3, 38:16-19, 39:24-40:6, 43:21-45:5). This distinction is critical because "clinical research" is a "broad category encompassing human subject-based

research." (*Id*. at 13:10-15). A "clinical trial," on the other hand, is a *category* of clinical research with "additional FDA regulations" that must be abided by. (*Id*. at 38:7-15).

Even Dr. Friedrich's clinical research experience is lacking. She obtained her Ph.D. in biomedical engineering in 2014 (*id*. at 20:9-11), but did not enter the industry until 2019, spending the intervening years in academic positions conducting preclinical lab research. (*Id*. at 25:12-28:7). Since then, she has held only two industry positions. The first was at General Dynamics IT, a non-CRO military health organization, where she managed research involving "soldier-focused health outcomes, devices, and things like that" in connection with "combat trauma." (*Id*. at 28:8-30:21, 34:21-23). Her second and current position is at Exponent—also not a CRO—where she has worked only since approximately April 2023 as a "senior associate consultant," assisting clients with clinical research protocols or performing litigation support such as "document review, developing the expert report, [and] helping to prepare the testifier for depositions." (*Id*. at 14:23-15:16, 39:11-23).

Despite Dr. Friedrich's lack of experience, she opines extensively that Biorasi adequately prepared for potential unblinding, implemented an appropriate communication plan for the Trial, properly trained staff on blinding procedure, and that Biorasi did not mismanage the aftermath of the unblinding. (Rebuttal Report at 36-38, 45-50, 53-60, 62-73). However, Dr. Friedrich has no experience in blinded clinical research and admits she has no experience implementing safeguards to prevent unblinding in a blinded study:

> Q. So you've never developed or implemented a control system to prevent unblinding in a clinical trial?
> A. That's correct.
> Q. How about in your clinical research?
> A. I don't believe it's ever been necessary.
> Q. And is that because they're not blinded?
> A. For the clinical research I've done, yeah, they probably weren't blinded.

7

…

Q. Have you ever been responsible for implementing like a control system to manage communication pathways in your clinical research?

A. I've not been responsible for implementing it, but I have been responsible for abiding by someone else's design.

(Ex. B, Friedrich Tr. 45:6-17, 113:22-25).

Moreover, Dr. Friedrich has never been in charge of drafting trial plans and procedures, has never drafted a communication plan, has never been responsible for implementing a control system to manage communications in a clinical research, and could not recall if she had ever been involved at all in generating "procedures to maintain a blind in [a] study." (*Id.* at 42:3-23, 46:12-19).

In sum, Biorasi is attempting to proffer an expert to testify about unblinding plans and procedures in a clinical trial when that expert (a) has never participated in a clinical trial, (b) has never been involved in blinded research more generally, and (c) has never been in charge of drafting trial plans and procedures. Here, Dr. Friedrich's lack of *any* clinical trial experience is not a peripheral deficiency – it is the central deficiency, because the entire subject matter of her opinions (*i.e.*, CRO blinding safeguards, training protocols, and unblinding response procedures) is inextricably bound up with clinical trial practice. Dr. Friedrich's inexperience renders her unqualified to serve as an expert. *See, e.g., Gomez v. Gen. Nutrition Corp.*, 323 F.Supp.3d 1368, 1378-79 (S.D. Fla. 2018) (expert unqualified to opine on web accessibility because he lacked "specialized knowledge of experience" and his professional experience was "at best tangentially related" to the topic); *Companhia Energetica Potiguar v. Caterpillar Inc.*, 2016 WL 7507848, at *7 (S.D. Fla. 2018) (expert unqualified because his experience was "too general to pass muster" and he lacked experience with diesel engines in the specific context at-issue in the case, even if he had experience with diesel engineers in other contexts); *Webb v. Carnival Corp.*, 321 F.R.D. 420,

427-29 (S.D. Fla. 2017) (concluding that expert with a background in law enforcement and as a security officer on other cruise ships was unqualified to testify on passenger's intoxication level absent toxicology, alcohol policy, or medical experience).

### ii. Dr. Iftikhar's Has Limited Clinical Trial Experience

Dr. Iftikhar's experience is similarly lacking. She obtained her Ph.D. in bioengineering in 2020 and then joined Machaon Diagnostics as a clinical research scientist. (Ex. C, Iftikhar Tr. 13:12-14:10, 15:2-12). She remained there for only seven months before leaving due to a change in the company's office location. (*Id*. at 21:15–22). During that brief tenure, she managed only one clinical trial, was staffed on another, and had a monitoring role in four others—for a total of six. (*Id*. at 22:15-23:7, 24:13-25:20, 27:3-12). None of those clinical trials were double-blinded. (*Id*. at 121:4-14). She then joined Exponent—which is not a CRO, but rather a "scientific and engineering consulting firm"—where she has worked on only two additional clinical trials. (*Id*. at 33:9-15, 120:14-23). Of those, only one was a double-blinded study, which involved a "wearable medical device" – not a pharmaceutical or immunotherapy product – and it did not involve the "sham shipping" complexities present in the ALZN002 trial. (*Id*. at 34:23-36:14; 121:7-21). In sum, across her entire career, Dr. Iftikhar has worked on only eight clinical trials, only one of which was double-blinded, and only three of which were blinded at all. (*Id*. at 187:12-188:5).

This dearth of double-blinded experience is significant. As Dr. Iftikhar herself explained, a "double-blind involves not only the patients themselves are blinded to whatever treatment is being administered but also personnel on the study, and that might include folks from the sponsor and [folks] from the CRO," whereas a "[s]ingle-blind is whether it's single-blinded where the patient doesn't know." (*Id*. at 99:21-100:8). She conceded that "there's more to consider in a double-blinded study than there is in a single-blinded study," (*id*. at 100:9-14), and that whether a study is double-blinded or single-blinded is itself a factor that contributes to the risk of inadvertent

9

unblinding.  (*Id*. at 101:24-102:21).  The presence of a sham shipment component—as in the ALZN002 trial—introduces further complexity, requiring "additional procedures in the trial itself that just need to be considered."  (*Id*. at 103:6–19).  Yet despite these heightened complexities, Dr. Iftikhar has worked on only one double-blinded study in her entire career, and that study did not involve sham shipping procedures.  (*Id*. at 121:15–21).

Despite Dr. Iftikhar's lack of experience, she opines extensively that certain trial plans prepared by Biorasi addressed and controlled for unblinding in a manner consistent with industry practices, and that Biorasi implemented appropriate procedural safeguards to maintain blinding. (Rebuttal Report at 39-45, 54-62).  However, she admitted she has never been responsible for drafting any of the categories of plans she opined on – apart from preparing a data management plan ***once***.[2]  At most, she has reviewed and edited plans that others drafted (*id*. at 38:3-15), without ultimate responsibility for those plans.  (*Id*. at 28:13-29:19). Even then, her experience is sparse. (*See e.g., id*. at 39:25-40:4 ("Q. Have you ever worked on a communication plan? A. I have reviewed a communication plan")).  When it comes to blinding procedures more generally, she could recall only a single instance—during her seven-month tenure at Machaon Diagnostics—in which she "contributed by working with her team" to edit a blinding procedure that "was part of the plan that was already drafted," and that study was not even double-blinded.  (*Id*. at 31:3-32:16, 121:4–14).  Similarly, at Exponent, she recalled only one instance in which she "reviewed and provided input" for a procedure to prevent unblinding, for which she did not have primary responsibility.  (*Id*. at 43:17-46:12).

---

[2] Ex. C, Iftikhar Tr. 30:7-10 (communications plan), 30:11-31:2 (monitoring plan), 157:3-5 (risk management plan); 160:2-5 (quality management plan), 171:2-4 (global specifications plan), 172:4-12 (medical monitoring plan); 173:10-16 (protocol deviation plan), 174:8-12 (data management plan), 175:17-20 (data validation plan), 176:9-12 (unblinding plan).

Dr. Iftikhar also opined that Biorasi's team was qualified and adequately trained for the ALZN002 trial.  (Rebuttal Report at 33-35, 45-53). However, Dr. Iftikhar admitted that she has never worked on an Alzheimer's clinical trial (*see* Ex. C, Iftikhar Tr. 27:17–19), and when asked what level of Alzheimer's clinical trial experience would be sufficient to qualify a team member for this particular trial, she repeatedly refused to answer.  (*Id*. at 78:5-84:15).  She could not say what level of experience she would deem sufficient for a team member to be staffed on this trial, testifying only that "[t]he experience that I deem sufficient for a clinical trial is what I've opined on in my report. I have not specified Alzheimer's." (*Id*. at 82:16–83:25).

Taken together, Dr. Iftikhar's limited, largely review-level exposure to study plans, her lack of authorship of key project documents, and her participation in only one double-blinded trial render her unqualified to opine on CRO obligations and industry standards for double-blind trial conduct and plan adequacy for the ALZN002 trial.

**B.** **Because Dr. Friedrich and Dr. Iftikhar Lack Qualifications in Double-Blinded Clinical Trials, Their Experience-Based "Industry Standards" Analyses Are Unreliable**

To assess reliability, courts consider "whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology can properly be applied to the facts in issue." *Gomez*, 323 F.Supp.3d at 1377 (quoting *Frazier*, 387 F.3d at 1261-62) (cleaned up). Even if an expert is qualified, the expert "may only testify about matters within the scope of their expertise." *La Gorce Palace Condo. Ass'n, Inc. v. Blackboard Specialty Ins. Co.*, 586 F.Supp.3d 1300, 1308 (S.D. Fla. 2022).  Where, as here, the expert witness relies "primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reasonably applied to the facts." *Payne*, 2014 WL 988754, at *7. Drs. Friedrich and Iftikhar  cannot  make  such  a  showing  because,  as  described  above,  their  experience  is

11

fundamentally lacking.  An expert who has never implemented blinding safeguards cannot explain how her experience informs opinions about blinding safeguards.  An expert who has never drafted a communications plan, monitoring plan, or unblinding plan cannot explain why her experience is a sufficient basis for opining on their adequacy.  And an expert who has never worked in a CRO cannot explain how her experience is "reasonably applied" to CRO industry standards.  The experience-based methodology Drs. Friedrich and Iftikhar purport to employ experience they simply do not have.

For example, Dr. Friedrich opines that "there was sufficient training on the blinding procedures" (*see* Rebuttal Report at 45-48) and that Biorasi "sufficiently document[ed] a variety of measures taken to blind the study and to maintain that blind, and response to unintentional unblinding" (Rebuttal Report at 54-58).  Yet Dr. Friedrich admitted she has no experience implementing safeguards to prevent unblinding in a blinded study and has no experience with blinded clinical research more generally.  (Ex. B, Friedrich Tr. 45:6-46:19, 113:22-25).  Dr. Iftikhar expresses the same opinions (*see* Rebuttal Report at 54-58) yet only has experience with a single double-blinded study. (Ex. C, Iftikhar Tr. 121:15–21).  Dr. Iftikhar goes further and opines that "Biorasi had adequate trial plans" despite having never been responsible for drafting any similar plans.  (*Supra* at 9-10).

Both experts' opinions rest on assertions about industry standards for CRO practice, blinding safeguards, and plan adequacy that they are not qualified to make.  As described above, Dr. Friedrich has never worked on a clinical trial and has never worked at a CRO. Dr. Iftikhar has worked on only a single double-blinded clinical trial, and her only CRO experience consists of seven months in an entry-level position at Machaon Diagnostics.  Neither expert, therefore, possesses the industry experience necessary to opine on industry standards for CRO clinical trial

12

practice.  Dr. Friedrich has never been part of that industry at all, and Dr. Iftikhar's experience with it is limited to a brief stint at a single CRO and a single double-blinded study—neither of which involved the logistical complexities present in the ALZN002 trial.  These narrow experiences cannot support the broad opinions both experts offer about what constitutes standard industry practice for maintaining blinding in a randomized, double-blinded clinical trial.

### C. Dr. Friedrich and Iftikhar Impermissibly Usurp the Role of the Fact Finder

Expert testimony is only helpful when it "illuminates matters beyond the understanding of the average lay person." *Umana-Fowler v. NCL (Bahamas) Ltd.*, 49 F.Supp.3d 1120, 1122 (S.D. Fla. 2014).  Expert testimony that "consists of nothing more than factual narratives that do not assist the trier of fact" is not permitted.  *In re Trasylol Prods. Liab. Litig.*, 709 F.Supp.2d 1323, 1332 (S.D. Fla. 2010).  Nor may an expert testify as to "intent, knowledge, or state of mind because these opinions are speculative and would not be helpful" to the trier of fact.  *Arevalo v. Coloplast Corp.*, 2020 WL 3958505, at *21 (N.D. Fla. 2020).

Biorasi's Rebuttal Report is replete with instances in which Drs. Friedrich and Iftikhar read record documents, weigh competing accounts, and render factual conclusions properly reserved for the fact finder.  Indeed, pages 19-31 of the Rebuttal report are under the heading "Summary of Events," which contain an extended factual narrative and timeline.  **Exhibit D** contains a list of instances in which the Rebuttal Report renders improper factual conclusions.  For example, in Section 5.5 of the Rebuttal Report, Dr. Friedrich and Dr. Iftikhar provide an extensive narrative of factual events and then conclude "[t]he above events are indicative of the various changes to the trial due to Alzamend's actions that the FERG coordinator may have been referring to her in January 19, 2024 email."  (Rebuttal Report at 73).  Dr. Friedrich admitted during her deposition that she did not "know [the FERG coordinator's] intent" and agreed that she was just "speculating as to what it might be."  (Ex. B, Friedrich Tr. 191:7-192:11).

Similarly, in section 5.4.2 the Rebuttal Report, Dr. Friedrich provides an extensive narrative of factual events and then concludes that "it is evident that there were multiple concurrent events that would have reasonably put Biorasi in contact with FERG in the days surrounding the unblinding event" and speculates that "it is equally reasonable to assume that the late shipment of IP was conflated by FERG themselves." (Rebuttal Report at 68). This opinion weighs evidence on a central disputed fact in this case – what Biorasi communicated to the FERG site and why FERG withdrew – and offers an opinion solely as to those facts.

The extent and unreliability of Biorasi's experts' factual determinations was on full display during their depositions. For example, both Dr. Friedrich and Dr. Iftikhar opined that "Alzamend had a significant role in determining unblinding procedures." (Rebuttal Report at 57). Dr. Friedrich confirmed this was a factual determination "based on the documents that I reviewed." (Ex. B, Friedrich Tr. 155:8-16). The primary document she relied on was the March 15, 2023 weekly sponsor meeting minutes. (*Id*. at 155:20–24). But when she was taken to that document, Dr. Friedrich admitted she had misread it—the meeting minutes referenced "unblinded" procedures, not "unblinding" procedures, a distinction she conceded was material—and agreed that the document "does not support the notion that Alzamend was responsible for unblinding procedures." (*Id*. at 156:9–159:19). Rather than concede the point, however, Dr. Friedrich dug in, claiming her opinion was supported by other evidence. (*Id*. at 158:2–160:5). What followed was approximately fifteen pages of questioning in which she was walked through each additional document, ultimately admitting that her support amounted to nothing more than an inference drawn from meeting minutes showing that Alzamend and Biorasi were "actively engaged in discussions . . . to settle on a plan for unintentional unblinding"—despite not knowing the substance of those discussions. (*Id*. at 158:21–170:17).

14

Dr. Iftikhar goes even further, purporting to interpret the contract at issue in this case. She opines that "manual and guideline updates were deemed out of scope at this time under the current contract, as Biorasi was limited to the original scope pending Alzamend's approval of the Change Order." (Rebuttal Report at 57-58). During her deposition, she confirmed this was not merely a recitation of the parties' positions but her own opinion that the updates were in fact out of scope: "My opinion is that, to the extent of what Biorasi was doing, it was out of scope." (Ex. C, Iftikhar Tr. 236:16–23). Yet she could not recall reviewing any specific provisions of the contract to support this conclusion. (*Id*. at 238:5–11). This is contract interpretation, not expert analysis— and Dr. Iftikhar has never drafted or negotiated a master services agreement or work order for a clinical trial. (*Id*. at 238:12–239:10). "Expert opinion testimony regarding the meanings of contractual provisions are irrelevant and hence inadmissible." *Ramjeawan v. Bank of Am. Corp*., 2010 WL 1645097, at *1 (S.D. Fla. 2010) (internal quotation marks omitted); *Beaubrun v. GEICO Gen. Ins. Co.*, 2018 WL 11354150, at *3 (S.D. Fla. 2018) ("As a threshold matter . . . expert testimony is inadmissible when it uses legal terminology to convey an opinion . . .").

Dr. Iftikhar also opines that "Biorasi worked with Alzamend in approving the additional specialized partners, and it was Alzamend that did not include Biorasi on part of the process," relying on a simple post-unblinding Note to File dated March 8, 2024. (Rebuttal Report at 34; Ex. C, Iftikhar Tr. 63:22-64:19). Yet when asked what expertise was needed to interpret that Note to File, Dr. Iftikhar could offer only that an expert is needed to know "that a note to file is considered an official document as part of the trial." (Ex. C, Iftikhar Tr. 64:20-68:25). She admitted that her conclusion was based on accepting the Note to File as credible (*id*. at 70:2-15), and on "reviewing a lot of documents and e-mail exchanges" that she could not identify. (*Id*. at 70:20-71:8).

15

Taken together, the pattern is clear: Drs. Friedrich and Iftikhar have structured their rebuttal around extended factual narratives that marshal documents, interpret evidence, make credibility determinations, and draw conclusions about what occurred during the ALZN002 trial and why. This approach "offers nothing more than what lawyers for the parties can argue in closing arguments," *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1011 (11th Cir. 2005). The Court should exclude both experts' testimony to the extent it constitutes impermissible fact-finding, or at a minimum preclude them from offering testimony that makes credibility determinations, weighs competing evidence, or renders factual conclusions about disputed events in the ALZN002 trial. *See, e.g.*, *Prosper v. Martin*, 989 F.3d 1242, 1249-50 (11th Cir. 2021) (finding expert's interpretation of video footage "not helpful because it did not offer anything the jury could not discern on its own . . . the jury did not need [the expert] to tell them what they could plainly see for themselves").

## V.  CONCLUSION

For all the above reasons, Alzamend respectfully requests that the Court grant this motion to exclude the expert testimony of Dr. Friedrich and Dr. Iftikhar.

### S.D. FLA. L.R. 7.1 CERTIFICATION

In accordance with S.D. Fla. L.R. 7.1(a)(3), counsel for Alzamend has conferred with defendant's counsel. Defendant opposes the relief requested here.

16

Dated: April 2, 2026                      Respectfully submitted,

                                          **RIVERO MESTRE LLP**
                                          2525 Ponce de Leon Blvd., Suite 1000
                                          Coral Gables, Florida 33134
                                          Telephone: (305) 445-2500
                                          Facsimile: (305) 445-2505
                                          E-mail: arivero@riveromestre.com
                                          E-mail: amalave@riveromestre.com


                              By:    */s/ Andrés Rivero*
                                     ANDRÉS RIVERO
                                     Florida Bar No. 613819
                                     ANA C. MALAVE
                                     Florida Bar No. 83839


                      **CERTIFICATE OF SERVICE**

        I certify that on April 2, 2026, I electronically filed this document with the Clerk of
Court using CM/ECF. I also certify that this document is being served today on all counsel of
record by transmission of Notices of Electronic Filing generated by CM/ECF.


                              By:    */s/ Andrés Rivero*
                                     ANDRÉS RIVERO


                                          17