# Exhibit A



E$^x$ponent®

**Expert Report of**
**Emily Friedrich, Ph.D., PMP**
**and Aimon Iftikhar, Ph.D.**

**Alzamend Neuro, Inc. v.**
**Biorasi, LLC**

# Exponent®

## Expert Report of Emily Friedrich, Ph.D., PMP and Aimon Iftikhar, Ph.D.

## Alzamend Neuro, Inc. v. Biorasi, LLC

*Prepared For:*

**David J. Carrier**
**Carlton Fields**
**IDS Center**
**80 South Eight Street, Suite 2800**
**Minneapolis, MN 5540**

*Prepared By:*

*Emily Friedrich*

**Emily Friedrich, Ph.D., PMP**
**Exponent**
25 N 38TH ST, 7th Floor
Philadelphia, PA 19104

*Aimon Iftikhar*

**Aimon Iftikhar, Ph.D.**
**Exponent**
149 Commonwealth Drive
Menlo Park, CA 94025

**February 18, 2026**

# Contents

| | Page |
|---|---|
| **List of Figures** | **v** |
| **List of Tables** | **vi** |
| **Acronyms and Abbreviations** | **vii** |
| **Limitations** | **ix** |
| **1  Scope of Work and Qualifications** | **1** |
| 1.1  Scope of work | 1 |
| 1.2  Qualifications and Compensation | 1 |
| 1.2.1  Emily Friedrich, Ph.D., PMP | 1 |
| 1.2.2  Aimon Iftikhar, Ph.D. | 2 |
| 1.3  Information Considered | 3 |
| **2  Clinical Trials** | **4** |
| 2.1  Overview of the Clinical Trial Process | 4 |
| 2.1.1  Clinical Trial Sponsor | 4 |
| 2.1.2  The Clinical Research Organization (CRO) | 4 |
| 2.1.3  Institutional Review Board (IRB) | 5 |
| 2.1.4  Clinical Sites | 5 |
| 2.1.5  Blinding a Clinical Trial Protocol | 6 |
| 2.2  Regulations and Standards Governing Clinical Research | 8 |
| 2.2.1  21 CFR Part 312: Investigational New Drug Application | 8 |
| 2.2.2  Additional Relevant 21 CFR Parts | 9 |
| 2.2.3  ICH E6(R1): Guideline for Good Clinical Practice E6(R2) | 10 |
| 2.2.4  Additional Relevant Industry Standards | 11 |
| **3  Alzamend's Clinical Protocol Details** | **12** |
| 3.1  Protocol Overview | 12 |
| 3.2  Protocol Execution | 13 |
| 3.3  Protocol Manuals | 16 |



**4       Summary of Events                                                                                19**

   4.1    Events Prior to the Unintentional Unblinding Event                                      19

   4.2    Unintentional Unblinding Event and Immediate Response                                   24

   4.3    Events Following the Unintentional Unblinding Event                                     28

**5       Rebuttal                                                                                         32**

   5.1    Dr. Hausheer's opinion that Biorasi's team was underqualified and under-resourced for
the ALZN002 trial (Dr. Iftikhar)                                                                      33

   5.2    Dr. Hausheer's opinion of inadequate training and protocol misunderstanding (Dr.
Friedrich)                                                                                           36

     5.2.1    Dr. Hausheer's opinion that the trial plans were inadequate (Dr. Iftikhar)        39

     5.2.2    Dr. Hausheer's opinion that site personnel were not trained on the blinding
procedure (Dr. Friedrich)                                                                            45

     5.2.3    Dr. Hausheer's opinion that there were systemic training deficiencies (Dr.
Friedrich and Dr. Iftikhar)                                                                          48

     5.2.4    Dr. Hausheer's opinion that there was insufficient follow-up training after
initial mistakes. (Dr. Iftikhar)                                                                     50

   5.3    Dr. Hausheer's opinion that Biorasi's inadequate training and inadequate procedures
contributed to the unblinding event (Dr. Friedrich)                                                  53

     5.3.1    Dr. Hausheer's opinion that there was a lack of preparation for potential
unblinding (Dr. Friedrich and Dr. Iftikhar)                                                          54

     5.3.2    Dr. Hausheer's opinion on communication plan adherence and enforcement
(Dr. Iftikhar and Dr. Friedrich)                                                                     58

     5.3.3    Dr. Hausheer's opinion of there being no firewall redaction or other
safeguard actions taken (Dr. Iftikhar)                                                               60

     5.3.4    Dr. Hausheer's opinion on improper CRA instruction authorization to IMIC
(Dr. Friedrich)                                                                                      61

     5.3.5    Dr. Hausheer's opinion of aftermath mismanagement and study continuation
(Dr. Friedrich and Dr. Iftikhar)                                                                     62

   5.4    Dr. Hausheer's opinion of mishandling of site inquiries and protocol deviations        65

     5.4.1    Dr. Hausheer's opinion that there was no timely escalation to the Sponsor.
(Dr. Iftikhar)                                                                                       65

     5.4.2    Dr. Hausheer's opinion that there was a failure to investigate and verify facts.
(Dr. Friedrich)                                                                                      65

     5.4.3    Dr. Hausheer's opinion that Biorasi failed to properly disclose its actions to
sponsor. (Dr. Friedrich)                                                                             69



5.5 Dr. Hausheer's opinion the ALZN002-01 trial could have resumed had Biorasi acted in accordance with industry standards (Dr. Friedrich and Dr. Iftikhar)      69

**6     Literature and References         74**

**Appendix A CV of Emily Friedrich, Ph.D., PMP**

**Appendix B CV of Aimon Iftikhar, Ph.D.**

**Appendix C List of Materials**



## List of Figures

**Page**

Figure 1.   Project Stakeholders for Alzamend ALZN002-01 trial.   13

Figure 2.   Alzamend Trial Shipping Lane Overview.   15

Figure 3.   Leukapheresis Workflow from the Leukapheresis Manual   17

Figure 4.   Shipping information provided to IMIC team on January 10, 2024.   37

Figure 5   Biorasi Unblinding Procedures from Biorasi SOP Management of Randomization codes in Clinical Trials   57

Figure 6.   Flowchart sent by Biorasi CRA to IMIC coordinator on January 18, 2024.   59



# List of Tables

**Page**

Table 1        Blinded and Unblinded Study Personnel (non-exhaustive)        14

Table 2.       Timeline of Events Prior to the Unintentional Unblinding Event on January 18, 2024        19

Table 3.       Timeline of Events Following the Unintentional Unblinding Event and Immediate Response on January 18-19, 2024        28



# Acronyms and Abbreviations

**CP** Communication Plan

**CPA** Clinical Project Associate

**CRA** Clinical Research Associate

**CRO** Contract Research Organization

**CTM** Clinical Trial Manager

**DA** Data Associate

**DM** Data Manager

**DMP** Data Management Plan

**DVP** Data Validation Plan

**FDA** Food and Drug Administration

**GPS** Global Project Specifications Plan

**IB** Investigator's Brochure

**ICF** Informed Consent Form

**IMPD** Investigator Medicinal Product Dossier

**IND** Investigational New Drug

**IP** Investigational Product

**IRT** Interactive Response Technology

**IWRS** Interactive Web Response System

**MM** Medical Monitor

**MMP** Medical Monitoring Plan

**MP** Monitoring Plan

**MW** Medical Writer



**PD** Project Director

**PM** Project Manager

**QA** Quality Assurance

**QMP** Quality Management Plan

**RMP** Risk Management Plan

**SA** Safety Associate

**SAP** Statistical Analysis Plan

**SM** Safety Manager

**SMP** Safety Management Plan

**SOP** Standard Operating Procedure

**STATS** Statistician

**TMF** Trial Master Plan

**TORO** Transfer of Regulatory Obligations



# Limitations

Exponent, Inc. ("Exponent") was retained by counsel for Biorasi, LLC ("Biorasi"), to perform analysis and provide rebuttal opinions and testimony related to the Alzamend Neuro, Inc., v. Biorasi, LLC matter. This report summarizes work performed to-date and presents the findings resulting from that work. This rebuttal report has been prepared in connection with the above-referenced litigation, any use of Exponent's work product outside the litigation is prohibited and at the users' own risk. The findings presented herein are made to a reasonable degree of scientific certainty. Exponent reserves the right to supplement this report and to expand or modify opinions based on review of additional material as it becomes available through ongoing discovery and/or through any additional work or review of additional work performed by others. Although we have not prepared trial exhibits at this time, we may use any and all of the information described or referenced in this report. Additionally, we may use existing materials for demonstrative purposes.



# 1  Scope of Work and Qualifications

## 1.1  Scope of work

This report presents Emily Friedrich, Ph.D., PMP, and Aimon Iftikhar, Ph.D.'s rebuttal expert opinions and bases for those opinions related to the case of Alzamend Neuro, Inc. against Biorasi, LLC (Case No. 1:25-cv-20481-BB) ("Alzamend v. Biorasi").[1] Exponent was retained to rebut the opinions provided by Plaintiff's expert Frederick Hausheer, M.D. This case involves Alzamend's clinical trial for their Alzheimer's investigational new drug, ALZN002, for which Biorasi was contracted as the Clinical Research Organization ("CRO") on February 17, 2023.[2, 3]

## 1.2  Qualifications and Compensation

### 1.2.1  Emily Friedrich, Ph.D., PMP

I am a Senior Associate in Exponent's Biomedical Engineering and Sciences practice. My curriculum vitae is attached as Appendix A, and it includes a list of my publications for at least the past 10 years. I have worked at Exponent since April 2023. I am a licensed Project Management Professional (PMP) and am certified in Good Clinical Practices (GCP). I have a Bachelor of Science in Molecular Genetics and Biochemistry with a minor in Chemistry from the University of Pittsburgh granted in 2007. I also have a Master of Science and a Doctor of Philosophy in Biomedical Engineering from Carnegie Mellon University, granted in 2011 and 2014, respectively. I completed postdoctoral training at Northwestern University Feinberg School of Medicine in the Department of Surgery and held a Research Instructor position at the University of Illinois at Chicago in the Department of Pharmacology.

Prior to joining Exponent, I served as a Biomedical Research Program Manager at a military treatment facility with General Dynamics Information Technology, a company that provides professional services including contracted clinical research support. In this capacity, I served as the subject matter expert for preclinical and clinical research, responsible for oversight of a team of eight contract staff, which included clinical research coordinators and a clinical protocol developer. I worked closely with physician principal investigators and the Institutional Review Board to develop protocols and secure institutional approvals. I also ensured that contracted study staff were executing studies according to study protocols and could demonstrate ongoing compliance following applicable regulations in the stringent government/military environment.

---

[1] Amended Complaint in the matter of Alzamend Neuro, Inc. v. Biorasi, LLC (Case No. 1:25-cv-20481-BB)

[2] BIO_138520 – 138551

[3] BIO_002933 – 2979



Clinical research coordinators on my team supported various types of clinical studies, including sponsor-initiated and blinded studies.

Since joining Exponent, I have been involved in providing technical support in the life sciences industry for due diligence, regulatory submissions, regulatory compliance, risk management, postmarketing surveillance, product development, product liability, and intellectual property matters. As part of my work at Exponent, I have been directly involved in the development, execution, and review of clinical research and human subjects protocols.

Exponent is being compensated at my current standard billing rate of $365 per hour for the time I spend on researching, reviewing, forming opinions, and providing testimony. Other Exponent consultants who assist me have different hourly rates. I have no financial interest in the outcome of this litigation.

## 1.2.2  Aimon Iftikhar, Ph.D.

I am a Senior Scientist in the Biomedical Engineering and Sciences practice at Exponent, Inc., specializing in clinical research and development of medical devices with a focus on assessing clinical efficacy and accuracy in real-world settings. My curriculum vitae is attached as Appendix B, and it includes a list of my publications for at least the past 10 years. I have a Bachelor of Science degree in Biomedical Engineering with minors in Mathematics and Materials Science and Engineering from the University of Connecticut in 2013. I earned a Master of Science degree in Biomedical Engineering from Carnegie Mellon University in 2014 and a Doctor of Philosophy in Bioengineering with a concentration in Tissue Engineering & Regenerative Medicine from the University of Pittsburgh in 2020.

Prior to joining Exponent, Inc., I was a Clinical Research Scientist at Machaon Diagnostics, Inc., a contract research organization (CRO) specializing in rare disease therapeutics, where I contributed to the design, management, and execution of clinical trials. In this role, I managed multi-site clinical research studies as well as authored and technically reviewed a wide range of regulatory documents, standard operating procedures, and clinical policies to ensure alignment with clinical processes as defined by ICH Good Clinical Practice and FDA regulations.

Since joining Exponent, Inc., I have worked to continue expanding the firm's clinical research capabilities, serving as a Sub-Investigator across pivotal clinical trials validating the therapeutic measurements derived from wearable medical devices in the consumer electronics space. My preclinical background in immunology and biomaterial development enables me to better understand the translation into clinical research settings while maintaining compliance with applicable clinical and quality standards (IRB, GLP/GCP/GCLP, ISO). I am certified in Good Clinical Practices and I have worked closely with Exponent's Quality Assurance team to support the organization's achievement of becoming compliant to ISO 14155. I have collaborated extensively with clinical monitors during site visits and audits to ensure data integrity, subject protection, and regulatory compliance. As a lead consultant supporting clinical operations at



Exponent, Inc., I have overseen and trained other consultants to ensure consistency in clinical practices and the proper alignment with regulatory standards.

I have extensive experience in clinical research operations consistent with ICH Good Clinical Practice, including holding the responsibility for the assessment, qualification, and oversight of vendors supporting clinical studies. This includes specialized recruitment providers, medical and clinical subcontractors, and validated clinical trial management systems (including specialized eConsent, Electronic Data Capture (EDC) and electronic Trial Master File (eTMF) platforms).

I have worked directly with multiple sponsor teams, navigating the relationships with direct communications and onsite visits, supporting studies throughout the full clinical trial lifecycle. This includes early-phase proposal development, protocol drafting and feasibility assessments, study start-up and site activation activities, ongoing clinical trial execution and monitoring support and ultimately study closeout activities.

My operational responsibilities have included staff qualification, onboarding, and ongoing training; maintenance of essential documents, oversight of protocol compliance and management of study infrastructure. I have supported numerous IRB protocol submissions and navigated modifications and amendments as required.

Exponent is being compensated at my current standard billing rate of $345 per hour for the time I spend on researching, reviewing, forming opinions, and providing testimony. Other Exponent consultants who assist me have different hourly rates. I have no financial interest in the outcome of this litigation.

## 1.3  Information Considered

We considered the documents listed in Appendix C in reaching the opinions presented in this report. We also relied on our education, general experience in the field, and knowledge acquired through years of research and consulting work in the fields of clinical research and biomedical engineering and sciences. Specific documents and materials relied upon in reaching the opinions in this report are referenced throughout the text.



# 2  Clinical Trials

## 2.1  Overview of the Clinical Trial Process

A clinical trial is a type of clinical research involving human subjects that have volunteered to participate in a rigorous, controlled research study designed to determine if an investigational product is safe and effective for its intended use. Clinical trials are typically initiated by a Sponsor and require the support of various organizations and vendors to safely conduct the trial.

### 2.1.1  Clinical Trial Sponsor

A Sponsor is typically a company that has developed the investigational product. For example, in the pharmaceutical space, the Sponsor has expertise in a developed drug and the disease area the drug is intended to treat. A Sponsor is responsible for all aspects of the design and development of their drug, and regulatory submissions to gain approval to test and ultimately market the drug.

The Sponsor submits an investigational new drug application (IND) to the Food and Drug Administration (FDA) to allow initiation of clinical testing in human subjects.[4] The IND is supported by preclinical data and includes the Sponsor's proposed clinical trial protocol and investigational plan. FDA reviews the IND to determine if it is scientifically sound, and if they agree that the trial will adequately protect the safety and rights of the subjects. FDA may also provide feedback on aspects of the proposed design of the trial, including if the trial is intended to be open label, blinded, or double-blinded (defined in Section 2.1.5).

### 2.1.2  The Clinical Research Organization (CRO)

The Sponsor may engage a Clinical Research Organization (CRO) to help it carry out the clinical protocol.[5] The CRO can handle operations and any other aspects of the trial that the Sponsor has delegated authority to it. However, the Sponsor always retains the ultimate responsibility for data quality and patient safety.[6] The CRO staffs the project with personnel to carry out agreed upon aspects of the trial protocol, which may include clinical trial operations such as monitoring and site management, project management, data management and statistical analysis, safety reporting, and quality assurance and quality control systems. The CRO is expected to conduct all tasks according to international standards, such as ICH E6, Good Clinical Practice, and FDA guidelines that exist for specific types of trials. Specific regulations and standards that govern clinical trials are discussed in more detail in Section 2.2.

---

[4] Investigational New Drug (IND) Application | FDA, https://www.fda.gov/drugs/types-applications/investigational-new-drug-ind-application, last accessed February 12, 2026.

[5] 21 CFR §312.3 – Definitions and interpretations.

[6] International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (ICH). 2018. "Integrated Addendum to ICH E6(R1): Guideline for Good Clinical Practice E6(R2)". See 5.2



### 2.1.3  Institutional Review Board (IRB)

Any research involving humans, such as a clinical trial protocol, requires approval by an Institutional Review Board (IRB).[7] The primary role of the IRB is to protect the rights, safety, and welfare of human subjects involved in research. The CRO may help the Sponsor obtain IRB approval for their clinical trial protocol. The first step is global protocol approval for the trial, followed by approval at individual clinical sites where the protocol will be executed.

### 2.1.4  Clinical Sites

The Sponsor and/or the CRO are responsible for finding and qualifying clinical sites and principal investigators (PIs) to enroll and treat the subjects in the trial.[8] The PI is typically a medical doctor with experience in the disease area that the drug is targeting. The Sponsor and/or the CRO will also review the credentials and capabilities of all anticipated site study staff in determining site selection. Clinical research coordinators are the personnel that manage and conduct the day-to-day activities of clinical research at the site.[9] Clinical research coordinators may already be employed by the study site to assist with clinical research, or they may be hired specifically for the clinical research protocol. There are organizations that provide certifications as a way to formally credential expertise for clinical research professionals, such as the Association of Clinical Research Professionals (ACRP), which provides the Certified Clinical Research Coordinator (CCRC) credential and the Society of Clinical Research Associates (SOCRA) which provides the Certified Clinical Research Professional (CCRP) credential.[10,11] These certifications support a clinical study coordinator's qualifications to support clinical research or a clinical trial in alignment with recognized FDA regulations and international standards such as the ICH Harmonized Guideline for Good Clinical Practices (GCP) (discussed in Section 2.2).

As noted above, the clinical trial protocol will need IRB approval for each clinical site, listing the PI and all study staff anticipated to support the work. The IRB, which may be the local IRB of the clinical site, or the same IRB used for global approval, will review the credentials of the PI and study staff to determine if they are qualified to participate. The PI is responsible for the conduct of the trial at their site. This includes supervision of study tasks delegated by the PI to

---

[7] Institutional Review Boards (IRBs) and Protection of Human Subjects in Clinical Trials, https://www.fda.gov/about-fda/cder-offices-and-divisions/institutional-review-boards-irbs-and-protection-human-subjects-clinical-trials, last accessed February 13, 2026.

[8] Oversight of Clinical Investigations — A Risk-Based Approach to Monitoring, Guidance for Industry, August 2013, https://www.fda.gov/media/116754/download, last accessed February 13, 2026.

[9] Clinical research coordinator - Toolkit, https://toolkit.ncats.nih.gov/glossary/clinical-research-coordinator/, last accessed February 12, 2026.

[10] CCRC Certification - ACRP, https://acrpnet.org/certification/crc-certification, last accessed February 12, 2026.

[11] CCRP Certification Program Overview | SOCRA, https://www.socra.org/certification/certification-program/program-overview/, last accessed February 7, 2026.



clinical site study staff.[12] A Delegation of Authority maintained at each site log captures what specific activities the PI has approved for each study staff member to support. The overall responsibility for a site protocol may become more complicated when study staff are contracted to support the trial by the PI or by the Sponsor. For instance, there may be staff involved that are not in the direct employ of the PI, but rather, staff provided by a third party to support the trial. FDA's "Guidance for Industry, Investigator Responsibilities — Protecting the Rights, Safety, and Welfare of Study Subjects" states, the investigator is still "responsible for supervising the study tasks performed by this staff, even though they are not in his/her direct employ during the conduct of the study."[13] However, the FDA guidance also describes the situation where "critical aspects of a study performed by parties not involved directly in patient care or contact and not under the direct control of the clinical investigator."[14] In this situation, because "the activities of these parties are critical to the outcome of the study and because the sponsor retains the services of the facility, the sponsor is responsible for ensuring that these parties are competent to fulfill and are fulfilling their responsibilities to the study."[15,16]

### 2.1.5  Blinding a Clinical Trial Protocol

Minimizing bias is a multifaceted aspect of a clinical study to consider during protocol design. Measures to reduce bias can include blinding during the trial and/or during outcome assessments, maintaining confidentiality of interim results, and prespecified decision rules and statistical analysis plans.[17]

---

[12] Guidance for Industry, Investigator Responsibilities — Protecting the Rights, Safety, and Welfare of Study Subjects, October 2009, https://www.fda.gov/media/77765/download, last accessed February 12, 2026.

[13] Guidance for Industry,Investigator Responsibilities — Protecting the Rights, Safety, and Welfare of Study Subjects, October 2009, https://www.fda.gov/media/77765/download, last accessed February 12, 2026.

[14] Guidance for Industry,Investigator Responsibilities — Protecting the Rights, Safety, and Welfare of Study Subjects, October 2009, https://www.fda.gov/media/77765/download, last accessed February 12, 2026.

[15] International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (ICH). 2018. "Integrated Addendum to ICH E6(R1): Guideline for Good Clinical Practice E6(R2)"

[16] Guidance for Industry,Investigator Responsibilities — Protecting the Rights, Safety, and Welfare of Study Subjects, October 2009, https://www.fda.gov/media/77765/download, last accessed February 12, 2026.

[17] Basics of Clinical Trial Design, 2024, https://www.fda.gov/media/185118/download, last accessed February 13, 2026.



Both FDA and the scientific literature recognize blinding as a crucial method to avoid bias[18] in clinical trials.[19,20,21] Although definitions can vary,[22,23] blinding has been generally described as "a process by which information that has the potential to influence study results is withheld from one or more parties involved in a research study."[24] FDA has stated, "blinding is used to ensure that during the trial the two arms are treated the same with differences only arising from the treatment received and not, for example, the expectation or desires of people involved."[25]

There can be different degrees of blinding, all or some of which may or may not be possible depending on the type of intervention or logistical challenges.[26] An unblinded, "open", or "open-label" study does not conceal information about the assigned interventions from any of the parties involved in the research.[27, 28] Conversely, in a fully blinded trial, "no one knows the treatment assignment of individual subjects or has access to interim results that include treatment assignment information, outside of an independent statistician/pharmacist/DMC [data monitoring committee]."[29] Single-blind, double-blind, and triple-blind can describe studies where one, two, or three groups, respectively, are blinded.[30]

---

[18] FDA has defined bias as "a systematic tendency for the estimate of treatment effect to deviate from its true value." See Adaptive Designs for Clinical Trials of Drugs and Biologics, Guidance for Industry, November 2019, https://www.fda.gov/media/78495/download, last accessed February 13, 2026.

[19] Monaghan, T.F.; Agudelo, C.W.; Rahman, S.N.;Wein, A.J.; Lazar, J.M.; Everaert, K.; Dmochowski, R.R. Blinding in Clinical Trials: Seeing the Big Picture. Medicina **2021**, 57, 647.

[20] Schulz, K.F.; Grimes, D.A. Blinding in randomised trials: hiding who got what. Lancet 2002, 359, 9307, 696-700

[21] Considerations for open-label clinical trials: design, conduct, and analysis, https://www.fda.gov/media/168664/download, last accessed February 13, 2026.

[22] Schulz, K.F.; Grimes, D.A. Blinding in randomised trials: hiding who got what. Lancet 2002, 359, 9307, 696-700

[23] Fergusson D, Glass K C, Waring D, Shapiro S. Turning a blind eye: the success of blinding reported in a random sample of randomised, placebo controlled trials BMJ 2004

[24] Monaghan, T.F.; Agudelo, C.W.; Rahman, S.N.;Wein, A.J.; Lazar, J.M.; Everaert, K.; Dmochowski, R.R. Blinding in Clinical Trials: Seeing the Big Picture. Medicina **2021**, 57, 647.

[25] Considerations for open-label clinical trials: design, conduct, and analysis, https://www.fda.gov/media/168664/download, last accessed February 13, 2026.

[26] Moustgaard H, Clayton G L, Jones H E, Boutron I, JÃ¸rgensen L, Laursen D R T et al. Impact of blinding on estimated treatment effects in randomised clinical trials: meta-epidemiological study BMJ 2020; 368 :l6802

[27] Considerations for open-label clinical trials: design, conduct, and analysis, https://www.fda.gov/media/168664/download, last accessed February 13, 2026.

[28] Monaghan, T.F.; Agudelo, C.W.; Rahman, S.N.;Wein, A.J.; Lazar, J.M.; Everaert, K.; Dmochowski, R.R. Blinding in Clinical Trials: Seeing the Big Picture. Medicina **2021**, 57, 647.

[29] Considerations for open-label clinical trials: design, conduct, and analysis, https://www.fda.gov/media/168664/download, last accessed February 13, 2026.

[30] Monaghan, T.F.; Agudelo, C.W.; Rahman, S.N.;Wein, A.J.; Lazar, J.M.; Everaert, K.; Dmochowski, R.R. Blinding in Clinical Trials: Seeing the Big Picture. Medicina **2021**, 57, 647.



Blinded individuals may include study participants, trial investigators, and/or assessors.[31,32,33] There are many blinding techniques for pharmaceutical trials described in the medical literature, including the use of similar capsules/tablets/bottles/syringes, masking the flavor of active oral treatments, and double-dummy procedures (the use of more than one placebo).[34]

While generally recognized as effective at mitigating bias, blinding has inherent limitations. Blinded trials are susceptible to unblinding or "code-breaking".[35,36] Unblinding has been noted to occur in multiple different ways including patients' discernment from clues or communications and researchers perceiving differences in interventions or viewing restricted notes.[37,38]

## 2.2  Regulations and Standards Governing Clinical Research

Clinical Trials are conducted within a structured regulatory framework designed to protect the rights and safety of human subjects while ensuring the integrity of clinical data. There are many widely recognized applicable regulatory guidelines and Good Clinical Practice (GCP) standards that govern the conduct of clinical research of investigational products.

Collectively, these regulations and standards establish a structured and accountable system for executing clinical trials. Compliance is not only a legal requirement, but ensures the credibility and reliability of research findings

### 2.2.1  21 CFR Part 312: Investigational New Drug Application

United States Food and Drug Administration (FDA) Regulations have a few key provisions for sponsor responsibilities under 21 CFR Part 312[39]:

- **§ 312.50[40] – General Responsibilities of Sponsors:**
  The sponsor is responsible for ensuring proper monitoring of the investigation, ensuring

---

[31] Schulz, K.F.; Grimes, D.A. Blinding in randomised trials: hiding who got what. Lancet 2002, 359, 9307, 696-700

[32] Fergusson D, Glass K C, Waring D, Shapiro S. Turning a blind eye: the success of blinding reported in a random sample of randomised, placebo controlled trials BMJ 2004

[33] Monaghan, T.F.; Agudelo, C.W.; Rahman, S.N.;Wein, A.J.; Lazar, J.M.; Everaert, K.; Dmochowski, R.R. Blinding in Clinical Trials: Seeing the Big Picture. Medicina **2021**, 57, 647.

[34] Monaghan, T.F.; Agudelo, C.W.; Rahman, S.N.;Wein, A.J.; Lazar, J.M.; Everaert, K.; Dmochowski, R.R. Blinding in Clinical Trials: Seeing the Big Picture. Medicina **2021**, 57, 647.

[35] Monaghan, T.F.; Agudelo, C.W.; Rahman, S.N.;Wein, A.J.; Lazar, J.M.; Everaert, K.; Dmochowski, R.R. Blinding in Clinical Trials: Seeing the Big Picture. Medicina **2021**, 57, 647.

[36] Bello S, Moustgaard H, Hróbjartsson A. Unreported formal assessment of unblinding occurred in 4 of 10 randomized clinical trials, unreported loss of blinding in 1 of 10 trials. J Clin Epidemiol. 2017 Jan;81:42-50.

[37] Monaghan, T.F.; Agudelo, C.W.; Rahman, S.N.;Wein, A.J.; Lazar, J.M.; Everaert, K.; Dmochowski, R.R. Blinding in Clinical Trials: Seeing the Big Picture. Medicina **2021**, 57, 647.

[38] Bello S, Moustgaard H, Hróbjartsson A. Unreported formal assessment of unblinding occurred in 4 of 10 randomized clinical trials, unreported loss of blinding in 1 of 10 trials. J Clin Epidemiol. 2017 Jan;81:42-50.

[39] 21 CFR §312 – Investigational New Drug Application

[40] 21 CFR §312.50 – General Responsibilities of Sponsors



that the investigation is conducted in accordance with the protocol and general investigational plan, maintaining an effective IND, and ensuring compliance with applicable regulatory requirements.

- **§ 312.53[41] – Selecting Investigators and Monitors:**
  Sponsors must select qualified investigators, obtain required regulatory commitments (e.g., Form FDA 1572), and select qualified monitors to ensure adequate monitoring of the investigation.

- **§ 312.55[42] – Informing Investigators:**
  Sponsors are required to provide investigators with the Investigator's Brochure and relevant safety updates or new information that may impact subject safety.

- **§ 312.56[43] – Review of Ongoing Investigations:**
  Sponsors shall monitor the progress of the clinical trial, secure compliance from investigators, and discontinue participation of noncompliant investigators when necessary.

- **§ 312.57[44] – Recordkeeping and Record Retention:**
  Sponsors must maintain adequate and accurate records, including correspondence, financial disclosures, and essential trial documentation.

## 2.2.2  Additional Relevant 21 CFR Parts

In addition to the sponsor responsibilities outlined in 21 CFR Part 312, several other relevant FDA Regulations govern critical aspects of clinical research conduct.

- **21 CFR Part 11[45] – Electronic Records; Electronic Signatures:**
  This regulation establishes criteria for electronic systems for electronic records and electronic signatures to be considered trustworthy and reliable as compared to paper records. The outline of various controls and audit trails intends to ensure data integrity and confidentiality when electronic systems are used in clinical research.

- **21 CFR Part 50[46] – Protection of Human Subjects:**
  This regulation establishes the requirements for obtaining and documenting legal informed consent from a clinical research participant. This mandates that clinical

---

[41] 21 CFR §312.53 – Selecting Investigators and Monitors

[42] 21 CFR §312.55 – Informing Investigators.

[43] 21 CFR §312.56 – Review of Ongoing Investigations.

[44] 21 CFR §312.57 – Recordkeeping and Record Retention.

[45] 21 CFR §11 – Electronic Records; Electronic Signatures.

[46] 21 CFR §50 – Protection of Human Subjects.



research participants are provided with sufficient information about the nature of the study, any potential risks and benefits, alternative options to participating and their rights, including the right to withdraw from participation without penalty.

- **21 CFR Part 54**[47] **– Financial Disclosure by Clinical Investigators:**
  This regulation requires sponsors to disclose financial interests and arrangements of clinical investigators that could affect the reliability of clinical data submitted to FDA.

- **21 CFR Part 56**[48] **– Institutional Review Boards (IRBs):**
  This regulation establishes requirements for IRB composition, approval criteria, and continuing review to ensure protection of the rights, safety, and welfare of human subjects.

### 2.2.3  ICH E6(R1): Guideline for Good Clinical Practice E6(R2)

The International Council for Harmonisation (ICH) guidelines provide an internationally recognized framework for conducting clinical trials ethically and generating data that is credible and capable of supporting regulatory submissions. The Integrated Addendum to ICH E6(R1): Guideline for Good Clinical Practice E6(R2) (hereafter referred to as "ICH E6(R2)"),[49] adopted by FDA on March 1, 2018,[50] was the applicable international standard for the design, conduct, performance, monitoring, auditing, recording, analysis, and reporting of clinical trials at the time of the Alzamend clinical trial. The latest Guideline for Good Clinical Practice E6(R3) (hereafter referred to as "ICH E6(R3)" was publicly released for consultation on May 19, 2023, and officially adopted January 6, 2025.[51] ICH E6 (R3) was updated to accommodate evolving clinical trial methodologies and technological advancements.

ICH E6 establishes guidelines to facilitate:

- Protection of trial participant rights, safety, and well-being

- Credible and accurate clinical trial data

- Risk-based quality management

---

[47] 21 CFR §54 – Financial Disclosure by Clinical Investigators.

[48] 21 CFR §56 – Institutional Review Boards (IRBs).

[49] International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (ICH). 2018. "Integrated Addendum to ICH E6(R1): Guideline for Good Clinical Practice E6(R2)".

[50] 83 FR 8882, March 1, 2018, https://www.federalregister.gov/documents/2018/03/01/2018-04154/e6r2-good-clinical-practice-integrated-addendum-to-e6r1-international-council-for-harmonisation, last accessed February 12, 2026.

[51] International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (ICH). 2025. "ICH Harmonised Guideline: Guideline for Good Clinical Practice E6(R3)".



- Appropriate sponsor oversight of vendors and service providers

## 2.2.4  Additional Relevant Industry Standards

In addition to regulatory requirements, there are several International Organization for Standardization (ISO) standards that support the quality and integrity of clinical research operations:

- ISO 9001 (Quality Management Systems)[52] establishes guidelines for quality management systems to ensure consistent processes and continuous improvement.
- ISO 27001 (Information Security Management Systems (ISMS))[53] provides a framework establishing and maintaining information security management systems to protect sensitive data.
- ISO 27701 (Privacy Information Management System (PIMS))[54] extends privacy information management requirements for data privacy, relevant to any organizations handling Personally Identifiable Information (PII).
- ISO 27017 (Security Techniques)[55] addresses considerations for cloud security controls and ISO 27018 (Protection of personally identifiable information)[56] in public cloud environments.
- ISO 14155 (Clinical investigation of medical devices for human subjects – Good clinical practice)[57] outlines GCP requirements for clinical research professionals.

.

---

[52] International Organization for Standardization (ISO), ISO 9001:2015 – Quality Management Systems – Requirements.

[53] International Organization for Standardization (ISO), ISO/IEC 27001:2022 – Information security, cybersecurity and privacy protection – Information security management systems – Requirements.

[54] International Organization for Standardization (ISO), ISO/IEC 27701:2025 – Information security, cybersecurity and privacy protection – Privacy information management systems – Requirements and guidance.

[55] International Organization for Standardization (ISO), ISO/IEC 27017:2015 – Information technology – Security techniques – Code of practice for information security controls based on ISO/IEC 27002 for cloud services.

[56] International Organization for Standardization (ISO), ISO/IEC 27018:2025 – Information security, cybersecurity and privacy protection – Guidelines for protection of personally identifiable information (PII) in public clouds acting as PII processors

[57] International Organization for Standardization (ISO), ISO/IEC 14155:2020 – Clinical investigation of medical devices for human subjects – Good clinical practice.



# 3  Alzamend's Clinical Protocol Details

## 3.1  Protocol Overview

Alzamend's clinical trial protocol (Protocol Number ALZN002-01) titled, "A randomized, double-blind, placebo-controlled, parallel-group, phase 1/2a study to assess the safety, tolerability, and efficacy of autologous amyloid beta mutant peptide-pulsed dendritic cells (ALZN002) in subjects with mild-to-moderate dementia of the Alzheimer's type" is a first-in-human study with the primary purpose to assess the safety and tolerability of multiple ascending doses of ALZN002 compared with that of placebo in subjects with mild to moderate dementia of the Alzheimer's type (AD).[58] The study is also designed to determine the optimal dosage of ALZN002 that allows for induction of anti-amyloid-beta (Aβ) antibody responses while maintaining safety. According to the ClinicalTrials.gov entry for protocol ALZN002-01, the trial, last updated September 2, 2025, was designated as "Active, Not Recruiting," which is defined by the website as "the study is ongoing, and participants are receiving an intervention or being examined, but potential participants are not currently being recruited or enrolled."[59]

The investigational product (IP), called ALZN002, is a cellular immunotherapy product that consists of autologous dendritic cells (DCs) pulsed with a novel peptide to facilitate production of antibodies that target amyloid and thereby reduce the accumulation of amyloid plaques in the brain. The ALZN002 cellular immunotherapy product will be manufactured from the subject's own (autologous) peripheral blood mononuclear cells (PBMCs) obtained by leukapheresis.[60] The study was designed to enroll approximately 20 – 30 subjects with mild-to-moderate Alzheimer's dementia, in up to three cohorts with ascending doses, where the first two subjects in each cohort would be randomized as sentinels (1 active and 1 placebo).[61] After consenting and enrolling in the study, baseline measurements would be taken, and subjects randomized to undergo leukapheresis to obtain PBMCs (IP group) or sham leukapheresis (placebo group). Prior to "Day 1", which is the first day of treatment day, the IP is manufactured from the subject's PBMCs, which requires between 42 – 52 days. For the placebo group, sham leukapheresis would be performed and no PBMCs will be collected. On Day 1, and subsequent treatment days, the subject received either IP (IP group) or a placebo treatment, consisting of saline of equal volume.[62] The two sentinel subjects would then be followed through 10 weeks after the third

---

[58] TMF1620 – 1702, see TMF1624

[59] Study Details | NCT05834296 | Study in Subjects With Mild-to-Moderate Alzheimer's Dementia | ClinicalTrials.gov, https://clinicaltrials.gov/study/NCT05834296, last accessed February 13, 2026.

[60] Leukapheresis is a procedure where blood is taken from a patient, the white blood cells (such as PBMCs) are removed or collected from the blood, and the remaining blood components are returned to the patient.

[61] TMF1620 – 1702, see TMF1627

[62] TMF1620 – 1702, see TMF1666



dose (Day 113 ± 2 days), and their safety data will be evaluated by the Safety Adjudication Committee.[63]

## 3.2  Protocol Execution

The Letter of Intent (LOI) between Alzamend Neuro Inc. and Biorasi, LLC was executed on January 2, 2023.[64] The Master Services Agreement for Clinical Research Organization Services between Alzamend and Biorasi to carry out the ALZN-002-01 trial was signed on February 17, 2023.[65] Execution of the ALZN002-01 trial required coordination between multiple stakeholders, illustrated in Figure 1. This included the sponsor Alzamend, the sites enrolling patients, the IP manufacturer, Biorasi, and Cryoport, who was contracted for cold chain shipping and shipping logistics.



*Figure 1:  Project Stakeholder*

Figure 1.       Project Stakeholders for Alzamend ALZN002-01 trial.[66]

Both leukapheresis and sham leukapheresis were to occur at IMIC, Inc. IMIC was initially set up to be both a site for enrolling patients (Site #2) and the leukapheresis center (a vendor).[67] The Clinical Research Cell Manufacturing Program at the University of Miami ("UM" hereafter) was designated as the manufacturer of the IP.[68] Therefore, the cells collected during leukapheresis

---

[63] TMF1620-TMF1702, see TMF1627

[64] BN000074 – 193

[65] BIO_138520-138551

[66] TMF10164 – 10186, TMF10172

[67] TMF12600 – TMF12604

[68] TMF1620 – TMF1702, see TMF1666



needed to be shipped from IMIC to UM in a special cold shipper from Cryoport. Once the IP was manufactured, UM would ship the IP to the site enrolling and treating patients. The study initiated First Excellence Research Group ("FERG" hereafter) as Site #1 to enroll the first two subjects under site PI Dr. Carballosa. In order to maintain the blinding of the study, a Cryoport shipper is shipped regardless of the treatment group. The shipments then would need to be handled only by unblinded study staff. All of Alzamend was blinded, and all of UM was unblinded. IMIC, FERG, and Biorasi had designated study staff that were blinded or unblinded. A guide to the sites, key personnel, and blinded status is shown in Table 1.

Table 1          Blinded and Unblinded Study Personnel (non-exhaustive)

| | Alzamend[69, 70] | Biorasi[71, 72] | FERG[73] | IMIC[74] | UM |
|---|---|---|---|---|---|
| **Blinded** | Stephan Jackman (CEO)<br><br>Kraig Roajphlastien (Senior Operations Manager)<br><br>Eve del Rio, (Regulatory Consultant, Rio Pharmaceutical Services)<br><br>Juan Martinez (Clinical Project Manager, Rio Pharmaceutical Services) | Ugur Aytac (Sr. Project Manager)<br><br>Josanne Johnson (Clinical Trial Manager)<br><br>Nancy Newark (VP Project Management)<br><br>Mary Lyda, (Head of Quality) | Dr. Raul Carballosa (Site PI)<br><br>Milka Vina (CRC) | Dr. Ramon Leon (Site PI)<br><br>Dr. Boris Nikolov (Sub I) | None. |
| **Unblinded** | None. | Juan Duany-Santos (CRA) | Daniela Garcia (CRC)<br><br>Alexis Martinez (pharmacist) | Loyda Espinoza (CRC)<br><br>Ronald Joseph (pharmacist) | Adriana Brooks<br><br>Yee-Shaun Lee (Scientist) |

---

[69] TMF5780

[70] BIO_138518

[71] TMF5780

[72] BIO_138518

[73] TMF9523 – 9524

[74] TMF9523 – 9524



There are two designated shipping lanes, one for leukapheresis product (Lane 1) and one for IP (Lane 2), shown in Figure 2. Briefly, the Cryoport shippers were reusable and available on demand from Cryoport. Upon scheduling a leukapheresis visit, a Cryoport shipper would be sent to from Cryoport to IMIC ("Mock Collection Site" in Figure 2).[75] After leukapheresis/sham leukapheresis, this shipper is sent to UM. UM then returns the empty shipper back to Cryoport. For IP treatments, a shipper sent from Cryoport to UM, such that the IP treatment or empty shipper for the placebo group arrives prior to Day 1.





Figure 2.      Alzamend Trial Shipping Lane Overview.[76]

---

[75] BIO_000484 – 536, see BIO_000517 – 518

[76] TMF9869 – 9923, see TMF9877



## 3.3  Protocol Manuals

The leukapheresis/sham leukapheresis and IP/placebo treatment processes are described in various ALZN002-01 Trial clinical protocol manuals and forms. For example, the Investigational Product Manual (hereafter referred to as "IP Manual") includes instructions for handling, storage, preparation, and shipping for the IP and sham treatments.[77] The Global Specifications Plan indicates that the IP Manual is owned by both Alzamend and Biorasi.[78] The IP Manual describes all the relevant steps for subjects randomized to the placebo group in Section 10.6, noting who is blinded or unblinded and where the cryoport shippers are going:[79]

*12.7. Subjects Randomized to Placebo*

*Subjects will be randomized to placebo in a 7:3 ratio. Subjects randomized to placebo will follow the processes as outlined below with the following exceptions:*

*• Placebo subjects will be referred to the apheresis facility and scheduled to attend in the same manner as subject receiving active IP.*

*• Sham leukapheresis will be performed on the placebo subjects during their leukapheresis procedure. No cells will be harvested at this time.*

*• Collection center to request C3 shipper from Cryoport using the same steps as listed above for active subjects.*

*• After the sham leukapheresis procedure is complete, the collection center will forward the C3 shipper to University of Miami. This shipper will be empty during transport.*

*• UM will return the empty shipper to Cryoport per instructions for active subjects.*

*• Upon scheduling of the IP administration, UM will notify Cryoport for the need for cryoshipper.*

*• Cryoshipper will be provided to UM in the same manner as above.*

*• UM will forward the empty shipper to the administration site.*

*• Unblinded pharmacist/designee will receive the shipment from UM and return the shipper to Cryoport per instructions above.*

*• Steps for Preparation and Administration of Placebo*

---

[77] BIO_000484 – 536

[78] TMF10164 – 10186, see TMF10176

[79] BIO_000484 – 536, see BIO_000517 – 518



*a. Using the provided 10ml vial of bacteriostatic saline, 0.9% draw up 0.5ml x 2 for cohort 1 and 0.5ml x 4 for cohort 2.*

*b. Using the same steps as above, prepare the IV administration using the same steps as above, replacing the active drug with the saline.*

*c. All remaining steps should be the same in regard to IV priming and flush, mixing, and infusion.*

The scope of the Leukapheresis Manual states, "This manual provides guidance on the Continuous Mononuclear Cell Collection and the procedure for sham leukapheresis", and it contains information on the sequence of events and the destination of shippers from the leukapheresis center, shown in Figure 3.[80]

### 7. Leukapheresis Workflow



Figure 3.      Leukapheresis Workflow from the Leukapheresis Manual[81]

The form in the Leukapheresis Manual that is meant to be completed by IMIC also specifies the following instructions:[82]

*Collection Site:*

*1. Send the original form with the apheresis unit and keep a copy on Subject's record.*

---

[80] TMF0113 – 247, see TMF0119

[81] TMF0113 – 247, see TMF0119

[82] TMF0113 – 247, see TMF0139



*2. Email Cryoport tracking# to abrooks1@med.miami.edu, kbfernandez@med.miami.edu, andjcorpuz@miami.edu.*

*CRCMP:*

*1. Email the completed page 1 of this form to the collection site and* josannejohnson@biorasi.com.



# 4  Summary of Events

## 4.1  Events Prior to the Unintentional Unblinding Event

Table 2 provides a summary timeline of various events that took place surrounding work performed under the Master Services Agreement between Alzamend Neuro Inc. and Biorasi, LLC, [83] and associated Work Order (WO) for the clinical trial ALZN002-01 "A Randomized, Double-blind, Placebo-controlled, Parallel-group, Phase 1/2a Study to Assess the Safety, Tolerability, and Efficacy of Autologous Amyloid Beta Mutant Peptide-Pulsed Dendritic Cells (ALZN002) in Subjects with Mild-to-Moderate Dementia of the Alzheimer's Type."[84] Table 2 also details events involving the IRB associated with the study, the two clinical sites (First Excellent Research Group ("FERG"; Site #1) and IMIC Research ("IMIC"; Site #2 and Leukapheresis site)), University of Miami, and other vendors associated with the clinical trial.

Table 2.    Timeline of Events Prior to the Unintentional Unblinding Event on January 18, 2024

| Date | Event |
| --- | --- |
| January 2, 2023 | Letter of Intent (LOI) executed between Alzamend Neuro Inc. and Biorasi, LLC[85] |
| February 2, 2023 | Biorasi requests documentation of FACT accreditation from First Excellent Research Group (FERG) on behalf of Alzamend Neuro Inc.[86] |
| February 13, 2023 | Completion of IMIC Research site feasibility document including list of IMIC qualifications and experience[87] |
| February 17, 2023 | Master Services Agreement executed between Alzamend Neuro Inc. and Biorasi, LLC[88] |
| February 17, 2023 | Work Order WO # ALZ 188-1 issued for "ALZN002-01: A Randomized, Double-blind, Placebo-controlled, Parallel-group, Phase 1/2a Study to Assess the Safety, Tolerability, and Efficacy of Autologous Amyloid Beta Mutant Peptide-Pulsed Dendritic Cells (ALZN002) in Subjects with Mild-to-Moderate Dementia of the Alzheimer's Type"[89] |
| April 19, 2023 | Meeting between Biorasi and Cryoport regarding Cryoport Shipping Lane Qualification[90] |
| April 26-May 1, 2023 | Completion of Cryoport Shipping Lane Qualification Runs for Lane #2[91] |

---

[83] BIO_138520 – 138551

[84] BIO_002933 – 2979

[85] BN000074 – 193

[86] BIO_135623

[87] TMF12724

[88] BIO_138520 – 138551

[89] BIO_002933 – 2979

[90] TMF0872 – 884

[91] TMF1429 – 1492, see TMF1434



| Date | Event |
|---|---|
| May 5, 2023 | Site Selection Visit for IMIC[92] |
| May 15, 2023 | Completion of Ronald Joseph and Boris Nikolov Individual Training Forms by Cryoport trainer (CRY-CVAL-P-0042; Rev. A; Shipping Lane Qualification for Biorasi, LLC, on Behalf of Alzamend Neuro, Inc.)[93] |
| May 16, 2023 | Addition of Loyda Espinoza to study team[94] |
| May 17, 2023 | Completion of Loyda Espinoza Individual Training Form by Cryoport trainer (CRY-CVAL-P-0042; Rev. A; Shipping Lane Qualification for Biorasi, LLC, on Behalf of Alzamend Neuro, Inc.)[95] |
| May 24- 25, 2023 | Email from Biorasi to IMIC Research related to missing Individual Training Form documentation and issues with Shipping Lane Qualification[96,97,98] |
| May 26, 2023 | Site Selection Visit Report issued for IMIC[99] |
| June 1-5, 2023 | Biorasi requests signature on Individual Training Forms from IMIC team in preparation for Shipping Lane Qualification (Ronald Joseph, Boris Nikolov, and Loyda Espinoza)[100,101] |
| June 14, 2023 | Repeat of Cryoport Shipping Lane Qualification for Lane #1 at IMIC with requested participation of Loyda Espinoza as "Technician" and Ronald Joseph as "Verified by" on "C3 Shipper Receipt, Inspection and Unloading Checklist" and "C3 Shipper Loading Checklist"[102] |
| June 14, 2023 | Sponsor requests reschedule of Site Initiation Visit at IMIC[103] |
| June 28-29, 2023 | Terumo training at IMIC[104] |
| June 29, 2023 | Advarra IRB issues Initial Approval Notice for IMIC Site (PI: Ramon Leon)[105] |
| July 5, 2023 | Biorasi / Alzamend Neuro Project Team Meeting<br><br>Meeting minutes discuss review of leukapheresis binder documents and SOPs by apheresis nurses and pending follow-up with Terumo to adjudicate any pending items and questions.[106] |

---

[92] ALZ_031946 – 31967, see ALZ_031946

[93] BIO_048557 – 48559, see BIO_48557 – 48558

[94] BIO_149739 – 149745, see BIO_149740 – 149741 (IMIC Communications (2).pdf)

[95] BIO_048557 – 48559, see BIO_48559

[96] BIO_145000 – 145001 (IMIC Communications.pdf)

[97] BIO_145008 (IMIC Communications.pdf)

[98] TMF12450

[99] ALZ_031946 – 31967, see ALZ_031962

[100] BIO_145475 (IMIC Communications.pdf)

[101] ALZ_053762

[102] BIO_078898 – 78899 (IMIC Communications.pdf)

[103] BIO_149781 (IMIC Communications (2).pdf)

[104] BIO_055213 – 55215 (IMIC Communications.pdf)

[105] TMF12580 – 12581

[106] BN 000257 – 264, see BN 000258



| Date | Event |
|---|---|
| July 20, 2023 | Teleconference Meeting: Leukapheresis/Sham Procedures Logistics[107] |
| August 3, 2023 | Screening of Subject 1003[108] |
| August 9, 2023 | Email from Alzamend to IMIC team including "reminder that **any IMIC staff working with Paul/Latesia during the leukopheresis/sham procedures should be an unblinded staff for the study**). There will also be a 'leukapheresis binder' for the study that will need to be stored in a **secured area where <u>only unblinded staff</u> can access**."[109] |
| September 25, 2023 | Notification to IMIC on change in Biorasi CRA from Devis Jalastin to Ginger Rappley[110] |
| September 27, 2023 | Advarra IRB issues Approval of Informed Consent Form and Protocol Document Modification for IMIC Site (PI: Ramon Leon)[111] |
| October 19, 2023 | Email from Biorasi to IMIC team suggesting Cryoport Refresher Training[112] |
| October 30, 2023 | Randomization of Subject 1003[113] |
| November 1, 2023 | Biorasi internal email including list of blinded and unblinded personnel at Sites 1 and 2 with specific instructions to review the documentation at IMIC for the leukapheresis procedure. Email further cautions "communication should be carefully reviewed to ensure no unblinding occurs. Discussion regarding any of the unblinded tasks above should only be had with the unblinded staff at the sites"[114] |
| November 1, 2023 | Email from Biorasi to IMIC team reviewing the communication plan for the study. Email states "[f]or communication regarding subjects in the study or subjects in screening, all questions should be directed to the ALZN002-01 clinical@biorasi.com email address. Please note that all members of this email address are blinded. **No communication regarding unblinded issues (leukapheresis, IP manufacture, shipment, or accountability, or randomization assignment) should be directed to this email.** Any information regarding these topics should be directed to Juan Duany-Santos, the unblinded CRA for this project" and "Maintaining the blind is important to the integrity of our study. Please take a minute before sending information to ensure that you are sending the information to the appropriate team members. Currently, there is **no Alzamend team member that is unblinded**. No unblinded information should be communicated to the Alzamend at this time. If you are uncertain about the information in the email, please contact me, or one of CRAs regarding the content of your message and we can direct you appropriately."[115] |

---

[107] BIO_055213 – 55215, see BIO_055213 (IMIC Communications.pdf)

[108] TMF12158 – 12159

[109] BIO_126501 – 126503, see BIO_126501 – 126502 (IMIC Communications.pdf)

[110] BIO_141237 – 141238 (IMIC Communications.pdf)

[111] BIO_140758 – 140760 (IMIC Communications.pdf)

[112] BIO_150263 – 150265, see BIO_150264 – 150265 (IMIC Communications(2).pdf)

[113] TMF12158 – 12159

[114] TMF9523 – 9524

[115] BIO_138518 (IMIC Communications.pdf)



| Date | Event |
|------|-------|
| November 2, 2023 | Biorasi completed Leukapheresis Observation Visit[116] |
| November 2, 2023 | Email from Biorasi to Loyda Espinoza with list of forms and documentation that should be part of the Leukapheresis binder for each subject, as well as attachment titled "ALZN002-01_Leukapheresis Manual_V.1.0_17AUG2023_(1).pdf"[117] |
| November 2, 2023 | Leukapheresis/Sham Procedure of Subject 1003, followed by successful delivery of package to University of Miami[118,119] |
| November 3, 2023 | Multiple emails between Biorasi and IMIC discussing request from University of Miami for missing collection information in Leukapheresis documentation for Subject 1003 |
| | • 11:17 AM: Biorasi contacts Loyda Espinoza stating "we are reviewing the record of this subject and found that the collection information (printout from the leukapheresis) was not sent to us. Could you please send it ASAP so we can complete the collection documentation." [120] |
| | • 12:16 PM: Loyda Espinoza responds to Biorasi asking what forms are needed and that "[s]hipping documentation was included with the sample" [121] |
| | • 1:29 PM: Biorasi responds to Loyda Espinoza stating what is needed is "[t]he information that machine recorded during the collection. The report for the run especially cell components, cell #, TNC etc." and "I think the Leukapheresis nurse can help here. Please ensure only unblinded personnel is involved." [122] |
| November 6, 2023 | Multiple emails from Biorasi to Loyda Espinoza following up on missing documentation for Subject 1003, including a request for the completed ""Leukapheresis Procedure Pre-assessment, Treatment and Notes" with a caution to "Please note this document may unblind whoever reviews it" and "Please ensure only unblinded Personnel is involved in this request."[123] |
| November 7, 2023 | Letter from Biorasi General Counsel to Alzamend for Breach of Contract stating Biorasi "has no choice but to pause work (other than what is required to oversee patient safety) related to your study, unless or until Alzamend comes current on all outstanding amounts."[124] |
| November 7, 2023 | Email from Biorasi to Loyda Espinoza following up on missing documentation for Subject 1003, including a request that the missing documents are faxed directly to the University of Miami.[125] |

---

[116] TMF12600 – 12604

[117] BIO_212295 (IMIC Communications.pdf)

[118] TMF9507

[119] TMF2505 – 2506

[120] BIO_376523 – 376526, see BIO_376526 (IMIC Communications.pdf)

[121] BIO_376523 – 376526, see BIO_376525 (IMIC Communications.pdf)

[122] BIO_376523 – 376526, see BIO_376525 (IMIC Communications.pdf)

[123] BIO_376523 – 376526, see BIO_376524 (IMIC Communications.pdf)

[124] ALZ 133733

[125] BIO_376523 – 376526, see BIO_376523 (IMIC Communications.pdf)



| Date | Event |
|---|---|
| November 8, 2023 | Email from Biorasi to Loyda Espinoza requesting response and following up on missing documentation for Subject 1003.[126] |
| December 1, 2023 | Email from Biorasi to Alzamend team discussing site and subjects update, including updates regarding Subject 1003 and Subject 1005.[127] |
| December 5, 2023 | Amended protocol issued "ALZN002-01 Protocol v3.0"[128] |
| December 6, 2023 | Screening of Subject 1005[129] |
| January 5, 2024 | Emails between Loyda Espinoza, IMIC team and Biorasi team confirming readiness for January 18, 2024 Subject 1005 Leukapheresis visit.[130] |
| January 9, 2024 | Biorasi completed issues Leukapheresis Observation Visit summary from November 2, 2023 visit. The following observations/findings were noted:<br><br>• Dr. Ramon Leon was not present at the time of the beginning of the procedure, hence the required leukapheresis approval form was signed by a nurse practitioner who is not clearly delegated to oversee the procedure.<br><br>• There was no Log or Standard Operating Procedure (SOP) at the site, needed to identify the staff assigned to complete the procedure, including other medically qualified staff.<br><br>• The Leukapheresis binder was not completely setup at the site. During the visit, site was provided the finalized Leukapheresis Manual as well as a checklist of documents and forms that should be completed and filed in the binder. Instructions were also given regarding keeping this binder under unblinded staff custody.<br><br>• Unblinded Pharmacist was not present, Pharmacy binder was not reviewed.<br><br>Additionally noted that "Given the site's dual role, as an investigational site and as a vendor (Leukapheresis Center) , there is a need for clarification of documentation for each function."[131] |
| January 10, 2024 | Biorasi completed IP training at FERG site. Site personnel trained and in attendance were: Daniela Garcia, Alexis Martin, Juan Duany-Santos, Lisy Cibrian Barosia (Study role "Sub–I"), signed by Yee-Shuan Lee as the trainer.[132] |
| January 11, 2024 | Email from Alzamend to IMIC Team requesting teleconference meeting for the following day to discuss the attached DOA log template for IMIC. Biorasi is not copied.[133] |

---

[126] BIO_376523 – 376526, see BIO_376523 (IMIC Communications.pdf)

[127] TMF1055 – 1230, see TMF1059

[128] TMF1055 – 1230, see TMF1055

[129] FERG0000228 – FERG0000573, see FERG0000451

[130] BIO_150331 – 150332 (IMIC Communications.pdf)

[131] TMF12600 – 12604

[132] FERG0000001 – 49, see FERG0000019 and FERG0000022

[133] LINICAL_000177-179, see LINICAL_000177-178



| Date | Event |
|---|---|
| January 11, 2024 | Email from Biorasi to IMIC team stating a shipment related to Subject 1005 has been scheduled for the "leukapheresis product to go to UM [University of Miami] on 18JAN2024"[134] |
| January 12, 2024 | Retraining meeting with IMIC that included blinding policies and procedures[135] |
| January 15, 2024 | Randomization of Subject 1005[136] |
| January 16, 2024 | Biorasi issues confirmation letter to FERG regarding January 22, 2024 Unblinded Interim Monitoring Visit to "perform overall and subject drug accountability and verify IP storage conditions, and to observe dose preparation procedures and observe both the IV and ID dosing for subject 1003."[137] |
| January 17, 2024 | Cryoport shipment scheduled from FERG Site to University of Miami originally scheduled for January 17, 2024 delayed to January 19, 2024 due to timing of order placement and inclement weather[138] |
| January 17, 2024 | FERG Site reports FedEx shipping delay leading to delayed Ionized Calcium testing of baseline labs prior to subject leukapheresis[139] |
| January 17, 2024 | Email from Alzamend to IMIC Team requesting completion of an updated Personnel Task Assignment Log and that the document is filed in the Leukapheresis binder.[140] |
| January 17-19, 2024 | IMIC Team completes Personnel Task Assignment Log (as Leukapheresis Site).[141] |
| January 18, 2024 | Leukapheresis/Sham Procedure of Subject 1005[142] |

## 4.2  Unintentional Unblinding Event and Immediate Response

On January 18, 2024, Loyda Espinoza, the unblinded study coordinator at IMIC,[143] called Juan Duany-Santos, the unblinded Clinical Research Associate (CRA) at Biorasi with a question that was unclear to the unblinded Biorasi CRA.[144, 145] Juan Duany-Santos requested that Loyda

---

[134] BIO_139049 – 139051

[135] FERG0000050 – 227, see FERG0000104

[136] TMF12158 – 12159

[137] FERG0000001 – 49, see FERG0000020

[138] TMF2529 – 2537, see TMF2531 – 2532

[139] TMF57589 – 57591

[140] LINICAL_000177-179, see LINICAL_000177

[141] LINICAL_000191 – 192

[142] TMF6543 – 6588, see TMF6557

[143] LINICAL_000191 – 192, see LINICAL_000191

[144] Declaration of Juan Duany Santos, dated February 18, 2026.

[145] Deposition of Juan Duany-Santos, taken February 16, 2026, p. 127:7 – 15



Espinoza email him for clarity and to document the question and response.[146, 147] Then, at 1:03 PM, Loyda Espinoza, sent an email to Juan Duany-Santos with the ALZN002-01_clinical@biorasi.com group email cc'd.[148] The subject line of the email read "Site: Dr. Ramon Leon | Patient: 1005 | Visit date: 18-JAN-2024", and the contents of the email read:

> Good afternoon Juan,
>
> Patient 1005 was seen on site this morning. I did not receive the sample as it seems patient is in sham.
>
> My question is the following: Where do I return the cryoport box received today 18-JAN-2024 at 11:52 am back to cryoport or UM?

Juan Duany-Santos replied directly to Loyda's original email, without any additional email addresses cc'd, at approximately 1:07 PM[149] with the IP Manual Sham Treatment Flow Chart and explains it "Per IP Manual, the C3 shipper should be sent to UM (with no contents)."[150]

Additionally, Josanne Johnson, Clinical Trial Manager at Biorasi, "recognized that the content of the first email message unblinded the recipients and sent an email at 2:11pm EST to everyone on the email distribution list requesting that the emails from the center not be read and immediately deleted.[151] However, the Biorasi staff on the distribution had already read the document."[152] Therefore, Kraig Roajphlastein, Sr Operations Manager at Alzamend, deleted the center's emails without opening them, and reached out to the additional Alzamend blinded team members on the distribution to instruct them to delete the emails without reading the contents.

Loyda Espinoza attempted to recall the email at 2:23 PM.[153] Following the attempted recall, at approximately 3:18 PM Loyda Espinoza emailed the ALZN002-01_clinical@biorasi.com group email address stating, "Please disregard the previous message, was sent in error. Sample was found."

At 3:41 PM, Advarra IRB acknowledged prompt reporting of the unblinding event.[154] Two subject numbers were identified: Subject 1003 and Subject 1005. The event description reads:

> Unintentional unblinding occurred when an email was sent from the leukapheresis vendor to a group email that contained blinded staff. This email

---

[146] Declaration of Juan Duany Santos, dated February 18, 2026.

[147] Deposition of Juan Duany-Santos, taken February 16, 2026, pp. 127:17 – 128:3 and 128:23 – 25

[148] BIO_181659 – 181660 (IMIC Communications.pdf)

[149] Deposition of Juan Duany-Santos, taken February 16, 2026, p.136:19 – 23

[150] BIO_181659 – 181660, see BIO_181659 (IMIC Communications.pdf)

[151] ALZ_061374

[152] FERG0000050 – 227, see FERG0000104 – 110

[153] ALZ_117199

[154] TMF2812 – 2813



> *address was noted to be blinded staff and not to be used for unblinded information. Currently enrolled in the study are the sentinel subjects 1003 and 1005. Because this is a 1:1 randomization for these subjects, by unblinding the one subject, both subjects assignments are now known by the clinical team. Subject 1003 is scheduled for dosing on 22JAN2024 and Subject 1005 has the leukapheresis/sham procedure performed today, 18JAN2024.*

At 5:41 PM, Mary Lyda, Head of Quality at Biorasi, emailed Alzamend describing the unintentional unblinding event. [155] The email states:

> *As you are aware, today the Leukapheresis site sent an email to the Clinical Team Group email address that unintentionally unblinded the Alzamend Study Team (including members of Alzamend's management and Biorasi's staff dedicated to this study). As required per protocol and under GCP, we have reported the unintentional unblinding to the central IRB. We provided the IRB with the preliminary information, and we will update them on our ongoing investigation. We strongly recommend that you notify the FDA. We recognize that the IP dosing for the first sentinel patient will need to be postponed, and we need to have a discussion with your team about next steps.*

In response, Stephan Jackman, CEO at Alzamend Neuro, replied that postposing the dosing may not be necessary because "it appears that the medical/safety personnel and/or the clinical trial site (FERG) were not unblinded."[156]

On January 19, 2024 at 8:51 AM, Nancy Newark, Vice President of Project Management at Biorasi, emailed the Biorasi team stating that QA advised not to communicate or respond to emails with any study personnel at the site, the sponsor or vendors until the unintentional unblinding investigation is complete.[157]

At 3:29 PM Mary Lyda, Head of Quality, at Biorasi, emailed Alzamend summarizing the teleconference that took place earlier that day.[158] She stated the discussion "allowed us to assess the situation, potential impact and next steps." The next steps were listed as follows:

> *1. Nancy to contact the Study Coordinator, Milka Vina at First Excellence Research Group, to request they postpone the patient dosing that is scheduled for Monday, 22 Jan. All agreed that there should be no other contacts with the site except for Nancy at this time.*

---

[155] BIO_140486 – 140488

[156] BIO_140486 – 140488

[157] BIO_169468 – 469

[158] BIO_090475 - 90476



*2. Nancy will inform Milka of the unintentional unblinding that is being investigated, Alzamend is preparing a protocol waiver to submit to the IRB, and we will keep her updated.*

*3. Nancy taking actions to change the Biorasi team members that were unblinded.*

*4. Nancy/Mary to draft a narrative to describe how the unintentional unblinding occurred.*

*5. Don/Eve to describe what actions they took related to the email.*

*6. Don to draft their request for a protocol waiver to submit to Advarra IRB.*

*7. Mary/Nancy will consolidate the draft protocol waiver for submission to the IRB for all to review.*

*8. Alzamend is considering if Don and Eve need to recuse themselves from the first two patients to avoid any risk or perception of risk.*

*9. Alzamend and Biorasi will reconvene at 5:30 (scheduled by Mary).*

*10. Kraig to send the response from Alzamend to the 14 December 2023 email from Mary asking them to confirm it was ok to continue with first dose while the protocol amendment was underway.*

As such, Ms. Newark emailed the Biorasi team that afternoon stating that Alzamend has been informed that the previously blinded Biorasi team members that received the email with the unblinding information have been removed from the study and will have no further contact with any FERG site staff.[159] The removed team members included Ugur, Josanne, Ginger and Daphne. She additionally stated that the IP dosing scheduled for Monday will need to be postponed.

On the morning of January 19, 2024, Milka Vina, Study Coordinator at FERG, emailed the Biorasi team regarding invoices originally dated January 4, 2024.[160] At 1:35 PM, Ms. Vina, emailed both the Biorasi and Alzamend team stating "[w]e have been trying to get in touch with Biorasi Team since this morning concerning several issues that have arise during the day with regards to Dosing Day 1 Monday 22 Jan 2024 and have not been successful. For a project like this to be successful we need communication in order to proceed. At this time please consider Monday's visit to be on HOLD until someone decides to call the site and the PI and gives us adequate and concrete information to our questions."[161]

---

[159] BIO_169468 – 469, see BIO_169468

[160] FERG000228 – 573, see FERG0000479 – 494

[161] BIO_178911 – 178912

Page 27



At 3:13 PM, Ms. Newark sent an email to Ms. Vina thanking her for taking her phone call and reiterating to postpone the IP dosing scheduled for Monday, January 22.[162] Additionally, she stated that a protocol waiver was being prepared and would be sent to her and Dr. Carballosa for review. She identified that Dr. Bonza Zlateska would be the Medical Monitor moving forward. The FERG site received shipment of the IP for Subject 1003 on January 19, 2024 at 11:50 AM;[163] however, based upon instructions from Alzamend and Biorasi, this was not given to Subject 1003 on January 22, 2024.[164]

Separately, at 3:33 PM, Adriana Brooks, Senior Laboratory Manager at University of Miami, emailed Loyda requesting a "completed chain of custody for yesterday's patient" as well as a missing return label.[165]

## 4.3  Events Following the Unintentional Unblinding Event

Table 3 provides a summary timeline of various events that took place following the immediate response to the unintentional unblinding event that took place on January 18, 2024 and beyond the termination of the Master Services Agreement between Alzamend Neuro Inc and Biorasi, LLC.

Table 3.    Timeline of Events Following the Unintentional Unblinding Event and Immediate Response on January 18-19, 2024

| Date | Event |
| --- | --- |
| January 22, 2024 | Study Protocol ALZN002-01 Waiver Request drafted by Alzamend describing the unintentional unblinding event and actions taken to mitigate risk.[166] |
| January 23, 2024 | Study Protocol ALZN002-01 Waiver Request describing the unintentional unblinding event and actions taken to mitigate risk was modified[167] and sent to Ms. Vina and Dr. Carballosa for review.[168] |
| January 24, 2024 | Email from Dr. Carballosa to Biorasi stating that he wishes to withdraw participation as Principal Investigator from the trial.[169] Ms. Newark forwards the email to Alzamend. In response, Mr. Jackman emails Dr. Carballosa requesting a virtual meeting to obtain clarity about his decision "to discuss best practices as we continue this study." |
| January 24, 2024 | Biorasi submits a message to Advarra IRB stating that "Dr. Carballosa has withdrawn participation in the study. The site has enrolled two subjects but no subject has yet received study drug. The subjects will be withdrawn from the |

---

[162] FERG000228 – 573, see FERG0000466

[163] FERG0000001 – 49, see FERG0000006 – 7

[164] FERG0000001 – 49, see FERG0000014

[165] BIO_151669  (IMIC Communications.pdf)

[166] BN 000285 – 289

[167] FERG0000050 - 227, see FERG0000104 – 110

[168] FERG0000050 - 227, see FERG0000130

[169] FERG0000050 - 227, see FERG0000128 – 129



| Date | Event |
|---|---|
| | study as well. The current continuing review will be withdrawn and a termination report will be submitted at that time."[170] |
| January 25, 2024 | Teleconference between Biorasi and Alzamend. Follow-up email from Ms. Newark to Alzamend states "Please provide Biorasi a written statement advising us of your next steps with study continuation."[171] |
| January 25, 2024 | Email from Alzamend to Dr. Carballosa stating "Consistent with regulatory requirements, we respectfully request that you provide us with full disclosure regarding the reasons for discontinuation and your plans for duty of care for subjects. A preferable approach would be to have an amicable teleconference to complete these activities and mutually address regulatory responsibilities. As you are aware, if we do not complete this activity, we have reporting obligations with the FDA and the IRB in order to satisfy regulatory closure."[172] |
| January 25, 2024 | Dr. Carballosa withdraws from Advarra IRB continuing review.[173] |
| January 25, 2024 | Email from Dr. Carballosa to Biorasi asking if Biorasi is going to submit the Termination Report to Advarra IRB or if he needs to do it. He states he would like to "finalize this issue by COB Friday."[174] Ms. Newark responds and states that Biorasi can submit the official notice of termination and "will follow through this morning and complete the notification of termination to the IRB." Additionally, she clarifies "they were notified yesterday of your request to withdrawal. We had to work within the system to make that notification per advisement of the IRB. We will close it out today." |
| January 26, 2024 | Email from Dr. Carballosa to Alzamend stating "Please follow up with Biorasi for all meetings and study closure procedures."[175] Thus, Mr. Jackman emailed Ms. Newark requesting to schedule a meeting with Dr. Carballosa and his team "to obtain full disclosure regarding FERG's reasons for discontinuation and plans for duty of care for subjects encompassing Study ALZN002-01."[176] |
| January 29, 2024 | Email from Biorasi to Dr. Carballosa requesting availability for a call with Alzamend.[177] A meeting is scheduled for January 30, 2024 at 11:30 AM.[178] |
| January 30, 2024 | Email from Biorasi to FERG requesting removal of "vein assessment fee"[179] from unpaid invoices for Subjects 1003, 1004, and 1005 (originally dated January 4, 2024[180]) due to the fee being "implemented only effective of the execution of the revised budget on 18 Jan 2024."[181] FERG responded to |

---

[170] FERG0000050 – 227, see FERG0000112

[171] BIO_144248

[172] FERG0000050 – 227, see FERG0000127 – 128

[173] FERG0000050 – 227, see FERG0000116 – 117

[174] FERG0000050 – 227, see FERG0000116 – 117

[175] FERG0000050 – 227, see FERG0000127

[176] FERG0000050 – 227, see FERG0000126 – 127

[177] FERG0000050 – 227, see FERG0000126

[178] FERG0000050 – 227, see FERG0000138

[179] FERG000228 – 573, see FERG0000477 – 479

[180] FERG000228 – 573, see FERG0000493 – 494

[181] FERG000228 – 573, see FERG0000476 – 479



| Date | Event |
|---|---|
|  | Biorasi and included Alzamend, stating that the assessments were performed at the instruction of Alzamend. Biorasi responded to the email stating the issue would be escalated for a quick resolution. Alzamend responded to the email stating that FERG should be paid for the work and asks Biorasi to "kindly adhere to this repeated request of including me in all email communications between Biorasi and the vendors going forward." |
| January 30, 2024 | Email from Biorasi to Alzamend following up on the meeting with Dr. Carballosa and Ms. Vina of the FERG Site.[182] Ms. Newark states "they were very clear on their reasons for discontinuing their participation in the study. They shared their concerns about the lack of experience of the Leukapheresis site and their frustration that these were raised by them earlier in the study startup. They shared their concern about the multiple protocol waivers and their opinion that there is a lack of control over the study procedures and communication." |
| January 31, 2024 | Alzamend notifies Biorasi that they have placed the project on hold pending an investigation from an independent auditor.[183] |
| January 31, 2024 | Linical Clinical Development Partner contacted to review and investigate an unintentional unblinding event concerning subjects enrolled with FERG.[184] |
| February 13, 2024 | Biorasi executes termination of Services Agreement with Alzamend[185] |
| February 14, 2024 | Subject 1003 IP intended for administration on January 22, 2024, shipped back to University of Miami by FERG[186, 187] |
| February 19, 2024 | Confirmation letter issued for the Close Out Monitoring Visit of FERG site.[188] Close Out Visit is scheduled for February 27-28, 2024. |
| February 22, 2024 | Advarra IRB issued Approval to Continue Study[189] |
| March 7, 2024 | Advarra IRB issues notification of IMIC site withdrawal "per client request"[190] |
| March 8, 2024 | Note to File titled "Alzamend Vendor Management" states "Alzamend internally vetted vendors contracted by Alzamend, and no documentation was provided to Biorasi..." "All contracts for the above vendors were executed between Alzamend and the vendor. All management of these vendors was performed by Alzamend during the course of the study." List of vendors includes IMIC.[191] |
| March 11, 2024 | Advarra IRB issues Routine Termination / Close Out Notice terminating IRB oversight for the protocol[192] |

---

[182] BIO_178992 – 178993

[183] BIO_271065 – 69, see BIO_271066 – 67

[184] LINICAL_000049 – 56, see LINICAL_000050

[185] BIO 135845 – 135846

[186] FERG0000001 – 49, see FERG0000014

[187] BIO_150648 – 150655, see BIO_150648

[188] FERG0000050 – 227, see FERG0000218 – 224

[189] TMF2814 – 2815

[190] TMF2817 – 2818

[191] TMF57533 – 57535, see TMF57533

[192] TMF2879 – 2880



| Date | Event |
| --- | --- |
| March 20-21, 2024 | Audit of FERG and IMIC sites by Linical Clinical Development Partner[193] |
| March 21, 2024 | Note to File titled "Sponsor Audit by Linical" indicates the FERG site audit had already taken place prior to the arrival of Biorasi.[194] |
| May 1, 2024 | Linical Audit Report of FERG and IMIC sites Issued[195] |

---

[193] LINICAL_000049 – 56, see LINICAL_000049

[194] BIO_017348 – 17349

[195] LINICAL_000049 – 56, see LINICAL_000049

# 5  Rebuttal

Dr. Hausheer has several opinions regarding Biorasi's role in the operational conduct of the Alzamend trial that we have provided a rebuttal for in the sections below. The dominant themes of Dr. Hausheer's opinions are based on unverified information that has not been introduced as fact by the parties involved prior to the writing of our report. He seemingly sources this information (although has not cited it) from a post-unblinding audit conducted by one of Biorasi's direct competitors in the Florida area, Linical.

There are several issues with the Linical audit. First, Biorasi did not agree to take part in the audit,[196] therefore, all information provided therein is inherently lacking Biorasi's input or perspective.[197] Second, audio of initial interviews that occurred one day before the audit was scheduled indicates the auditor was asking leading questions, suggesting answers to the interviewee, and generally behaving in an unprofessional manner.[198] Finally, the conclusions of the Linical audit report are based on two phone calls that we have no evidence of occurring as they were described in the audit report. The content of these two phone calls apparently forms the basis of the majority of Dr. Hausheer's opinions. Dr. Hausheer recognizes in his report that this information is not reliable and carefully hedges his opinions with phrasing such as "I have assumed," "if supported by the factual record," "if the Biorasi CRA…was not equipped to answer," and "if she communicated such a misidentification."[199] We further note within this rebuttal where his opinions are tainted by assumed or hypothetical information.

In preparing our rebuttal opinions, we evaluated each of Dr. Hausheer's opinions and underlying analyses on an individual basis, identifying the subject matter addressed. For each topic, we reviewed the relevant industry standards and guidance applicable to those topics and the relevant materials from Biorasi related to their execution and management of the ALZN002-01 clinical trial, which we relied upon in forming our rebuttal opinions. We then assessed whether the materials and analyses relied upon by Dr. Hausheer adequately supported his opinions. We have indicated in each heading below which rebuttal opinions are held by Dr. Friedrich or Dr. Iftikhar and which rebuttal opinions are jointly held.

---

[196] TMF10989 – 10990

[197] LINICAL_000049 – 56, see LINICAL_000050

[198] LINICAL_000916, timestamps: 00:12:28 – 00:12:34, 00:21:1 - 00:21:48, 00:23:38 – 00:23:48

[199] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, pp. 17, 21, 24, 25.



## 5.1  Dr. Hausheer's opinion that Biorasi's team was underqualified and under-resourced for the ALZN002 trial (Dr. Iftikhar)

Dr. Hausheer has several opinions about the qualifications of and resources available to the Biorasi team that I disagree with. In his report, he states, "The Biorasi CVs produced for operationally central roles (e.g., CRA/CTM/PM and medical/safety leadership) reveal that they do not have sufficient prior experience executing (i) autologous leukapheresis-dependent manufacturing (cell collection, followed by an interim manufacturing step followed by return shipment), (ii) cold-chain/custody logistics for tracking and ensuring the drug product or sham/placebo is available to the dosing site, or (iii) randomized double-blind sham-controlled execution where sham leukapheresis is used to preserve blinding of the autologous therapy vs. sham, particularly in a neurodegenerative immunotherapy program."[200] I disagree with his characterization of what domain knowledge a CRO and their staff members should have.

First, I will address Dr. Hausheer's characterization of CROs. CROs inherently work with the Sponsor's expertise to execute trials, not the other way around. Under ICH E6(R2), a CRO may provide appropriate operational oversight and quality management for delegated study activities,[201] but not necessarily by internal ownership of all specialized technical capabilities. It is not reasonable to expect a single entity to have or claim to have the domain knowledge in the disparate areas that Dr. Hausheer lists. In fact, Biorasi recognized this and *did* engage all appropriate domain experts that have the relevant experience and rightly relied on them for technical input. For example, the specialized cold-chain/custody logistics was a capability that a third-party vendor, Cryoport, could provide. Cryoport is in the business of providing temperature-controlled supply chain solutions and Biorasi proceeded to engage in a contract with them.[202,203] The Clinical Research Cell Manufacturing Program at the University of Miami was contracted to perform the technical interim manufacturing steps in accordance with the study protocol.[204] IMIC Research indicated their site's experience with autologous therapy, leukapheresis capabilities, and Dr. Leon's experience conducting approximately 31 Alzheimer's disease clinical studies as the PI.[205,206] As the selected CRO, Biorasi worked with Alzamend's specialized requirements to ensure proper resources and qualified personnel were utilized for the purpose of executing the clinical trial. Biorasi recognized that specialized capabilities were necessary for a successful trial.

---

[200] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 20.

[201] International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (ICH). 2018. "Integrated Addendum to ICH E6(R1): Guideline for Good Clinical Practice E6(R2)" Section 5.2

[202] BIO_002933 – 2979, see BIO_002947

[203] TMF9869 – 9923

[204] TMF1620 – 1702, see TMF1666

[205] TMF12725 – 12746, see TMF12729

[206] TMF12724



It should be noted that Biorasi did not refuse to work with any specialized vendors or third parties, and worked with Alzamend's approved selections for the trial.[207],[208, 209, 210]Biorasi could have claimed to have the capabilities "in house" but instead chose to go through proper channels with specialized third parties to make sure the most qualified groups were a part of the trial. These services were managed as pass-through costs, rather than retained internally as profit, reflecting the deliberate and compliance-driven decision to prioritize technical expertise and quality of the trial. Furthermore, the feasibility questionnaires completed by the sites prior to being chosen to conduct the trial indicate their respective experience with Alzheimer's trials. Alzamend was fully aware of and had visibility to which sites had conducted both cell therapy and Alzheimer's studies previously.[211, 212, 213, 214, 215, 216]

Biorasi worked with Alzamend in approving the additional specialized partners, and it was Alzamend that did not include Biorasi on part of the process. This is documented in the Note to File dated March 8, 2024 that "Alzamend internally vetted vendors contracted by Alzamend, and no documentation was provided to Biorasi for the following vendors…" and includes a list of vendors that had contracts executed between Alzamend and the vendor, which included "IMIC (acting as leukapheresis center)."[217] An additional note states the following: "All management of these vendors was performed by Alzamend during the course of the study."[218] It is evident that Biorasi was diligent in making sure the appropriate vendors were a part of the trial, and Biorasi followed industry standards in building a site strategy for the success of the clinical trial.

Next, Dr. Hausheer makes several vague statements about the qualifications of Biorasi staff. For example, Dr. Hausheer makes several assumptions related to a Biorasi VP taking on the Project Director duties during the trial. For example, he states that the Biorasi VP was not trained on the project, and that this would be a deviation from industry practices "[i]f supported by the factual record..."[219] This is not supported by the factual record. Biorasi had SOP PM-024 Transitioning of Team Members in place for the transition of project team members.[220] Team Member Transition Form, FRM-PM-01, for protocol ALZN002-01 was completed on October 19, 2023 to

---

[207] TMF57532

[208] TMF4158

[209] BIO_002933 – 2979, see BIO_002945 – 2946 and BIO_002948

[210] TMF4158

[211] TMF4143

[212] TMF4144

[213] TMF4150

[214] TMF4157

[215] TMF4142

[216] TMF12724

[217] TMF57533 – 57535, see TMF57533

[218] TMF57533 – 57535, see TMF57533

[219] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 21.

[220] BIO_134915 – 134923



transition the Project Director role from Sergey Pavelenko to Nancy Newark.[221] The Team Member Transition Form documents various transition activities, including access to appropriate systems, protocol training to be completed by October 27, 2023, and review of tasks relevant to the role.[222] More generally, Dr. Hausheer states, "Many of these individuals do not even have sufficient experience in Alzheimer's randomized trials,"[223] but fails to specify what experience he would deem as sufficient.

Regulatory frameworks express clearly that sponsors, CROs, and third-party vendors will collectively contribute distinct competencies necessary for trial execution. ICH E6(R2) evaluates trial conduct through the lens of system adequacy and oversight effectiveness, not through specialized technical expertise.[224] It is neither reasonable nor consistent with regulatory expectations to require a single CRO to demonstrate in-house expertise across manufacturing, cold-chain logistics, and specific gene therapy mechanisms simultaneously. ACRO has been defined as an organization contracted by the sponsor to perform one or more clinical trial related duties and functions, without any restrictions based on specificity or complexity of a protocol.[225] Instead, regulations focus on documented delegation of duties along with validated systems and operations to ensure compliant trial execution. The ultimate responsibility for trial quality and data integrity remains with the sponsor, even when functions.[226] CROs are commercial service organizations whose business model is built on providing broad operational and therapeutic support across clinical development, allowing sponsors to leverage an established infrastructure without maintaining internal capabilities themselves.

Thus, based on my review of the materials and analysis above, Biorasi did not misrepresent their capabilities by claiming specialized expertise in manufacturing, cold-chain logistics or Alzamend's gene therapy mechanisms. These functions were intentionally performed by qualified third-party vendors selected for their expertise. Rather, it is my opinion that Biorasi accurately represented themselves as a CRO with the operational infrastructure and expertise required to execute a clinical trial in accordance with regulatory and sponsor expectations. Dr. Hausheer's claim that Biorasi was underqualified or under-resourced is not supported as it contradicts their ICH-defined role of providing centralized coordination, oversight and quality management as agreed by Alzamend in the WO and MSA.[227, 228]

---

[221] TMF10187 – 10196

[222] TMF10187 – 10196

[223] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 20.

[224] International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (ICH). 2018. "Integrated Addendum to ICH E6(R1): Guideline for Good Clinical Practice E6(R2)" Section 4 and Section 5

[225] 21 CFR §312.3(b) — Definition of Contract Research Organization.

[226] International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (ICH). 2018. "Integrated Addendum to ICH E6(R1): Guideline for Good Clinical Practice E6(R2)" Section 5.2

[227] BIO_002933 – 2979

[228] BIO_138520 – 138551



## 5.2  Dr. Hausheer's opinion of inadequate training and protocol misunderstanding (Dr. Friedrich)

Dr. Hausheer holds the opinion that there was "a pervasive lack of training and protocol understanding among both Biorasi's personnel and the clinical site staff under Biorasi's supervision."[229] He broadly states that the trial was "complex and blind-fragile" and that "every individual involved must understand the protocol (including complex procedures designed to maintain blinding, safety and quality of the study) and their specific responsibilities." [230] It is important to note that the IMIC coordinator that unblinded the study (hereafter referred to as the "IMIC coordinator" or "Loyda Espinoza") had one singular role that would be performed identically regardless of the enrolled subject being in the treatment group or the sham group: to ship the Cryoport box to UM using the pre-made shipping label included with the shipper.[231, 232] This fact is detailed in the signed Delegation of Authority (DoA) log of IMIC staff member's responsibilities delegated to them by the Site PI, Dr. Leon,[233] as well as in email correspondence on May 26, 2023 from Juan Martinez (Rio Pharma/Alzamend) to Josanne Johnson (Biorasi):[234]

> *Thank you for taking my call and clarifying Loyda's role as unblinded shipper ONLY at Dr. Leon's site. I reviewed her CV and she could be the unblinded shipper, but CANNOT be involved with the IP preparation, etc. (backup pharmacist) as she only has a High School degree. Just want to be sure we are both on the same page about her role. So, approved for shipping ONLY!! As an unblinded staff shipping the Leukopak to UM, she cannot be involved in any other procedures during the study.*

Therefore, although the protocol was complex overall, this particular coordinator's role was not complex. Despite this and per their responsibility in the WO,[235] Biorasi spent significant effort in coordinating and following up on training for the shipping procedure with IMIC, which included following up with the specific coordinator that unblinded the study directly on May 24, 2023,[236] May 25, 2023,[237, 238] May 26, 2023.[239,240] The repeat Shipping Lane 1 qualification run for the

---

[229] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 21.

[230] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 21.

[231] TMF0113 – 247, see TMF0119

[232] TMF9869 – 9923, see TMF9877

[233] LINICAL_000191-192

[234] TMF11027 – 11029, see TMF11028

[235] BIO_002933 – 2979, see BIO_002943

[236] BIO_145008 – 145009 (IMIC Communications.pdf)

[237] TMF12450

[238] BIO_120151 (IMIC Communications.pdf)

[239] TMF12446 – 12447

[240] BIO_050903 – 50905, see BIO_050903 (IMIC Communications.pdf)



IMIC team, discussed in the May 26, 2023 meeting,[241] was conducted on June 14, 2023 and documented in Cryoport Client Validation Report titled "Biorasi, LLC Fresh Leukapheresis Material and Cryopreserved Investigational Product Shipping Lane Qualification Final Report."[242, 243] Biorasi also conducted a "Cryoport shipping refresher" training with the IMIC team on October 20, 2023 to review shipping instructions prior to the first subject in the study.[244]

In addition, Biorasi followed up with the IMIC team (Dr. Nikolov, Dr. Joseph, Loyda Espinoza) on January 11, 2024 that the shipment has been scheduled for the "leukapheresis product to go to UM on 18JAN2024," clearly indicating where the Cryoport shipper was expected to go.[245] Attached to this email was the shipping order confirmation, which also displayed the shipping destination in multiple locations for the pre-arranged shipping to UM from IMIC, shown in Figure 4.



### Order #323289 for Biorasi LLC (BIOR006)

Phone: 786-388-0700 Fax: Address: 18851 NE 29th Ave Suite 800 Miami, FL 33180 US
Sales Territory: Southeast Submitted At: 10 Jan 2024 03:54 PM EST
Study / Project Number: 188-1

| Ship From | Ship To |
|---|---|
| IMIC Research<br>9380 SW 150th Street,<br>Suite 140<br>Miami, FL 33176 US | University of Miami<br>1501 NW 10th Ave, Rm 903<br>Biomedical Research Bldg, ISCI<br>Miami, FL 33136 US |

- Shipment Reference #: Subject 1005

| Leg | Scheduled Pickup | Pickup Method | Pickup Confirmation | Actual Pickup | Estimated Delivery | Updated Estimated Delivery | Actual Delivery |
|---|---|---|---|---|---|---|---|
| 1 | - | PICKUP | | - | 18 Jan 2024 12:00 AM EST | 18 Jan 2024 12:00 AM EST | - |
| 2 | 18 Jan 2024 02:00 PM EST | PICKUP | | - | 18 Jan 2024 12:00 AM EST | 18 Jan 2024 12:00 AM EST | - |
| 3 | 19 Jan 2024 12:00 PM EST | PICKUP | | - | - | - | - |

| Shipping Provider | Account | Service | Source | Destination | Tracking |
|---|---|---|---|---|---|
| | | | Cryoport Morris Plains | IMIC Research | |
| CryoPDP | Cryoport - CryoPDP | SAME_DAY_DELIVERY | IMIC Research | University of Miami | |
| | | | University of Miami | Cryoport Morris Plains | |

Figure 4.        Shipping information provided to IMIC team on January 10, 2024.[246]

Additionally, in my opinion based on my education and training and experience in hiring and managing clinical research coordinators, there is a reasonable and basic expectation, that a GCP certified,[247] Society of Clinical Research Association (SOCRA) Certified Clinical Research

---

[241] TMF12446 – 12447

[242] LINICAL_000290 – 403, see LINICAL_000363 - 365

[243] It is my understanding that the June 14, 2023 qualification run is the repeat of shipping Lane #1 discussed on May 26, 2023 that needed to be scheduled. (BIO_078897 – 78902, see BIO078900)

[244] BIO_374464 (IMIC Communications.pdf)

[245] BIO_139049

[246] BIO_139049 - 139050

[247] TMF12788



Professional (CCRP),[248, 249] with clinical study coordination dating back to 2000 already understands 1) the importance of protecting the study's blinding and 2) their responsibility to have read and understood the study protocol prior to a study day. This remains true regardless of IMIC operating as a site or as the leukapheresis center. Therefore, it was reasonable for Biorasi to have also expected that with the IMIC coordinator's prior training and experience, Biorasi's documented training on the protocol and shipping procedures,[250, 251, 252, 253] as well as the IMIC coordinator's access to the appropriate on-site materials, such as the Leukapheresis binder and manual,[254] that she was capable of carrying out her single task according to the protocol.

Finally, in the May 26, 2023 email described above, it is also apparent that Alzamend was aware of the qualifications of the IMIC coordinator and approved her role in shipping. Further, Alzamend was aware of the delinquency of IMIC in following through with training and other study related documentation, as Alzamend often broke the communication plan to follow up directly with IMIC, while not copying Biorasi.[255, 256] According to item 10.5 under Site Management in the WO, in the event of infringements, breaches, misconduct, fraud and negative trends, Alzamend was responsible for determining the investigator's ultimate continuation in the study.[257] Alzamend had already decided not to move forward with IMIC as "Site 2" for enrollment of patients, choosing instead for IMIC to serve only as the leukapheresis center (a vendor) due to their concerns with IMIC. For example, in the weekly project meeting on December 7, 2023, Biorasi documented that Eve del Rio (Alzamend) had shared "she does not want to initiate [IMIC] as a result of the PI's lack of involvement in the study" further saying the PI "relies on Dr. Nikolov for all study-related matters and is very disengaged with the study."[258] If Alzamend believed IMIC was unqualified for leukapheresis and related duties, it was Alzamend's responsibility to address the issue and remove them from the study.

Dr. Hausheer holds several additional subopinions related to his opinion of inadequate training and protocol misunderstanding that I address below.

---

[248] BIO_120827 - 120829

[249] CCRP Certification Program Overview | SOCRA, https://www.socra.org/certification/certification-program/program-overview/, last accessed February 7, 2026.

[250] BIO_048557 - 48559

[251] BIO_374464 (IMIC Communications.pdf)

[252] BIO_125658 – 125662, see BIO_125660 from (IMIC Communications (2).pdf)

[253] ALZ_006345 – 6351, see ALZ6351

[254] TMF12600 – 12604

[255] LINICAL_000191-192

[256] LINICAL_000177-190, see LINICAL_000177-178

[257] BIO_002933 – 2979, see BIO_002949

[258] TMF9182 – 9228, see TMF9221



### 5.2.1  Dr. Hausheer's opinion that the trial plans were inadequate (Dr. Iftikhar)

Dr. Hausheer holds the opinion that there were inadequate trial plans that did not "consistently identify inadvertent/unplanned unblinding as a foreseeable operational risk"[259] and cites to the Risk Management Plan v1.0,[260] Quality Management Plan v1.0,[261] Communication Plan v1.0,[262] Global Project Specifications Plan v1.0,[263] Monitoring Plan v1.0,[264] Medical Monitoring Plan v2.0,[265] Trial Master File ("TMF") Plan v1.0,[266] Data Management Plan v1.0,[267] Data Validation Plan v1.0,[268] and the Protocol Deviation Plan v1.0.[269] I have reviewed these plans and disagree with Dr. Hausheer's opinion that they are inadequate as plans inherently describe an approach to processes to be conducted, and not necessarily the outputs of those activities. First, I will address the various plans and demonstrate that they are adequate and in alignment with industry practices. Then, I will describe the various places where Biorasi appropriately documented unplanned blinding processes and controls.

A risk management plan describes an **approach** to how risks will be identified, tracked, and evaluated; following the approach in the plan then generates or points to specific documentation, risk identification, and the risk mitigation.[270, 271] However, Dr. Hausheer states that the Risk Management Plan "does not identify blind integrity or inadvertent unblinding as a discrete, study-specific risk with defined preventative controls and response actions."[272] He fails to acknowledge that the Risk Management Plan v1.0, approved by Alzamend on March 8, 2023, clearly states under Purpose and Scope that "The Plan includes a list of minimum criteria and does not replace an understanding of, or adherence to, the requirements contained in the approved protocol, applicable regulations, guidelines or Standard Operating Procedures (SOPs) governing this clinical study."[273] Further, the blinding strategy that is part of the approved protocol was reviewed by FDA as part of the IND submission, prior to the involvement of

---

[259] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 22.

[260] TMF57812 – 57831

[261] TMF10044 – 10058

[262] TMF9775 – 9811

[263] TMF10164 – 10186

[264] TMF9812 – 9862

[265] TMF57755 – 57775

[266] TMF57832 – 57865

[267] TMF12884 – 12928

[268] TMF12929 – 12953

[269] TMF57488 – 57511

[270] International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (ICH). 2018. "Integrated Addendum to ICH E6(R1): Guideline for Good Clinical Practice E6(R2)" Section 5

[271] International Organization for Standardization (ISO), ISO 14971:2019 – Application of risk management to medical devices.

[272] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 22.

[273] TMF57812 – TMF57831, see TMF57813 and TMF57817



Biorasi.[274] ICH guidelines do not require every foreseeable operational risk to be individually listed in a single trial plan when the risk is already controlled through established procedures and systems. Biorasi already had such procedures and systems in place, including explicit SOPs to handle unplanned unblinding events. For example, the Interim Monitoring Visit SOP, Section 10.4.6 states:[275]

> *If unblinding has occurred (accidental or intentional), determine if the unblinding was done by authorized personnel, after consultation with the relevant Study team member(s) (e.g. Medical Monitor or Sponsor) and that the occurrence and reporting was appropriately documented in source documents, the regulatory binder and CRF, as required.*

Therefore, the specific risk of accidental unblinding is not in the Risk Management Plan, as Dr. Hausheer would seemingly prefer and implies it should be; but rather, it is documented appropriately elsewhere.

Similarly, the Quality Management Plan v1.0, approved by Alzamend on March 17, 2023, describes "how the project team members will plan for, execute, control, and assure quality standards" and the quality performance metrics expected during the execution of the trial.[276] The general design of the plan is not expected to have "trial-specific controls for preventing/containing inadvertent unblinding"[277] as Dr. Hausheer believes it should. Under ICH E6(R2) guidelines, a Quality Management system should be implemented "to manage quality throughout all stages of the trial process" using overarching quality framework, a risk-based approach and corrective and preventative action (CAPA) processes applicable to the trial.[278] It is not intended to restate detailed trial-specific controls, such as governing blinding/unblinding incidents.

The Communication Plan v1.0, approved by Alzamend on April 11, 2023, contains specific language that "the processes and quality standards set forth by this Communication Plan are approved for use in this study."[279] This plan is intended to describe the overarching structure of communication and escalation pathways among trial stakeholders. It is not intended to provide risk-specific procedures, as Dr. Hausheer believes there should be, such as a "communications firewall" with "restricted distribution lists, or prohibited recipients for unblinded operational topics."[280]

---

[274] ALZ_032320 – 32321

[275] BIO_134250 – 134277, see BIO_134262 – 134263

[276] TMF10044 – 10058, see TMF10045 and TMF10049

[277] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 22.

[278] International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (ICH). 2018. "Integrated Addendum to ICH E6(R1): Guideline for Good Clinical Practice E6(R2)" Section 5.0 – 5.2, 5.20

[279] TMF9775 – TMF9811, see TMF9776

[280] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 22.



The Global Specifications Plan's purpose is to "provide an overall framework for the study activities of the ALZN002-001 clinical study in terms of the project timelines, project team structure, study documents supporting the conduct of the study, guidance on training matrix to be followed for the study and the applicable SOPs during the course of the study."[281] While its purpose is to describe the overall trial strategy rather than specific procedural workflows, Section 6 of the Global Specifications Plan v1.0 (approved by Alzamend on March 30, 2023)[282] lists the applicable Biorasi SOPs and states, "For each of the services provided by Biorasi in reference to the ALZN002-01 clinical trial, Biorasi will follow Biorasi SOPs."[283] Therefore, while Dr. Hausheer claims that Biorasi does "not provide a practical incident-response playbook for inadvertent unblinding,"[284] the Global Specifications plan specifically points to the relevant SOPs for that issue.

Dr. Hausheer claims that the Monitoring Plan v1.0 (approved by Alzamend on March 8, 2023)[285] and Medical Monitoring Plan v2.0 (approved by Alzamend on May 7, 2023)[286] do not provide "stepwise preventive controls or an incident-response workflow for inadvertent unblinding during routine operations and query resolution."[287] This again misconstrues the intended purpose of monitoring plans. Under ICH E6(R2) monitoring plans should "describe the monitoring strategy, the monitoring responsibilities of all the parties involved, the various monitoring methods to be used, and the rationale for their use."[288] They are not required to list every "preventive control" as Dr. Hausheer states. Similarly, medical monitoring operates under the guidelines that the rights and well-being of human subjects are protected throughout the course of the clinical trial. This includes any medical management required for subject eligibility and safety, protocol interpretation, drug interactions and overall assessment of subject adverse events. These plans include language that consistently highlights that they do "not replace an understanding of, or adherence to, the requirements contained in the approved protocol, applicable regulations, guidelines or Standard Operating Procedures (SOPs) governing this study." [289, 290]

The purpose of the Protocol Deviation Plan v1.0, approved by Alzamend on August 14, 2023, is to provide guidance to "assist study personnel with the proper identification, management, reporting, and tracking of protocol deviations," again specifying an approach to follow, and is

---

[281] TMF10164 – TMF10186, see TMF10169

[282] TMF10164 – TMF10186, see TMF10167

[283] TMF10164 – TMF10186, see TMF10180 – TMF10181

[284] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p 22.

[285] TMF9812 – TMF9862, see TMF9813

[286] TMF57755 – TMF57775, see TMF57756 – TMF57757

[287] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 22.

[288] International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (ICH). 2018. "Integrated Addendum to ICH E6(R1): Guideline for Good Clinical Practice E6(R2)" Section 5.18.7

[289] TMF9812 – TMF9862, see TMF9819

[290] TMF57755 – TMF57775, see TMF57761



not intended to specify how to respond to potential, specific, unplanned deviations.[291] Again, the protocol deviation plan is not intended to "provide classifications and handling steps tailored to blind integrity breaches," as Dr. Hausheer claims it should.[292] Rather, Biorasi provided clear instructions for documenting and escalating deviation events in Biorasi's Deviation/Quality Incident Reporting SOP,[293] including the assessment of impact on subject safety and data integrity.

The Data Management Plan v1.0, approved by Alzamend on April 4, 2023, documents the detailed definition of data quality standards and data management activities required to achieve the study protocol objectives.[294] Dr. Hausheer states that the Data Management Plan does not "establish 'blind-safe' query governance"[295] and does not recognize the fact that such controls were already defined and implemented through governing Biorasi SOPs. Specifically, Biorasi's SOP titled "Management of Randomization codes in Clinical Trials" establishes safeguards to preserve blind integrity, including restricted access to unblinded randomization information, and password-protected files.[296] Additional protections in place describe an "Unblinded Database Administrator" who maintains segregation of unblinded information until unblinding is formally approved. Dr. Hausheer's claim of "blind-safe query governance"[297] was already addressed through the use of validated clinical systems[298, 299] and established SOPs during the clinical trial.[300]

The Data Validation Plan v1.0, approved by Alzamend on July 9, 2023, documents the process of clinical data validation throughout the course of the clinical study.[301] The plan establishes standardized data review and query management within validated systems and is not intended to address blinding requirements. Dr. Hausheer has an issue with this plan not "defining validation steps for key blind-integrity controls"[302] but fails to recognize the continuous pattern that the blind-integrity controls have been appropriately defined elsewhere in the Biorasi SOPs.[303] Dr. Hausheer suffers from a fundamental misunderstanding; he does not seem to understand the difference between the various plans that are typical in clinical trial management by a CRO and standard operating procedures. This is clear in his report where he states "I found insufficient

---

[291] TMF57488 – 57511, see TMF57489 and TMF57492

[292] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p.22.

[293] BIO_134517 – 134538

[294] TMF12884 - TMF12928, see TMF12886 and TMF12893

[295] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p.22

[296] BIO_135114 – 135131, see BIO135117 – 135118 and BIO135123

[297] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 22.

[298] TMF2130 – 2294, see TMF2138

[299] Merative. Zelta Platform – Security and Compliance, https://www.merative.com/clinical-development, last accessed February 11, 2026

[300] BIO_135114 – 135131

[301] TMF12929 – TMF12953, see TMF12930 – 12931 and TMF12935

[302] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, pp. 22-23.

[303] BIO_134250 – 134277, see BIO_134274 – 134275



standard operating procedures listed" referring to the list of study plans.[304] These are not the same thing. He fails to reference or acknowledge that Biorasi did have several SOPs to follow in the event of unplanned unblinding. For example, Section 10.4.6 of the Biorasi SOP titled "Interim Monitoring Visit," states:[305]

> *If unblinding has occurred (accidental or intentional), determine if the unblinding was done by authorized personnel, after consultation with the relevant Study team member(s) (e.g. Medical Monitor or Sponsor) and that the occurrence and reporting was appropriately documented in source documents, the regulatory binder and CRF, as required.*

Additionally, Section 10.1 "Generation and Handling of Randomization Code" and Section 10.5 "Premature Unblinding of Randomization code" in the Biorasi SOP titled "Management of Randomization codes in Clinical Trials" include the following statements:[306]

> *As unauthorized/unplanned access to randomization codes must be prevented to restrain the potential to introduce bias in blinded clinical trials, if premature unblinding occurs, obtain written explanation for any action that led to prematurely unblinding the randomization assignments, including those individuals who were unblinded, the date(s) of unblinding, and reason(s) for unblinding.*

and

> *Assessment of possible ramifications must be made with Biorasi Quality Assurance and the Project Director by filing a deviation in Biorasi Quality Management system as the GN-014 Deviation/Quality Incident Reporting SOP and follow up Corrective Actions and preventive actions until completion.*

and

> *Unblinding procedures shall either be as specified in the study protocol or study specific plan such as Unblinding Plan, which is controlled by Sponsor and/or Clinical operations.*

Section 10.7 "Blinded and Unblinded Monitoring (when applicable" in the Biorasi SOP titled "Interim Monitoring Visit" also states:[307]

> *Some clinical studies may require both a blinded team and an unblinded team which would consist of blinded and unblinded Monitors. The procedures in this*

---

[304] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 23.

[305] BIO_134250 – 134277, see BIO_134262 – 134263

[306] BIO_135114 – 135131, see BIO_135122 – 135125

[307] BIO_134250 – 134277, see BIO_134274 – 134275



> *SOP are to be followed in such clinical studies for both blinded and unblinded Monitors, although separate communication and reporting pathways may likely be established for each to ensure that unintentional unblinding of the project to blinded study team members does not occur.*
>
> *For such studies, there will be two separate monitors:*
>
> a) *The blinded monitor will be responsible for monitoring all aspects of the clinical Study except IP management.*
>
> b) *The unblinded monitor will be responsible for monitoring the IP management of the clinical study.*

The Biorasi SOP titled "Site Management" states in Section 10.7 "Site Management Activities – Regulatory Management (IRB/IEC)":[308]

> *Check that procedure are implemented and followed to prevent Investigators and Monitors from seeing un-blinded reports (i.e. interim or final unblinded reports) sent to IRB/IEC (where applicable).*

Finally, the study protocol and the IP Manual also states, "Unblinding of the treatment assignment for any reason will be considered a protocol deviation except when conducted for the safety of a subject."[309, 310] The study protocol also states "Subjects for whom the treatment assignment is unblinded will be prematurely withdrawn from the study but may continue to be monitored for safety and efficacy."[311]

Industry standards do not require risks to be redundantly enumerated in each individual trial plan when effective procedural controls are already in place. ICH E6(R2) does state that "the investigator should promptly document and explain to the sponsor any premature unblinding (e.g., accidental unblinding, unblinding due to a serious adverse event) of the investigational products."[312] Upon review and analysis of the materials, it is my opinion that Biorasi had adequate trial plans that Alzamend reviewed and approved, which outlined frameworks and guidance for the course of the ALZN002 Trial. Dr. Hausheer continues to insist that these plans should "consistently identify inadvertent/unplanned unblinding as a foreseeable operational risk"[313] but does not acknowledge that the actual purpose and objective of these plans are to be high-level. Unplanned unblinding was a foreseeable operational risk that was appropriately identified and controlled through trial documentation other than the trial plans, where it was

---

[308] BIO_134314 – 134326, see BIO_134324

[309] TMF1620 – 1702, see TMF1665

[310] BIO_000484 – 536, see BIO_000496

[311] TMF1620 – 1702, see TMF1665

[312] International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (ICH). 2018. "Integrated Addendum to ICH E6(R1): Guideline for Good Clinical Practice E6(R2)" Section 4.7

[313] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 22.



expected to be. This included SOPs[314, 315, 316] and trial documentation[317, 318] governing blinded data access and handling. Therefore, Dr. Hausheer's opinion that trial plans were inadequate completely ignores that the procedures did exist and cannot be relied upon within any reasonable degree of scientific certainty.

### 5.2.2  Dr. Hausheer's opinion that site personnel were not trained on the blinding procedure (Dr. Friedrich)

Dr. Hausheer holds the opinion that site personnel were not trained on the blinding procedure. He refers only to the process of shipping an empty Cryoport "back to the clinical site," by which I infer he means "to the manufacturer, UM."[319] First, this is only one small piece of the overall blinding strategy for the study, as designed by Alzamend. Blinding procedures included generation of a randomization code, shipping an empty box from IMIC to UM for the sham leukapheresis cohort (Lane 1), shipping an empty box from UM to FERG for the sham leukapheresis cohort's IP treatment (Lane 2), blinding the patient to the treatment they received by covering the IV bag and tubes, conducting additional sham leukapheresis procedures at a similar frequency as required for the IP treatment group, as well as clear instructions from Biorasi on communications regarding blinding/unblinding.[320, 321, 322]

The instructions sent by Biorasi on communication expectations were straightforward: there was only one unblinded CRA to contact for unblinded communications, all others were blinded.[323] The November 1, 2023 email from Biorasi detailing communication expectations for blinded/unblinded communications was sent to all study staff at FERG, IMIC, and both group emails, and is shown below:[324]

> *For communication regarding subjects in the study or subjects in screening, all questions should be directed to the* ALZN002-01_clinical@biorasi.com *email address. Please note that all members of this email address are blinded.* ***No communication regarding unblinded issues (leukapheresis, IP manufacture, shipment, or accountability, or randomization assignment) should be directed to***

---

[314] BIO_134250 – 134277, see BIO_134262 – 134263 and BIO_134274 – 134275

[315] BIO_134314 – 134326, see BIO_134324

[316] BIO_135114 – 135131, see BIO_135123 – 135125

[317] TMF1620 – 1702, see TMF1665

[318] BIO_000484 – 536, see BIO_000495 – 497

[319] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 23.

[320] BIO_138518

[321] BIO_000484 – 536, see BIO_000505 – 509 and BIO_000517

[322] TMF0113 – 247, see TMF0137 – 139

[323] BIO_138518

[324] BIO_138518



> *this email. Any information regarding these topics should be directed to Juan Duany-Santos, the unblinded CRA for this project.*

> and

> *For communication regarding any other issues, you may contact ALZN002-01_process@biorasi.com email address. This email address is used for budget, regulatory, and supply questions and issues. **Again, all members of this list are blinded.** For issues regarding any part of the unblinded portion of the study, please contact Juan Duany-Santos using the contact details above.*

> and

> *Currently, there is **no Alzamend team member that is unblinded**.*

The Sponsor also provided instructions directly to the IMIC site to help them prepare for their procedures. In an email from Kraig Roajphlastien to the IMIC site on September 5, 2023,[325] he states the following:

> *Boris confirmed that IMIC received the leukapheresis binder and that it is stored in the <u>unblinded personnel area</u>.*

> *On the day of the Leukapheresis/Sham procedure, kindly arrive a little early so that you can ensure that you are able to login to the computer and print the leukopak labels. A friendly reminder that **<u>to maintain the blind for the study, you must complete all the paperwork/print the labels the same way for both an active subject and a placebo subject.</u>** There will be a Cryoport shipper (with a leukopak, or "empty") leaving IMIC for U Miami after the leukapheresis/sham procedure is complete.*

> *Should you need assistance while you are at IMIC, the following **unblinded IMIC personnel** are available to assist you.*

> *Dr. Ronald Joseph – Unblinded Pharmacist*

> *Loyda Espinoza – Unblinded Study Coordinator*

> *… **Kindly note that Eve, Juan, and I are all blinded personnel.***

> ***<u>I would like to reiterate the importance of maintaining the blind after subject randomization so none of the blinded parties (at Biorasi, FERG, IMIC, and Alzamend) are inadvertently unblinded from poor communication/lack of preparation!</u>***

---

[325] BIO_12558 – 125662, see BIO_125659 – 125660 (IMIC_Communications (2).pdf)



There were additional reminders about emails and blinding in correspondence to IMIC. For example, Biorasi made several requests to the IMIC coordinator for documentation after subject 1003. On the November 6, 2023 Biorasi requested the completed "Leukapheresis Procedure Pre-assessment, Treatment, and Notes" document, and specifically warned, "Please note this document will unblind whoever reviews it. It should not be sent via email. Instead, please fax the completed form to U Miami" and in another email the same day, "Please ensure only unblinded personnel is involved in this request."[326]

Further, although the blinding strategy designed by Alzamend was thorough and included multiple facets, the coordinator that unblinded the study had the singular role of shipping the Cryoport box to UM. As noted above in Section 5.2, the procedure of shipping the provided Cryoport box to UM *did not change*, regardless of the subject undergoing leukapheresis or sham leukapheresis. The instructions for the shipping procedure were also straightforward, and located in multiple locations for ease of access.[327, 328, 329] There were two distinct shipping lanes for leukapheresis and IP. Figure 2 demonstrates the order of transit for the Cryoport shippers between the sites. The Cryoport shipping procedure training was documented at IMIC[330] and is described as follows:

> *We covered the responsibilities of the collection/clinical site for the SLQ, including introduction to the team, overview of the shipping lanes, operation of the C3 2-8C and CXHV2 shippers, packout materials, and orientation to LiveView.*

Additionally, the Study Protocol ALZN002-01 Waiver Request indicates that there was "a retraining meeting on 12 January 2024 with the center that included blinding policies and procedures."[331, 332]

Based on my review of the materials and analysis above, it is my opinion that there was sufficient training on the blinding procedures. Dr. Hausheer's opinion that site personnel were not trained on the blinding procedures cannot be relied upon within any reasonable degree of scientific certainty.

---

[326] BIO_376523 – 376526, see BIO_376524 (IMIC_Communications.pdf)

[327] BIO_000484 – 536, see BIO_000497 – 500, BIO_000517 - 516, and BIO_000524

[328] TMF0113 – 247, see TMF0119 and TMF0138 – 139

[329] TMF4537 – 4591, see for example TMF4545 and TMF4560 – 4563

[330] BIO_048557 - 48559

[331] It is my understanding that "the center" refers to IMIC.

[332] FERG0000050 - 227, see FERG0000104



### 5.2.3  Dr. Hausheer's opinion that there were systemic training deficiencies (Dr. Friedrich and Dr. Iftikhar)

Dr. Hausheer holds the opinion that there were systemic training deficiencies and refers to both the content of the training materials and the completion of training by study staff.[333] He states in his report that, "Biorasi was responsible for creating an Investigational Product Manual describing the Cryoport procedure, and query resolution was part of their duties" and further opines that "when unblinding risks and response procedures are not specified in the essential documents, effective protocol specific training on those controls cannot reliably occur, because training content is necessarily derived from the governing procedures and plans."[334] I disagree that unblinding risk and response procedures were missing from key documents, such as the IP Manual. The blinding strategy was multi-faceted, which is accurately reflected in the IP Manual (also described in Section 5.3.1). For example, the IP Manual contains multiple statements clearly identifying the various strategies and procedures for blinding:[335]

> *The randomization code will be kept strictly confidential until the time of unblinding, with respect to each respective study part, and will not be broken without authorization, except in circumstances described below.*
>
> *The pharmacy staff and site staff performing leukapheresis procedure (or sham) will be unblinded and separated from the site staff administering the investigational treatment who will remain blinded.*
>
> *Blinding will not be compromised for individuals involved with operational aspects of the study, as well as individuals involved with the planning and conduct of the final statistical analyses.*
>
> *Because the placebo will have a different appearance from the active investigational product, only unblinded personnel will handle IP shipments, thawing, and administration.*
>
> *Furthermore, the leukapheresis and sham leukapheresis procedures will be concealed by identical appearance and procedures.*

Importantly, the study protocol and the IP Manual also state that, "Unblinding of the treatment assignment for any reason will be considered a protocol deviation except when conducted for the safety of a subject."[336, 337]

---

[333] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 23-24.

[334] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 23.

[335] BIO_000484 – 536, see BIO_000495 – 497

[336] TMF1620 – 1702, see TMF1665

[337] BIO_000484 – 536, see BIO_000496



The IP Manual also describes all necessary Cryoport procedures for both treatment groups, including when the shipping container would be empty and where it was to be shipped after each procedure step. Section 12.7 titled "Subjects Randomized to Placebo" of the IP Manual states, "After the sham leukapheresis procedure is complete, the collection center will forward the C3 shipper to UM. This shipper will be empty during transport."[338] This is the same shipping destination as for the leukapheresis product. Therefore, additional description or training in where to ship the sham treatment C3 shipper would not be necessary, as the procedure is, by design to preserve blinding, the same. Finally, the IP Manual is owned by both Alzamend and Biorasi.[339]

I disagree with Dr. Hausheer's opinion that study staff were deficient in training. For example, Dr. Hausheer states in his report that during the transition of a Biorasi VP to acting Project Director, "Biorasi did not conduct sufficient training for that personnel change based on my review of the training records and materials used for training, and study documents."[340] He then blames this lack of training for a conversation that the Biorasi VP hypothetically had with the site PI. Dr. Hausheer states, "[i]f she communicated such a misidentification or mix-up to the Principal Investigator, it **would** indicate that she failed to understand"[emphasis added] the protocol.[341] As described in Section 5.1, Biorasi followed their SOP for team member transition and documented this in their Team Member Transition Form.[342] More importantly, Dr. Hausheer appears to again be relying on unverified information from the Linical Audit report that he has to assume to be true in order to form his opinion.[343] Additionally, Dr. Hausheer states the "the Biorasi CRA (Juan Duany-Santos) is not reflected as trained on the IM training logs, and the surrounding training record reflects gaps in protocol-specific and safety-governance training."[344] However, the Biorasi CRA received clear instructions on his duties in the study in a November 1, 2023 email, which included a reference to his previous training, as follows:[345]

> *I just wanted to provide you a reference for blinded/unblinded personnel and functions for our study. We covered this in training but I thought a reference guide would be helpful. That way we can ensure compliance with blinding.*

Further, Juan Duany-Santos testified that his training on the protocol included completing a survey review of the protocol and all the study manuals, a training session from the clinical trial

---

[338] BIO_000484 – 536, see BIO_000517

[339] TMF10164 – 10186, see TMF10176

[340] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 24.

[341] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 24.

[342] TMF10187 – 10196

[343] LINICAL_000049 – 56, see LINICAL_000052

[344] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, pp. 23 – 24.

[345] TMF9523 – 9524



manager, training with UM regarding IP preparation and administration, and refresher trainings throughout the study.[346, 347]

Therefore, based on my review of materials and analysis above, it is my opinion that unblinding risk and response procedures were not missing from key documents and study staff were trained in the appropriate procedures. Dr. Hausheer's opinion that there were systemic training deficiencies cannot be relied upon within a reasonable degree of scientific certainty.

### 5.2.4 Dr. Hausheer's opinion that there was insufficient follow-up training after initial mistakes. (Dr. Iftikhar)

Dr. Hausheer holds the opinion that there was insufficient follow-up training after initial mistakes. He states in his report that "Standard industry practice after a first-run of a complex process is to debrief and reinforce training in preparation for the next run" and that he has "not seen evidence that Biorasi conducted a sufficient debrief and supplemental training."[348] I disagree with Dr. Hausheer's assessment, as there is well-documented support that Biorasi spent significant effort in following up with and retraining IMIC following the Cryoport qualification runs in May and June 2023, and before, during, and after the first leukapheresis subject in November 2023, as described in more detail below.

Biorasi began training IMIC on the relevant shipping procedures in May 2023, within the same month as IMIC's site selection visit.[349] A Lane 1 qualification run was scheduled for May 10-11, 2023 at IMIC.[350] After this, Cryoport shared the Cryoport training recording with the IMIC team, which included the IMIC coordinator, and their Cryoport initialed training forms.[351, 352] Biorasi followed up to request that IMIC complete the missing qualification run documentation on May 24, 2023.[353] On May 25, 2023 Biorasi followed up with Dr. Nikolov, Loyda Espinoza, and Dr. Joseph to schedule a meeting to discuss the issues encountered during the qualification shipment run and "formulate a plan moving forward."[354] On May 26, 2023, Biorasi provided the meeting agenda for the meeting to discuss the qualification shipment and stated "please ensure that Loyda and Dr. Joseph can attend the meeting as they will be the main contacts for shipping going forward."[355] Topics included "Review of Shipping Lane 1 on 23May2023/Lessons Learned," "Steps moving forward," and "Scheduling of training and repeat of Shipping Lane 1

---

[346] Declaration of Juan Duany Santos, dated February 18, 2026.

[347] Deposition of Juan Duany-Santos, taken February 16, 2026 (Rough), pp. 29:2 – 17 and 35:13 – 36:1

[348] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 24.

[349] TMF12725 – 12746

[350] TMF1043 - 1045

[351] BIO_144689 (IMIC Communications.pdf)

[352] BIO_048557 - 48559

[353] BIO_145000 – 01 (IMIC Communications.pdf)

[354] TMF12450

[355] TMF12446 – 12447



qualification." On June 1, 2023 and June 5, 2023, Biorasi followed up in an email with the IMIC team for all to sign their training forms that had been initialed by Cryoport.[356, 357] On June 14, 2023, the Lane 1 qualification run was scheduled with IMIC and shipping was initiated by Cryoport the previous day.[358] Project Team Meeting Minutes from July 5, 2023 document that the Leukapheresis binder documents and SOPs were reviewed by the apheresis nurses on June 29, 2023 and that Eve del Rio (Alzamend hired consultant) was to then have a meeting with the apheresis nurses for "further review of provided input," indicating both awareness of the IMIC team of the protocol leukapheresis documents, and their and Alzamend's input into the materials.[359] Many of these actions taken by Biorasi were intended to debrief with IMIC on the qualification run and other related leukapheresis processes IMIC was responsible for, and ultimately to correct issues moving forward.

Ahead of the initial leukapheresis subject in November, Biorasi followed up with IMIC via email to schedule Cryoport training.[360] Biorasi then sent a Teams meeting invite for October 20, 2023, with the subject "Cryoport shipping refresher," to Loyda Espinoza and Dr. Joseph.[361, 362] The included note states "We will review the shipping instructions for the leukapheresis product prior to the first subject,"[363] which supports that, contrary to Dr. Hausheer's opinion, Biorasi was reinforcing training following the qualification runs and prior to the first subject.

On November 1, 2023, Biorasi internally discussed what specific items the unblinded Biorasi CRA should review during the monitoring visit (IMV) scheduled to coincide with the first leukapheresis subject, which supports Biorasi's commitment to ensuring the site was compliant with the procedures they were trained on. The focus of the IMV included,[364]

> *1. Documentation regarding the leukapheresis process. Each subject should have a procedure note. This documentation is in the leukapheresis manual itself. The leukapheresis nurses should complete this information for each subject receiving actual leukapheresis.*
>
> *2. Subject referral form should be completed and filed in the leukapheresis binder*
>
> *3. Subject acceptance form should be completed and filed in the leukapheresis binder.*

---

[356] BIO_145475 (IMIC Communications.pdf)

[357] ALZ_053762 - 53763

[358] BIO_078897 - 78899

[359] BN_000257 – 264, see BN_000258 and BN_000263

[360] BIO_150263 – 150265, see BIO_150264 (IMIC Communications (2).pdf)

[361] BIO_374464 (IMIC Communications.pdf)

[362] The training appears to have been rescheduled by IMIC to October 23, 2023. See BIO_151580 (IMIC Communications.pdf)

[363] BIO_374464 (IMIC Communications.pdf)

[364] BIO_226533 – 226534



*4. Randomization log.*

*5. Cryoport documentation (added after our conversation)*

*6. Observation of leukapheresis procedure*

*7. Access to the leukapheresis documentation (location of binder and limited access)*

The IMV at IMIC was conducted on November 2, 2023 by Juan Duany-Santos, CRA (Biorasi), the day of leukapheresis for subject 1003[365,366] and was intended for Biorasi to "observe the conduct of the Leukapheresis/Sham procedure and ensure that proper documentation was maintained, as per the Leukapheresis Manual."[367] On November 6–8, 2023, Biorasi followed up multiple times with IMIC for missing shipping and leukapheresis documentation for subject 1003.[368] On January 5, 2024, IMIC confirmed they would be ready for the January 18, 2023 subject (subject 1005).[369] Biorasi sent the "Follow-up for Site Visit" letter dated January 9, 2024 to IMIC which reviewed deficiencies from the November 2, 2023 IMV.[370] The letter states that "During the visit, site was provided the finalized Leukapheresis Manual as well as a checklist of documents and forms that should be completed and filed in the binder. Instructions were also given regarding keeping this binder under unblinded custody," which indicates an immediate correction by Biorasi for IMIC's deficiency of not having the finalized manual and checklist on site prior to the study day. On January 11, 2024 Biorasi emailed the IMIC team (Dr. Nikolov, Dr. Joseph, and Loyda Espinoza) that the shipment had been scheduled for the "leukapheresis product to go to UM on 18JAN2024" reinforcing the specific shipping procedure IMIC was responsible for.[371] Additionally, the Study Protocol ALZN002-01 Waiver Request indicates that on January 12, 2024 there was "a retraining meeting with the center that included blinding policies and procedures."[372]

In summary, Biorasi documented debriefs, follow-ups, and retraining for IMIC, in agreement with the "Standard industry practice" that Dr. Hausheer refers to, in order to prepare the site for success on subsequent study days. Further, based on my review of materials and analysis above, it is my opinion that Biorasi's diligence of follow up demonstrates that Biorasi was actively fulfilling their role by providing appropriate oversight and was committed toward the success of

---

[365] TMF9507

[366] TMF2505 – 2506

[367] TMF12600 – 12604

[368] BIO_376523 – 376526 (IMIC Communications.pdf)

[369] BIO_115201 – 115204 (IMIC Communications.pdf)

[370] TMF12600 – 12604

[371] BIO_139049

[372] FERG0000050 – 227, see FERG0000104



the trial. Therefore, Dr. Hausheer's opinion that Biorasi was insufficient in follow-up training after initial mistakes cannot be relied upon with any reasonable degree of scientific certainty.

## 5.3 Dr. Hausheer's opinion that Biorasi's inadequate training and inadequate procedures contributed to the unblinding event (Dr. Friedrich)

Dr. Hausheer holds the opinion that Biorasi's inadequate training and inadequate procedures contributed to the unblinding event. Dr. Hausheer states in his report that "through a series of foreseeable missteps, [Biorasi] allowed a preventable unblinding to occur."[373] I disagree. As described in Section 5.2, Biorasi provided the IMIC coordinator with ample training, training refreshers, and access to necessary documentation on site to perform her role in shipping the Cryoport shipper to UM. The IMIC coordinator also had more than sufficient training and experience to know that the first place to look for answers is the documentation that is required to be on site and accessible.[374, 375] This includes relevant protocols, procedures, or manuals, developed by or with Alzamend, and reviewed and approved by Alzamend.[376] The IMIC coordinator had access to such materials, which describe the shipment "from Center to UM" in the table of contents and within the text, and in the Leukapheresis Workflow.[377] In addition, Biorasi followed up with the IMIC team (Dr. Nikolov, Dr. Joseph, Loyda Espinoza) on January 11, 2024 that the shipment has been scheduled for the "leukapheresis product to go to UM on 18JAN2024," clearly indicating where the Cryoport shipper was expected to go.[378] Attached to this email was the shipping order confirmation, which also displayed the shipping destination in multiple locations for the pre-arranged shipping to UM from IMIC, shown in .

Therefore, based on my review of materials and analysis above, it is my opinion that Biorasi's training and procedures were adequate and did not contribute to the unblinding event.

Dr. Hausheer also holds several opinions related to his main opinion that Biorasi's inadequate training and inadequate procedures contributed to the unblinding event that I disagree with. Dr. Hausheer states in his report that there were "multiple layers of clinical operations for the ALZN002 trial in which Biorasi systematically failed to properly manage and maintain control" which include "Lack of Preparation for Potential Unblinding," "Communication Plan Adherence and Enforcement," "No Firewall Redaction or Other Safeguard Actions Taken," "Improper CRA

---

[373] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 25.

[374] BIO_120827 – 120829

[375] TMF12788

[376] According to the Global Specifications Plan, Alzamend owned the Study Protocol, and Biorasi and Alzamend owned the IP Manual. TMF10164 – 10186, see TMF10173 and TMF10176

[377] TMF0113 – 247, see TMF0115, TMF0119, TMF0138

[378] BIO_139049 - 139050



Instruction and authorization to IMIC," and "Aftermath Mismanagement and Study Continuation."[379] I rebut each of these points below.

### 5.3.1 Dr. Hausheer's opinion that there was a lack of preparation for potential unblinding (Dr. Friedrich and Dr. Iftikhar)

Dr. Hausheer holds the opinion that there was a lack of preparation for potential unblinding. In his report, Dr. Hausheer states "the key study specific governing documents such as the various management plans nor any procedures listed did *not* sufficiently identify this as a major foreseeable risk factor nor did they address what various parties must do in case of accidental unblinding, or how to prevent one beyond generic cautions."[380] I disagree. Once again, Dr. Hausheer appears fixated on the potential of a person to send an email as the major risk to unblinding in the Alzamend trial. Emailing the correct unblinded recipient is only one small piece of the overall blinding strategy for the study, as designed by Alzamend. Accordingly, literature and industry standards focus on the various methods and best practices for blinding patients and practitioners, and does not discuss methods of communication beyond the need for ensuring proper monitoring and conducting on-site visits.[381, 382, 383] Blinding procedures in the Alzamend trial included generation of a randomization code, shipping an empty box from IMIC to UM for the sham leukapheresis cohort (Lane 1), shipping an empty box from UM to FERG for the sham leukapheresis cohort's IP treatment (Lane 2), blinding the patient and staff to the treatment the subject received by covering the IV bag and tubes, as well as clear instructions from Biorasi regarding email addresses that are blinded or unblinded.[384, 385]

The instructions sent by Biorasi regarding communication expectations were straightforward: there was only one unblinded CRA to contact for unblinded communications, all others were blinded.[386] Unblinding is a risk that is generally well understood by clinical researchers and clinical research coordinators, and is not unique to Alzamend's protocol; all study staff were sufficiently trained in the importance of maintaining the study blind prior to the study, evidenced by their GCP certifications and experience in clinical research.[387] I therefore disagree with Dr. Hausheer that unblinding specifically by sending an email to the wrong address would need to be

---

[379] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 25-26.

[380] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 25.

[381] U.S. Food and Drug Administration. (2013). Guidance for Industry. Oversight of clinical investigations — A risk-based approach to monitoring.

[382] Monaghan, T.F.; Agudelo, C.W.; Rahman, S.N.;Wein, A.J.; Lazar, J.M.; Everaert, K.; Dmochowski, R.R. Blinding in Clinical Trials: Seeing the Big Picture. Medicina **2021**, 57, 647.

[383] Schulz, K.F.; Grimes, D.A. Blinding in randomised trials: hiding who got what. Lancet 2002, 359, 9307, 696-700

[384] BIO_138518 (IMIC Communications.pdf)

[385] BIO_000484 – 536, TMF0113 – 247

[386] BIO_138518

[387] TMF12788; BIO_120827 – 120829, TMF12747 – 12748; TMF12791; TMF12764 – 12769; TMF12780 – 12785



identified separately as a "major foreseeable risk factor" or that it would need additional specialized training.

Just as there are multiple facets to the blinding strategy, there were multiple controls in place to prevent unblinding. For example, the "preparation for potential unblinding" as Dr. Hausheer terms it, for the shipping procedures for IP shipments was to have only unblinded personnel involved in receiving of the Cryoport shippers to mitigate the risk of the wrong person opening the Cryoport and unblinding the study.[388] Additionally, pharmacy and site staff performing the leukapheresis or sham leukapheresis procedure were also unblinded and separated from the blinded site staff administering the IP treatment.[389]

In fact, the risk of unblinding the patients and/or investigators responsible for the evaluation of safety and efficacy would have a much greater potential to negatively impact the integrity of the data in comparison to unblinding of other study personnel, as was the case during the unblinding event.[390] The risks of unblinding the patients and investigators were controlled in various ways. According to the IP Manual, these risks were controlled by blinding the subject and any blinded study staff to the treatment the subject received by giving the subject a placebo treatment and covering the IV bag and tubes.[391] In addition, blinded study staff were protected from accidental unblinding by the shipping procedure, which involved shipments from the leukapheresis center to UM on leukapheresis study days and from UM to FERG on treatment days, regardless of the treatment group.[392]

Biorasi also had several SOPs to follow in the event of unplanned unblinding. For example, the Section 10.4.6 of the Biorasi SOP titled "Interim Monitoring Visit," states:[393]

> *If unblinding has occurred (accidental or intentional), determine if the unblinding was done by authorized personnel, after consultation with the relevant Study team member(s) (e.g. Medical Monitor or Sponsor) and that the occurrence and reporting was appropriately documented in source documents, the regulatory binder and CRF, as required.*

The Biorasi SOP titled "Management of Randomization codes in Clinical Trials," contains a flowchart to follow for unblinding events (Figure 5). Additionally, Section 10.1 "Generation and Handling of Randomization Code" and Section 10.5 "Premature Unblinding of Randomization

---

[388] BIO_000484 – 536, see BIO_000496, BIO_000501

[389] BIO_000484 – 536, see BIO_000496

[390] Bello S, Moustgaard H, Hróbjartsson A. Unreported formal assessment of unblinding occurred in 4 of 10 randomized clinical trials, unreported loss of blinding in 1 of 10 trials. J Clin Epidemiol. 2017 Jan;81:42-50.

[391] BIO_000484 – 536, see BIO_000505 – 509

[392] BIO_000484 – 536, see BIO_000517 – 518

[393] BIO_134250 – 134277, see BIO_134262 – 134263



code" in the Biorasi SOP titled "Management of Randomization codes in Clinical Trials," states:[394]

> *As unauthorized/unplanned access to randomization codes must be prevented to restrain the potential to introduce bias in blinded clinical trials, if premature unblinding occurs, obtain written explanation for any action that led to prematurely unblinding the randomization assignments, including those individuals who were unblinded, the date(s) of unblinding, and reason(s) for unblinding.*

and

> *Assessment of possible ramifications must be made with Biorasi Quality Assurance and the Project Director by filing a deviation in Biorasi Quality Management system as the GN-014 Deviation/Quality Incident Reporting SOP and follow up Corrective Actions and preventive actions until completion.*

and

> *Unblinding procedures shall either be as specified in the study protocol or study specific plan such as Unblinding Plan, which is controlled by Sponsor and/or Clinical operations.*

---

[394] BIO_135114 – 134131, see BIO_135122 – 35125





Figure 5       Biorasi Unblinding Procedures from Biorasi SOP Management of Randomization codes in Clinical Trials [395]

The Biorasi SOP titled "Site Management" states in Section 10.7:[396]

> *Check that procedure are implemented and followed to prevent Investigators and Monitors from seeing un-blinded reports (i.e. interim or final unblinded reports) sent to IRB/IEC (where applicable).*

Finally, the study protocol and the IP Manual also state, "Unblinding of the treatment assignment for any reason will be considered a protocol deviation except when conducted for the safety of a subject."[397, 398]

It is also important to note that Alzamend had a significant role in determining unblinding procedures. Per the March 15, 2023 weekly sponsor meeting minutes, Alzamend was assigned as the action item owner for providing unblinding procedures.[399] Biorasi conducted several meetings with their unblinded biostatistician internally and with Alzamend in October of 2023 regarding statistical anonymization of data.[400] Biorasi shared concerns during the October 26, 2023 weekly sponsor meeting that the data transfer and anonymization process could "lead to

---

[395] BIO_135114 – 134131, see BIO_135121

[396] BIO_134314 – 134326, see BIO_134324

[397] TMF1620 – 1702, see TMF1665

[398] BIO_000484 – 536, see BIO_000496

[399] TMF5459 – 5491

[400] TMF6500 – 6536; TMF8921 – 8966



inadvertent unblinding based on recent discussions/requests from the Alzamend team and cause significant risk to the study integrity."[401] A decision was made to implement an anonymized participant number early in all documentation to prevent unblinding, schedule a separate call to review and implement the process promptly, and have the Biorasi unblinded biostatistician join weekly sponsor calls.[402, 403] Documentation from the weekly sponsor meeting on November 2, 2023 shows that Alzamend requested assistance documenting an Unintentional Unblinding Plan.[404] However, manual and guideline updates were deemed out of scope at this time under the current contract, as Biorasi was limited to the original scope pending Alzamend's approval of the Change Order.[405] Therefore, Biorasi was actively involved in identifying, planning for and mitigating the risk of unintentional unblinding to the extent the approved WO allowed.

Based on my review of the materials and analysis above, it is my opinion that 1) Alzamend designed blinding procedures in the study protocol and related protocol materials and 2) the Biorasi SOPs sufficiently document a variety of measures taken to blind the study and to maintain that blind, and response to unintentional unblinding. As described in greater detail in Section 5.3.5, Biorasi followed their SOPs when the unblinding event occurred. Therefore, Dr. Hausheer's opinion that there was a lack of preparation for potential unblinding for the Alzamend study is not supported and cannot be relied upon within a reasonable degree of scientific certainty.

### 5.3.2  Dr. Hausheer's opinion on communication plan adherence and enforcement (Dr. Iftikhar and Dr. Friedrich)

Dr. Hausheer holds the opinion that the Communication Plan had "general escalation concepts" but "insufficient technical safeguards."[406] As discussed in Section 5.2.1, the Communication Plan, reviewed and approved by Alzamend,[407, 408] was intended to "to provide an overall framework for the communications throughout the study" and includes multiple Appendices with templates for carrying out specific communications planning activities.[409] For example, Appendix I: Contact Details, includes a table with columns for Team Member, Title, Role, and most importantly, if the contact is blinded or unblinded.[410] As previously stated in Section 5.2.1, it is my opinion that the trial plans, including the Communication Plan, were adequate.

---

[401] TMF8921 – 8966

[402] TMF8921 – 8966

[403] TMF8133 – 8179

[404] TMF8133 – 8179

[405] TMF5984 – 6021

[406] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, pp. 25-26.

[407] It is my understanding the Rio Pharmaceuticals provided approvals on behalf of Alzamend.

[408] BIO_002933 – 2979, see BIO_002942

[409] TMF9775 – 9811, see TMF9780, TMF9804 – 9806

[410] TMF9775 – 9811, see TMF9804



Dr. Hausheer also states in his report that industry practice would be to have an unblinded CRO internally filter communications, such that "when an unblinded study person calls or emails him with a query, he knows the answer and responds, or promptly finds the answer from an appropriate person and responds directly back to the query."[411] This is exactly how Biorasi set up communications for this trial. There was one unblinded CRA responsible for fielding unblinded questions, and this is who was contacted by the IMIC coordinator.[412, 413] There is no evidence to support that the unblinded CRA did not know the answer or how to find the answer, and as discussed further in Section 5.3.4, there are various reasons why someone would request for a conversation to be put into an email, including for documentation or clarification. In replying to the IMIC coordinators email, the unblinded Biorasi CRA provided the correct information and the flowchart from the IP Manual (Figure 6). Again, Dr. Hausheer relies on unverified information regarding a phone call he was not party to.



Figure 6.        Flowchart sent by Biorasi CRA to IMIC coordinator on January 18, 2024.[414]

Therefore, based on my review of the materials and analysis above, it is my opinion that Biorasi had a system in place for unblinded communications. However, human error led to a mistake that resulted in unblinding. Dr. Hausheer's opinion relied on speculative information and cannot be relied upon within a reasonable degree of scientific certainty.

---

[411] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 26.

[412] BIO_138518

[413] BIO_181659 – 181660 (IMIC Communications.pdf)

[414] BIO_181659 – 181660, see BIO_181659 (IMIC Communications.pdf)



### 5.3.3  Dr. Hausheer's opinion of there being no firewall redaction or other safeguard actions taken (Dr. Iftikhar)

Dr. Hausheer holds the opinion that it is "industry standard practice to have some type of access and control system in email that will not allow an unblinded person to send emails to a blinded person."[415] I disagree that it is industry practice to have an email control system that blocks study personnel and this claim is factually unsupported and inconsistent with governing regulatory guidance and widely accepted clinical trial operations. In my experience working with a variety of Sponsors and CROs, it is not standard practice to implement an email control system as Dr. Hausheer describes. If there is such a system – it does not seem to be commonly validated and there is no explicit regulatory requirement under applicable FDA regulations nor within ICH E6 guidelines (See Section 2.2) that mandates the implementation of technical email system restrictions to prevent communication between blinded and unblinded personnel.[416, 417]

Instead, industry standards indicate to adopt a risk-based and systems-oriented framework that affords flexibility in how operational risks are managed.[418] Trial integrity is protected through procedural controls, delegation of roles and responsibilities, and oversight and training. Blinding protection is typically achieved through defined separation of blinded and unblinded roles, SOPs governing unblinding procedures, as well as monitoring and quality oversight.[419] There is evidence that Biorasi did implement such safeguards according to their SOPs for communications in this specific trial (further discussed in Section 5.3.1.).[420, 421, 422] For example, Biorasi designated only one unblinded CRA to field questions, as discussed above in Section 5.3.2. Additionally, Biorasi requested that certain information in the trial be faxed instead of emailed to reduce the possibility of unblinding events occurring via emails to the wrong recipients.[423]

Weekly Project Team Meeting Minutes from August 17, 2023 indicate that Alzamend requested to be copied on all communications:[424]

---

[415] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 26.

[416] International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (ICH). 2018. "Integrated Addendum to ICH E6(R1): Guideline for Good Clinical Practice E6(R2)"

[417] U.S. Food and Drug Administration. (2013). Guidance for Industry. Oversight of clinical investigations — A risk-based approach to monitoring.

[418] International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (ICH). 2018. "Integrated Addendum to ICH E6(R1): Guideline for Good Clinical Practice E6(R2)" Section 5.0

[419] International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (ICH). 2018. "Integrated Addendum to ICH E6(R1): Guideline for Good Clinical Practice E6(R2)" Section 4.7 and Section 5.13

[420] BIO_134250 – 134277, see BIO_134262 – 134263

[421] BIO_134314 – 134326, see BIO_134324

[422] BIO_135114 – 135131, see BIO_135122 – 135125

[423] BIO_376523 – 376526, (IMIC Communications.pdf) see BIO_376524

[424] TMF8538 – 8586, see TMF8579



*Stephan advises the Biorasi team to have the ALZ team copied on all communications from the site. This is especially pertinent for all patient results received for the first two sentinel patients moving forward.*

Additionally, FERG (Site 1) had "expressed concerns and stress over having multiple calls and emails from various members of the team."[425] The email distribution lists included personnel from both Alzamend and Biorasi.[426] The purpose of these email distribution lists was to streamline study-related correspondence and "consolidate requests made to the sites from data management, vendors, and the Alzamend team in order to minimize duplicate requests, have a proper flow of communication from all stakeholders."[427] Importantly, these lists were blinded.

Biorasi navigated Alzamend's request for distribution lists when presenting a structured communication plan with defined timelines and issued clear instructions distinguishing blinded from unblinded communications.[428, 429] The purpose of the email distribution lists were also communicated to the study team in an email stating "For communication regarding subjects in the study or subjects in screening" and that "all questions should be directed to the ALZN002-01_clinical@biorasi.com email address."[430] During subsequent meetings, Biorasi continued to reinforce the separation of blinded and unblinded functions, discussing backup monitor assignments for both roles.[431]

Dr. Hausheer's theoretical wish for a "firewall redaction or safeguard action"[432] does not necessarily translate to common practice among Sponsors and CROs, especially for a trial with so many sites and vendors. However, Biorasi did have safeguards in place to prevent accidental unblinding. Based on my experience working for and with CRO's and on my review of the materials and analysis above, it is my opinion that it is not "industry standard practice" to have the type of email access and control system described by Dr. Hausheer. Therefore, Dr. Hausheer's opinion that it is industry practice to have some type of access and control system in email cannot be relied upon to a reasonable degree of scientific certainty.

### 5.3.4  Dr. Hausheer's opinion on improper CRA instruction authorization to IMIC (Dr. Friedrich)

Dr. Hausheer holds the opinion that there was improper CRA instruction and authorization to IMIC. In his report, Dr. Hausheer states, "The Biorasi CRA should not have instructed that the

---

[425] TMF8833 – TMF8844, see TMF8838

[426] TMF7220 – 7263, see TMF7239

[427] TMF8833 – TMF8844, see TMF8838

[428] TMF9523 – 9524

[429] BIO_138518 (IMIC Communications.pdf)

[430] BIO_138518 (IMIC Communications.pdf)

[431] TMF9240 – 9277, see TMF9264

[432] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 26.



IMIC site coordinator send an email, particularly where insufficient safeguards to prevent unblinding risk via email" or "delegate that accountability back to the site in a manner that risks protocol violations."[433] Dr. Hausheer is making an assumption about what was said on a phone call that he was not party to. Per the Biorasi email instructions, the Biorasi CRA was the correct and only person for the IMIC coordinator to reach out to.[434] If the Biorasi CRA did in fact request that IMIC coordinator email him during a phone call, there are a number of reasonable motivations for doing so. Just as Dr. Hausheer believes that, theoretically, the Biorasi CRA instructed the IMIC coordinator to email him because he didn't know the answer, on the contrary, he could have instructed the email because he could not understand her question due to poor connection, incoherent communication, or because he wanted a written record of their conversation as documentation. Finally, the Biorasi CRA did know the answer or where to find the answer as he responded to her email within minutes with the correct instructions (see Figure 6 above).[435, 436, 437]

Based on my review of the materials and analysis above, there is no evidence that the Biorasi CRA improperly instructed the IMIC coordinator. Therefore, Dr. Hausheer's opinion that an email was instructed because of Biorasi not knowing the answer to the IMIC coordinator's question is speculative and cannot be relied upon within a reasonable degree of scientific certainty.

### 5.3.5  Dr. Hausheer's opinion of aftermath mismanagement and study continuation (Dr. Friedrich and Dr. Iftikhar)

Dr. Hausheer has an opinion about the "aftermath mismanagement and study continuation," where he provides a long list of the appropriate actions that should have been taken, including "to immediately notify the sponsor and IRB."[438] I agree with the actions listed by Dr. Hausheer, as apparently Biorasi did too, because that is what they did. Biorasi immediately informed the IRB with preliminary information, receiving IRB confirmation of receipt at 3:41 PM on January 18, 2023:[439]

> ***Event Description (if applicable)****: Unintentional unblinding occurred when an email was sent from the leukapheresis vendor to a group email that contained blinded staff. This email address was noted to be blinded staff and not to be used for unblinded information. Currently enrolled in the study are the sentinel subjects 1003 and 1005. Because this is a 1:1 randomization for these subjects, by*

---

[433] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 26.

[434] BIO_138518 (IMIC Communications.pdf)

[435] Declaration of Juan Duany Santos, dated February 18, 2026.

[436] Deposition of Juan Duany-Santos, taken February 16, 2026, p.136:19 – 23.

[437] BIO_181659 – 181660 (IMIC Communications.pdf), see BIO_181659

[438] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 26.

[439] TMF2812 – 2813



*unblinding the one subject, both subjects assignments are now known by the clinical team. Subject 1003 is scheduled for dosing on 22JAN2024 and Subject 1005 has the leukapheresis/sham procedure performed today, 18JAN2024.*

Biorasi next informed the Sponsor. On January 18, 2023, 5:41 PM, Biorasi (Mary, Head of Quality) emailed Alzamend to say:[440]

*As required per protocol and under GCP, we have reported the unintentional unblinding to the central IRB. We provided the IRB with the preliminary information, and we will update them on our ongoing investigation. We strongly recommend that you notify the FDA.*

As opposed to mismanagement, Biorasi's course of action indicates their understanding of regulatory requirements. In this email exchange, Biorasi noted that a next step may be to delay the treatment scheduled for the following Monday.[441] Alzamend disagreed with Biorasi's suggestion and stated that postposing the dosing may not be necessary because "it appears that the medical/safety personnel and/or the clinical trial site (FERG) were not unblinded."[442] However, Alzamend's own study protocol states, "Subjects for whom the treatment assignment is unblinded will be prematurely withdrawn from the study but may continue to be monitored for safety and efficacy" and does not provide any exceptions or provisions for the unblinding referring to the previously blinded subject, Sponsor, Principal Investigator, or the study staff.[443] This is additionally in agreement with ICH E6(R2) which states that "investigator should not implement any deviation from, or changes of the protocol without agreement by the sponsor and prior review and documented approval/favourable opinion from the IRB/IEC of an amendment…"[444] Therefore, the conservative approach for Biorasi to take was to pause the study to determine a path forward and not continue with the scheduled treatment.

Biorasi then met with the Sponsor the following day to discuss the course of action. Biorasi followed up after the meeting with a comprehensive list of actions in progress or planned:[445]

*To summarize next steps:*

*1. Nancy to contact the Study Coordinator, Milka Vina at First Excellence Research Group, to request they postpone the patient dosing that is scheduled for Monday, 22 Jan. All agreed that there should be no other contacts with the site except for Nancy at this time.*

---

[440] BIO_140486 – 140488

[441] BIO_140486 – 140488

[442] BIO_140486 – 140488

[443] TMF1620 – 1702, see TMF1665

[444] International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (ICH). 2018. "Integrated Addendum to ICH E6(R1): Guideline for Good Clinical Practice E6(R2)" Section 4.5.2

[445] BIO_090475 - 90476



*2. Nancy will inform Milka of the unintentional unblinding that is being investigated, Alzamend is preparing a protocol waiver to submit to the IRB, and we will keep her updated.*

*3. Nancy taking actions to change the Biorasi team members that were unblinded.*

*4. Nancy/Mary to draft a narrative to describe how the unintentional unblinding occurred.*

*5. Don/Eve to describe what actions they took related to the email.*

*6. Don to draft their request for a protocol waiver to submit to Advarra IRB.*

*7. Mary/Nancy will consolidate the draft protocol waiver for submission to the IRB for all to review.*

*8. Alzamend is considering if Don and Eve need to recuse themselves from the first two patients to avoid any risk or perception of risk.*

*9. Alzamend and Biorasi will reconvene at 5:30 (scheduled by Mary).*

*10. Kraig to send the response from Alzamend to the 14 December 2023 email from Mary asking them to confirm it was ok to continue with first dose while the protocol amendment was underway.*

The proper course of action initiated by Biorasi is therefore well-documented. It is unclear what Dr. Hausheer is referring to in his report where he summarizes that, "miscommunications and mismanagement adversely impacted one of the most fundamental obligations in a blinded trial."[446] He further states that "There is also no operative rationale to make unverified statements about potential missing or mixed-up samples, defective drug product risk or misidentification of drug product."[447] I agree with this statement, and there is currently no evidence that I am aware of that supports Dr. Hausheer's interpretation of events that this occurred as he describes.

Finally, Dr. Hausheer states in his report that "It was conceivable to treat the unblinding of the first two as an isolated incident, implement fixes (re-training, maybe separating roles more strictly), and move on with the trial."[448]

Based on my review of the materials and analysis above, the course of action proposed and taken by Biorasi supports that the trial could have continued. This is supported by the IRB Notification of Approval to Continue Study received on February 22, 2024 following Biorasi's submission of

---

[446] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 27.

[447] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 26.

[448] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 27.



preliminary information on the unblinding event to the IRB.[449] This is also in agreement with Dr. Hausheer's proposed proper course of action described in his report. Therefore, Dr. Hausheer's opinion that Biorasi mismanaged the "aftermath" causing the discontinuation of the trial cannot be relied upon within a reasonable degree of scientific certainty.

## 5.4  Dr. Hausheer's opinion of mishandling of site inquiries and protocol deviations

Dr. Hausheer has several opinions related to alleged mishandling of site inquiries and protocol deviations that I disagree with. I address each one below.

### 5.4.1  Dr. Hausheer's opinion that there was no timely escalation to the Sponsor. (Dr. Iftikhar)

Dr. Hausheer holds the opinion that there was no timely escalation disclosure to the Sponsor. In his report he states, "If Biorasi did not provide prompt written notice to Alzamend of concerns regarding missing, lost or defective drug product, despite MSA Section 2.8(b) obligating them to do so, this would have deprived the sponsor of any opportunity to assist in managing the issue and safeguarding the trial."[450] While I agree with his recitation of MSA Section 2.8(b), I disagree with his opinion. First, it is unclear what "missing, lost, or defective drug product" Dr. Hausheer is referring to, as he provides no citation for this supposed fact and phrases his opinion as another hypothetical situation. More importantly, email correspondence on January 18, 2023, between Biorasi and Alzamend demonstrated that escalation of the unblinding event occurred promptly, within hours.[451]

Based on the information I reviewed, there was timely escalation of the unblinding event to Alzamend. Therefore, Dr. Hausheer's statement is factually incorrect, and his opinion on there not being timely escalation to the sponsor cannot be relied upon within a reasonable degree of scientific certainty.

### 5.4.2  Dr. Hausheer's opinion that there was a failure to investigate and verify facts. (Dr. Friedrich)

Dr. Hausheer holds the opinion that Biorasi failed to investigate and verify the facts surrounding the unblinding event and "acted outside the bounds of recognized regulatory and industry standards when raising breach of protocol concerns to the Principal Investigator."[452] I disagree. First, Dr. Hausheer then states in his report, "While Biorasi investigated the issue, they should

---

[449] TMF2814 – 2815

[450] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 27.

[451] BIO_140486 – 140488, see BIO_140488

[452] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, pp. 19 and 27.



have been careful not to alarm the PI," contradicting his opinion that they did not investigate the issue. Dr. Hausheer then refers to "the CRO's alarming communications" and "inflammatory statements" between Biorasi and the FERG PI that caused "PI/site withdrawal and termination of the study."[453] This is again information that Dr. Hausheer assumes to be true, as there is no recording or other evidence of this phone call between the FERG PI and Biorasi.

Biorasi was required to inform FERG about the unblinding event according to the WO. For example, the WO states Biorasi is responsible to collect "essential regulatory documents, commitments, and information from the investigators", to "Provide and maintain information for investigators needed to conduct the investigation properly" and "Inform participating investigators of new observations discovered/reported regarding adverse effects and safe use for the investigational product" and to "Assist sites with Central IRB submissions."[454] Biorasi was also required to inform the FERG PI of the unblinding event, because the IP Manual categorizes unblinding as "a protocol deviation except when conducted for the safety of a subject,"[455] and the protocol further states "Subjects for whom the treatment assignment is unblinded will be prematurely withdrawn from the study."[456] The protocol waiver appropriately disclosed the sequence of events related to the accidental unblinding, who was unblinded, the immediate actions taken to mitigate the risk, and remedial actions. The language was not inflammatory and followed the steps outlined in the Biorasi summary provided to Alzamend after their January 19, 2024 teleconference. The Protocol Deviation Summary, Waiver Request and Remedial Actions section of the waiver included the following summary describing the events and that there was the potential for there to be no impact to the study:[457]

> *An e-mail with limited distribution erroneously unblinded some Biorasi (CRO) study personnel for 2 sentinel subjects in study ALZN002-0 I. Unblinding of Alzamend team members, although included in the email distribution, was mitigated successfully. The Principal Investigator, site study personnel and study subjects were not unblinded. No impact on the safety and tolerability of subjects to study treatments can be anticipated. No impact on the integrity of essential objective data collected can be expected. Actions taken can also be expected to avoid compromise of subjective (efficacy) data.*

The Adjudication of Potential Risks to Study Integrity section of the waiver further summarized that:[458]

---

[453] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, pp. 27 – 28.

[454] BIO_002933 – 2979, see BIO_002951 and BIO_002971

[455] BIO_000484 – 536, see BIO_000496

[456] TMF1620 – 1702, see TMF1665

[457] BN 000285 – 289, see BN 000288

[458] BN 000285 – 289, see BN 000287



> *The study team is confident that the discovered and partially remedied unblinding events described here can be expected to result in <u>no</u> unblinding of patients or study site personnel, and that there is no need for changes in study procedures, other than planned protections from future unblinding via personnel changes. It is further concluded that there are no incremental safety or tolerability risks to subjects.*

The Waiver Request section of the waiver noted:[459]

> *Based on the overall circumstances and facts, the principal investigator and study team request a protocol waiver to allow the study to continue and proceed with the planned dosing of the 2 sentinel subjects.*

Finally, the Remedial Action section of the waiver indicated all steps that have been taken or that would be taken to preserve the study and avoid future failures:[460]

> *Biorasi staff who were unblinded as a result of reading the email are being replaced; the Medical Monitor already was replaced on 19 Jan 2024 and the site notified of the change.*
>
> *A Root Cause Analysis will be implemented to determine causality of the unintentional unblinding of team members, to assess the systems around those problems, and to identify key points of failure. Finally, solutions will be identified to avoid future failures.*
>
> *In the current situation, the cause was a communication failure (human error) by an apheresis staff member. This will be addressed expeditiously via focused training, including supporting written guidance documents. The involved (required to be unblinded) administrative apheresis staff member was excluded from further participation in the study, with assignment of an alternative, qualified and unblinded staff member, who will be extensively trained regarding study requirements, including blinding conventions.*

Therefore, the language in the Waiver Request indicates that not only did an investigation occur, but also that the conclusions were in line with human error leading to an unblinding event and not missing IP. Importantly, the communication to the FERG PI, by way of the waiver request, was appropriate and in line with both the WO and regulatory requirements. Again, the Waiver Request was presented to the FERG PI for review and approval to move forward with the study.

Further, in criticizing Biorasi for being in communication with the FERG PI, Dr. Hausheer also fails to recognize the full sequence of events. The unblinding incident occurred on January 18,

---

[459] BN 000285 – 289, see BN 000288

[460] BN 000285 – 289, see BN 000288



2024, which was a Thursday. The investigation of this event and planning of next steps, including planning for the protocol waiver, occurred the following day, a Friday. Concurrently, FERG was preparing for the IP treatment of the other study subject the following Monday. This required the shipment of the empty Cryoport shipper from Cryoport to UM, scheduled to arrive on January 17, 2024, and then from UM to FERG with the IP, scheduled to arrive on January 18, 2024.[461] FERG contacted Alzamend, "to inquire what's going on with this Cryoport delivery since they are only there until 3 PM today," according to Kraig Roajphlastien in an email sent at 12:53 PM because "everyone at Biorasi seems to be in meetings."[462] The shipment was ultimately delayed by one full business day due to late shipping further compounded by weather conditions, which was communicated to Alzamend and FERG on January 18, 2024 following Kraig Roajphlastien's email; this delay required further coordination of delivery.[463, 464] In addition to the IP shipment delay issue, on January 19, 2024, FERG also received invoices from Biorasi with edits from the Biorasi PM based on the approved budgets.[465, 466] The FERG coordinator disagreed with the requested edits in the invoice because the Sponsor had directed FERG to perform tasks not yet in an approved budget. The FERG coordinator then stated:[467]

> *Good Morning*
>
> *Please be advised that both the vein assessment and Leukapheresis Stipend were approved by the sponsor. Ugur kindly check your emails as you were part of all the back and forth with Barbara Valdes on the details.*
>
> *If things are different today as it seems to be with everything else in this trial, please advise so I can put a halt to dosing visit 12 scheduled for Monday 22Jan2024 until this issue is resolved.*
>
> *Thank You*

Taken together, it is evident that there were multiple concurrent events that would have reasonably put Biorasi in contact with FERG in the days surrounding the unblinding event.

Without knowing precisely what was communicated over the phone, it is equally reasonable to assume that the late shipment of IP was conflated by FERG themselves as being related to the need to delay treatment and meant that the IP was unaccounted for. Based on the details of the shipping delay, the IP heading to FERG was never unaccounted for.

---

[461] TMF2529 – 2537, see TMF2531 – 2533

[462] BIO_143778 – 143786, see BIO_143781

[463] TMF2529 – 2537, see TMF2531 – 2533

[464] BIO_143778 - 143786, see BIO_143778 - 14380

[465] BIO_150648 – 150655

[466] FERG000228 – 573, see FERG0000476 – 479

[467] BIO_150648 – 150655, see BIO_150648



Based on my review of the materials and analysis above, communication between Biorasi and FERG on January 18-19, 2024 was necessary and the decision to postpone the scheduled treatment on Monday needed to occur rapidly. Dr. Hausheer provides no evidence that this communication occurred between Biorasi and the FERG PI. Furthermore, there is evidence that it did not occur at all, according to a signed declaration from Nancy Newark.[468] Therefore, Dr. Hausheer's opinions based on specifics of those phone conversations cannot be relied upon within a reasonable degree of scientific certainty.

### 5.4.3  Dr. Hausheer's opinion that Biorasi failed to properly disclose its actions to sponsor. (Dr. Friedrich)

Dr. Hausheer holds the opinion that Biorasi failed to properly disclose their actions to the Sponsor. In his report, he states only that, "**To the extent that** Biorasi's management did not inform Alzamend of its communications to the Principal Investigator or site of missing, lost, mixed up or mislabeled study drug product, this would be a gross deviation (these are all major protocol deviations **if they occurred**) from industry standards expected of a CRO."[469] [emphasis added] Dr. Hausheer is again providing only hypothetical situations and no other support. The shipping information for the IP does not indicate that the IP was lost at any time.[470, 471]

Based on my review of the materials and analysis above, there is no evidence that there was any "missing, lost, mixed up or mislabeled study drug product" for Biorasi to report to the Sponsor, as the shipping of IP was appropriately tracked. Therefore, Dr. Hausheer's opinion on what Biorasi communicated to the Principal Investigator about missing IP, and then what Biorasi reported back to Alzamend regarding that hypothetical communication, cannot be relied upon within any reasonable degree of scientific certainty.

## 5.5  Dr. Hausheer's opinion the ALZN002-01 trial could have resumed had Biorasi acted in accordance with industry standards (Dr. Friedrich and Dr. Iftikhar)

Dr. Hausheer holds the opinion that the ALZN002-01 trial could have resumed had Biorasi acted in accordance with industry standards. I agree that the trial could have continued. I disagree that Biorasi's actions were not in accordance with industry standards or that Biorasi's actions prevented the trial from resuming. In his report, Dr. Hausheer opines that "Biorasi's course of misconduct combined with its systemic failures in GCP standards led to an unfortunate premature and unwarranted cessation" of the trial but fails to specify what specific part of the

---

[468] Declaration of Nancy Newark, dated February 18, 2026.

[469] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 28.

[470] TMF2529 – 2537, see TMF2531 – 2533

[471] BIO_143778 – 143786, see BIO_143778 – 14380



standard he is referring to.[472] Dr. Hausheer also states "A competent CRO acts as a problem-solving stabilizing force during incidents"[473] but fails to recognize the steps Biorasi took once a problem was identified during the study.

As described in Section 5.3.5, Biorasi documented the appropriate course of action to take following the unblinding event that would have allowed the trial to continue.[474, 475] This course of action was indeed in line with industry standards and practices. In accordance with ICH E6 (R2), the investigator is responsible for promptly documenting and explaining any premature unblinding of the investigational product to the sponsor.[476] This can include the preparation of written reports to the sponsor, the IRB, and institution, if applicable, that reflect any deviations or changes that may significantly affect trial conduct or risk to subjects.[477] Accordingly, Biorasi did immediately submit preliminary information to the IRB on the unblinding event[478] and indicated they would provide Alzamend a report ("draft a narrative to describe how the unintentional unblinding occurred"[479]) and assist with the protocol waiver,[480] which Biorasi was also prepared to submit to the IRB once signed by Dr. Carballosa.[481] Biorasi also promptly notified the sponsor, providing detailed updates on implemented measures, and outlining the next steps, including the recommendation for the sponsor to report this to the FDA.[482, 483] This demonstrates that Biorasi followed established procedures and understood the appropriate response in such scenarios, consistent with ICH E6(R2) guidance on unblinding and trial oversight.[484, 485]

Based on my review of the materials and analysis above and in Section 5.3.5, it is my opinion that Biorasi followed industry standards and practices in their proposed course of action after the unblinding event. Therefore, Dr. Hausheer's opinion that Biorasi did not act in accordance with industry standards cannot be relied upon with a reasonable degree of scientific certainty.

---

[472] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 28.

[473] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 28.

[474] BIO_090475 - 90476

[475] FERG0000050 - 227, see FERG0000130

[476] International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (ICH). 2018. "Integrated Addendum to ICH E6(R1): Guideline for Good Clinical Practice E6(R2)" Section 4.7

[477] International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (ICH). 2018. "Integrated Addendum to ICH E6(R1): Guideline for Good Clinical Practice E6(R2)" Section 4.10.2

[478] TMF2812 - 2813

[479] BIO_090475 – 90476

[480] FERG0000050 – 227, see FERG0000104 – 111

[481] FERG0000050 - 227, see FERG0000130

[482] BIO_140486 - 140488, see BIO_140488

[483] BIO_090475 - 90476

[484] International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (ICH). 2018. "Integrated Addendum to ICH E6(R1): Guideline for Good Clinical Practice E6(R2)" Section 4.7

[485] International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (ICH). 2018. "Integrated Addendum to ICH E6(R1): Guideline for Good Clinical Practice E6(R2)" Section 5.5



The email from Biorasi to Alzamend on January 19, 2024, summarizing the planned and in-progress steps to recover the study also demonstrated Biorasi's willingness to problem solve:[486]

> *To summarize next steps:*
>
> *1. Nancy to contact the Study Coordinator, Milka Vina at First Excellence Research Group, to request they postpone the patient dosing that is scheduled for Monday, 22 Jan. All agreed that there should be no other contacts with the site except for Nancy at this time.*
>
> *2. Nancy will inform Milka of the unintentional unblinding that is being investigated, Alzamend is preparing a protocol waiver to submit to the IRB, and we will keep her updated.*
>
> *3. Nancy taking actions to change the Biorasi team members that were unblinded.*
>
> *4. Nancy/Mary to draft a narrative to describe how the unintentional unblinding occurred.*
>
> *5. Don/Eve to describe what actions they took related to the email.*
>
> *6. Don to draft their request for a protocol waiver to submit to Advarra IRB.*
>
> *7. Mary/Nancy will consolidate the draft protocol waiver for submission to the IRB for all to review.*
>
> *8. Alzamend is considering if Don and Eve need to recuse themselves from the first two patients to avoid any risk or perception of risk.*
>
> *9. Alzamend and Biorasi will reconvene at 5:30 (scheduled by Mary).*
>
> *10. Kraig to send the response from Alzamend to the 14 December 2023 email from Mary asking them to confirm it was ok to continue with first dose while the protocol amendment was underway.*

Approval of the protocol waiver by the principal investigator was required and if granted, the trial would have been able to proceed. Importantly, Biorasi was not responsible for Dr. Carballosa's decision to either sign the protocol waiver or withdraw from the study. The PI's decision to decline approval of the protocol waiver, despite the clear mitigation of risk provided in the actions taken and remedial actions to be taken, highlights the influence the PI has over continuation of a clinical trial due to their responsibility for the conduct of the trial at their site.[487] In a recorded interview between the Linical auditor and the FERG coordinator, the FERG coordinator stated the reason for Dr. Carballosa withdrawing from the study was related to fears

---

[486] BIO_090475 - 90476

[487] International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (ICH). 2016. "Integrated Addendum to ICH E6(R1): Guideline for Good Clinical Practice E6(R2)" Section 4



that a mistake made at IMIC would negatively impact Dr. Carballosa, including the potential risk to his medical license.[488] She specifically said, "they make a mistake and we have to pay for it" and it was this FERG coordinator that suggested that continuing with the study would put Dr. Carballosa's medical license at risk.[489]

The Linical audit audio recording of the FERG coordinators interview is in alignment with months of email communications between FERG, Biorasi, and the Sponsor that document FERG's related to potential changes to the treatment schedule due to the late IP shipment, and disagreements about invoicing (see Section 5.4.2).[490, 491, 492, 493] The FERG coordinator appears to be frustrated in her email communication to Biorasi on January 19, 2024, when she stated:[494]

> *If things are different today as it seems to be with everything else in this trial, please advise so I can put a halt to dosing visit 12 scheduled for Monday 22Jan2024 until this issue is resolved.*

Multiple vendor updates or changes from August 2023 through October 2023 resulted in updates to site-level documents and the site budget for FERG.[495] Alzamend's pending review of Change Order #1, in their possession since August 25, 2023,[496] and which persisted through January 2024,[497] limited their study contributions, as many study tasks were deemed out of scope under the original contract.[498] The new Change Order was to include pricing for out-of-scope work for updates to study documents including the IP and Leukapheresis Manual resulting from the revised protocol.[499] Additionally, during Biorasi's internal meeting on November 7, 2023, legal informed the team they sent a letter to Alzamend placing all Biorasi work on immediate hold "until resolution to the invoices/late payments are received by Biorasi",[500] which by Biorasi's internal meeting on December 5, 2023, included "the First Subject Enrolled Milestone and other past due invoices".[501] Alzamend's delinquency in fulfilling these invoices delayed study activities in November and early December 2023. Additionally, protocol deviation waivers and a revised waiver were submitted between October and December to use historical PET scans for eligibility, screening, and baseline for several subjects to avoid further delays from imaging

---

[488] LINICAL_000916, see 00:07:54 – 00:08:07

[489] LINICAL_000916, see 00:04:02 – 00:04:11, 00:07:54 – 00:08:07

[490] TMF2529 – 2537, see TMF2531 – 2533

[491] BIO_143778 – 143786

[492] BIO_150648 – 150655

[493] FERG0000227 – 573, see FERG0000476-479

[494] BIO_150648 – 150655, see BIO_150648

[495] TMF9182 – 9228, see TMF9188

[496] TMF5091 – 5130, see TMF5100

[497] TMF6500 – 6536, see TMF6500 and TMF6514

[498] TMF5984 – 6021, see TMF6000 and TMF6003 – 6004

[499] TMF9182 – 9228, see TMF9222

[500] TMF7455 – 7495, see TMF7492

[501] TMF7364 – 7404, see TMF7401



vendor issues.[502, 503] Biorasi scheduled a call with FERG and Alzamend on January 12, 2024, to discuss these deviations and the role of the new imaging vendor.[504] The above events are indicative of the various changes to the trial due to Alzamend's actions that the FERG coordinator may have been referring to her in January 19, 2024 email.

Interestingly, according to the Linical audit audio recording, the FERG coordinator mentions that she had worked with Biorasi before on an Alzheimer's study, notes how there were no issues with this trial and indicates the Sponsor was not closely involved.[505] I confirmed this study was a clinical trial for an Alzheimer's Disease treatment titled "Lomecel-B Effects on Alzheimer's Disease" and included FERG and IMIC.[506]

Dr. Hausheer ultimately believes that "Alzamend was left with no viable path to continue the trial after the Principal Investigator and his site's withdrawal from the study."[507] He further states in his report that "Biorasi's course of misconduct combined with its systemic failures in GCP standards led to an unfortunate premature and unwarranted cessation…," placing the blame on Biorasi for Alzamend not having a viable path forward.[508] In his report he treats TORO as a blanket mechanism for assigning fault to Biorasi for any aspect of the trial that did not proceed as planned, and fails to acknowledge the evidence described throughout this report of Biorasi following industry and regulatory standards in its management of the clinical trial, and in their duties assigned in the TORO. Dr. Hausheer also fails to acknowledge that the ultimate responsibility for trial quality and data integrity remains with the sponsor, even when certain functions are delegated to a CRO, including some or all regulatory obligations under a TORO.[509] Based on my review, the record does not support Dr. Hausheer's opinion that the ALZN002-01 trial could have resumed had Biorasi acted in accordance with industry standards.

---

[502] TMF8655 – 8701, see 8672

[503] TMF9182 – 9228, see 9199

[504] TMF6543 – 6588, see TMF6584

[505] LINICAL000916, timestamp: 00:24:06 – 00:26:08

[506] Study Details | NCT05233774 | Lomecel-B Effects on Alzheimer's Disease | ClinicalTrials.gov, https://clinicaltrials.gov/study/NCT05233774?cond=Alzheimer%27s%20Disease%20OR%20Neurodegenerative%20Diseases%20OR%20Parkinson%20Disease&spons=bioRASI,%20LLC&rank=2#collaborators-and-investigators, last accessed February 10, 2026.

[507] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 19.

[508] Expert Report of Frederick Hausheer, M.D., dated February 4, 2026, p. 28.

[509] International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (ICH). 2018. "Integrated Addendum to ICH E6(R1): Guideline for Good Clinical Practice E6(R2)" Section 5.2



# 6  Literature and References

21 CFR §11 – Electronic Records; Electronic Signatures.

21 CFR §50 – Protection of Human Subjects.

21 CFR §54 – Financial Disclosure by Clinical Investigators.

21 CFR §56 – Institutional Review Boards (IRBs).

21 CFR §312 – Investigational New Drug Application

21 CFR §312.50 – General Responsibilities of Sponsors

21 CFR §312.53 – Selecting Investigators and Monitors

21 CFR §312.55 – Informing Investigators.

21 CFR §312.56 – Review of Ongoing Investigations.

21 CFR §312.3 – Definitions and interpretations.

21 CFR §312.57 – Recordkeeping and Record Retention.

83 FR 8882, March 1, 2018, https://www.federalregister.gov/documents/2018/03/01/2018-04154/e6r2-good-clinical-practice-integrated-addendum-to-e6r1-international-council-for-harmonisation

Adaptive Designs for Clinical Trials of Drugs and Biologics, Guidance for Industry, November 2019, https://www.fda.gov/media/78495/download

Basics of Clinical Trial Design, 2024, https://www.fda.gov/media/185118/download

Bello S, Moustgaard H, Hróbjartsson A. Unreported formal assessment of unblinding occurred in 4 of 10 randomized clinical trials, unreported loss of blinding in 1 of 10 trials. J Clin Epidemiol. 2017 Jan; 81:42-50.

CCRC Certification - ACRP, https://acrpnet.org/certification/crc-certification

CCRP Certification Program Overview | SOCRA, https://www.socra.org/certification/certification-program/program-overview/

Clinical research coordinator - Toolkit, https://toolkit.ncats.nih.gov/glossary/clinical-research-coordinator/

Considerations for open-label clinical trials: design, conduct, and analysis, https://www.fda.gov/media/168664/download

Fergusson D, Glass K C, Waring D, Shapiro S. Turning a blind eye: the success of blinding reported in a random sample of randomised, placebo controlled trials BMJ 2004

Guidance for Industry, Investigator Responsibilities — Protecting the Rights, Safety, and Welfare of Study Subjects, October 2009, https://www.fda.gov/media/77765/download

Institutional Review Boards (IRBs) and Protection of Human Subjects in Clinical Trials, https://www.fda.gov/about-fda/cder-offices-and-divisions/institutional-review-boards-irbs-and-protection-human-subjects-clinical-trials



International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (ICH). 2018. "Integrated Addendum to ICH E6(R1): Guideline for Good Clinical Practice E6(R2)".

International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (ICH). 2025. "ICH Harmonised Guideline: Guideline for Good Clinical Practice E6(R3)".

International Organization for Standardization (ISO), ISO 9001:2015 – Quality Management Systems – Requirements.

International Organization for Standardization (ISO), ISO/IEC 14155:2020 – Clinical investigation of medical devices for human subjects – Good clinical practice.

International Organization for Standardization (ISO), ISO 14971:2019 – Application of risk management to medical devices.

International Organization for Standardization (ISO), ISO/IEC 27001:2022 – Information security, cybersecurity and privacy protection – Information security management systems – Requirements.

International Organization for Standardization (ISO), ISO/IEC 27701:2025 – Information security, cybersecurity and privacy protection – Privacy information management systems – Requirements and guidance.

International Organization for Standardization (ISO), ISO/IEC 27017:2015 – Information technology – Security techniques – Code of practice for information security controls based on ISO/IEC 27002 for cloud services.

International Organization for Standardization (ISO), ISO/IEC 27018:2025 – Information security, cybersecurity and privacy protection – Guidelines for protection of personally identifiable information (PII) in public clouds acting as PII processors

Investigational New Drug (IND) Application | FDA, https://www.fda.gov/drugs/types-applications/investigational-new-drug-ind-application

Merative. Zelta Platform – Security and Compliance, https://www.merative.com/clinical-development

Monaghan, T.F.; Agudelo, C.W.; Rahman, S.N.;Wein, A.J.; Lazar, J.M.; Everaert, K.; Dmochowski, R.R. Blinding in Clinical Trials: Seeing the Big Picture. Medicina 2021, 57, 647.

Moustgaard H, Clayton G L, Jones H E, Boutron I, JÃ¸rgensen L, Laursen D R T et al. Impact of blinding on estimated treatment effects in randomised clinical trials: meta-epidemiological study BMJ 2020; 368 :l6802

Oversight of Clinical Investigations — A Risk-Based Approach to Monitoring, Guidance for Industry, August 2013, https://www.fda.gov/media/116754/download

Schulz, K.F.; Grimes, D.A. Blinding in randomised trials: hiding who got what. Lancet 2002, 359, 9307, 696-700

Study Details | NCT05233774 | Lomecel-B Effects on Alzheimer's Disease | ClinicalTrials.gov, https://clinicaltrials.gov/study/NCT05233774?cond=Alzheimer%27s%20Disease%20OR



%20Neurodegenerative%20Diseases%20OR%20Parkinson%20Disease&spons=bioRASI ,%20LLC&rank=2#collaborators-and-investigators

Study Details | NCT05834296 | Study in Subjects With Mild-to-Moderate Alzheimer's Dementia | ClinicalTrials.gov, https://clinicaltrials.gov/study/NCT05834296

U.S. Food and Drug Administration. (2013). Guidance for Industry. Oversight of clinical investigations — A risk-based approach to monitoring.



## Appendix A

## CV of Emily Friedrich, Ph.D., PMP





# Exponent®
Engineering & Scientific Consulting

## Emily Friedrich, Ph.D.

Senior Associate | Biomedical Engineering and Sciences
Philadelphia
+1-215-594-8851 | efriedrich@exponent.com

## Professional Profile

Dr. Friedrich has broad expertise spanning biomaterials characterization, biomaterial-tissue interactions, pre-clinical and clinical study design, study management, and analysis. She has experience working within plastic and reconstructive surgery, dermatology, and emergency medicine evaluating medical devices ranging from biologically derived scaffolds and skin substitutes for tissue regeneration to medical device performance in austere environments.

Dr. Friedrich earned her Ph.D. at Carnegie Mellon University where her work focused on the synthesis, characterization, and biological transport of anti-inflammatory hyaluronic acid-based biomaterials for applications including burns, wound healing, and atopic dermatitis. To accomplish this, she leveraged techniques across chemistry, biology, and engineering including advanced imaging techniques such as fluorescence correlation spectroscopy (FCS). She then worked at Northwestern University as a postdoctoral fellow in the Division of Plastic Surgery conducting basic and translational research focused on hypertrophic scar biology and treatments. Additionally, at Northwestern she optimized the processing of biologically derived tissue scaffolds for the treatment of volumetric muscle loss and other soft tissue injuries both in collaboration with industry partners and on Department of Defense funded grant programs.

As a Research Instructor at the University of Illinois at Chicago, Dr. Friedrich led biochemistry intensive research to elucidate a novel pathway in pulmonary vascular permeability. As part of a multidisciplinary team, she confirmed the specific route of protein leak in a mouse model of pulmonary edema using transmission electron microscopy (TEM).

Prior to joining Exponent, Dr. Friedrich served as Biomedical Research Program Manager with General Dynamics Information Technology. In this role, she provided high level guidance to a research group composed of military physicians and contracted research support staff. She served as the subject matter expert for preclinical and clinical research evaluating products, procedures, and devices for hemorrhage control and resuscitation in large animal, cadaver, and human subject models.

## Academic Credentials & Professional Honors

Ph.D., Biomedical Engineering, Carnegie Mellon University, 2014

M.S., Biomedical Engineering, Carnegie Mellon University, 2011

B.S., Molecular Genetics and Biochemistry, University of Pittsburgh, 2007

Congressionally Directed Medical Research Program Combat Readiness – Rapid Development and Translational Research Award, Naval Medical Center Portsmouth, 2020 – 2022

Military Health System Research Symposium 2020 Outstanding Research Accomplishment/Team/Military

A - 1

National Institutes of Health Lung Biology and Pathobiology T32 Training Grant, University of Illinois at Chicago, 2017 – 2019

Teaching Assistant Award, Carnegie Mellon University, 2014

Best Poster Award, McGowan Institute for Regenerative Medicine Second Annual Symposium on Regenerative Rehabilitation, 2012

## Licenses and Certifications

Good Clinical Practices (GCP) in Medical Device Clinical Investigations

Project Management Professional (PMP)

## Prior Experience

Biomedical Research Program Manager, General Dynamics IT, 2019-2023

Research Instructor, University of Illinois at Chicago, 2017 – 2019

Postdoctoral Fellow, Northwestern University, 2015-2017

## Professional Affiliations

Project Management Institute

Women in Bio (member Philadelphia Chapter)

## Publications

Wilson M, Stuart S, Lassiter B, Parker T Jr, Martin C 3rd, Healy R, Treager C, Sulava E, Gower L, Fernandez P, Friedrich E. (2024) Pharmacokinetics of Tranexamic Acid (TXA) Delivered by Expeditious Routes in a Swine Model of Polytrauma and Hemorrhagic Shock. Prehosp Emerg Care. 28(5):680-688. doi: 10.1080/10903127.2024.2342025.

Lopachin T, Treager CD, Sulava EF, Stuart SM, Bohan ML, Boboc M, Fernandez P, Bianchi WD, McGowan AJ, Friedrich EE. (2023) Ultrasound Localization of Resuscitative Endovascular Balloon Occlusion of the Aorta in a Human Cadaver Model. J Spec Oper Med. 23(2):73-77. doi:10.55460/8MDD-BY4I.

Hafer, A., Verga, J., Sulava, E., Friedrich, E., Sheldon, D., Boboc, M., Bohan, M., Norris, E., Gaspary, M., & Stuart, S. (2023). The evaluation of Hemoblast Bellows for arterial hemorrhage control in a swine model of vascular injury. Trauma, 0(0). doi:10.1177/14604086231152670

Stuart, S. M., Treager, C. D., Lopachin, T. R., Moss, P. I., & Friedrich, E. E. (2022). Persistence of procoagulable thromboelastography results in hospitalized COVID-19 patients despite clinical improvement. Eur Rev Med Pharmacol Sci, 26(9), 3399-3405. doi:10.26355/eurrev_202205_28761

Stuart, S. M., Bohan, M. L., & Friedrich, E. E. (2022). Speed, Skill Retention, and End User Perceptions of iTClamp Application by Navy Corpsmen on a Manikin Model of Femoral Hemorrhage. Mil Med. doi:10.1093/milmed/usac355

Stuart, S. M., Bohan, M. L., McLean, J. B., Walchak, A. C., & Friedrich, E. E. (2022). iTClamp-Mediated Wound Closure Speeds Control of Arterial Hemorrhage With or Without Additional Hemostatic Agents. J

© 2026 Exponent, Inc. All Rights Reserved   •   www.exponent.com   •   888.656.EXPO   •   Page 2

A - 2

Spec Oper Med, 22(4), 87-92. doi:10.55460/tpmg-0mqu

Getz, C. W., Stuart, S. M., Barbour, B. M., Verga, J. M., Roszko, P. J. D., & Friedrich, E. E. (2022). Cric in the Dark: Surgical Cricothyrotomy in Low Light Tactical Environments. J Spec Oper Med, 22(4), 50-54. doi:10.55460/8dr3-b0rh

Treager, C., Lopachin, T., Mandichak, S., Kinney, B., Bohan, M., Boboc, M., Go, C., Friedrich, E., & Stuart, S. (2021). A comparison of efficacy, efficiency, and durability in novel tourniquet designs. J Trauma Acute Care Surg, 91(2S Suppl 2), S139-S145. doi:10.1097/TA.0000000000003216

Zhao, J., Jia, S., Xie, P., Friedrich, E., Galiano, R. D., Qi, S., Mao, R., Mustoe, T. A., & Hong, S. J. (2020). Knockdown of sodium channel Na(x) reduces dermatitis symptoms in rabbit skin. Lab Invest, 100(5), 751-761. doi:10.1038/s41374-020-0371-1

Jones, J. H., Friedrich, E., Hong, Z., Minshall, R. D., & Malik, A. B. (2020). PV1 in Caveolae Controls Lung Endothelial Permeability. Am J Respir Cell Mol Biol, 63(4), 531-539. doi:10.1165/rcmb.2020-0102OC

Friedrich, E. E., Hong, Z., Xiong, S., Zhong, M., Di, A., Rehman, J., Komarova, Y. A., & Malik, A. B. (2019). Endothelial cell Piezo1 mediates pressure-induced lung vascular hyperpermeability via disruption of adherens junctions. Proc Natl Acad Sci U S A, 116(26), 12980-12985. doi:10.1073/pnas.1902165116

Friedrich, E. E., Lanier, S. T., Niknam-Bienia, S., Arenas, G. A., Rajendran, D., Wertheim, J. A., & Galiano, R. D. (2018). Residual sodium dodecyl sulfate in decellularized muscle matrices leads to fibroblast activation in vitro and foreign body response in vivo. J Tissue Eng Regen Med, 12(3), e1704-e1715. doi:10.1002/term.2604

Friedrich, E. E., & Washburn, N. R. (2017). Transport patterns of anti-TNF-alpha in burn wounds: Therapeutic implications of hyaluronic acid conjugation. Biomaterials, 114, 10-22. doi:10.1016/j.biomaterials.2016.11.003

Friedrich EE, Niknam-Bienia S, Xie P, Jia SX, Hong SJ, Mustoe TA, Galiano RD. (2017) Thermal injury model in the rabbit ear with quantifiable burn progression and hypertrophic scar. Wound Repair Regen. 25(2):327-337. doi: 10.1111/wrr.12518.

Zhao, J., Zhong, A., Friedrich, E. E., Jia, S., Xie, P., Galiano, R. D., Mustoe, T. A., & Hong, S. J. (2017). S100A12 Induced in the Epidermis by Reduced Hydration Activates Dermal Fibroblasts and Causes Dermal Fibrosis. J Invest Dermatol, 137(3), 650-659. doi:10.1016/j.jid.2016.10.040

Ramadan, M. H., Sansone, N. J., Pendergast, L. M., Friedrich, E. E., & Washburn, N. R. (2016). Non-fouling hyaluronic acid coatings for improved sandwich ELISA measurements in plasma. Analytical Methods, 8(6), 1222-1228. doi:10.1039/C5AY03092G

Korkmaz, E., Friedrich, E. E., Ramadan, M. H., Erdos, G., Mathers, A. R., Ozdoganlar, O. B., Washburn, N. R., & Falo, L. D., Jr. (2016). Tip-Loaded Dissolvable Microneedle Arrays Effectively Deliver Polymer-Conjugated Antibody Inhibitors of Tumor-Necrosis-Factor-Alpha Into Human Skin. J Pharm Sci, 105(11), 3453-3457. doi:10.1016/j.xphs.2016.07.008

Korkmaz, E., Friedrich, E. E., Ramadan, M. H., Erdos, G., Mathers, A. R., Burak Ozdoganlar, O., Washburn, N. R., & Falo, L. D., Jr. (2015). Therapeutic intradermal delivery of tumor necrosis factor-alpha antibodies using tip-loaded dissolvable microneedle arrays. Acta Biomater, 24, 96-105. doi:10.1016/j.actbio.2015.05.036

Friedrich, E. E., Azofiefa, A., Fisch, E., & Washburn, N. R. (2015). Local delivery of antitumor necrosis factor-alpha through conjugation to hyaluronic acid: dosing strategies and early healing effects in a rat burn model. J Burn Care Res, 36(2), e90-e101. doi:10.1097/BCR.0000000000000140

© 2026 Exponent, Inc. All Rights Reserved   •   www.exponent.com   •   888.656.EXPO   •   Page 3

A - 3

Friedrich, E. E., Sun, L. T., Natesan, S., Zamora, D. O., Christy, R. J., & Washburn, N. R. (2014). Effects of hyaluronic acid conjugation on anti-TNF-alpha inhibition of inflammation in burns. J Biomed Mater Res A, 102(5), 1527-1536. doi:10.1002/jbm.a.34829

Washburn, N. R., Prata, J. E., Friedrich, E. E., Ramadan, M. H., Elder, A. N., & Sun, L. T. (2013). Polymer-conjugated inhibitors of tumor necrosis factor-alpha for local control of inflammation. Biomatter, 3(3). doi:10.4161/biom.25597

Sun, L. T., Friedrich, E., Heuslein, J. L., Pferdehirt, R. E., Dangelo, N. M., Natesan, S., Christy, R. J., & Washburn, N. R. (2012). Reduction of burn progression with topical delivery of (antitumor necrosis factor-alpha)-hyaluronic acid conjugates. Wound Repair Regen, 20(4), 563-572. doi:10.1111/j.1524-475X.2012.00813.x

Lou, H., Montoya, S. E., Alerte, T. N., Wang, J., Wu, J., Peng, X., Hong, C. S., Friedrich, E. E., Mader, S. A., Pedersen, C. J., Marcus, B. S., McCormack, A. L., Di Monte, D. A., Daubner, S. C., & Perez, R. G. (2010). Serine 129 phosphorylation reduces the ability of alpha-synuclein to regulate tyrosine hydroxylase and protein phosphatase 2A in vitro and in vivo. J Biol Chem, 285(23), 17648-17661. doi:10.1074/jbc.M110.100867

Alerte, T. N., Akinfolarin, A. A., Friedrich, E. E., Mader, S. A., Hong, C. S., & Perez, R. G. (2008). Alpha-synuclein aggregation alters tyrosine hydroxylase phosphorylation and immunoreactivity: lessons from viral transduction of knockout mice. Neurosci Lett, 435(1), 24-29. doi:10.1016/j.neulet.2008.02.014

**Presentations**

Friedrich EE, Hong Z, Xiong S, Zhong M, Rehman J, Komarova YA, Malik AB. Endothelial Cell Expressed Piezo1 Regulates Pressure-Induced Lung Vascular Permeability. Oral presentation selected from abstracts at the Vascular Cell Biology Gordon Research Conference, Ventura, California, January 20-25, 2019.

Friedrich EE, Niknam-Bienia S, Lanier ST, Arenas G, Hong SJ, Wertheim J, Mustoe TA, Galiano RD. Complete Removal of SDS Necessary for Biologically Derived Scaffold Integration in Muscle Wound Repair. Oral presentation selected from abstracts at the 29th Annual Wound Healing Society Meeting, San Diego, California, April 5-9, 2017.

Friedrich EE, Sun LT, Washburn NR, Natesan S, Zamora DO, Christy RJ. Improving Burn Outcomes with (Anti-TNF-alpha)-Polysaccharide. Poster presented at the 2012 All Hands AFIRM meeting, St. Pete Beach, Florida, Feb 14, 2012.

Friedrich EE, Wehmeyer JL, Natesan S, Christy RJ. Development of Supercritical CO2-Treated Human Amniotic Membrane Combined with Adipose Derived Stem Cells. Poster preview and poster presented at the McGowan Institute for Regenerative Medicine Second Annual Symposium on Regenerative Rehabilitation, Pittsburgh, Pennsylvania, Nov 13-14, 2012.

Azis M, Bagla N, Costa J, Desai K, Friedrich E, Heshmati M, Li C. Redesigning the Lift Chair. Poster presented during the National Science Foundation site visit to Quality of Life Technology Center, Pittsburgh, Pennsylvania, April 12, 2011

## Peer Reviews

Journal of Tissue Engineering and Regenerative Medicine

Military Medicine

## Appendix B

## CV of Aimon Iftikhar, Ph.D.





# E<sup>x</sup>ponent®
Engineering & Scientific Consulting

## Aimon Iftikhar, Ph.D.

Senior Scientist | Biomedical Engineering and Sciences
Menlo Park
+1-650-688-7246 |  aiftikhar@exponent.com

## Professional Profile

Dr. Iftikhar specializes in characterizing biomaterial-tissue interactions and developing immunomodulatory strategies to enhance the understanding of the tissue specific micro-environment. She has extensive experience in the translational sciences field and in developing clinically relevant research models to highlight the best approach to understanding host-biomaterial interactions.

Dr. Iftikhar's preclinical background in immunology, polymer chemistry, and biomaterial development enables her to better understand the translation into clinical research studies and maintaining clinical standards (IRB, CAP/CLIA, GLP/GCLP, ISO). She has experience managing multi-site clinical research studies as well as authoring and providing technical review on numerous regulatory documents, procedures, and policies to ensure consistency with clinical processes.

Prior to joining Exponent, Dr. Iftikhar was a Clinical Research Scientist at Machaon Diagnostics conducting clinical research studies. Dr. Iftikhar completed her Ph.D. in Biomedical Engineering at the McGowan Institute for Regenerative Medicine at University of Pittsburgh. Her research expertise includes biomolecule eluting polymeric coatings, classification of inflammatory and tissue remodeling responses to biomaterials, characterization of biomaterials for fertility preservation, and using surgical, immunohistochemical and biochemical assay techniques to characterize the complex immune response to implants in women's health.

## Academic Credentials & Professional Honors

Ph.D., Bioengineering, University of Pittsburgh, 2020

M.S., Biomedical Engineering, Carnegie Mellon University, 2014

B.S., Biomedical Engineering, University of Connecticut, 2013

National Institutes of Health TL1 Clinical & Translational Science Fellowship 2016 -2019

Society for Biomaterials "STAR" Award 2018

Bridgeside Research Forum "Best Presentation" Award 2018

## Licenses and Certifications

Good Clinical Practices (GCP) in Medical Device Clinical Investigations

B - 1

## Prior Experience

Clinical Research Scientist, Machaon Diagnostics, Mar 2021 – Nov 2021

## Professional Affiliations

American Association for the Advancement of Science (AAAS)

Society for Biomaterials (SFB)

Tissue Engineering & Regenerative Medicine International Society (TERMIS)

## Languages

Urdu

## Publications

Hachim D, Iftikhar A, LoPresti ST, Nolfi AL, Rege, R., Skillen C, Umeda, Y., Brown BN. Distinct macrophage populations and phenotypes associated with IL-4 mediated immunomodulation at the host implant surface. Biomaterials Science. 2020.

Hachim, D., Iftikhar, A., LoPresti, ST., Nolfi, AL., Ravichandar, S., Skillen, CD., Brown, BN. "Distinct release strategies are required to modulate macrophage phenotype in young versus aged animals." J Control Release. 2019. 305:65-74.

Ninh, C., Iftikhar, A., Cramer, M., Bettinger, C. "Diffusion-reaction models of genipin incorporation into fibrin networks." Journal of Materials Chemistry B. 2015. 3(22): 4607-4615.

**Presentations**

Iftikhar A., Moalli, P., Brown, B. "Development of a Novel Rabbit Surgical Model of Pelvic Reconstruction for the Use of Testing an IL-4 Eluting Coated Polypropylene Mesh." AiChE 2018. Podium Presentation.

Iftikhar A., Moalli, P., Brown, B. "A Clinically Relevant Rabbit Surgical Model of Pelvic Reconstruction to Evaluate the Immune Response to Novel Surgical Materials." AUGS PFD Week 2018. Podium Presentation.

Iftikhar A., Moalli, P., Brown, B. "A Clinically Relevant Rabbit Surgical Model of Pelvic Reconstruction to Evaluate the Immune Response to Novel Surgical Materials." TERMIS World Congress, 2018.

Iftikhar A., Moalli, P., Brown, B. "A Clinically Relevant Rabbit Surgical Model of Pelvic Reconstruction to Evaluate the Immune Response to Novel Surgical Materials." Bridgeside Research Forum 2018. Podium Presentation.

Iftikhar A., Moalli, P., Brown, B. "A Clinically Relevant Rabbit Surgical Model of Pelvic Reconstruction to Evaluate the Immune Response to Novel Surgical Materials." Society for Biomaterials 2018. Podium Presentation.

Iftikhar A., Moalli, P., Brown, B. "A Clinically Relevant Rabbit Surgical Model of Pelvic Reconstruction to Evaluate the Immune Response to Novel Surgical Materials." Regenerative Medicine Workshop 2018. Poster Presentation.

Iftikhar A., Moalli, P., Brown, B. "A Clinically Relevant Rabbit Surgical Model of Pelvic Reconstruction to Evaluate the Immune Response to Novel Surgical Materials." Translational Science 2018. Poster

B - 2

Presentation.

Iftikhar A., Moalli, P., Brown, B. "Development of a Clinically Relevant Rabbit Surgical Model for Investigation of the Host Response to Polypropylene Mesh for Pelvic Organ Prolapse." Bridgeside Research Forum 2017. Podium Presentation.

Iftikhar A., Moalli, P., Brown, B. "Development of a Clinically Relevant Rabbit Surgical Model for Investigation of the Host Response to Polypropylene Mesh for Pelvic Organ Prolapse." Clinical and Translational Sciences Institute 2017.

Iftikhar A., Knight, K., Carter, C., Moalli, P., Brown, B. "Development of a Clinically Relevant Rabbit Surgical Model for Investigation of the Host Response to Polypropylene Mesh for Pelvic Organ Prolapse." Translational Sciences 2017. Poster Presentation.

Iftikhar A., Knight, K., Carter, C., Moalli, P., Brown, B. "Development of a Clinically Relevant Rabbit Surgical Model for Investigation of the Host Response to Polypropylene Mesh for Pelvic Organ Prolapse." Society for Biomaterials 2017. Poster Presentation.

Iftikhar A., Hachim, D., Brown, B. "Layer Up: Drug Eluting Coating Technology for Implantable Devices and Biomaterials." Tissue Engineering & Regenerative Medicine International Society 2016. Podium Presentation.

Iftikhar, A., Cramer, M., Bettinger, C. "Enzymatic Resistance and Mechanical Stability of Genipin-Crosslinked Films." Tissue Engineering & Regenerative Medicine International Society 2015. Poster Presentation.

Iftikhar, A., Cramer, M., Bettinger, C. "Enzymatic Resistance and Mechanical Stability of Genipin-Crosslinked Films." Society for Biomaterials 2015. Poster Presentation.

## Project Experience

Dr. Iftikhar has experience with developing and practicing in vivo invasive surgical techniques in preclinical animal models (C57BL/6 Mice, Wistar Rats, New Zealand Rabbits, Rhesus Macaques). She is well-versed in managing clinical research studies including coordinating patient recruitment, study testing, audit schedules and managing deliverables.

B - 3

# Appendix C

## List of Materials



**List of Materials as Produced and Materials Referenced in Report**

**Legal Documents:**

Complaint, Case 1:25-cv-20481-BB, dated January 21, 2025.

Amended Complaint, Case 1:25-cv-20481-BB, dated May 5, 2025.

Defendant's Response to Plaintiff's Request for Production of Documents, dated August 1, 2025.

Defendant's Answers to Plaintiff's First Set of Interrogatories, dated August 1, 2025.

Alzamend Neuro, Inc.'s Objections and Responses to Defendant's First Request for Production, dated September 2, 2025.

Defendant's First Amended and Supplemental Answers to Plaintiff's First Set of Interrogatories, dated September 16, 2025.

Alzamend Neuro, Inc.'s Response to Biorasi, LLC's First Set of Interrogatories, dated September 17, 2025.

Alzamend Neuro, Inc.'s Responses to Defendant's Requests for Admission, dated September 17, 2025.

Defendant's Second Amended and Supplemental Answers to Plaintiff's First Set of Interrogatories, dated October 1, 2025.

Defendant's Third Set of Supplemental Answers to Plaintiff's First Set of Interrogatories, dated November 13, 2025.

Defendant's Supplemental Answers to Plaintiff's Interrogatories Nos.: 7, 11 and 13, dated January 16, 2026.

Alzamend Neuro, Inc.'s Amended Responses to Biorasi, LLC's Interrogatories 4 & 5, dated January 16, 2026.

Defendant, Biorasi's Privilege Log, dated December 1, 2025.

Defendant Biorasi, LLC's Motion to Dismiss (Oral Argument Requested), dated March 31, 2025.

Defendant's Memorandum of Law in Support of Motion to Dismiss Amended Complaint, dated June 13, 2025.

Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss the Amended Complaint, dated July 18, 2025.

C - 1

Defendant's Reply in Support of Motion to Dismiss Amended Complaint, dated August 8, 2025.

Alzamend Neuro, Inc.'s Expert Witness Disclosure, dated February 4, 2026.

**Declarations**

Declaration of Juan Duany Santos, dated February 18, 2026.

Declaration of Nancy Newark, dated February 18, 2026.

**Despositions**

Deposition of Juan Duany-Santos (Rough), taken February 16, 2026.

**Expert Reports:**

Expert Report of Frederick Hausheer, MD, with Attachment A

**Bates Numbered Documents:**

ALZ_000001-ALZ_137072

BIO_000290-BIO_601183

BN 000074-BN 000254

BN 000257-BN 000289

FERG0000001-FERG0000662

LINICAL_000001-LINICAL_000917

TMF0001-TMF57870

**Non-Bates Numbered Documents:**

IMIC Communications

IMIC_Communications (2)

**Literature and References:**

21 CFR §11 – Electronic Records; Electronic Signatures.

21 CFR §50 – Protection of Human Subjects.

21 CFR §54 – Financial Disclosure by Clinical Investigators.

21 CFR §56 – Institutional Review Boards (IRBs).

21 CFR §312 – Investigational New Drug Application

C - 2

21 CFR §312.3 – Definitions and interpretations.

21 CFR §312.50 – General Responsibilities of Sponsors

21 CFR §312.53 – Selecting Investigators and Monitors

21 CFR §312.55 – Informing Investigators.

21 CFR §312.56 – Review of Ongoing Investigations.

21 CFR §312.57 – Recordkeeping and Record Retention.

83 FR 8882, March 1, 2018, https://www.federalregister.gov/documents/2018/03/01/2018-04154/e6r2-good-clinical-practice-integrated-addendum-to-e6r1-international-council-for-harmonisation

Adaptive Designs for Clinical Trials of Drugs and Biologics, Guidance for Industry, November 2019, https://www.fda.gov/media/78495/download

Basics of Clinical Trial Design, 2024, https://www.fda.gov/media/185118/download

Bello S, Moustgaard H, Hróbjartsson A. Unreported formal assessment of unblinding occurred in 4 of 10 randomized clinical trials, unreported loss of blinding in 1 of 10 trials. J Clin Epidemiol. 2017 Jan;81:42-50.

CCRC Certification - ACRP, https://acrpnet.org/certification/crc-certification

CCRP Certification Program Overview | SOCRA, https://www.socra.org/certification/certification-program/program-overview/

Clinical research coordinator - Toolkit, https://toolkit.ncats.nih.gov/glossary/clinical-research-coordinator/

Considerations for open-label clinical trials: design, conduct, and analysis, https://www.fda.gov/media/168664/download

Fergusson D, Glass K C, Waring D, Shapiro S. Turning a blind eye: the success of blinding reported in a random sample of randomised, placebo controlled trials BMJ 2004

Guidance for Industry, Investigator Responsibilities — Protecting the Rights, Safety, and Welfare of Study Subjects, October 2009, https://www.fda.gov/media/77765/download

Institutional Review Boards (IRBs) and Protection of Human Subjects in Clinical Trials, https://www.fda.gov/about-fda/cder-offices-and-divisions/institutional-review-boards-irbs-and-protection-human-subjects-clinical-trials

International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (ICH). 2018. "Integrated Addendum to ICH E6(R1): Guideline for Good Clinical Practice E6(R2)".

C - 3

International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (ICH). 2025. "ICH Harmonised Guideline: Guideline for Good Clinical Practice E6(R3)".

International Organization for Standardization (ISO), ISO 9001:2015 – Quality Management Systems – Requirements.

International Organization for Standardization (ISO), ISO/IEC 14155:2020 – Clinical investigation of medical devices for human subjects – Good clinical practice.

International Organization for Standardization (ISO), ISO 14971:2019 – Application of risk management to medical devices.

International Organization for Standardization (ISO), ISO/IEC 27001:2022 – Information security, cybersecurity and privacy protection – Information security management systems – Requirements.

International Organization for Standardization (ISO), ISO/IEC 27701:2025 – Information security, cybersecurity and privacy protection – Privacy information management systems – Requirements and guidance.

International Organization for Standardization (ISO), ISO/IEC 27017:2015 – Information technology – Security techniques – Code of practice for information security controls based on ISO/IEC 27002 for cloud services.

International Organization for Standardization (ISO), ISO/IEC 27018:2025 – Information security, cybersecurity and privacy protection – Guidelines for protection of personally identifiable information (PII) in public clouds acting as PII processors

Investigational New Drug (IND) Application | FDA, https://www.fda.gov/drugs/types-applications/investigational-new-drug-ind-application

Merative. Zelta Platform – Security and Compliance, https://www.merative.com/clinical-development

Monaghan, T.F.; Agudelo, C.W.; Rahman, S.N.;Wein, A.J.; Lazar, J.M.; Everaert, K.; Dmochowski, R.R. Blinding in Clinical Trials: Seeing the Big Picture. Medicina 2021, 57, 647.

Moustgaard H, Clayton G L, Jones H E, Boutron I, JÃ¸rgensen L, Laursen D R T et al. Impact of blinding on estimated treatment effects in randomised clinical trials: meta-epidemiological study BMJ 2020; 368 :l6802

Oversight of Clinical Investigations — A Risk-Based Approach to Monitoring, Guidance for Industry, August 2013, https://www.fda.gov/media/116754/download

Schulz, K.F.; Grimes, D.A. Blinding in randomised trials: hiding who got what. Lancet 2002, 359, 9307, 696-700

C - 4

Study Details | NCT05233774 | Lomecel-B Effects on Alzheimer's Disease | ClinicalTrials.gov, https://clinicaltrials.gov/study/NCT05233774?cond=Alzheimer%27s%20Disease%20OR%20Neurodegenerative%20Diseases%20OR%20Parkinson%20Disease&spons=bioRASI,%20LLC&rank=2#collaborators-and-investigators

Study Details | NCT05834296 | Study in Subjects With Mild-to-Moderate Alzheimer's Dementia | ClinicalTrials.gov, https://clinicaltrials.gov/study/NCT05834296

U.S. Food and Drug Administration. (2013). Guidance for Industry. Oversight of clinical investigations — A risk-based approach to monitoring.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

ALZAMEND NEURO, INC.,

        Plaintiff,

v.

BIORASI, LLC,

        Defendant.

_____/

Case No.:  25-cv-20481-BB

## <u>DECLARATION OF JUAN DUANY SANTOS</u>

I, Juan Duany Santos, declare as follows:

1. I am a Senior Clinical Research Associate Clinical Operations at Biorasi, LLC ("Biorasi").  I have held that position since 2025 and have been employed at Biorasi since 2021. My job responsibilities include monitoring conduct of clinical studies at the site level. As part of this, I conduct site visits and participate in site selection and evaluation.

2. Beginning on or about October 2023, I was the assigned Clinical Research Associate ("CRA") for the ALZN002 Trial. I was unblinded throughout the study.

3. By virtue of my unblinded-CRA position during the ALZN002 Trial, I am familiar with the training provided and procedures in place for maintaining double-blind status.

4. Individuals involved in the study were told to contact me for any information regarding unblinded issues, including, specifically, leukapheresis, investigational product (IP) manufacture, shipment, accountability, or randomization assignment. This included individuals from IMIC and anyone from the clinical sites.

5. This procedure was noted in various email communications to both blind and unblinded individuals working in the study, as well as in the training provided regarding Cryoport shipping procedures, including but not limited to, an November 1, 2023 email, where unblinded

143639464.1

IMIC individuals were again directed to contact me directly with any questions that may contain unblinded information.

6.      On or about August through October 2023, I received training relating to my duties as the CRA and which discussed maintaining double-blind status.

7.      The training specifically consisted of self-review of the study documents, including the study protocol, IP manual, and other relevant documents.

8.      On August 18, 2023, I received specific relevant study protocol training with Josanne Johnson to prepare for a meeting with the Sponsor, Alzamend Neuro, Inc.

9.      On October 25, 2023, I attended the Cryoport shipping refresher training described above that included IMIC individuals, including Loyda Espinoza.

10.     Prior to any leukapheresis activity as part of the study, IMIC participated in at least one "dry run" to practice the Cryoport shipping procedures that would be followed during the actual and sham leukapheresis procedures.

11.     Loyda Espinoza was the unblinded study coordinator at IMIC; her responsibilities were limited to shipping the IP after the actual and sham leukapheresis procedures; the procedures were the same for both actual and sham.

12.     Loyda Espinoza called me on January 18, 2024 with a question about shipping procedure. The phone call lasted less than one minute.

13.     I directed Ms. Espinoza to put her inquiry into writing via email to me, as was my standard protocol for all inquiries, as it ensured the question was fully understood and there is documentation for both the question and answer.

14.     During that call, I never instructed Loyda to include any other recipients on the email other than me when sending me her inquiry.

143639464.1

15.     Sometime after our phone call, I received an email from Loyda Espinoza. The email was sent to me, an unblinded pharmacist from IMIC, and ALZN002-01_clinical@biorasi.com.

16.     At the time, I was not familiar with the ALZN002-01_clinical@biorasi.com address.

17.     I now understand that the I was not a recipient of emails to the ALZN002-01_clinical@biorasi.com address because it contained only blinded study participants.

18.     I do not know why Loyda included the ALZN002-01_clinical@biorasi.com address in her communication with me.

19.     The inclusion of the ALZN002-01_clinical@biorasi.com address was not part of proper procedure, as noted in Josanne Johnson's November 1, 2023 email.

20.     Within five minutes, I responded to Loyda's email, first removing the ALZN002-01_clinical@biorasi.com address, advising her as to how to proceed pursuant to the applicable IP Manual, and including screenshot of the applicable procedure for her future reference, if needed.

I declare under penalty of perjury that the foregoing is true and correct.



Signed by:

Juan C Duany-Santos

Signer Name: Juan C Duany-Santos
Signing Reason: I have reviewed this document
Signing Time: 18 February 2026 | 2:40:32 PM PST
FF2DB15593D34BBD8497A0A1FD4A8DDB

_____
Juan Duany Santos
Date

143639464.1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

ALZAMEND NEURO, INC.,

        Plaintiff,

v.

BIORASI, LLC,

        Defendant.

_____/

Case No.: 25-cv-20481-BB

**DECLARATION OF NANCY NEWARK**

I, Nancy Newark, declare as follows:

1) I am a Vice President of Project Management for Biorasi, LLC ("Biorasi"). I have held that position for over three years and have been employed at Biorasi since October 2022. My job responsibilities include providing strategic leadership and oversight for planning, execution and delivery of complex projects and programs, and ensuring compliance with Biorasi SOPs, ICH-GCP and applicable regulatory requirements.

2) I was directly involved with the ALZN002 Clinical Trial ("Trial") from the time the study was awarded to Biorasi.

3) In October 2023, I was assigned to fill the role of Project Director for the Trial and was blinded throughout the study.

4) I did not make a statement to Dr. Raul Carballosa that there were missing or misplaced samples.

5) I did not make a statement to Dr. Carballosa or anyone at First Excellent Research Group that the active treatment for Subject 1003 might be defective or misidentified.

6) I did not threaten Dr. Carballosa's medical license.

143688595.1

7) I did not tell Dr. Carballosa that administering treatment to Subject 1003 could jeopardize his medical license.

*Nancy Newark*

Nancy Newark
Date: February 18, 2026

143688595.1