# Exhibit B

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

————————————————————————————————————

ALZAMEND NEURO, INC.,

                        Plaintiff,

            -against-

BIORASI, LLC,

                        Defendant.

Case No. 25-cv-20481-BB

————————————————————————————————————

                        March 18, 2026

                        9:12 a.m.

            VIDEOCONFERENCE DEPOSITION of

EMILY FRIEDRICH, taken by Plaintiff, held

at 25 North 38th Street, Philadelphia,

Pennsylvania before Wayne Hock, a Notary

Public of the State of New York.

A P P E A R A N C E S:

OLSHAN FROME WOLOSKY LLP
Attorneys for Plaintiff
1325 Avenue of the Americas
New York, New York 10019
BY:      SAHAND FARAHATI, ESQ.
sfarahati@olshanlaw.com
(via videoconference)

CARLTON FIELDS PA
Attorneys for Defendant
80 South 8th Street
Minneapolis, Minneapolis 55402

BY:      DAVID J. CARRIER, ESQ.
dcarrier@carltonfields.com
(via videoconference)
NATALIE DONIS, ESQ.
ndonis@carltonfields.com
(via videoconference)

ALSO PRESENT:

KEVIN GALLAGHER, Videographer
(via videoconference)
BRIAN CHAIKEN
(via videoconference)

*      *      *

Page 10

E. Friedrich

report of Emily Friedrich and Aimon

Iftikhar, assuming I'm pronouncing that

right.   That is dated February 18, 2026;

correct?

A.    Correct.

Q.    And did you prepared this

report?

A.    Yes.

Q.    In conjunction with Dr.

Iftikhar; correct?

A.    Correct.

Q.    And the portions that you wrote

are the portions that are specified in the

report?

A.    Yes.

Q.    Did you have any input on the

portions that your name was not specified

on?

A.    Dr. Iftikhar and I reviewed each

other's sections as well.

Q.    But she is primarily -- you each

have primary responsibility over the

sections that you're designated on;

correct?

Page 11

E. Friedrich

A.    Correct.

Q.    Have you ever testified as an expert at trial or by deposition?

A.    No, I have not.

Q.    Have you ever acted as an expert in any sort of litigation?

A.    No, I have not.

MR. CARRIER: Objection to form.

Go ahead.

Q.    Have you -- and just to confirm, so you have never been approved as an expert by any court in this country; correct?

MR. CARRIER: I object to form.

Go ahead.

THE WITNESS:  Correct, I have not testified in any legal matters as an expert.

Q.    So you've never been qualified as an expert in any litigation, arbitration, any kind of legal matter?

MR. CARRIER: Same objection.

Q.    Correct?

MR. CARRIER: Go ahead.

Page 12

E. Friedrich

THE WITNESS: I have not testified, correct.

Q. I'm not talking about testifying, I'm asking as having been qualified as an expert.

MR. CARRIER: I object to the form.

THE WITNESS: Can you rephrase that? I'm not sure I understand.

Q. Oftentimes you will, you know, submit either an expert report in a litigation.

You've never submitted an expert report in a litigation either; correct?

A. Correct.

Q. Okay.

So no court in this country has ever deemed you qualified to be an expert in a particular matter; correct?

MR. CARRIER: I object to form.

Go ahead.

THE WITNESS: To the extent that I have never submitted an expert report or testified, that would be

Page 13

E. Friedrich

correct.

Q. Okay. Got it.

Ms. Friedrich, how would you describe your area of expertise?

A. I have broad expertise in clinical research operations and the underlying ethical frameworks involved in clinical research.

Q. So clinical research is a broad category; right?

MR. CARRIER: Objection to form.

THE WITNESS: Correct, clinical research is a broad category of human subject-based research.

Q. Could you be a little more specific? When you say you're an expert in clinical research and operations, what do you really mean by that?

A. Sure.

So I have worked previously as biomedical research program manager where I served as the subject matter expert for preclinical and clinical research consisting primarily military physicians

Page 14

E. Friedrich

in conducting their research, which entailed developing clinical research protocols, submitting those clinical research protocols to an ethics committee such as an IRB.

Once gaining IRB approval, I participated and executing of those clinical research studies. I was responsible for ensuring that everyone maintained complains with those IRB studies, including staff that I managed. So as part of that role, I managed a team of eight contract staff, some of which included clinical research coordinators and a clinical protocol developer. So I would make sure that any clinical research protocols that were kicking off had appropriately trained and staffed personnel to run those studies and was responsible for their overall performance as part of those.

In my current role as a senior associate at Exponent, I am still involved in a fair amount of clinical research,

Page 15

E. Friedrich

both proactive projects being that I assist clients with developing clinical research protocols, executing those protocols, interacting with the IRB, maintaining compliance with the protocols. And then I will also be involved in reactive projects, so litigation which involves working on a team supporting document review, developing the expert report, helping to prepare the testifier for depositions, and in some of those cases, I have reviewed clinical trial documentation, protocols, clinical trial reports, and things like that as part of my work.

Q. We'll get into that substance shortly here.

What I'm really trying to figure out with my question is how you would describe your area of expertise, not necessarily what you've done, but what is it that you are an expert in? When I asked you that question, you said, you know, clinical trial -- excuse me,

Page 16

E. Friedrich

clinical research operations.  That just seems broad to me.

Is there a narrower way to define what you would consider yourself an expert in?

MR. CARRIER: I object to form.

Go ahead.

THE WITNESS:  Clinical research does require quite a few different skills in order to successfully conduct it.  So I think the project management aspects are always going to sound broad but are required in providing expertise in clinical research.

Q.    So would you say you are an expert in all aspects of project management for a clinical -- for clinical research?

MR. CARRIER: I object to form.

Go ahead.

THE WITNESS:  I hold a project management professional certification and consider myself an expert in

Page 17

E. Friedrich

project management in general, and that is applied to clinical research operations.  Regardless of what type of clinical research is being conducted or what the top topic is, they all follow the same underlying framework, both the ethical frameworks and operational frameworks.

Q.    So you consider yourself an expert in all aspects of project management for any kind of clinical research?

MR. CARRIER: I object to form.

Go ahead.

THE WITNESS:  I'm uncomfortable with the word "all", but I am, yes, an expert in clinical research operations.

Q.    Why are you uncomfortable with the word "all"?

A.    I can't speak to every single aspect of any clinical research that's ever happened.  I can speak to the experience that I've had.

Page 18

E. Friedrich

Q.   But in terms of the types of clinical research you're aware of and the types of clinical trials you're aware of, like the clinical trial we're dealing with today, you believe you are an expert in all aspects of project management for clinical research?

MR. CARRIER: I object to form.

Go ahead.

THE WITNESS:  Can you phrase that any more specifically?  That's quite vague.

Q.   It's to me the concept of being an expert in project management for clinical research itself is vague.  So what I'm trying to understand is if there's anything more narrow that you consider yourself on expert in or to you your expertise is just that broad.

MR. CARRIER: Same objection.

THE WITNESS:  I'm sorry, what's the question?

Q.   So just to confirm, you cannot narrow your expertise any further than to

Page 19

E. Friedrich

say you are an expert in all aspects of project management and clinical research?

MR. CARRIER: I object to form. The misstates prior testimony.

Go ahead.

MR. FARAHATI: Let me rephrase that.

Q.    You can't narrow your expertise any further than to say you are an expert in project management for clinical research; is that correct?

MR. CARRIER: Same objection.

THE WITNESS:  I'm an expert in clinical research operations and the underlying ethical principles involved in clinical research.

Q.    Okay.

And that applies for any kind of clinical research?

A.    Yes.

Q.    All right.

So let's just go through your educational history here.

You have a bachelor of science

Page 20

E. Friedrich

that you obtained in 2007; correct?

A.     Correct.

Q.     Okay.

And then you obtained your master's in 2011 in biomedical engineering?

A.     That is correct.

Q.     And then a Ph.D. in 2014 also in biomedical engineering?

A.     That is correct.

Q.     Okay.

And what was your dissertation on?

A.     I was studying a biologics-based biomaterial and the effects of that material in burn wound healing.

Q.     Okay.

Do you have any certifications?

A.     Yes, I am certified in good clinical practices and I -- as I mentioned, I have the PMP, project management professional, certification.

Q.     Okay.

So let's take that in turn.

Page 21

E. Friedrich

Are you certified in a specific aspect of good clinical practices or good clinical practices generally?

A.   The certification that I have is engineered towards medical devices.

Q.   Okay.

When you say medical devices, what do you mean by that?

A.   Clinical investigations regarding medical devices.  I was required to obtain that certification for a specific project in my current role.

Q.   And are there certifications for other areas of good clinical practices as well?

A.   Yes, they're all based on the same good clinical practice guideline. The different certifications are just tailored to the different types of clinical research.  Clinical trials have different regulations depending on what is being tested.  I have actually taken the drugs and biologics version as well.  It just expired after one year.

Page 22

E. Friedrich

Q.    So you're not currently certified in that?

A.    Correct.

Q.    And how long -- what do you need to do to get certified?  Is it a program, a training?  How does it work?

A.    It's training.  There's review of the good clinical practice guidelines and associated FDA regulations.  There's a test that you take.

Q.    And approximately how long is that training?

A.    I honestly don't recall.  A few hours to take the test, I believe.  I don't recall how long I spent preparing for it.

Q.    Is it more or less than a week?

A.    Probably around a week would be accurate.  It's based on a lot of principles that I'm already familiar with, so it probably didn't take that much time.

Q.    Are there courses you need to watch to get this certification?

A.    I believe --

Page 23

E. Friedrich

Q.    Or is it just a test?

A.    No, I believe there were -- I'm trying to recall.

I believe there are courses, videos integrated into the certification process.  I did it through CITI and that's typically how those work.

Q.    And approximately how long would you say those videos were in total?

A.    There typically are different videos for each section that would be between a couple of minutes to maybe thirty minutes, maybe a dozen or so videos.

Q.    So a dozen or so videos from a couple of minutes to thirty minutes.

So in total probably not more than six hours?

A.    Yes, that sounds like it.

Q.    Now, can you tell me a little bit about the PMP certification you just described?

A.    Sure.

So I did that when I was at

Page 24

E. Friedrich

Northwestern.  I took -- it was a semester-long course that I took through Northwestern University, and that was a -- I want to say four-hour test.

Q.    How long was the course?

A.    A semester.

Q.    Okay.

How many times would it meet a week, would you say?

A.    I believe it met once a week for two or three hours.

Q.    Got it.

A.    It amounted to a thirty-five-hour credit course at Northwestern.

Q.    All right.

And this is -- what was the name of this course?

A.    I don't recall specifically. Probably something like project management professional preparation course.

Q.    I see.

Is this the foundation of your expertise in project management for

Page 25

E. Friedrich

clinical studies?

MR. CARRIER: I object to form.

Go ahead.

THE WITNESS:  In addition to the experience that I have in this clinical research, the project management professional framework supports what I know about clinical research operations.

Q.    Okay.

So let's go to that.  So let's talk about your postgraduation experience.

I understand you were you were a -- you had a postdoctoral fellowship for a couple of years from 2015 through 2017; is that right?

A.    That's correct.  That was through the Feinberg School of Medicine and the department of surgery where I worked with two full-time clinical plastic surgeons conducting research.

Q.    Okay.

And you conducted research for these surgeons?

Page 26

E. Friedrich

A.     Yes.  They did both kind of translational research and clinical research.  I was more on the translational side.  But we did do a fair amount of IRB-approved studies in order to get human clinical samples for our testing and analysis.

Q.     What's the difference between translational research and clinical research?

A.     Translational research would typically be done in a lab and not involve enrolling patients for an interventional study.

Q.     Got it.

What's the general size of the staff that would have been involved in the research that you conducted here?

A.     At Northwestern, there were the two principal investigators, myself as the postdoc, we had a couple M.D.s that conducted a lot of the animal surgeries, some med students that contributed.  Maybe under ten people.

Page 27

E. Friedrich

Q.    Okay.

But this research was all conducted on site?

A.    Yes, it was primarily just lab bench-based.  Preclinical research might be an easier way to understand it than translational.

Q.    Okay.  I got it.

Then after that, from 2017 through 2019, you were a research instructor at the University of Illinois; is that accurate?

A.    Yes.  That was in the department of pharmacology.  I was studying endothelial cell biology in that group, so preclinical research.

Q.    How would you define the difference between preclinical and clinical research?

A.    Preclinical does not involve human subjects.

Q.    Okay.

So at this stage you wouldn't have been involved in any clinical trials;

Page 28

E. Friedrich

correct?

A.    Correct.

Q.    So then you became the biomedical research program manager at General Dynamics; is that accurate?

A.    That is accurate.

Q.    That's from 2019 through 2023?

A.    Yes.

Q.    Okay.

What is General Dynamics?

A.    General Dynamics -- and actually I was with General Dynamics IT, which is a branch of General Dynamics -- is a large company that provides contracted research support for government and military institutions to support preclinical and clinical research.  So my group in particular was to support preclinical and clinical research which is why I had a variety of clinical research coordinators, clinical protocol developer, and staff like that.

Q.    And what --

A.    General Dynamics -- go ahead,

E. Friedrich

I'm sorry.

Q.    No, sorry, go ahead.

What you just described, was that for General Dynamics generally or General Dynamics IT?

A.    General Dynamics IT.  General Dynamics is a huge company.  I don't know everything that they do.

Q.    I've seen their videos with the robot dogs; right?

A.    Yes.  I didn't have any robot dogs.

Q.    Okay.  That's unfortunate.

So General Dynamics IT then, what kinds of research would they provide support for?

A.    Sure.

So again only the division I worked in which was military health provided any type of research support for any time of military health-related research, so typically soldier-focused health outcomes, devices, and things like that.

Page 30

E. Friedrich

Q.    Okay.

So you were specifically in the military health research division of General Dynamics IT; correct?

A.    Yes.

Q.    And that's for the entire time you were there?

A.    Yes.

Q.    Okay.

And when you say "soldier-focused health outcomes", what is that?  Are we talking medications here that were being researched or are they devices, are they -- I'm just trying to understand what kinds of things we're talking about.

A.    In my group in particular, which was combat trauma-focused, it was whatever the military physicians were interested in studying, which could be devices or drugs.

Q.    And you did both?

A.    Yes.

Q.    Did you have a focus?

MR. CARRIER: Objection to form.

Page 31

E. Friedrich

Go ahead.

THE WITNESS:  The focus was -- and its relation to combat trauma.

Q.    I know.  But you said it could be devices or drugs and I'm asking were one of the --

MR. FARAHATI: Let me rephrase that.

Q.    You said it could be devices or drugs.

Did you have more experience in one of those than the other?

A.    For the clinical research we were doing, I would say we did probably more devices and procedures.

Q.    And when you say more, do you have a rough estimate of the percentage split between the two?

A.    I have no idea.  Maybe seventy percent devices.

Q.    Okay.

And you said your role with respect to this research was program manager; is that accurate?

Page 32

E. Friedrich

A.    That's correct.

Q.    What does that mean?

A.    In this specific case, it means that I was in charge of several aspects of the group's research, as program manager deciding which projects to pursue.  So the military physicians would come to me with their ideas often were being deployed, they'd generate ideas of the things they wanted to study while they're in a remote or austere environment.  They'd bring it back to me, we'd figure out feasibility of the idea, we'd figure out -- or I would determine if we had the funding to test what they wanted to test.

But then also, as the subject matter expert for preclinical and clinical research, I was also guiding their development of those projects, the development of the protocols, the execution of the protocols, and the compliance with the protocols.  So basically every aspect of the research was under my purview.

Page 33

E. Friedrich

As part of that role and as being a contractor, I also had the unique position to be able to sit in on the institution review board meetings to observe other people's projects and how they were being reviewed by the IRB, so I also gained a fair amount of experience in just understanding my type of clinical research protocol that was coming through that institution.

Q.   So it sounds like in this scenario you were functionally the sponsor of the clinical research in creating these protocols.

Is that an accurate statement?

A.   I don't think I would consider it to be a sponsor.  I would often, in generating new projects, coordinate with sponsors to see basically if they would give us their devices or I guess devices primarily for us to test.  I would consider this more as a -- probably a site-level position but consulting with principal investigators that otherwise

Page 34

E. Friedrich didn't have a good understanding of how to conduct clinical research.

Q.   Okay.  Got it.

I'm just trying to put it in terms of, you know, the parties we have in this case, which you are well familiar with right now.

So when you say a site-level position, this is something similar to, you know, FERG as it relates to this case; is that correct?

A.   Yes.  I think that would be a good way to look at it.  So I would be managing the coordinators which would be like Milka's position, and then I would also be guiding the principal investigators which would be the physicians.

Q.   But -- okay.  I got it.

So General Dynamics IT was not a CRO; correct?

A.   They're not specifically a CRO.  They provide contracted clinical research support which has overlap with what a CRO

Page 35

E. Friedrich
provides.

Q.   What are the differences?

A.   I think the main difference is that General Dynamics IT provides additional services that would fall outside of a traditional CRO because we supported preclinical research at the same time.  So they're -- basically General Dynamics IT is able to provide a variety of clinical and preclinical research support staff.

Q.   Do they ever act as a CRO in managing, you know, the full scope of a trial for a sponsor?

A.   I'm not sure I can speak to that.  I don't know if I know to answer. But I know that I had colleagues --

Q.   I might be able to narrow this down.

In your role at General Dynamics IT, have you ever worked on any projects where you were acting as sort of a CRO role where you were responsible for, you know, the full scope of the clinical

Page 36

E. Friedrich

trial?

MR. CARRIER: I object to the form.

Go ahead.

THE WITNESS:  I would say no. In that role, I was not doing that specifically.

Q.    So in your role, you were not ever on projects where you were taking on the function of a CRO; is that accurate?

MR. CARRIER: I object to the form.

THE WITNESS:  I don't know that that's entirely accurate because a CRO can be contracted to do many tasks for a clinical study or very few tasks for a clinical study, so there's definitely overlap between the two.  I was responsible for ensuring that my team was maintaining compliance with the IRB protocols and I was responsible for that staff in general in their execution of the protocols.

Q.    But to the extent we're talking

Page 37

E. Friedrich

about a CRO that was contracted to perform large portions of the study and oversight and management of the study, you've never been a part of projects at General Dynamics IT where you were taking on that sort of role; correct?

MR. CARRIER: I object to form.

THE WITNESS:  I don't think that's accurate how you stated it.  I had, in my role, quite a lot of responsibility over the execution of the clinical research that was being conducted.

Q.    Well, I guess let me put it like this.

Well, actually, before I get to that, I just want to understand.

When you say clinical research, are you talking about -- you also mentioned there was preclinical research involved; correct?

A.    Correct.

Q.    It was a mix?

A.    Correct.  We did both.

Page 38

E. Friedrich

Q.   Was there one of those things that you did more of?

A.   I would say it was pretty evenly split between the two.

Q.   Okay.

And when you say clinical research, is there a distinction between that and a clinical trial?

A.   So a clinical trial is one type of clinical research.  They all have the same underlying ethical and operational framework.  Clinical trials have some additional FDA regulations that they have to abide by.

Q.   Were you a part of any clinical trials in your role at General Dynamics IT?

A.   No.

Q.   Okay.

Let's just talk about your role at Exponent real quick.

Is Exponent a CRO?

A.   Yes.

Q.   I got the answer, but before

Page 39

E. Friedrich

that I want to understand, you've been at Exponent from December, 2021 to the present; is that accurate?

A.    That doesn't sound accurate.

Q.    It might not be, in my case you can correct me.  We've got two experts in this case.  It's possible I copied the date from the wrong one.

A.    I believe I started in April, 2023.

Q.    That makes a lot more sense, because you were at General Dynamics until 2023.

And what's your title at Exponent?

A.    I'm a senior associate consultant.

Q.    And just to confirm, Exponent's not a CRO; correct?

MR. CARRIER: I object to form.

THE WITNESS:  Correct, Exponent is not a CRO.

Q.    In your role at Exponent, have you ever worked on any clinical trials?

Page 40

E. Friedrich

MR. CARRIER: I object to form.

THE WITNESS:  I have reviewed documentation related to clinical trials, but I have not conducted any clinical trials.

Q.    Okay.

Have you ever drafted the documentation for the clinical trials or was your role more of a review and analysis kind of position?

A.    In the proactive work that I've done, I have developed and drafted clinical research protocols.  And for the reactive work, I have reviewed clinical trial documentation.

Q.    What's the difference between proactive and reactive work?

A.    Proactive would be not litigation-related, so a client that needs help with their -- with usually developing a plan for getting FDA clearance or approval.

Q.    Okay.

So are these sort of one-offs

Page 41

E. Friedrich

that come in, develop this plan for this study, or are you staffing these studies from beginning to end?

MR. CARRIER: I object to form.

THE WITNESS:  It entirely depends on the client.  We do a bit of both.  In the projects I've been specifically involved in, I have written, developed protocols and submitted them to internal and external IRBs for approval.  I have then taken those protocols and executed the study and taken that all the way through study closeout.  It just depends on what the need is for the client.

Q.    Okay.

And when you say protocols, you're referring to the actual protocol like the one Alzamend initially drafted in this case; correct?

A.    Correct.  So the human subjects protocol that gets submitted to an ethics committee or an IRB.

Page 42

E. Friedrich

Q.    All right.

Would you have ever been in charge of drafting the trial plans and procedures?

A.    No.

Q.    So you've never drafted like a communication plan; correct?

A.    No, I've never drafted a communication plan.

Q.    You've never drafted a monitoring plan?

A.    No.

Q.    And you would have never been in charge of implementing, you know, policies or procedures to maintain a blind in the study; correct?

A.    I have actually worked on blinded studies that were preclinical, which had their own procedures for maintaining the blind of those.  I don't recall if I was involved in generating the procedure.

Q.    And when you mentioned that you've drafted clinical protocols in your

Page 43

E. Friedrich

role at Exponent, these are clinical protocols for clinical trials; correct?

A.    Or clinical research.

Q.    Were you a part of ever drafting a protocol for a clinical trial?

A.    I may have had one project where it would have been considered a clinical trial.  I'm just not positive.

Q.    Okay.

But you don't specifically remember drafting --

A.    Correct.

Q.    Okay.

And if it there was, it would have just been that one project?

A.    Probably.

Q.    So in your role at Exponent, you haven't been involved in --

MR. FARAHATI: Strike that.

Q.    In your role at Exponent, the clinical research you've been involved in has been clinical research as opposed to clinical trials?

A.    That's correct, although they

Page 44

E. Friedrich

have the same underlying ethical and operational frameworks.

Q.    But you did testify earlier that clinical trials have additional regulatory frameworks involved; correct?

A.    Depending on the -- what is being tested, there are typically additional FDA regulations for clinical trials.

Q.    Okay.

Have you ever been a part -- we've talked about Exponent and it sounds like you weren't part of clinical trials there.

And in your role at General Dynamics IT, you weren't part of clinical trials there either; correct?

A.    Correct.

Q.    Have you ever been a part of a clinical trial?

A.    When I worked for the startup company for my PI and grad school, I was involved in the planning and quoting stage of the phase I safety for the product that

Page 45

E. Friedrich

I was developing.

Q.    But you weren't part of the actual execution of the trial?

A.    No, it was never executed.

Q.    So you've never developed or implemented a control system to prevent unblinding in a clinical trial?

A.    That's correct.

Q.    How about in your clinical research?

A.    I don't believe it's ever been necessary.

Q.    And is that because they're not blinded?

A.    For the clinical research I've done, yeah, they probably weren't blinded.

Q.    So -- and I'm just talking about your experience generally.

When we're talking about the clinical research that you've been a part of, this clinical research generally was not blinded; is that accurate?

A.    That's accurate.

Q.    And putting aside, you know, the

Page 46

E. Friedrich

blind itself, have you ever been responsible for implementing or drafting control systems just to manage communications in a clinical trial?

A.    No.

Q.    How about in your clinical research?

A.    I'm sorry, can you repeat the question?

Q.    Yeah, no problem.

Have you ever been responsible for implementing like a control system to manage communication pathways in your clinical research?

A.    I've not been responsible for implementing it, but I have been responsible for abiding by someone else's design.

Q.    Have you ever drafted or negotiated a master services agreement for clinical work?

MR. CARRIER: I object to form.

Go ahead.

THE WITNESS:  I have quite a bit

Page 47

E. Friedrich

of experience in the quoting, like requesting quotes for different aspects of clinical research so, you know, determining what is going to be required.  I don't know that -- I don't believe any of those projects got to the full or have gotten yet to that master services agreement.

Q.    Is that because of these clinical research projects you've been a part of have been in their early stages?

A.    Yeah, primarily.

Q.    Have you ever drafted or negotiated a work order?

A.    For other contracted work, yes, I have been involved but not for clinical research.

Q.    And not for a clinical trial either?

A.    Correct.

Q.    All right.

Let's take a look at your report.  We'll mark that Friedrich Exhibit 1.

Page 112

E. Friedrich
because Alzamend was following up with
IMIC to get a task assignment log, that
means that Alzamend knew there were issues
with IMIC?

A.    Well, the task assignment log
should have existed prior to the first
leukapheresis procedure which would have
been in November, so it's more speaking to
the lapse in time between the first
subject and when this got signed.

Q.    You're still speculating that
because Alzamend was following up with
IMIC regarding this task assignment log,
that means they knew there were issues
with IMIC?

MR. CARRIER: Objection to form.
Go ahead.
THE WITNESS:  To the extent that
Alzamend was having difficulty getting
IMIC to fill out this form.

Q.    So is that a yes?

A.    I'm not agreeing that I'm
speculating.  I'm just stating --

Q.    Understood.

Page 113

E. Friedrich

But you are drawing the inference; correct?

A.    Correct.

Q.    And you're assuming that Alzamend was having trouble getting this form because it's something that should have happened earlier; correct?

MR. CARRIER: Objection to form.

THE WITNESS:  That's the conclusion that I made based on my review and analysis of the documents.

Q.    Let's go back to your report.

I'll ask you some general questions here.

Are there risks involved in double-blind studies?

MR. CARRIER: Objection to form.

THE WITNESS:  There are risks in any clinical study, including a double-blind study.

Q.    I think we talked about this before, but you've never been a part of a double-blinded study; correct?

A.    That's correct.

Page 114

E. Friedrich

Q. Let's go to section 5.2.2 of your report. I can give a page number in a second. It's page forty-five.

A. Okay.

Q. So in this section, you're opining that Biorasi properly trained staff on blinding procedure; is that accurate?

A. That's accurate.

Q. And you're making this opinion despite the fact that you've never participated in a blinded study; is that accurate?

A. I am making this opinion based on my review and analysis of the materials and on the industry standards and also literature that I reviewed in this case.

Q. And that is despite the fact that you've never participated in a blinded study; is that correct?

MR. CARRIER: Objection to form.

Q. I think your answer might have been lost in the objection.

Can you repeat it?

E. Friedrich

unblinding.

Q.    Okay.

So there's nothing at least here that explicitly talks about a preventative approach to inadvertent unblinding; correct?

A.    Correct.  These quotations are more specifically about measures to be taken if it occurs.

Q.    Okay.  Got it.

Let's go to page fifty-seven of your report.

A.    Okay.

Q.    Do you see where -- it's at the bottom.  You say, "it is also important to note that Alzamend had a significant role in determining unblinding procedures"?

A.    Yeah.

Q.    Are you opining as a matter of fact that Alzamend had a significant role in determining unblinding procedures?

A.    So that's more or less an introductory sentence to the following parts of the paragraph which are

Page 155

E. Friedrich

describing meeting minutes where Alzamend and Biorasi were discussing unblinding procedures as it relates to the recommendations of the biostatistician.

Q.   We'll get to the support that you talk about there.

But I want no know are you forming an opinion that makes a factual determination that Alzamend had a significant role in determining unblinding procedures?

MR. CARRIER: I object to form.

THE WITNESS:   That is my opinion based on the documents that I reviewed.

Q.   And that's an opinion you're setting forth in your report here?

A.   Yes.

Q.   And that opinion is based on this March 15, 2023 weekly sponsor meeting minute?

MR. CARRIER: Objection to form.

THE WITNESS:   Yes.

MR. FARAHATI: Let's take a look

Page 156

E. Friedrich

at that.

(Whereupon, an e-mail dated March 22, 2023 was marked Friedrich Exhibit 6 for identification.)

Q.    All right.

This will be entered as Exhibit 6.  This is TMF 5459.

Is this the document that you're using to support the proposition that Alzamend had a significant role in unblinding procedures?

MR. CARRIER: I object to form.

THE WITNESS:  That is what I cited, yes.

Q.    Is there a difference between the phrase "unblinding procedures" and "unblinded procedures" to you?

A.    Yes.  Unblinded procedures would be procedures carried out that were unblinded, like Loyda's role, for instance.

Unblinding procedures would be procedures related to either purposefully or accidentally unblinding the data of the

Page 157

E. Friedrich

study.

Q.    Okay.

When you say like -- so unblinded procedures would be like a description of how to ship the Cryoport, that kind of thing; right?

A.    Yeah, yeah.

Q.    Okay.

So could you show me where in this document you're supporting you cited supports the notion that Alzamend was responsible for unblinding procedures?

A.    Yeah.

Q.    I can scroll.

I assume it's one of these action items?

A.    Yeah, probably.

Q.    Do you want me to search for something?

A.    It's item seven on 5461, so a task owner Alzamend; description, provide unblinded -- oh, I see what you're saying, unblinded procedures.  I believe there's another --

Page 158

E. Friedrich

Q.    This was the document you said supports that proposition; correct?

A.    Correct.  I think there's another place that I was referring to.

Q.    But you didn't cite anything else in your report; correct?

A.    No.  I think there's another place within this document.

Q.    Oh, could you show me?

A.    I'm looking for it.

What I think I am trying to refer to is the next footnote four hundred.

Q.    What do you mean, it's a different document?

A.    It's a different document, yeah.

Q.    So it's not in this document?

A.    No.  I think the only thing in that one is that item seven, which --

Q.    But you would agree that this document doesn't actually support that Alzamend was responsible for unblinding procedures; correct?

MR. CARRIER: Objection to form.

Page 159

E. Friedrich

THE WITNESS:  I think it's ambiguous.  But the next footnote is --

Q.   You didn't think it was ambiguous a couple of minutes ago, did you, when we were talking about unblinding versus unblinded?

A.   Sure, you're correct, but if we could move to the other footnote --

Q.   I just want to be absolutely clear.

You would agree with me that this particular document does not support the notion that Alzamend was responsible for unblinding procedures; correct?

A.   It appears they were responsible for unblinded procedures.  I'm agreeing with you, correct.

Q.   All right.

So what's the next footnote?

A.   It's TMF 6055 and TMF 8921.

Q.   Sorry, it's footnote number?

A.   Four hundred.

Q.   That's TMF 6500 and TMF 8921?

Page 160

E. Friedrich

A.    That's correct.

Q.    Do we need to look at both of them or is there one that encompasses?

A.    I'm not sure.  I don't recall.

Q.    I'll pull them up.  TMF 6500 and then TMF 8921.

We're going to share my screen again.

Can you see this?

A.    Yes.

MR. FARAHATI: I'm going to enter as Exhibit 6 the document that is Bates stamped as TMF 6500.

Excuse me, strike that.

I'm entering as Exhibit 7 the document that's Bates stamped 6500. That's TMF 6500.

And then I'm going to enter as Exhibit 8 the document that's Bates stamped TMF 8921.

(Whereupon, an e-mail dated January 9, 2024 was marked Friedrich Exhibit 7 for identification.)

(Whereupon, an e-mail dated

Page 161

E. Friedrich

October 31, 2023 was marked Friedrich Exhibit 8 for identification.)

Q.    All right.

So just show me where in Exhibit 7 I can find the support for the proposition that Alzamend was significantly involved.

A.    It's related to the statistical anonymization of data which is in a couple of places.

Q.    Give me a Bates number.

A.    I'm working on it.

6525.   That's not what I'm looking for though.

Q.    Just let me know where to go.

A.    So in 6525, which is page twenty-six, so there's this bullet about statistical anonymization of data.  This is where we're talking about the unblinded stats team to understand the requirement, internal discussion ongoing.  So that's about -- you have to have procedures related to how to keep the data anonymized or blinded and then when to unblind it I

Page 162

E. Friedrich

believe was the discussion they were having.

Q.   Doesn't this say here "Biorasi to come up with plan and documentation"?

A.   Correct, to understand -- and Alzamend to understand the requirement. They're working on it together.

Q.   It doesn't say they're working on it together.

It just says Alzamend to understand; right?

MR. CARRIER: I object to form.

THE WITNESS:  Call with Biorasi stats team and Alzamend.  I interpreted that they were on the call together discussing --

Q.   And do you recall --

A.   -- the topic.

Q.   And because they were on the call together discussing the topic, you made the leap to say that Alzamend had significant involvement in unblinding plans and procedures?

MR. CARRIER: I object to form.

Page 163

E. Friedrich

THE WITNESS:  That particular sentence just says -- in my report just says they conducted several meetings with --

Q.    I'm not talking about particular sentence though.  I'm talking about your sentence where you say, "it is important to note that Alzamend had a significant role in determining unblinding procedures".

So I'm asking you where the support is for that.

A.    I understand that.  I believe it's going to be the communication of the next several sentences, and I don't have these documents memorized to recall which footnote is what you were looking for.

Q.    So you don't know sitting here what the support is for that statement?

MR. CARRIER: I object to form.

Go ahead.

THE WITNESS:  I just don't recall this --

Q.    I'm happy to open documents.  So

Page 164

E. Friedrich

this is one of the documents you told me to open a moment ago and it doesn't seem to support that proposition.

MR. CARRIER: Objection to form.

Go ahead.

THE WITNESS:  It supports the sentence that it's citing.

Q.    I know, but that's not the sentence I was asking you to give me the support for.  I'm asking you to give me the support for the proposition that Alzamend had significant involvement in determining unblinding procedures.

MR. CARRIER: Objection to form.

Q.    You would agree with me that this document does not support that proposition; correct?

MR. CARRIER: Objection to form.

Sahand, that's not what she said.  You've got to let her finish the question.  She was responding to that and explaining how it does.  Then you can ask the next question.

MR. FARAHATI: I'll let her

Page 165

E. Friedrich

finish.

Q.    Please answer my question.

A.    Okay.

What I'm trying to say is there are multiple sentences in this paragraph that support the opening sentence.  I don't recall each of these documents that were cited.

So this first one supports the sentence that the footnote is on.  We're going to have to open the remainder for me to accurately find what supports --

Q.    Let's just take a look at the paragraph to understand what it is that you think supports it.

Your first sent is what it says.

The second sentence is that "Alzamend was assigned the action item owner for providing unblinding procedures".  We already looked at that document, and you agreed with me that doesn't actually support this proposition; correct?

MR. CARRIER: Objection to form.

Page 166

E. Friedrich

THE WITNESS:  Can I just have a minute to read the paragraph?

Q.    Yes.

A.    (Reviewing).

Okay.

The next several sentences provide more support.  The other sentences were kind of just setting up that they were having these ongoing meetings.

Footnote four hundred one further sets up that Biorasi shared concerns during this weekly sponsor meeting, so again we're talking about how Biorasi and Alzamend are continually meeting every week to discuss different issues related to the trial.  Biorasi --

Q.    So let me pause you for a second --

A.    Biorasi --

Q.    I want to address what you just said.

So far the evidence that you've described -- and I understand you'll describe some more -- but so far it's just

Page 167

E. Friedrich

the fact that Biorasi and Alzamend were involved in meetings to discuss the topic of unblinding; correct?

MR. CARRIER: Objection.

THE WITNESS:  That is what that sentence is saying.  That's not what the paragraph as a whole is saying, so that's --

Q.    I get that.  And we'll get to the rest of the paragraph.  I just wanted to make sure.  I want to take it in turn.

So so far that's your basis, but go on.

A.    Got it.

MR. CARRIER: Objection to form.

THE WITNESS:  Okay.

So as I was saying, "Biorasi shared concerns that the data transfer and anonymization process could lead to inadvertent unblinding based on recent discussions requests from the Alzamend team and cause significant risk to the study integrity".  That's footnote four hundred one.

Page 168

E. Friedrich

The next sentence, "a decision was made to implement an anonymized participant number early in all documentation to prevent unblinding, schedule a separate call to review and implement the process promptly, and have the Biorasi unblinded statistician join weekly sponsor calls".

"Then documentation from the weekly sponsor meeting on November 2, 2023 shows that Alzamend requested assistant documenting an unintentional unblinding plan.  However, manual guideline updates were deemed out of scope at this time under the current contract pending Alzamend's approval of the change order".

So it's really those three sentences in the middle that have direct quotes is the support for the first sentence.

Q.    Okay.

Which aspect of these quotes

Page 169

E. Friedrich

support that Alzamend had a significant role in determining the procedures?

A.    They were actively engaged in discussions with Biorasi to settle on a plan for unintentional unblinding.

Q.    So because -- do you know anything about the content of these discussions?

MR. CARRIER: Objection to form.

THE WITNESS:  I was obviously not in the meetings where they were discussing --

Q.    Did you review transcripts?

A.    No.

Q.    Did you review recordings?

A.    No.

Q.    So you don't recall -- you don't know the specifics of what they discussed, you just generally know that these topics were discussed; correct?

MR. CARRIER: Objection to form.

THE WITNESS:  I know how they were described in the meeting minutes.

Q.    But sitting here, you're telling

Page 170

E. Friedrich

me that they were described in the way you're quoting them; correct?

MR. CARRIER: Objection to form.

THE WITNESS:  Correct.

Q.    And so you're drawing a leap --

MR. FARAHATI: Strike that.

Q.    You're drawing an inference that because these meeting minutes involved Biorasi and Alzamend discussing unblinded, that means that Biorasi -- excuse me, that Alzamend was significantly involved in determining unblinding procedures; correct?

MR. CARRIER: Objection to form.

THE WITNESS:  Correct, that's my view based on --

Q.    Got it.

But just to confirm, this second sentence you have in that paragraph where you say, "per the March 15, 2023 weekly sponsor meeting meetings, Alzamend was assigned as the action item owner for providing unblinding procedures", that's simply incorrect; right?

Page 171

E. Friedrich

MR. CARRIER: Objection to form.

THE WITNESS:  I'm actually not sure it's incorrect.  Its misquoted in the document that said unblinded procedures.

Q.    Yeah.

And when we looked at the actual quoted version, you told me that unblinded procedures refer to something differently than unblinding procedures.

A.    Correct, that's different from the unblinding plan.

Q.    So this sentence is incorrect; correct?

A.    Sure.

MR. FARAHATI: Let me rephrase that just because of the double correct.

Q.    This sentence is incorrect; right?

A.    Yes, I would concede that.  Yes.

Q.    Fair enough.

When you say down here at the bottom -- it's in the middle paragraph and

Page 190

E. Friedrich

fulfilling these invoices delayed study activities in November and early December, 2023.

Q.    Are you expressing that opinion in this matter?

A.    It's not an opinion.  I'm just reciting what's in the documents I reviewed.

Q.    So you're not expressing this opinion in the matter?

A.    Not in this sentence.  It was just what was in the document.

Q.    Have you reviewed the invoices?

A.    No, I have not.

Q.    You're not an accounting expert; right?

A.    I am not and I will not be providing opinions related to accounting.

Q.    Are you opining that Alzamend should have fulfilled these invoices you referenced?

A.    I am simply stating what occurred.

Q.    Let's go to page seventy-three.

Page 191

E. Friedrich

That's the next page.

Do you see at the bottom paragraph there you say --

MR. FARAHATI: Excuse me, strike that.

Q.    Do you see at the paragraph at the at the top of the page at the end of it you say, "the above events are indicative of the various changes to the trial due to Alzamend's actions that the FERG coordinator may have been referring to in her January 19, 2024 e-mail".

Do you see that?

A.    Yes.

Q.    Are you expressing an opinion as to what the FERG coordinator might have been referring to in her January 19, 2024 e-mail?

MR. CARRIER: Objection to form.

THE WITNESS:  I'm just saying there were a lot of changes in the trial and the FERG coordinator, in her January 19 e-mail, said -- let me find it -- if things are different today,

Page 192

E. Friedrich

as it seems to be with everything else in this trial, these are some of the things they could have been referring to.  But I obviously don't know her intent.

Q.    Okay.

So you're just speculating as to what it might be?

MR. CARRIER: Objection to form.

THE WITNESS:  Correct.

Q.    What part of Dr. Hausheer's report is this responsive to?

A.    Well, in this section of Dr. Hausheer's report, he is -- he is placing blame on Biorasi and I am just providing some context to other events that were going on at the time as well, which includes changes to the trial.

Q.    What do you mean by placing blame?  Placing blame as to what?

A.    I believe Dr. Hausheer is saying -- he states, "Biorasi's course of misconduct combined with its systemic failures in GCP standards led to

Page 193

E. Friedrich

unfortunate, premature, and unwarranted cessation", which I took to mean he is blaming Biorasi for the trial -- for Dr. Carballosa exiting the trial.

Q.   And so what your opinion is that Dr. Carballosa may have exited the trial because of these various changes that you've referenced here?

A.   My opinion is that the record does not support Dr. Hausheer's opinion. I am not making any opinions about causation or fault.

Q.   All right.

Just the last section here -- we're almost there -- the very last paragraph of the report, towards the end of it do you see the sentence that goes, "Dr. Hausheer also fails to acknowledge that the ultimate responsibility for trial quality and data integrity remains with the sponsor even when certain functions are delegated to a CRO, including some or all regulatory obligations under a TORO".

Do you see that?

Page 228

CERTIFICATION BY REPORTER

I, Wayne Hock, a Notary Public of the State of New York, do hereby certify:

That the testimony in the within proceeding was held before me at the aforesaid time and place;

That said witness was duly sworn before the commencement of the testimony, and that the testimony was taken stenographically by me, then transcribed under my supervision, and that the within transcript is a true record of the testimony of said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, that I am not interested directly or indirectly in the matter in controversy, nor am I in the employ of any of the counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 23rd day of March, 2026.

Wayne Hock