# Exhibit C

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

_____

ALZAMEND NEURO, INC.,

Plaintiff,

-against-

BIORASI, LLC,

Defendant.

Case No. 25-cv-20481-BB

_____

March 18, 2026

2:45 p.m.

VIDEOCONFERENCE DEPOSITION of AIMON IFTIKHAR, taken by Plaintiff, held at 149 Commonwealth Drive, Menlo Park, California before Wayne Hock, a Notary Public of the State of New York.

Page 2

A P P E A R A N C E S:

OLSHAN FROME WOLOSKY LLP
Attorneys for Plaintiff
            1325 Avenue of the Americas
            New York, New York 10019
BY:     SAHAND FARAHATI, ESQ.
            sfarahati@olshanlaw.com
            (via videoconference)


CARLTON FIELDS PA
Attorneys for Defendant
            80 South 8th Street
            Minneapolis, Minneapolis 55402
BY:     DAVID J. CARRIER, ESQ.
            dcarrier@carltonfields.com
            (via videoconference)
            NATALIE DONIS, ESQ.
            ndonis@carltonfields.com
            (via videoconference)

ALSO PRESENT:

            KEVIN GALLAGHER, Videographer
            (via videoconference)
            BRIAN CHAIKEN
            (via videoconference)
                *      *      *

A. Iftikhar

Q.    Okay.

This report was previously marked in the record as Friedrich Exhibit 1.  We'll refer to it as that going forward.

Do you have it handy?

A.    Yes.  I have a physical copy of my report.

Q.    So this exhibit, when we're talking about it, we'll each have our own versions and we'll go through it that way. If there are other exhibits that I direct to, I'll put them up on the screen so we can both look at the same thing.

Sound good?

A.    Sounds good.

Q.    Have you reviewed anything since writing your report that changes any of the opinions expressed in your report?

A.    No.

Q.    So you don't intend to make any changes or revisions; correct?

A.    No, I do not.

Q.    Okay.

A. Iftikhar

You don't have any personal involvement in any of the events that underlie this case; correct?

A.   No, I do not.

Q.   So your understanding of the record was based entirely on your review of the documents and the trial record in this case; correct?

A.   Correct.

Q.   Have you ever testified as an expert at trial or by deposition?

A.   No, I have not yet.

Q.   Have you ever prepared an expert report for litigation or arbitration?

A.   At Exponent, I have supported a written expert report across a few different cases.

Q.   But have you ever written one yourself?

MR. CARRIER: Objection.

Go ahead.

THE WITNESS:  I have written parts of an expert report myself.

Q.   Was your name listed as an

Page 11

A.  Iftikhar author?

A.    No, it was not.

Q.    So this is the first report that you have actually authored; correct?

A.    Correct.

Q.    So you've never been deemed to qualify as an expert by any court in this country; correct?

MR. CARRIER: Objection to form.

Go ahead.

THE WITNESS:  I work at Exponent which is a scientific consulting company that hires experts in their field, and so I am deemed an expert in my field by Exponent.

Q.    And I'm not asking whether you're qualify as an expert or should qualify as an expert.

I'm just asking have you ever been deemed to be qualified as an expert by a court?

MR. CARRIER: Same objection.

THE WITNESS:  Not by a court.

Q.    How would you describe your area

Page 12

A. Iftikhar

of expertise?

A.     I have expertise in both biomedical engineering and clinical research.  Specifically for this case my background applies with clinical research operations as well as infrastructure as well as the responsibilities of a CRO.

I have worked on numerous clinical trials in the past, both from the beginning stage all the way to the end, so study startup, activities, working with sponsors to develop protocols, feasibility assessments, things like that, and then study execution, monitoring, as well as study and closeout activities as well.

Q.     Let's go to appendix B of your report.  We can walk through some of the items you just listed.  I can give you a page number once I'm there myself.

This is your -- page ninety-two of the PDF.

A.     Got it.

Q.     This is your CV?

A.     Uh-huh, yes.

Page 13

A. Iftikhar

Q.    So you received a bachelor of science in biomedical engineering in 2015; correct?

A.    Correct.

Q.    And a master of science in biomedical engineering in 2014; correct?

A.    Correct.

Q.    And then you received your Ph.D. in biomedical engineering --

MR. FARAHATI: Strike that.

Q.    Your Ph.D. in bioengineering in 2020; correct?

A.    Correct.

Q.    Is there a difference between biomedical engineering and bioengineering?

A.    They are used interchangeably in the field.

Q.    And what was your dissertation on for your Ph.D.?

A.    My dissertation focused on developing different biomolecule coatings for a pelvic mesh and basically understanding what that response looks like, both host and inflammatory response.

Page 14

A. Iftikhar

Q.    Were you involved in any clinical trials during your education?

A.    I was not involved in any clinical trials.  However, a lot of my work was in the preclinical space, so my fellowship that was awarded was by the Clinical and Translational Science Institute, so I did work with PharmDs who were in that space.

Q.    Do you have any certifications?

A.    I do.  I have my good clinical practice certification.

Q.    Is that a certification of a particular area of good clinical practices?

A.    It is in medical device clinical investigations.

Q.    That's the same thing that Dr. Friedrich has; right?

A.    I believe so.

Q.    So I will skip all my questions about what that is.

So let's talk about your professional experience a little bit.

Page 15

A. Iftikhar

When you graduated, you went straight into industry; is that correct?

A.   When I graduated from my Ph.D.?

Q.   Correct.

A.   Yeah, when I graduated from my Ph.D., my next line of work was in -- was work as a CRO as a clinical research scientist.

Q.   And that was Machaon Diagnostics?

A.   Yeah, Machaon Diagnostics.

Q.   Oh, Machaon, that's how you pronounce it?

A.   Yeah.

Q.   I might forget that, but I'll try.

Let me bring that up here.  I might have missed it.  There we go.

It says you were a clinical research scientist.

What is that?

A.   A clinical research scientist is a scientist that works in clinical research and contributes to a variety of

Page 16

A. Iftikhar responsibilities throughout the course of clinical trials being conducted at that company.

Q.    In what sense -- what sense do you mean contribute?

A.    Contributes in the sense that at least the role I was in as a clinical research scientist I contributed to the study design of a clinical trial.  I also contributed to the management of a clinical trial.  I contributed to the actual execution of a clinical trial.  I also contributed to written documents, so policies, procedures, as well as study plans and agreements for those clinical trials.

Q.    What do you mean when you use the word "contribute"?  That you had a part to play in these factions or something else?

A.    Correct, that I was responsible for doing some of these items or some of these actions.

Q.    Were you ever responsible for

Page 20

A. Iftikhar

A.    That chain of command can vary depending on the company itself, so I can only really speak to the CRO I worked at and what I've just generally seen across other trials.  And so typically coordinators are the folks who are conducting the study or part of different procedures in the study.

Associates are those that are maintaining the documentation and compliance within a study and kind of coordinating things from that perspective.

Hierarchy and then scientists will make up potentially roles in all of those, so it's a little bit hierarching [sic] in the sense that the scientists are looking at the trial design as well as all of these other things that I mentioned previously.  And then there's typically a director that -- of the department that is responsible for overseeing everything.

Q.    Is there a project manager in this --

A.    Yes.

Page 21

A. Iftikhar

Q.    -- hierarchy?

A.    I also was a project manager for some of the trials that I worked on.

Q.    And so you would have reported in all of these trials to the director of the department?

A.    All of trials that were conducted at Machaon Diagnostics, I did report to the director of clinical research.

Q.    Did you report to anyone else as well?

A.    No.

Q.    And you were at Machaon for seven months?

A.    Yeah, less than a year.

Q.    Why did you leave?

A.    They actually were moving locations to be further away from where I lived, so the commute was going to be pretty tough.  That's actually really why.

Q.    Got you.

And when we're talking about these clinical trials, in terms of the

Page 22

A. Iftikhar staffing, were you staffed on specific clinical trials that you were kind of on throughout their inception to their execution or would it work that you would come in on a clinical trial, provide some work, and then work on a different clinical trial?

A.    While I was at Machaon, I was working on some clinical trials from the beginning to the end and others that had already been ongoing that I was then included as part of, so a little mix of those, to be honest.

Q.    So how many clinical trials let's say that you were on from beginning to end that you worked at Machaon?

A.    I worked on two from beginning to end and I supported --

Q.    Sorry, go on.

A.    And I supported my role with six clinical trials in total.

Q.    The two that you worked on from beginning to end, were these happening at the same time or did one end and you

Page 23

A. Iftikhar started on the other?

A. There was some overlap. Someone started before the other one.

Q. So in total, you worked on eight clinical trials at Machaon?

A. No, six including those two.

Q. So in total, you worked on six at Machaon, two that you were staffed on and then four that you supported in certain aspects?

So let's talk about the two clinical trials you were staffed on.

Could you tell me a little bit about what they were each about?

A. Sure.

So one of them was involving -- so this CRO focuses on rare blood disorders in therapeutic areas, and so one trial focused on folks who were deficient in a plasminogen receptor, and so we had an alternative replacement therapy that we were providing to those folks, so it was very specialized.

And then the other trial that I

Page 24

A. Iftikhar worked on was with validating a device that was going to be reading different measurements of coagulation of blood samples.

Q.    Were any of these clinical trials trials for, you know, any kind of pharmaceutical?

A.    Yes.

Q.    Which one?

A.    The plasminogen.

Q.    So let's talk about that one.

That was the first one that you described as a replacement therapy?

A.    Yes.

Q.    What was your role in that clinical trial?

A.    I was a clinical research scientist.

Q.    Okay.

But who did you -- when we originally spoke, you said sometimes you acted as the project director and other times --

A.    Project manager.

Page 25

A. Iftikhar

Q.    Was that this trial?

A.    This trial, no, I was not the project manager of this trial.

Q.    So someone was the project manager of this trial?

A.    Yes.

Q.    And you reported to them?

A.    I did not report to them.  I worked with them.

Q.    And did this trial complete while you were at --

A.    Yes.

Q.    -- Machaon?

Did the second trial complete while you were at Machaon?

A.    Yes.

Q.    And were you acting as the project manager in that trial?

A.    Yes.

Q.    Were either of these trials blinded?

A.    Yes.

Q.    Which ones?

A.    Both.

Page 26

A. Iftikhar

Q.    Did they involve sham shipping logistics?

A.    No, they did not.

Q.    How many different sites were involved?

A.    The -- the device trial that I was the project manager of had three sites and the plasminogen had just one.

Q.    Got it.

And there were vendors separate from that?

A.    Yes.

Q.    Did anyone report to you?

A.    Not directly.

Q.    So you were a sort of an island in that sense; right?  You didn't report to anyone other than the -- I think you said the director and no one reported to you either?

A.    Correct.

Q.    And in terms of the six other clinical trials that you had some role on, what were --

MR. FARAHATI: Excuse me, strike

Page 27

A.  Iftikhar

that.

Q.    The four other clinical trials that you had some involvement in, what was your involvement on those?

A.    My involvement kind of related to either initial documentation review just to ensure things were kind of in place as well as some of the monitoring aspects of the trial.  So again, just making sure the trial's being conducted in complies with the regulatory guidelines.

Q.    The trial as a whole or any particular aspects of the trial?

A.    The trial conduct, anything that was being done at our site.

Q.    Did you ever work on an Alzheimer's clinical trial?

A.    No.

Q.    Did any of these blinded trials require mimicry logistics to maintain the blind?

MR. CARRIER: Objection to form.

Go ahead.

Q.    When I say mimicry logistics,

Page 28

A. Iftikhar

I'm referring to sort of shipments that are designed to appear identical for active and placebo subject to preserve the blind.

Do you understand what I'm saying there?

A. Yes.

Q. So none of the trials you worked on involved mimicry logistics as I've just described them; correct?

A. As you've just described, yeah.

Q. Were you ever ultimately responsible for any project's documents that you contributed to?

A. What do you mean by "ultimately responsible"?

Q. In terms of was there anyone else at Machaon that would have needed to review and sign off on them?

MR. CARRIER: Objection to form.

Go ahead.

THE WITNESS: Yes. So a lot of documentation that we work on is technically reviewed by scientists and

Page 29

A. Iftikhar

then quality assurance also reviews --
we have our own QA process for
documentation.

Q.      Okay.

So as part of your role in
contributing to the, you know, project
document that were created, you never
actually had ultimate responsibility in
signing off on them; correct?

MR. CARRIER: Objection to form.

Go ahead.

THE WITNESS:  Signing off on
them?  I did sign off on --

Q.      I know you signed off.

You weren't the last stop at
Machaon before these went out to either
the sponsor or whoever they were going to?

A.      Right, our QA department, yeah.

Q.      So have you -- what sorts of
documents would you have prepared with
respect to these clinical trials?

A.      That is a lengthy-ish kind of
list.  It's kind of broad.

Q.      Let me narrow this down a bit.

Page 30

A. Iftikhar

Would you have planned trial plans with respect to these clinical trials?

A.    Yes.  Study plan agreements, technical agreements, data agreements.

Q.    Have you ever prepared a communication plan?

A.    I have not prepared a communication plan.

Q.    Have you ever prepared a monitoring plan?

A.    I have contributed to a monitoring plan.

Q.    And what do you mean by "contributed"?

A.    What I mean by contribute is I worked with my team to write and develop a monitoring plan.

Q.    But you've never been personally responsible for developing the plan from scratch; correct?

MR. CARRIER: Objection to form.

Go ahead.

THE WITNESS:  Personally

Page 31

A. Iftikhar

responsible, no.

Q.    What about any plans to implement and maintain a blind?

MR. CARRIER: Objection to form.

THE WITNESS:  Yes, I have contributed by working with my team to write and review a plan for blinding procedures.

Q.    Okay.

So you were part of a team that did that; correct?

A.    Yes.

Q.    How big was that team?

A.    At the time I believe we were about four to five individuals.

Q.    And what was your role in that aspect?

A.    As a clinical research scientist?

Q.    No, no.

You mentioned that there was four to five scientists and that you contributed to the development of plans to prevent and maintain -- to prevent

Page 32

A. Iftikhar unblinding and maintain the blind.

I'm just asking what was your role with respect to those plans?

A.    I edited and reviewed the procedures that we had in place.

Q.    I see.

Someone else drafted them though; correct?

A.    That was part of the plan that was already drafted that I reviewed and edited.

Q.    And was that the only time, at least that you can remember?

A.    For the blind procedures?

Q.    Yes.

MR. CARRIER: Objection to form.

Go ahead.

THE WITNESS:  I don't recall.

Q.    So at least sitting here today, that's the only time you can remember that you worked on any blinding procedures or documents or plans to maintain a blind; correct?

A.    Not necessarily since I've

Page 33

A. Iftikhar worked on other clinical trials at Exponent.  So these would be at Machaon I have not.

Q.    At Machaon you didn't.  At Exponent you may have.

So let's actually move on to Exponent.

Is Exponent a CRO?

A.    No.

Q.    How is Exponent different than a CRO?

A.    Exponent as a whole is a scientific and engineering consulting firm.

Q.    How is that different than a CRO?

A.    A CRO is either a contract research organization or clinical research organization that solely focuses on contract work in the clinical research space.  Exponent does a variety of things outside of that scope.

Q.    Does Exponent manage clinical trials?

Page 34

A. Iftikhar

A.    Folks at Exponent do manage clinical trials.

Q.    So let me ask you -- and have you managed clinical trials at Exponent?

A.    Yes, I have.

Q.    And to what -- when I say manage, to what extent were you involved in these clinical trials?

A.    These clinical trials I was involved from startup to study closeout and I was the project manager.

Q.    And how many clinical trials?

A.    End to end, two clinical trials.

Q.    You've given me a number that is too -- not big enough that I would just glows over and small enough that I have to ask you about each of these individually. If you had said like fifty, we would have been talking generalities and we would have probably done sooner. But since it's two, we'll talk about each of them.

Could you just describe to me the first one?

MR. CARRIER: Objection to form.

Page 35

A. Iftikhar

Go ahead.

THE WITNESS:  Well, I'll preface this with the fact that there are confidentiality agreements in place for these -- both of the trials that were conducted here, so I can only generally explain that we worked on a wearable device.

Q.   So I'll just say for the record we can designate this portion of the transcript confidential.  That means it can't be used outside the litigation.

I will ask you some more questions.  I don't need to know the trade secret aspects of what happened there, but when you say a wearable device, are you talking about -- like what kind of treatment was this in reference to?

A.   A wearable device -- a wearable medical device to treat -- it's not necessarily a treatment, it's an intervention.

Q.   Did it have to do with Alzheimer's?

Page 36

A. Iftikhar

A.    Not specifically.

Q.    And what was the second clinical trial?

A.    The second clinical trial was also with a wearable medical device.

Q.    Did these trials involve a double-blind?

A.    The trial -- actually, the first one that I'm referring to, yes, did have a double-blind setup.

Q.    The second one didn't?

A.    No, the second one had a single-blind.

Q.    What was your role in each of these trials?

A.    The first one I was -- I mean, my role at Exponent specifically as a senior scientist, but for the trial I was a project manager.

Q.    So who --

A.    And a sub investigator.

Q.    Who reported to you?

A.    The research team.

Q.    How big is the team?

Page 37

A. Iftikhar

A.    The first trial was approximately three to four folks.

Yeah, I want to correct the record that I was a sub investigator for both of those trials.

Q.    And a project manager?

A.    And a project manager, yeah.

Yeah, I think the terms -- in terms of responsibility overlap.

Q.    Who did you reach out -- who did you report to on that first trial?

A.    In a clinical trial, I don't report to anyone per se.  As my role at Exponent, I have a supervisor who's not involved in the clinical trial, so I'm like a consultant.

Q.    Were there multiple sites involved for this clinical trial?

A.    Yes.

Q.    All right.

In the second clinical trial, what was your role with that?

A.    I was also a sub investigator and I was like a co-project manager with

Page 38

A. Iftikhar another sub investigator.

Q. How many people reported to you there?

A. The research team was approximately six people.

Q. And all six reported to you?

A. Yes.

Q. So as part of these clinical trials, would you have drafted project plans?

A. Part of these clinical trials, I have worked on some of the project plans. These were in conjunction with the sponsor team.

Q. And was the sponsor team in charge of drafting the project plans in these clinical trials?

MR. CARRIER: Objection to form. Go ahead.

THE WITNESS: Not specifically. The responsibility was between both of us.

Q. Okay. So to what extent were you

Page 39

A. Iftikhar involved in drafting the project plans?

A. To the extent that I was reviewing, editing, and finalizing the project plans for this study.

Q. Okay.

But you weren't drafting them from scratch?

A. No.

Q. Was the sponsor team doing that?

A. Part of the plans were coming from the sponsor team.

Q. So --

A. And part of it was our input.

Q. So you were taking on more of a review role?

MR. CARRIER: Objection to form.

THE WITNESS: Review and editorial.

Q. Review and editorial. Got it.

A. As well as experience.

Q. So at Exponent, have you ever drafted a communication plan?

A. At Exponent, no, I have not.

Q. Have you ever worked on a

Page 40

A.   Iftikhar communication plan?

A.     I have reviewed a communication plan.

Q.     And how about a monitoring plan?

A.     Yes.

Q.     To draft it or reviewed?

A.     Partially both.

Q.     Okay.

So have you drafted a monitoring plan from scratch?

A.     Not from scratch since we have relevant information for our monitoring plan already in place.

Q.     Have you prepared the first draft of the monitoring plan?

A.     No.

Q.     That would have been the sponsor team?

A.     Partially both, our team and the sponsor team.

Q.     At Exponent, have you ever implemented any plans or protocols to maintain a blind?

A.     Yes.

Page 41

A. Iftikhar

Q.    And that would have been for this first trial?

A.    Yes.

Q.    Can you describe that?

A.    There's quite a bit to consider when it comes to blinding procedures, and so some of those relate to data kept in the EDC, who has access to what in the different electronic platforms.  For the relevance in this case, we did have randomization and blinding e-mail address that is also provided with instructions to the whole team on how to use.

Q.    Sorry, could you repeat that? My computer cut out a bit and I missed part of your answer.  We could also have the court reporter read it if you'd prefer.

A.    Sure.

Actually, if the court corporate can repeat.

(Whereupon the requested portion was read back by the reporter)

Q.    What do you mean by -- it

Page 42

A. Iftikhar sounded like you said relevance and blinding e-mail address.

What did you mean there?

A.    Relevance to this case.

Q.    So what do you mean by blinding e-mail address?

A.    An e-mail address that is involved with the blinding of the study.

Q.    Could you elaborate?  You mean an individual that is designated as the person that blinded people should each out to with questions?

A.    No.  I'm referring to an e-mail address that's been created with regards to the blinding assignments.

Q.    Walk me through that.  Give me a little more detail as to how that works and what you're referring to.

A.    So an e-mail address where there's communication about who has been randomized into the study, and so there is like one aspect of an e-mail address that's there and then another e-mail address that's related to just blinding

Page 43

A. Iftikhar overall.

Q. I'm still not following.

When you say e-mail addresses, are you talking about like Listservs?

A. I'm talking about a distribution list.

Q. A distribution list. Okay.

So you were involved in putting together distribution lists for blinded and unblinded?

A. I was not responsible for creating the distribution list. However, the trial I worked on had a distribution list.

Q. I see.

I'm asking for were you ever responsible for preparing a plan or procedure to prevent unblinding in the trial that you've worked on.

A. Got you.

I have contributed to reviewing and drafting a plan.

Q. You contributed but you haven't had the primary responsible for doing so?

Page 44

A. Iftikhar

MR. CARRIER: Objection to form.

Go ahead.

THE WITNESS:  No, no one person has primary responsibility in this space.  It's a lot of teamwork on how these plans get done and finalized.

Q.    You didn't take the first draft of the plan?

A.    No.

Q.    Who did?

A.    I don't recall.

Q.    And would you have just reviewed it as part of your contribution?

A.    Reviewed and provided input as well.

A lot of these plans are evolving documents, and so they need to be considered for each trial, the relevance, and how in depth you need to go.

Q.    And so this -- now I'm talking about the entirety of your experience.

What we have just talked about is the only unblinding plan or procedure you have had experience with?

Page 45

A. Iftikhar

MR. CARRIER: Objection. Form.

THE WITNESS: The unblinding plans and procedures that we just talked about for these trials, correct.

Q. Were there more than one? I thought it was just with respect to the first trial we had talked about.

A. Yeah. The second trial was single-blinded, so there was still an element of blinding. The first trial was double-blinded.

Q. But our conversation just now about your role and the unblinding plans and procedures and your involvement, you were speaking with respect to both?

MR. CARRIER: I object to the form.

Go ahead.

THE WITNESS: I was primarily speaking to the first trial. However, there's relevance to the second one.

Q. In the second trial, were you involved in putting together the first

Page 46

A. Iftikhar

draft of an unblinding plan or procedure or plan to maintain the blind?

A.    I was involved with the discussions with the sponsor team on how to implement the blind.

Q.    But did you put together the plan itself?

A.    No.

Q.    You just had involvement in the discussions with the sponsor team?

A.    Yes.

Q.    I think we can move on.

I guess I will show you what has been previously marked as Friedrich --

A.    Okay.

Q.    -- Exhibit 8.

MR. FARAHATI: Actually, strike that.

Q.    It's Friedrich Exhibit 9.

I'll share my screen.

Did you review any of these resumés as part of your work on this case?

MR. CARRIER: Objection to form.

Go ahead.

Page 47

A. Iftikhar

THE WITNESS:  I did review CVs.

Q.    Do you recall that this CV is Juan Carlos Duany Santos?

A.    Yes, I see it has Juan Carlos Duany Santos written up there.

Q.    And then we'll move on to Friedrich Exhibit 10.  This is Bates stamped BIO 236201.

See that this is the CV of Josanne Johnson.

A.    Yes, I see Josanne Johnson.

Q.    Do you see that Ms. Johnson has been -- let's start at the top here.

Do you see that Ms. Johnson was a clinical trial manager from 2022 to the present at Biorasi?

A.    I see that's written there.

Q.    And you see that before that she was a project manager?

A.    Yes, I see that's written there.

Q.    And then before that, a project director in 2019?

A.    Yes.

Q.    And a senior clinical research

Page 62

A. Iftikhar

work with Alzamend's approved selections for the trial.

Q. What kinds of documents did you look at to make that determination?

A. Oh, we can go into the specific ones cited here. However, I know we looked at or I looked at the feasibility assessments for the different third parties that were being considered. And then there was another sheet with a column that had Alzamend's approval or disapproval or commentary on those third parties.

Q. Do you need to be an expert to review a sheet that has Alzamend's approval or disapproval or commentary?

MR. CARRIER: Objection.

Go ahead.

THE WITNESS: Can you repeat the question?

Q. Do you need to be an expert to review a sheet that has Alzamend's approval or disapproval or commentary --

MR. CARRIER: Objection.

Page 63

A. Iftikhar

Q.    -- regarding a vendor?

A.    I think you need to be experienced in the clinical trial space to understand what is being -- what is being written in those documents.

Q.    Do you see at the bottom of your paragraph you say, "Alzamend was fully aware of and had visibilities [sic] to which sites had conducted both cell therapy and Alzamend studies previously"?

A.    Yes.

Q.    So you're here proffering your opinion as to what Alzamend was aware of?

MR. CARRIER: Objection to form.

THE WITNESS:  My opinion is that, based on the evidence that I reviewed, that Alzamend was privy to the sites being considered for the trial.

Q.    Got it.

And now do you see the next part here, "Biorasi worked with Alzamend in approving the additional specialized partners and it was Alzamend that did not

Page 64

A. Iftikhar

include Biorasi on part of the process"?

A.    Yes, I see that language.

Q.    Was that based on this note to file dated March 8 that has the quoted language you reference in this e-mail?

A.    The note to file specifically lists the vendors that were contracted by Alzamend and the details that Biorasi did not have that documentation.

Q.    And based on that, you conclude that Biorasi worked with Alzamend in approving the additional specialized partners and it was Alzamend that did not crude Biorasi as part of the process?

MR. CARRIER: I object to form.

Go ahead.

THE WITNESS:  That is my opinion.

Q.    Do you need to be an expert to read and interpret that note to file?

MR. CARRIER: Same objection.

THE WITNESS:  Yes, to understand the context of what a note to file even means within a clinical trial.

Page 65

A. Iftikhar

It's an official document.

MR. FARAHATI: I can pull up the note to file here.  Let's do that.

We are going to mark this as Iftikhar Exhibit 1.  This is going to be a document that is Bates stamped TMF 57533.

(Whereupon, a document entitled Note to File dated March 8, 2024 was marked Iftikhar Exhibit 1 for identification.)

Q.    Is this the note to file we were just discussing?

A.    Yes, it appears to be the one we were talking about.

Q.    And in this note to file it says that "per Biorasi's SOPs, vendor managed by the sponsor require qualification by the sponsor.  The Alzamend study team was asked for vendor qualification documentation which was not provided.  Alzamend internally vetted vendors contracted by Alzamend and no documentation was provided to Biorasi for

Page 66

A. Iftikhar

the following vendors.

"All contracts for the above vendors were executed by Alzamend and the vendor.  All management of these vendors was performed by Alzamend during the courts of study".

Do you see that?

A.    Yes.

Q.    So it's your opinion that you need to be an expert in clinical trials operations to understand that this document is saying that these vendors were managed by Alzamend?

MR. CARRIER: Objection to form.

THE WITNESS:  Yes, because within a clinical trial, there are clearly a variety of third parties and typically a CRO's responsibilities are involved with the third parties used for the clinical trial.  So this clarification that's written here in the note to file is important to understand within the context of how clinical trials are typically run.

Page 67

A. Iftikhar

Q.    And only an expert can understand that?

MR. CARRIER: Objection to form.

THE WITNESS: An expert in the realm of clinical trials.

Q.    Okay.

Do you see that this note to file is dated March 8, 2024?

A.    Yes.

Q.    That's after the unblinding event; right?

A.    Understood.

Q.    Does that impact the weight you would assign this note to file?

A.    No.

MR. CARRIER: I object to form.

Q.    You don't think the fact that this note to file happened after the unblinding event might make it a little bit less credible than if it had been before?

MR. CARRIER: Objection to form.

THE WITNESS:  No, I do not.

Q.    Did you consider that when

Page 68

A. Iftikhar

writing your opinion?

A.     Note to files can exist at any point throughout the course of a trial, whether it's the beginning or the end or even after the fact.

Q.     So you looked at this note to file and made yourself a credibility determination that it's a credible document and then used it to form the basis of your opinion here that Biorasi worked with Alzamend in approving the additional specialized partners and it was Alzamend that did not include Biorasi on part of the process; is that accurate?

MR. CARRIER: Objection to form.

THE WITNESS:  You would have to be an expert in clinical trials to understand that a note to file is an official document in the clinical trial space that can be audited and can potentially be reviewed by the FDA, and so that note to file is considered an official document as part of the trial.

Page 69

A. Iftikhar

Q.    So is what I just said accurate?

A.    Can you repeat what you just said?

MR. FARAHATI: Can we have the court reporter just read that question back.

(Whereupon the requested portion was read back by the reporter)

THE WITNESS:  You say -- sorry, can you repeat the first part of that, that I credibly --

Q.    You made a credibility determination as to the --

A.    I made a credibility determination.

MR. CARRIER: Objection to form.

MR. FARAHATI: Let me rephrase my question.

Q.    You looked at the note to file and you determined that it was credible; correct?

A.    I looked at a note to file with which is an official document in clinical trials.

Page 70

A.  Iftikhar

Q.    And you determined that it was credible?

MR. CARRIER: Objection to form.

THE WITNESS:  A note to file is a credible document.

Q.    And because it's a credible document, you made an opinion that Biorasi worked with Alzamend in approving the additional specialized partners and it was Alzamend that did not include Biorasi on part of the process; is that accurate?

MR. CARRIER: Objection to form.

THE WITNESS:  That supports my opinion.

Q.    But is it accurate that you made this opinion after looking at that document and determining that it was credible?

A.    I made this opinion by reviewing a lot of documents and e-mail exchanges and so, in the context of the grand scheme of the case, there's definitely more that indicates to what my opinion is.  However, this document explicitly states that.

Page 71

A. Iftikhar

Q.    But those other documents that you reviewed, they're not cited here; are they?

A.    Let's see.  That have I cited here.

In this specific section, I've cited the note to file.

Q.    Those aren't documents cited here; correct?

A.    Correct.

Q.    So you've looked at this note to file and some other unspecified e-mails and determined that Biorasi worked with Alzamend in approving the additional specialized partners and it was Alzamend that did not include Biorasi on part of that process; is that accurate?

MR. CARRIER: Objection to form.

THE WITNESS:  No.  There are not unspecified e-mails.  I have cited the NTF for this explicit evidence on this conclusion.

Q.    I mentioned the NTF.  I said the note to file and some unspecified e-mails.

Page 72

A. Iftikhar

MR. CARRIER: Objection to form.

THE WITNESS:  Can you repeat the question?

Q.    You -- to make this opinion that Biorasi worked with Alzamend in approving the additional specialized partners and it was Alzamend that did not include Biorasi as part of that process, you reviewed the note to file and some unspecified e-mails?

A.    That's not correct.

MR. CARRIER: No, objection to form.

Q.    Why isn't that correct?

A.    As you read the full section of my report, there are other contributing documents that support this opinion.

Q.    So let's go with here.

Do you see where you say that, for example, he states that the Biorasi VP was not trained on the project and that this would be a deviation from industry practices if supported by the factual record and that this is not supported by the factual record?

Page 73

A. Iftikhar

A.    Yes, I see that.

Q.    And your support for that is the fact that Biorasi had an SOP in place; is that accurate?

A.    The support -- the supporting document is that besides the SOP, there was a team transition form that documented the transition activities, and that included access to appropriate systems, protocol training.

MR. FARAHATI: We'll take a look at that.

We will mark this as Iftikhar Exhibit 2, and it's a document Bates stamped TMF 10187.

(Whereupon, an e-mail dated October 20, 2023 was marked Iftikhar Exhibit 2 for identification.)

Q.    Is this the document that you were referring to?

A.    Are you sharing your screen?

Q.    Oh, no, I'm not.

Is this the document you're referring to?

Page 74

A. Iftikhar

A.    Can you scroll down?  That first page you were showing me was TMF 10189.  I believe you said you were starting at 10187.

Q.    Where do you want me to go to?

A.    Just starting from the top to the bottom.  Perfect.  And then keep scrolling.

Yes.

Q.    So this is the document you're referring to?

A.    Yes.

Q.    And this shows that Nancy Newark was trained?

A.    This is a form that's completed for the transition of Nancy Newark.

Q.    And are you opining that this means that Nancy Newark was trained as part of the transition?

A.    I am implying that the transition from the project director role from Sergey to Nancy Newark was documented in this form.

Q.    Yeah, but I don't think we're

Page 75

A. Iftikhar just talking about documented.  I think we're talking about whether or not she was trained as part of that transition.

Am I wrong?

A.    Part of the training is the documentation.

Q.    Okay.

But how about the rest of the training?

A.    The training letter listed there.

Q.    So your opinion that she was properly trained as part of the transition is based on these trainings that are listed here at the bottom of page TMF 10190?

A.    This form supports that.

Q.    Does this form include any identification on what the content of those trainings were?

A.    This does highlight protocol training.

Q.    Right.

But it doesn't say --

Page 76

A. Iftikhar

A.    And the relevant plans for the project's training matrix.

Q.    But it doesn't show what the training consisted of; does it?

A.    That is listed, the protocol training and the relevant plans.

Q.    All it says is protocol training.

So you don't know what the training actually looked like; right?

A.    The protocol.

Q.    And it says, "to be completed by October 27"; right?

A.    Yeah, I see that.

Q.    So it wasn't necessarily completed on this date; correct?

A.    Yeah.

Q.    You haven't seen any recordings of these trainings; right?

A.    I have not seen recordings. However, it looks like the way they administer these trainings is through an LMS system, so that's an internal company system where these documents are provided.

Page 77

A. Iftikhar

Q. And how would that work, they're just provided and asked to read them or is there like a documentation that goes along with it?

A. I cannot really speculate what the LMS system at Biorasi was. However, typically LMS systems can require you to review a document as well as complete a quiz or a questionnaire confirming that you have reviewed and understood the document. There's also a digital certificate that confirms that.

Q. And you don't know what it was like at Biorasi?

A. I don't know the requirements set in their LMS system specifically.

Q. So your only basis for understanding what might have happened in that training is this document here?

MR. CARRIER: Objection to form. Go ahead.

THE WITNESS: This -- let me just read my report.

I'm documenting the transition

Page 78

A. Iftikhar between Sergey and Nancy in the project director role.

Q. That's what I'm referring to.

So do you see where you say at the top of page thirty-five, you say, "more generally, Dr. Hausheer states many of these individuals do not even have sufficient experience in Alzheimer's randomized trials but fails to specify what experience he would seem sufficient"?

A. Yes, I see that statement.

Q. What experience would you deem sufficient?

A. Here I'm actually referring to Dr. Hausheer here not providing information what he deems sufficient for his opinion.

Q. No, I understand that.

I'm just asking in your expert opinion, what experience would be sufficient?

A. Experience with what? Sufficient for what?

Sorry, the question's vague.

Page 79

A. Iftikhar

Q.    It's in reference to this section of your report.

You're saying that Dr. Hausheer states many of these individuals do not have sufficient experience in Alzheimer's clinical trials.  He's obviously referring to experience with respect to being staffed on the trial; right?  So you're saying they don't have enough Alzheimer's randomized trial experience to be staffed on the Alzamend trial; right?  Is that your understanding of Dr. Hausheer's opinion?

A.    Yeah.

Q.    What level of experience with Alzheimer's randomized trials would you deem sufficient?

A.    That is outside the scope of my opinion or my opinion is focused more on the operational responsibilities of a CRO and the operational infrastructure within a CRO that's required to run a clinical trial.

Q.    Aren't you rebutting Dr.

Page 80

A. Iftikhar Hausheer's opinion that the trial team was underqualified?

A. Yeah, I'm rebutting his opinion that Biorasi's team was underqualified and underresourced.

Q. But it's outside the scope of your expertise as to what would constitute a qualified team?

MR. CARRIER: Objection to form.

THE WITNESS: What I'm referring to is the experience in Alzheimer's randomized trials that you're asking.

Q. You don't know what level of experience in Alzheimer's trials would be sufficient for a team member to be qualified for this trial?

MR. CARRIER: Objection. Form.

THE WITNESS: I am speaking to the qualifications of a CRO in the general aspect of clinical trials, so I'm not speaking towards an Alzheimer's trial.

Q. Understood.

But we're talking about the

Page 81

A. Iftikhar

trial in this case; correct?  And the trial in this case was an Alzheimer's trial; right?

A.    Yeah, it was a clinical trial.

Q.    Understood.

So I'm just trying to understand what you would consider to be a qualified team for this trial.

So what levels of Alzheimer's randomized trial experience would you deem to be sufficient?

MR. CARRIER: Objection to form.

THE WITNESS:  I am speaking to the experience of a clinical -- a CRO having the expertise to conduct a clinical trial, not specifically for Alzheimer's trials.  For any clinical trial.

Q.    Okay.

So you're not talking about this particular clinical trial, you're talking about clinical trials generally?

A.    I am talking about this clinical trial as it is a clinical trial.

Page 82

A. Iftikhar

Q.    It's also an Alzheimer's trial.

A.    It's also randomized.  There's a lot of components to this clinical trial besides Alzheimer's.

Q.    Right.

I'll ask it one more time.

I'm just trying to understand what level of experience you would consider sufficient for this particular trial?  And if you don't know, that's fine, but I need an answer to the question.

MR. CARRIER: Objection to the form.

THE WITNESS:  The level of experience considering for this specific trial is related to clinical trial experience at a CRO and the operational responsibilities around that.

Q.    So is it your answer that you don't think any Alzheimer's-related experience is necessary?

MR. CARRIER: Objection to form.

Page 83

A. Iftikhar

THE WITNESS:  No, I'm not saying it's necessary, I'm just saying that there is a lot of components to what a CRO's experience needs to be to conduct a clinical trial.

Q.    I'm not asking about that generally.  I'm asking what was this CRO's experience needed to be to conduct this clinical trial.

So I guess let me ask again.

What level of experience would deem sufficient --

MR. FARAHATI: Strike that.

Q.    What level of Alzheimer's clinical trial experience would you deem sufficient to be staffed on part of this clinical trial?

MR. CARRIER: Objection to form.

Go ahead.

THE WITNESS:  The experience that I deem sufficient for a clinical trial is what I've opined on in my report.  I have not specified Alzheimer's.

Page 84

A. Iftikhar

Q.    So you don't think any Alzheimer's experience is necessary?

MR. CARRIER: Objection to form.

THE WITNESS:  I did not say that.

Q.    So which is it, do you think Alzheimer's experience is necessary for this clinical trial or not?

MR. CARRIER: Objection to form.

THE WITNESS:  Based on my opinions and everything I've reviewed, there is more to that answer.  It's not a simple black and white question where Alzheimer's or not.

MR. CARRIER: I think we've been going about ninety minutes.

MR. FARAHATI: Yeah, that's fine. Let's go off the record and let's talk about it.

THE VIDEOGRAPHER: We're off the record now at approximately 4:14 p.m.

(Whereupon a break was taken)

THE VIDEOGRAPHER: We are now going back on the record approximately

Page 85

A. Iftikhar

4:29 p.m.

This is media number two.

Go ahead, counsel.

Q.    Okay.

Let me just find where.

Do you see in the second paragraph there -- we're on page thirty-five.

A.    Okay.

Q.    In the second paragraph right in the middle it starts to say, "it is neither reasonable nor consistent with regulatory expectations to require a single CRO to demonstrate in-house expertise across manufacturing, cold chain logistics, and specific gene therapy mechanisms simultaneously".

A.    Yes, I see that language.

Q.    And is your opinion here just limited to whether or not those expertise are in-house and you're saying that it's not reasonable to expect that all of those expertise may necessarily be in-house at one CRO?

Page 98

A. Iftikhar

Q.    And is the risk of inadvertent unblinding sometimes heightened in a study depending on how that study is set up?

MR. CARRIER: I object to form.

THE WITNESS:  I didn't understand your question, but it is a risk.

Q.    But certain trials have a greater risk for inadvertent unblinding than others; right?

MR. CARRIER: I object to the form.

THE WITNESS:  No, I can't speak to that.

Q.    Is that because you don't know or because you disagree?

A.    It's just because there's more to that question.  When you say certain trials, that's very broad.

Q.    He yeah, I'm asking in general, some trials have greater risk for inadvertent unblinding than others; right?

MR. CARRIER: I object to form.

THE WITNESS:  It really depends

Page 99

A. Iftikhar

on a variety of things.  It depends on the type of trial that you're looking at, things like that.

Q.    Yeah.

And depending on those variety of things, some might have a higher risk of inadvertent unblinding; right?

MR. CARRIER: I object to form.

THE WITNESS:  I just can't determine that some might have more than others.

Q.    Sitting here, you can't say one way or another whether some trials might be more prone to inadvertent unblinding than others?

A.    I can't speak to the design of all clinical trials.  There's a lot that comes into play and that factors into how they're designed.

Q.    Some trials -- let me ask you this, what's the difference between a double-blind and a single-blind?

A.    A double-blind involves not only the patients themselves are blinded to

Page 100

A. Iftikhar whatever treatment is being administered but also personnel on the study, and that might include folks from the sponsor and spokes from the CRO.

Single-blind is whether it's single-blinded where the patient doesn't know.

Q.    Is the risk of unblinding greater typically in a double-blinded study than a single-blinded study?

A.    I would say that there's more to consider in a double-blinded study than there is in a single-blinded study.

Q.    And so that would mean that the risk of unblinding is typically greater in a double-blinded study than a single-blinded study; right?

A.    Not necessarily, because it really just comes down to the trial design itself.

Q.    I'm not asking you to make an absolute statement that every double-blinded study has a higher risk than every other single-blinded study.

Page 101

A. Iftikhar

I'm asking in general, based on your experience, is it typical that a double-blinded study would have a greater risk of unblinding than a single-blinded study?

MR. CARRIER: I object to form.

THE WITNESS:  In my experience, the risk exists regardless of what type of study.

Q.   And that risk is always the same?

A.   It's difficult to quantify that risk.

Q.   And is that because you're just not experienced enough to be able to quantify it or is that because something else?

MR. CARRIER: I object to form.

THE WITNESS:  Not -- I'm pretty experienced in the clinical trial space, so I understand what it means to look at risk in a clinical trial.

Q.   I'm just trying to understand what factors might make unblinding a

Page 102

A. Iftikhar

greater risk in some studies than others.

A.    Got you.

There are -- it comes down to trial design.  There are factors regarding how data is kept, so this is where you want to start at the very beginning of who's deciding between a placebo or sham or whatever versus the actual treatment group itself and then how that information is relayed throughout the course of the trial itself, so there's a lot of components that play a role on the blinding procedures that are written in.

Q.    Let's just talk about some of those components and some of those factors.

Is one of those factors whether or not the study is a double-blinded study or a single-blinded study?

A.    Yes.

Q.    Is one of those factors also whether or not the study has a sham placebo component?

MR. CARRIER: I object to form.

Page 103

A. Iftikhar

THE WITNESS:  That is the -- I mean, the blinding aspect includes having a sham or placebo opposing a treatment.

Q.    I guess let me reframe it as is one of those factors whether or not the study has a sham shipment component to it?

MR. CARRIER: Same objection.

THE WITNESS:  A sham shipment could be a factor to consider.

Q.    Okay.

And having it would increase the likelihood of the risk of inadvertent unblinding; right?

A.    Having sham shipping would just introduce additional procedures in the trial itself that just need to be considered.

Q.    And are there any other factors that might have made unblinding a heightened risk in this trial?

A.    In general, any other factors to consider?  I think the use of heightened risk is something I don't agree with where

Page 104

A. Iftikhar

there is just the risk of unblinding.

Q.    I guess let's say how would you prefer I prize it?  I think you know what I'm getting at.  I'm trying to figure out what factors might contribute to that risk.

Are you more comfortable with that phrasing?

A.    Sure.

Q.    Are there any other factors that might contribute to the risk of inadvertent unblinding in this trial other than -- and I think so far we've spoken about the sham shipment component and we've also spoken about the fact that it was a double-blind as opposed to a single-blind.

A.    So besides that, I would say other factors include how data is stored, so where it's being kept, who has access to that data, and who understands the difference between a sham placebo versus a treatment.

Q.    And so in this particular study,

Page 119

A. Iftikhar

are written.

Q.    What are those considerations with respect to human error?

A.    The considerations with where?

Q.    With respect to human error.

A.    Whose considerations?

Q.    You said there were considerations pursuant to the GCP and the other standards that need to be abided by.

I'm asking you okay, what are those considerations as they apply to human error?

A.    I'll have to review, but I don't recall.

Q.    Okay.

So you don't recall right now how human error should be accounted for in trial plans or procedures relating to unblinding?

MR. CARRIER: Objection to form.

THE WITNESS:  I don't recall if there's specific language regarding human error in the regulations that we discussed.

Page 120

A. Iftikhar

Q.    And you're not otherwise aware of any reason why human error should be accounted for in those trial plans and procedures?

A.    No.

Q.    Let's go on to -- I just wanted to recap the actual clinical trials you were part of.

There were four of them, correct, that you were staffed on?

A.    Can you specify during when?

Q.    Any time.

I remember at the beginning of the deposition you mentioned there were two at your prior employment and then there were two at your time in Exponent; right?

A.    So there were two that I was staffed on from beginning to end and there was four that I was staffed on that I still worked on during my time at Machaon and then at Exponent, two.

Q.    There were two you were on -- there were four you were on beginning to

Page 121

A. Iftikhar

end though; correct?

A.     Correct.

Q.     And were the ones at Machaon double-blinded?

A.     No.

Q.     And of the one you were staffed on at Exponent, only one of them was double-blinded; correct?

A.     Yes.

Q.     And what about the remaining four that you had some input into at Machaon, were any of those double-blinded?

A.     No.

Q.     So you've only worked on one double-blinded study; correct?

A.     I've worked on one double-blinded study.

Q.     And did that double-blinded study involve sham shipping procedures?

A.     No, it did not.

Q.     Let's go to -- let me find this part of your report.  It's at the bottom of page thirty-nine.  You say, "further, the blinding strategy that is part of the

Page 122

A. Iftikhar

approved protocol was reviewed by the FDA as part of the IND submission prior to the involvement of Biorasi"?

A.    Yeah, I see that.

Q.    What do you mean by "the blinding strategy"?

A.    What I mean is the blinding elements of the protocol.

Q.    That's separate though from a plan to maintain those blinding elements; correct?

A.    Not necessarily.

Q.    In this case, is it?

MR. CARRIER: I object to form.

THE WITNESS:  Not necessarily.

Q.    What do you mean by "not necessarily"?

A.    What I mean is that there's probably details in the protocol that also aid in the blinding procedures as well.

Q.    But you're saying probably.

So sitting here today, you don't know?

A.    I do know.

Page 156

A. Iftikhar

trial.

Q.    So you don't have an understanding one way or the other whether or not it includes response actions in the event of an inadvertent unblinding?

A.    That's not true.

MR. CARRIER: Objection and beyond the scope.

Go ahead.

Q.    Let me address David's objection.

Do you have an opinion as to whether or not this trial plan, the risk management plan provides response actions in the event of an inadvertent unblinding?

A.    My opinion is regarding Dr. Hausheer claiming that the trial plans were inadequate.

MR. FARAHATI: Okay.

I'm going to move to strike that answer as nonresponsive.

Q.    I didn't ask you what your opinion was about.  I asked you whether or not you had an opinion about the issue I

Page 157

A. Iftikhar

asked you about, but we'll move on.

Have you ever drafted a risk management plan for a clinical trial?

A.    I have not.

Q.    Did you review the quality management plan as part of your opinion?

A.    Yes.

Q.    On page forty of your report, you state that -- you acknowledge at the bottom of the second to last paragraph that a quality management plan -- a quality management system should be implemented to manage quality throughout all stages of the trial process using overarching quality framework, a risk-based approach, and corrective and preventative action processes as applicable to the trial; correct?

A.    Yes.

Q.    Does the quality management plan in this case establish specific controls for preventing inadvertent unblinding?

MR. CARRIER: Objection.  Beyond the scope.

Page 158

A. Iftikhar

THE WITNESS:  This is beyond the scope in that the scope of my report is to review whether or not the trial plans were inadequate as Dr. Hausheer claims to be.

Q.    Do you have an opinion one way or the other as to whether or not the quality management plan in this case established specific controls for preventing inadvertent unblinding?

A.    My opinion is that the quality management plan is not intended to restate detailed trial-specific controls, such as unblinding.

MR. FARAHATI: Okay.

Move to strike as nonresponsive.

Q.    I didn't ask you what your opinion was.  I'm asking whether you held an opinion as to the question I asked, but I'll ask you another question now.

Does the quality management plan in this case establish specific controls for containing an inadvertent unblinding?

MR. CARRIER: Objection.  Beyond

A. Iftikhar

the scope.

You can answer.

THE WITNESS:  And I will continue to reiterate my opinion is to review -- is based on the review of the quality management plan for it to follow the ICH E6 GCP guidelines on what that quality management plan should uphold.

Q.    You don't have an opinion one way or the other in this case as to whether or not the quality management plan in place during the Alzamend trial established specific controls for containing inadvertent unblinding; correct?

A.    My opinion is about the quality management plan being adequate.

MR. FARAHATI: Move to strike as responsive.

Q.    Moving on, have you ever prepared a quality management plan?

A.    I have reviewed and edited quality management plans.

Page 160

A. Iftikhar

Q.    But you've never prepared one yourself; correct?

A.    I have not authored directly a quality management plan.

Q.    How about let's move on to the communication plan.

Did you review the communication plan in place during the Alzamend trial?

A.    Yes.

Q.    In a blinded trial, is it important to account for the blind in communication and escalation pathways?

A.    Sorry, repeat that question?

Q.    In a blinded trial, is it important to account for the blind in communication and escalated pathways?

MR. FARAHATI: Excuse me, let me ask that again.

Q.    In a blinded trial, is it important to account for the blind in communication and escalation pathways?

A.    Yes.

Q.    Does the communication plan --

MR. FARAHATI: Strike that.

Page 161

A.  Iftikhar

Q.    Do you have an opinion one way or the other as to whether or not the communication plan identifies blind integrity or inadvertent blinding as a discrete study-specific risk?

A.    I do not have an opinion.

Q.    Okay.

Do you have an opinion one way or the other as to whether or not the communication plan establishes specific controls for preventing inadvertent unblinding?

A.    This goes back to the fact that my opinion is about the communication plan, is to review it for adequacy.

MR. FARAHATI: Move to strike as nonresponsive.  That wasn't my question.

Q.    Do you have an opinion one way or the other as to whether or not the communication plan establishes specific controls for containing inadvertent unblinding?

A.    My opinion is that the

Page 170

A. Iftikhar

A.   My opinion is regarding the overall trial strategy that's described in the global specifications plan.

Q.   I'm going to try one more time. Otherwise we're back exactly where we were before the break.

Do you have an opinion about whether or not the global specifications plan establishes specific controls for preventing inadvertent unblinding?

A.   I don't have an opinion that the global specifications plan has specific controls listed in there.

Q.   Do you have an opinion as to whether or not the global specifications plan establishes specific controls for contain inadvertent unblinding?

A.   I don't have an opinion.

Q.   Do you have an opinion as to whether or not the global specifications plan accounts for blinded communications in any way?

A.   I don't have an opinion.

Q.   Do you have an opinion -- let me

Page 171

A. Iftikhar

ask you this, have you ever drafted a global specifications plan?

A.    No, I have not.

Q.    All right.

Have you reviewed the monitoring plan and medical monitoring plan?

A.    Yes.

Q.    Do you have an opinion about whether or not the monitoring plan and medical monitoring plan in this case describe preventative controls or an incident response work flow for inadvertent unblinding?

A.    My opinions in my report talk about reviewing the monitoring plan and the medical monitoring plan which describes monitoring strategy and responsibilities.  I don't have an opinion to the stepwise preventative controls that you're mentioning.

MR. FARAHATI: Move to strike the first part of that answer as nonresponsive.

Q.    Do you have an opinion --

Page 172

A. Iftikhar

MR. FARAHATI: Actually, strike that.

Q.    Have you ever prepared a monitoring plan and a medical monitoring plan?

A.    I've assisted in drafting and editing and reviewing a monitoring plan, reviewing medical monitoring plans.

Q.    Have you ever prepared one yourself?

A.    No.

Q.    Do you have an opinion about whether the monitoring plan and the medical monitoring plan address unblinding in any way?

A.    I do not have an opinion.

Q.    Move on to the protocol deviation plan, did you review that plan as part of your opinion?

A.    Yes.

Q.    Do you have an opinion as to whether or not the protocol deviation plan in this case defines inadvertent unblinding as a deviation category or

Page 173

A. Iftikhar provides classifications in handling steps tailored to blind integrity breaches?

A.    I do not have an opinion.

Q.    Do you have an opinion as to whether or not the protocol deviation plan addresses inadvertent unblinding in any way?

A.    I do not have an opinion.

Q.    Have you ever prepared a protocol deviation plan?

A.    I have edited and reviewed a protocol deviation plan.

Q.    Have you ever prepared a protocol deviation plan?

A.    No.

Q.    Have you looked at the data management plan in this case?

A.    Yes.

Q.    Do you have an opinion as to whether or not the data management plan establishes blind safe query governance, for example, content rules, routing restrictions, and controls preventing treatment-revealing information from being

Page 174

A. Iftikhar

sent to blinded individuals?

A.     I don't have an opinion.

Q.     Do you have an opinion one way or the other as to whether the data management plan addresses blinding at all?

A.     I don't have an opinion.

Q.     Have you ever prepared a data management plan?

A.     I have.

Q.     How many?

A.     One that I prepared.

Q.     Okay.

Moving on to the data validation plan, do you have an opinion --

MR. FARAHATI: Well, strike that.

Q.     Have you reviewed the data validation plan in this case?

A.     Yes.

Q.     Do you have an opinion as to whether or not that data validation plan defines validation steps for key blind integrity controls, for example preventing leakage through listings and queries, documenting and positioning

Page 175

A. Iftikhar unblinding-related deviations, and confirming containment actions?

A.     The data validation plan establishes standardized data review and query management within validated systems and is not intended to address blinding requirements.

MR. FARAHATI: Move to strike as nonresponsive for the same reasons we've been discussing.

Q.     Do you have an opinion one way or the other as to whether the data validation plan addresses unblinding or blinding at all?

A.     I don't have an opinion.

Q.     Have you ever prepared a data validation plan?

A.     I've edited and reviewed, not prepared.

Q.     Okay.  I think we're through that, that section.

A.     That sounds good.

Q.     Actually, I may have one more.

Do you recall that earlier we

Page 176

A.  Iftikhar looked at an SOP that talked about an unblinding plan?

A.    Can you point to this?

Q.    It's on page forty-three.

A.    Got it.

Q.    Do you see that?

A.    Yeah.

Q.    Have you ever prepared an unblinding plan?

A.    I have not prepared.  I have reviewed.

Q.    Okay.

At page forty of the report, do you see where you say, "ICH guidelines do not require every foreseeable operational risk to be individually listed in a single trial plan when the risk is already controlled through established procedures and systems"?

A.    Yes.

Q.    Do the guidelines require that the risk to be --

MR. FARAHATI: Strike that.

Q.    Do the guidelines require that

A. Iftikhar

risks be acknowledged and mitigated where they are foreseeable?

MR. CARRIER: I object to form.

THE WITNESS:  The guidelines are very overarching and there are guidelines on how to review risk.

Q.    Do they require that risks be acknowledged and mitigated where foreseeable?

A.    Let me just double-check the language in the guidelines.

(Reviewing).

Can you repeat your question?

Q.    Page forty of the PDF, you wrote, "ICH guidelines do not require every foreseeable operational risk to be individually listed in a single trial plan when risk is already controlled through established procedures and systems".

My question is: Do the ICH guidelines require risks to be acknowledged and mitigated where they are foreseeable?

A.    The ICH guidelines do not

Page 186

A. Iftikhar regulations as well.

Q. Are there any -- is there anything that a clinical -- a CRO --

MR. FARAHATI: Strike that.

Q. Is there anything that a CRO might be obligated to do in a clinical trial that's not based on standards that enumerated specifically in the GCP or the ICH?

MR. CARRIER: Objection to form.

THE WITNESS: This comes down to whether or not the CRO and the sponsor have different agreements that are not aligned with the global --

Q. You're not aware of in any industry standards outside of what's expressly referenced in the ICH or the GCP; correct?

A. The global and federal guidelines, correct, and my own experience.

Q. Okay.

So what would constitute industry standards for you is what's in

Page 187

A. Iftikhar the GCP, what's listed in the ICH, and your personal experience on one blinded -- excuse me, one double-blinded clinical trial; correct?

MR. CARRIER: Objection to form.

THE WITNESS:  In addition to other clinical trials that I've experienced, other stakeholders I've talked to in this space, I have that experience as well.

Q.    When we're talking about other clinical trials you've experienced, that number is six; correct?

A.    Six at Machaon.

Q.    So eight total; correct?

A.    Yeah.

Q.    And only one of which was double-blinded; correct?

A.    Yeah.

Q.    And only three of which were even blinded at all; is that correct?

A.    Yeah.

Q.    One was a double-blind, two was a single-blind?

Page 188

A. Iftikhar

A.    Single-blind.

Q.    And then the rest were unblinded; right?

A.    Yes.

Q.    If a study were to have specific processes and procedures in place to maintain a blind and prevent inadvertent unblinding, where would you expect to see those documented?

MR. CARRIER: Objection to form.

THE WITNESS:  That is beyond the scope of what I was asked to review.

Q.    Okay.

So you don't have an opinion one way or the other as to where you might expect to see documentation pertaining to processes and procedures to maintain a blind; correct?

MR. CARRIER: Objection to form.

THE WITNESS:  Well, I can say that my opinion is that -- and this is just based off of documents I reviewed and also my past experiences that blinding information or elements of

Page 189

A. Iftikhar

blinding are written in the study protocol, different protocols that are designed for the study itself, as well as specific SOPs and other policies that might be written into place.

Q.    Okay.

So do you or do you not have an opinion as to whether one could expect to find information --

MR. FARAHATI: Strike that.

Q.    Do you or do you not have an opinion as to where one could expect to find the specific processes and procedures in place to maintain a blind?

A.    I do have an opinion and that can be in a variety of places.

Q.    Okay.

Now, could you just list these places?

A.    This is not comprehensive, however, it's possible for these to be listed in the study protocols, design for the clinical trial itself, other SOPs, other documents.

Page 235

A. Iftikhar

Q.    What do you mean here "to the extent the approved work order allowed"?

A.    Here, the sentence before, I recognize that Biorasi was limited to the original scope pending a change order. And so there's -- there's an initial work order and then there's the change order that probably -- that would have included an additional scope of working on this further or more in detail.

Q.    But you're not proffering an opinion one way or the other as to anything actually being within or outside the scope of either of these documents; right?

A.    Sorry, can you repeat the question?

Q.    You're not proffering an opinion as to whether anything was actually inside or outside the scope of the work order; correct?

A.    I do write that the manual and guideline updates were deemed out of scope at this time under their current contract.

Page 236

A. Iftikhar

Q.    So you are offering an opinion as to whether or not the manual and guideline updates are within the scope of the work order?

MR. CARRIER: Objection to form.

THE WITNESS:  My opinion is talking about how Alzamend requested assistance documenting the unintentional unblinding plan and however those updates were deemed out of scope based off of that citation.

Q.    I'm not asking whether or not they were deemed out of scope.  I'm asking whether or not they were out of scope.

Do you have an opinion one way or another as to whether or not those manual and guideline updates are out of scope of the work order?

MR. CARRIER: Objection to form.

THE WITNESS:  My opinion is that, to the extent of what Biorasi was doing, it was out of scope.

Q.    Okay.

So you do have an opinion that

Page 237

A. Iftikhar

these were out of scope?  Did you review the work order?

A.    Yes.

Q.    You reviewed the MSA?

A.    Yes.

Q.    So you are proving an opinion in this litigation as to what services were and were not in the scope of the work order?

MR. CARRIER: Objection to form.

THE WITNESS:  No, I reviewed the work order and the MSA and other contractual agreements just to get an understanding of the rules that Alzamend and Biorasi had determined for the purposes of their partnership.

Q.    But you are proffering an opinion that the manual and guidelines updates --

A.    My opinion is with the specific unintentional unblinding plan that Alzamend was requesting assistance for.

Q.    Sitting here today, do you recall why -- the basis for your opinion

Page 238

A. Iftikhar

that that was outside the scope of the work order?

A.    No, I don't recall.

Q.    So you don't even recall if you reviewed the specific provisions of the work order to determine whether or not these manual and guideline updates were within the scope?

A.    I may have.  I just don't recall at this time.

Q.    Have you ever drafted a master services agreement for a clinical trial?

A.    No, I've worked with our legal team on that front.

Q.    Have you ever negotiated a master services agreement for a clinical trial?

A.    No.

Q.    Have you ever drafted a work order for a clinical trial?

A.    There are -- in the clinical trial realm, there are parallel documents to work orders, so there's a statement of work, SOWs.  So I have drafted and worked

Page 239

A. Iftikhar

on SOWs.

Q.    How many?

A.    Let's see.  Three.

Q.    You never worked on a work order though; right?

        MR. CARRIER: Objection to form.

        THE WITNESS:  Yeah, I guess for the purpose of your question, not specifically a work order.

Q.    Have you ever negotiated a work order?

A.    No.

Q.    I think I asked this.

        Just to be absolutely sure, you never wrote a communication plan; right?

A.    Correct.

Q.    Okay.

        We're going to go to the next section of your report, 5.3.3.

A.    Okay.

Q.    Do you see that you write that it is not industry practice to have an e-mail control system that blocks study personnel?

Page 240

A. Iftikhar

A.    Sure.  Yes.

Q.    You've never used such an e-mail control system in a blinded study; right?

A.    I have not used the e-mail control system that Dr. Hausheer here describes in a blinded study, correct.

Q.    But what he's describing is a tool that can be used to maintain the blind; right?

MR. CARRIER: Objection to form.

THE WITNESS:  Yeah, it sounds like what he's describing is an e-mail control system.

Q.    Are you aware of any tools that are industry standard to be used in clinical trials?

A.    Yeah.  There's a lot of electronic platforms that can be used within a clinical trial, so -- and they do use them in this trial as well.  So there's the EDC, there's the ETMF, there's also the IWRT.

Q.    What do these tools do, as a general matter?

Page 296

CERTIFICATION BY REPORTER

I, Wayne Hock, a Notary Public of the State of New York, do hereby certify:

That the testimony in the within proceeding was held before me at the aforesaid time and place;

That said witness was duly sworn before the commencement of the testimony, and that the testimony was taken stenographically by me, then transcribed under my supervision, and that the within transcript is a true record of the testimony of said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, that I am not interested directly or indirectly in the matter in controversy, nor am I in the employ of any of the counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 23rd day of March, 2026.

Wayne Hock