# Exhibit E

CONFIDENTIAL

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.: 25-cv-20481-BB**

ALZAMEND NEURO, INC.,

       Plaintiff,

v.

BIORASI, LLC,

       Defendant.

**EXPERT REPORT OF FREDERICK HAUSHEER, M.D.**

CONFIDENTIAL

CONFIDENTIAL

**TABLE OF CONTENTS**

PROFESSIONAL BACKGROUND AND QUALIFICATIONS ..................................................... 3

THE ALZN002-01 CLINICAL TRIAL AND APPLICABLE REGULATIONS AND INDUSTRY STANDARDS ................................................................................................................ 6

    Sponsor Responsibilities and Transfer of Regulatory Obligations to CRO (21 C.F.R. Part 312). ..........................................................................................................................9

    Good Clinical Practice (ICH E6) and Industry Standards. .......................................11

    The Relationship Between Alzamend and Biorasi. ...................................................15

    The Unblinding Event ...............................................................................................17

OPINIONS ....................................................................................................................... 18

ANALYSIS ........................................................................................................................ 20

    I.   Biorasi's Team Was Underqualified and Under-Resourced for the ALZN002 Trial .........................................................................................................................20

    II.   Inadequate Training and Protocol Misunderstanding ...............................................21

    III.   Biorasi's Inadequate Training and Inadequate Procedures Contributed to the Unblinding Event .....................................................................................................25

    IV.   Mishandling of Site Inquiries and Protocol Deviations .............................................27

    V.   The ALZN002-01 Trial Could Have Resumed Had Biorasi Acted in Accordance With Industry Standards ........................................................................28

CONCLUSIONS ................................................................................................................ 28

APPENDIX A: FREDERICK HAUSHEER, MD CV .......................................................... 30

APPENDIX B: REFERENCES & SUPPORTING DOCUMENTS REVIEWED ..................... 31

APPENDIX C: GLOSSARY ............................................................................................... 38

APPENDIX D: PUBLICATIONS AND OTHER CASES ...................................................... 40

CONFIDENTIAL

CONFIDENTIAL

I am engaged on behalf of plaintiff Alzamend Neuro, Inc. ("Alzamend") in the above referenced matter against defendant Biorasi, LLC ("Biorasi"). I was asked to opine on whether Biorasi, LLC, as the Contract Research Organization ("CRO") responsible for the ALZN002-01 clinical trial (the "ALZN002 Trial"), performed its obligations in accordance with industry standards. My opinions address Biorasi's conduct with respect to staff qualifications and training, protocol adherence, maintenance of the study blind, deviation management, escalation procedures, and sponsor-CRO communications. All work was or will be performed by me. I have been requested to provide expert testimony regarding my opinions and prepare this report in accordance with the applicable Federal Rules of Civil Procedure.

This report does not make any factual determinations. Except where noted, I have relied on the written record, which I have assumed authentic and complete. I reserve the right to update my report as additional information is developed in discovery.

## PROFESSIONAL BACKGROUND AND QUALIFICATIONS

My name is **Frederick Hausheer, M.D.**, and I am a physician-scientist and biopharmaceutical research executive with over 37 years of experience in clinical drug development, including extensive Phase I–III clinical trial management under FDA and other international regulatory frameworks. I earned my M.D. from the University of Missouri-Columbia (completing medical school in three years), completed my internship and residency training there. I have held board certifications in Internal Medicine (since 1985) and Medical Oncology (since 1987). I completed a fellowship in Medical Oncology (in two years, with promotion to faculty) at the Johns Hopkins Oncology Center and Hospital, concentrating in Pharmacology and Experimental Therapeutics research and development. Prior to my medical training and post-doctoral training, I completed a B.S. degree in Biology and an M.S. degree in Physiology and Biophysics. During my training and early career, I gained first-hand experience conducting clinical trials in compliance with FDA regulations and Good Clinical Practice (GCP), serving as a clinical investigator on clinical trials and interacting with trial sponsors and Contract Research Organizations (CROs). I also served as a voting member of the National Cancer Institute's Institutional Review Board (IRB) and as an ad hoc expert advisor to the FDA on oncology drug development programs under review.

I have held senior executive leadership positions in both pharmaceutical companies and CROs that conduct clinical trials. I have served as Global Chief Medical Officer for several organizations, including Tier 1, large, and mid-size CROs and biopharma companies, where I was responsible for ensuring that clinical trials were designed, managed, and executed with high quality and regulatory standards across multiple therapeutic areas (oncology, rheumatology, neurology, immunotherapy, rare diseases, and various other indications).

In the past 37 years I have negotiated, participated in, overseen, managed numerous sponsor-CRO contracts for clinical trials with well-known CROs such as IQVIA, Charles River Laboratories, Wuxi-AppTec, Syneos Health, Medpace Holdings, PPD, Advanced Clinical, Worldwide Clinical, ICON, Parexel, PSI, and other smaller and domestic US and foreign CROs, including clinical trials that are double-blind and placebo controlled, involving dendritic cell vaccines, including autologous cell therapy based trials. I have been hired and/or retained by CROs and by commercial

CONFIDENTIAL

CONFIDENTIAL

sponsors to help them with structuring risk-managed terms and provisions for contracts for various types of trials, organizing and participating in bid defenses, protocol development, ICH GCP compliance requirements and medical safety and pharmacovigilance oversight and reporting.

I served as the Global Chief Medical Officer for WuXi AppTec, one of the largest global CROs supporting nonclinical and clinical research and development therapeutic programs and providing clinical trial CRO services for more than 1,200 active investigational clinical trials. In that role, I had executive leadership and management accountability and oversight for clinical operations, project management, medical monitoring, safety and pharmacovigilance, regulatory affairs, pharmacology/pharmacokinetics, and GCP compliance as it applies to certain aspects of manufacturing (drug supply, chain of custody/compliance issues, expedited resolution of quality issues, and quality elements) and clinical trial conduct management and execution. A significant portion of my work involved identifying and mitigating GCP compliance and commercial risks in trials, direct communications with FDA and other regulators, and participation in and overseeing CRO contract bids, Sponsor-CRO contract provisions, and site/investigator contracts and services for clinical trials. I also provided interim Chief Medical Officer services and advisory support in these fields to more than 70 client biotech/pharma companies, overseeing and contributing to 200+ Investigational New Drug (IND) applications (including ~120 IND applications with the FDA) across various indications (oncology, neurology, infectious disease, cardiovascular, rheumatology, rare diseases, etc.). In these capacities, I advised sponsors of all sizes (large pharma to small biotech) on commercial clinical program design, development, and operational execution in compliance with applicable regulations and industry guidance standards.

I also served as Chief Medical Officer at InClin, a mid-tier CRO, where I led medical oversight and trial design, IND document preparation and reviews, regulatory strategy and GCP and FDA compliance, implemented risk-based and conventional monitoring strategies, chaired safety governance committees, and ensured inspection readiness through corrective and preventive action (CAPA) and risk management systems. In this role and others, I focused on remediation of GCP non-compliance, including protocol deviations/violations and training and qualifying clinical personnel.

I remain actively involved and am currently under contract as an expert consultant with a mid-tier US-based CRO, providing guidance on regulatory matters, protocol development and trial design, GCP compliance, and quality systems.

Throughout my career, I have designed and/or held management oversight and decision-making authority involving the conduct of hundreds of clinical trials worldwide, including randomized, double-blind, placebo-controlled studies similar in design to the ALZN002 trial at issue (the "ALZN002 Trial"). This includes: (i) double-blind randomized placebo-controlled trials; and (ii) trials involving novel, complex biologic investigational therapeutic products, including autologous ex vivo engineered cell-based immunotherapies requiring leukapheresis (e.g., bone marrow transplantation and chimeric antigen receptor T-cell (CAR T) therapies) and trials requiring intensive coordination among sponsors, CROs, manufacturing sites, clinical sites, and regulators.

CONFIDENTIAL

CONFIDENTIAL

119   The relevant fields of expertise that are applicable to this litigation include the following areas:

1. **Good Clinical Practice (GCP) compliance and FDA regulations:** I have extensive experience and familiarity with FDA regulations and GCP guidelines in the pharmaceutical and biotechnology industry. I have formulated, drafted, implemented, and overseen numerous INDs, their protocols, and other essential trial documents, quality, and risk management processes, procedures, and systems to meet FDA regulatory requirements (21 CFR Parts 11, 50, 54, 56, 312) and have served as an external ad hoc expert reviewer to FDA. I am very experienced in overseeing sponsor and CRO obligations under 21 CFR §312 (IND regulations) and with contracts which transfer obligations to CROs. I have experience in preparing, negotiating, managing, and overseeing such Transfer of Regulatory Obligations documents to formally transfer IND sponsor duties to CROs and ensuring CROs fulfill those duties.

2. **Sponsor–CRO relationships and contracts:** I have extensive first-hand experience in lead managing and oversight in this area and regularly advise companies on CRO selection, contracting provisions, quality and risk management, and trial management and oversight. I am intimately familiar with industry standards and commonly used provisions for sponsor–CRO obligations under master service agreements, work orders, and clinical trial agreements. This includes formulating and managing task ownership matrices and ensuring CROs perform their contracted duties with qualified personnel, proper plans, and procedures for risk management, protocol implementation, communications, monitoring, IP management, and training. I have negotiated, overseen and enforced master service agreement and work order provisions requiring CROs to provide qualified staff, training of personnel, and adhere to industry standards.

3. **Clinical trial blinding and unblinding, major protocol violations and quality:** I have designed and overseen trial protocols with blinding and unblinding procedures and understand the critical importance of safeguarding and maintaining the blind to ensure valid, unbiased results. I have implemented and overseen risk and quality management plans, monitoring plans, and communication plans to segregate blinded and unblinded personnel and prevent erroneous and unplanned unblinding. I have managed and resolved emergent and unplanned unblinding incidents and other major protocol violations, and applied the standard of care, including documentation and response/resolution actions, Institutional Review Board (IRB) and FDA notifications, to remedy and mitigate these incidents promptly to salvage, correct, and preserve study integrity and successful trial continuation.

4. **Site and investigator monitoring, study-specific training, and management:** I have overseen large teams of CRAs, medical monitors, and other personnel to ensure trial sites are properly trained to follow protocol requirements, and investigational product treatment and handling. I have extensive experience in qualifying investigators and sites, providing protocol and study procedures training, and ensuring ongoing compliance by monitoring and reporting. I have developed training materials, actually trained study personnel for

CONFIDENTIAL

CONFIDENTIAL

protocol adherence, investigational product management, protocol deviation handling, and query resolution, and I have overseen and managed escalation processes and corrective and preventative actions for issues that may arise. I have also led and managed industry-standard corrective and preventive actions (CAPA) remediation efforts when trial personnel fail to understand or follow protocol procedures.

5. **Regulatory compliance, issue management and reporting:** I have participated in numerous FDA sponsor meetings and communications, safety monitoring committees, overseen medical monitoring activities, and ensured prompt escalation and documentation of major protocol deviations or safety issues in accordance with FDA regulations and GCP. I have directly interacted with FDA in reporting unexpected serious adverse events and significant adverse trial events, and I understand what is expected of sponsors/CROs when handling potential trial-halting events, such as major GCP noncompliance including major protocol breaches involving ethical and/or consent issues, chain of custody, drug product issues, data quality issues, and/or safety concerns. I have implemented and overseen CAPA plans and audits and have prepared teams for regulatory inspections, focusing on proactive issue management.

My curriculum vitae (CV) contains further details of my education, training, certifications, publications, and issued patents. I have been qualified and testified as an expert in clinical trial operations and oversight management, FDA regulatory compliance, and GCP in prior legal matters, including cases involving CRO performance and noncompliance with GCP industry standards and FDA regulations. In those matters I have opined on whether CROs met the applicable industry standards and contractual obligations in managing clinical trials.

My hourly billing rate is $800 per hour for testimony, and $650 per hour for all other work, including the preparation of this report.  My compensation is not tied to the outcome of this case.

## THE ALZN002-01 CLINICAL TRIAL AND APPLICABLE REGULATIONS AND INDUSTRY STANDARDS

The ALZN002 Trial was a first-in-human, randomized, double-blind, placebo-controlled, parallel-group, phase 1/2a study of 20 to 30 subjects enrolled and treated. The primary purpose of this study was to assess the safety and tolerability of multiple ascending doses of ALZN002, a novel mechanism cell-based therapy that has therapeutic potential to medically delay or halt the progression of Alzheimer's Disease ("AD"). The ALZN002 trial was aimed at assessing the safety and preliminary efficacy signals of ALZN002 administration compared to placebo in subjects with mild to moderate dementia of the Alzheimer's type and to determine the optimal dosage of ALZN002 while maintaining acceptable safety and tolerability. The overall objective of this study was to determine an appropriate dose of the vaccine to be evaluated for efficacy and safety in a larger phase 2b study where evaluation of potential efficacy is the primary study aim. Sentinel efficacy data was also to be obtained in this study. (ALZN002-01 Clinical Protocol v3.0 (5 Dec 2023), ALZ_136987, and earlier versions).

CONFIDENTIAL

CONFIDENTIAL

The ALZN002 Trial is a complex study design with several notable features that invoke specific regulatory and industry standards and their management:

- Since this is a first-in-human study, there are no prior verified safety risks of this treatment other than those associated with leukapheresis, intravenous (IV) infusion and intradermal (ID) injection, and potential safety risks that have been observed with other similar immunomodulatory medicaments.

- It is a randomized study where eligible patients are randomly assigned to treatment vs. control using prespecified, acceptable randomization methods and procedures which must be adhered to.

- It is a double-blind study meaning that neither specific prespecified study personnel nor the patients know who is receiving active investigational study treatment vs. placebo. For the ALZN002 Trial, the sponsor, subjects, investigators, sponsor expert panel, Safety Adjudication Committee (SAC), and site staff involved in evaluating subjects' eligibility and assessment of study outcomes were to be blinded to randomized treatment assignment. Prespecified pharmacy and site staff performing and processing leukapheresis (or sham) and staff manufacturing, handling and shipping final drug product or placebo were to be unblinded and separated from communication and/or information transmittal to any blinded study personnel, including the site staff administering the investigational treatment who are supposed to remain blinded. For such a trial design, blinding is not merely a statistical formality; it mandates implementation of defined structural study specific plans, processes, procedures and personnel safeguards to prevent bias in clinical assessments, safety evaluations, and operational decision-making. (ICH E10 Choice of Control Group (2000)).

- The study is placebo controlled wherein the identification, frequency, severity, seriousness, and potential causal relationship of the observed safety signal events and the observed potential efficacy events can be objectively compared between those patients randomized in the placebo (sham leukapheresis) control cohort vs. the active treatment (ALZN002). (ICH E10 Choice of Control Group (2000)).

- The use of randomization, blinding and placebo control in clinical trials are well recognized established medical and scientific methods aimed at making fair and objective assessment of safety and efficacy by minimizing potential or actual bias with regard to investigational treatment safety and efficacy outcomes. These are commonly used control provisions in clinical trial designs, and the principles involved are well recognized in the industry with extensive guidance provisions. (ICH E10 Choice of Control Group (2000)).

- In this type of trial design, a sham placebo-controlled workflow inherently creates predictable "information-leak" high risk for unblinding pathways because operational steps (for example, whether a leukapheresis sample is shipped and an investigational product is

CONFIDENTIAL

CONFIDENTIAL

manufactured) differ between the active and placebo arms and can signal treatment assignment unless tightly controlled.

- A set of study governance documents were prepared by Biorasi, including the Quality Management Plan, the Risk Management Plan, Monitoring Plan, Investigational Product (IP) Manual, Leukapheresis Manual, Specialty Lab Manual, Medical Monitoring Plan, Safety Management Plan, Data Management Plan, Project Communication Plan, and a Site Communication Matrix, among others. For example, the IP Manual and Leukapheresis Manual detailed the processes for handling the leukapheresis and cell product for both active and placebo arms, and the Site Communication Matrix explicitly delineated which email addresses were to be used for "unblinded" topics vs. routine communications. All these documents were Biorasi's responsibility to develop and implement (per the Work Order task list). They represent the intended control framework for the study. These study specific essential documents collectively define the trial's operational steps and governance expectations and should contain processes and procedures to address inadvertent unblinding and emergency unblinding, major protocol deviations, escalation, and measures to safeguard the blind.

- Key trial documents-such as study plans and manuals-typically reflect comprehensive efforts to protect the study blind through written procedures and targeted training. Common safeguards include requiring a "dummy" shipment (an empty Cryoport container) for placebo subjects to mirror the active arm's cell shipment. In practice, protecting and maintaining the blind in ALZN002-01 was a foreseeable critical challenge that an experienced CRO would know and make best efforts to address.

- In my experience, such sham (placebo)-controlled studies that involve autologous cell therapy workflows and multiple external vendors demand heightened attention to: (i) segregation of study personnel roles so that "blinded" study personnel are separated and protected from any "unblinded" personnel communications and handling logistics, (ii) restricted access to randomization and treatment information on study subjects, (iii) strictly controlled communication channels with blinded vs. unblinded personnel, including study personnel, vendors, sites and investigators, (iv) validated distribution lists and email controls that ensure unblinded information can only be sent to those who "need and authorized to know," and (v) conduct scenario-based training and rehearsal for unplanned unblinding events, including emergency unblinding for safety. All of these measures are industry-standard procedures and safeguards that are well recognized.

- Furthermore, such safeguarding the blind requirements are intensified in a small, sentinel-based trial like the ALZN002 Trial because any breach of integrity (unblinding or other critical deviation) can have a disproportionately large impact on the small early stage trial's viability. Notably, with only two sentinel subjects, unblinding one patient essentially unblinds the pair. In summary, the ALZN002 Trial's inherent double-blind, placebo-control design instantly engages the requirements to address the foreseeable risk of inadvertent unblinding and the need for blinding protection and maintenance of the blind,

CONFIDENTIAL

CONFIDENTIAL

and the need for specifying rapid effective corrective and protective actions in the event of any inadvertent unblinding.

**Sponsor Responsibilities and Transfer of Regulatory Obligations to CRO (21 C.F.R. Part 312)**.

The management and conduct of the ALZN002 Trial is governed, in part, by the FDA's IND regulations. Under 21 C.F.R. §312.50 and 21 C.F.R. §312.52[1], a clinical investigation must be conducted properly and in compliance with the protocol and GCP, and fulfillment of those responsibilities may be delegated to a CRO via a written agreement (a Transfer of Regulatory Obligations ("TORO")). Specifically, 21 C.F.R. §312.50 requires the sponsor (or in this case the CRO via TORO) to ensure that a study is conducted in accordance with the investigational plan and study protocol, and that proper monitoring and oversight of risk and quality for the study is maintained. Sponsors must also ensure that FDA and IRB requirements are met (such as obtaining informed consent and IRB approval, per 21 C.F.R. Parts 50 (informed consent requirements) and 56 (Institutional Review Board requirements).

The ALZN002-01 protocol itself reflects these expectations, including the investigator's commitment to conduct the clinical investigation in accordance with ICH regulations and U.S. IND regulations (21 C.F.R. Part 312). (21 C.F.R. §312.50) (ALZN002-01 Protocol v2.0 – Investigator Signature (12Apr2023) and (ALZN002-01 Protocol v3.0 – Investigator Signature (5 Dec 2023), ALZ_136987).

The Alzamend–Biorasi Master Services Agreement (the "Master Services Agreement" or "MSA")[2] acknowledges the transfers of tasks and responsibilities through a TORO attachment, and the Work Order (the "Work Order" or "WO")[3] includes a TORO enumerating multiple sponsor obligations under 21 C.F.R. Part 312 that were transferred to Biorasi. (MSA § 2.3 (Transfer of Obligations Under 21 CFR §312)); (WO at TORO Attachment A and Task Matrix).

The obligations transferred to Biorasi are directly implicated here, including specific tasks, management, planning and procedural monitoring of the investigation to ensure protocol/GCP compliance, evaluation of investigator performance for non-compliance, control and records of investigational product shipment/disposition (including specific shipping information), and other sponsor responsibilities in Subpart D. These are not abstract duties; they are essential core operational controls (by personnel, plans, processes and procedures) in a randomized, double-blind placebo-controlled autologous-cell trial with complex logistics. (WO at TORO Attachment A-5 (Sections A–C)) and Task Matrix).

---

[1] To the extent I refer to relevant regulations, I am referring to them as an industry participant and speaking to how they are understood by industry participants. I am not applying any legal opinion or making any determination as to the legal effect of the regulations.

[2] The MSA can be found at BIO_213840.

[3] The Work Order can be found at BIO_002933.

CONFIDENTIAL

CONFIDENTIAL

GCP standards further specify how sponsors and CROs should fulfill these responsibilities. ICH E6 emphasizes that, when a sponsor transfers trial-related duties to a CRO, the CRO should implement quality systems and ensure compliance and oversight management for the transferred tasks. ICH E6(R3) further emphasizes risk-proportionate quality management, including identification of critical-to-quality factors and implementation of safeguards for risks to trial integrity such as inadvertent unblinding. In a blinded trial, maintaining appropriate separation of blinded and unblinded functions and communications is an expected control, and unplanned unblinding should trigger defined assessment and corrective and/or preventative actions. (FDA Guidance: ICH E6(R3) Good Clinical Practice).

Key requirements for conducting the trial include selecting qualified investigators and study personnel, providing them the information needed and specific training to conduct the trial in accordance with the protocol, ensuring that such proper training and monitoring is performed and maintained, maintaining effective oversight of trial conduct, and promptly informing the sponsor, IRB, FDA and all investigators of any significant new findings (e.g. treatment related adverse effects). Under TORO the CRO is subject to the same regulations as the sponsor for any assumed responsibilities, including penalties for non-compliance. Key obligations include adhering to specific regulations (including those in 21 CFR Part 312 for clinical trials), complying with contractual agreements, ensuring data quality and integrity, and meeting reporting requirements. In practice, a CRO that contractually accepts and agrees to perform TORO designated duties is expected to perform all of them to the same FDA and industry standards as the sponsor would. The FDA regulations and industry standards applicable to the TORO and oversight and operational accountability for the same by Biorasi are outlined in the Master Services Agreement and the Work Order Agreement.

Once a designated regulatory obligation is transferred to a CRO, that CRO is required to comply with the specific obligations transferred by the MSA/WO Task Matrix and with all applicable regulations as if it were the sponsor for those obligations, and the CRO can be held responsible by the FDA for any failures. In the case of Alzamend and Biorasi, the MSA and Work Order explicitly executed such a transfer: the Work Order's Attachment A-5 is a TORO listing the specific sponsor duties under 21 C.F.R. Part 312 that Biorasi assumed. These included core responsibilities directly relevant to the issues in this case, e.g. monitoring the investigation, ensuring the trial is conducted according to protocol and GCP, managing the investigational product shipment and disposition records, and ensuring prompt reporting and escalation of problems. Biorasi was expected to carry out all delegated sponsor responsibilities properly and to the same standards expected of the sponsor itself.

The TORO in the Alzamend–Biorasi Master Services Agreement - and specifically in the Work Order - transferred numerous tasks and operational and management control accountabilities at issue here to Biorasi. For example, Biorasi assumed responsibility for "ensuring proper monitoring of the investigation," "control and documentation of investigational product shipment and disposition," and "prompt communication of results and findings," among other duties. These are not abstract checkboxes; they involve direct on-the-ground tasks like making sure that Clinical Research Associates (CRAs) are adequately overseeing site conduct, that any protocol deviations

CONFIDENTIAL

CONFIDENTIAL

are identified and addressed, that drug shipments (including empty placebo shipments) are tracked and recorded, and that any significant problems (like potential unblinding or safety issues) are immediately escalated and documented. The importance of these obligations in a blinded autologous-cell trial cannot be overstated: if the CRO fails in monitoring, communication control, or product tracking, compliance with the study protocol and procedures, the integrity and safety of the trial are directly jeopardized. The performance standards for the contracted scope of work for the ALZN001-02 trial that Biorasi was obligated to perform are specified Article 2.1 and 2.2 of the MSA.

Here, the Work Order's Task Matrix put Biorasi in charge of many operational aspects of the ALZN002 trial, from risk and quality management, training and communications, monitoring, protocol adherence, drug logistics, and issue management. (WO at Task Matrix §§ 1-7). As detailed in this report, many of these responsibilities were not fulfilled to industry standards, contributing to the trial's failure.

**Good Clinical Practice (ICH E6) and Industry Standards**.

In addition to FDA regulations, the conduct of the ALZN002-01 clinical trial is guided by the International Council for Harmonisation (ICH) Good Clinical Practice (GCP) guidelines, which are universally recognized as industry standards of practice and are consistent with FDA's regulations. ICH GCP guidelines are aimed at ensuring high-quality trial conduct, ethical consent, patient safety, and at identifying, mitigating, and remedying risks or deviations associated with the study. These regulations and standards incorporate sound scientific and medical principles into study design and trial conduct by ensuring deviations are monitored, corrected and properly reported, training and ensuring only qualified study personnel are involved, managing drug supply, and other trial-related operations and procedures.

GCP guidelines (ICH E6) also emphasize that sponsors or their CRO TORO designees are responsible for trial oversight and for ensuring both their own staff and investigators are qualified and trained for their roles. A CRO TORO designee must monitor and manage the trial to ensure the study adheres to the protocol, study plans, procedures in accordance with FDA regulations and GCP, and protect and maintain the trial blind when applicable. They must also implement risk management, quality assurance, communication, and monitoring plans to ensure timely issue escalation, mitigation and resolution. The CRO is expected to conduct all transferred clinical trial activities and their oversight in accordance with GCP industry standards and FDA regulations.

FDA's guidance on investigator responsibilities reinforces that a contracted CRO with designated TORO should ensure qualified trial staff are adequately trained on the study protocol and procedures, and that written risk and quality management plans and clear oversight/communication pathways are established and maintained for questions or issues that may arise. The FDA guidance expects the CRO to engage in study-specific risk and quality management - including plans, processes, procedures, trained personnel, and to maintain active, competent oversight of study conduct – to monitor the trial, preserve the blind (with appropriate unblinding procedures), and ensure protocol adherence. This includes robust handling of

CONFIDENTIAL

CONFIDENTIAL

investigator inquiries and immediate escalation of significant problems to all relevant parties, including the IRB and FDA when required. (ICH E6 (R2) and (R3).

ICH E6(R3), a recently finalized update as of 2025, highlights the need to identify "critical to quality" factors and proactively manage risks that could affect trial integrity; the risk of inadvertent unblinding is a critical quality factor that is well recognized for a trial such as ALZN002-01.

In a blinded trial, maintaining the blind is, by definition, a critical-to-quality factor to be addressed proactively. Such foreseeable threats like inadvertent unblinding are normally identified in advance and mitigated. Contingency plans with prespecified corrective and mitigation steps are usually prepared. GCP expects that the contracted CRO will have written processes, plans, procedures to do this (through risk management and quality management plans, monitoring plans, communication plans, procedures, training, SOPs, etc.). Moreover, if an unplanned unblinding event occurs, GCP dictates that it should trigger prompt action: assessment of impact, documentation, and implementation of corrective and preventive actions (CAPA) to mitigate the deviation and to prevent recurrence. As I will discuss, Biorasi's performance materially deviated from these principles and practices; the unblinding risk was not appropriately identified, planned and trained for, which allowed the unblinding event to occur, and the resulting ad hoc and ineffectual response to the unblinding event, which played a tangible role in the ultimately unnecessary and premature termination of the trial.

The Work Order's TORO outlined Biorasi's responsibilities for critical functions such as investigator selection, trial monitoring, investigational product management, and communications management. Under the MSA and Work Order TORO provisions, Biorasi was expected to oversee the ALZN002-01 trial as if it were the sponsor, in compliance with FDA regulations and GCP. These provisions included: (i) providing adequately trained and qualified personnel; (ii) adhering strictly to the protocol and essential documents including essential study plans, processes, and procedures (including all blinding and unblinding procedures); (iii) properly monitoring and addressing queries from the sites; (iv) promptly escalating issues; and (iv) maintaining open and accurate communication with the sponsor. The MSA and Work Order incorporated these expectations, requiring industry-standard diligence and explicitly transferring key regulatory obligations to Biorasi (*see* MSA §2; WO at Task Ownership Matrix and TORO).

Additionally, several GCP principles are particularly relevant to Biorasi's conduct in the following areas.

1. **Qualified Personnel and Training**: GCP standards require that investigators, their staff, and clinical monitors be qualified by education, training, and experience for their trial roles. They also require that CROs with delegated obligations ensure all trial personnel are adequately trained on the protocol and their duties (ICH GCP (R2) and (R3)). In this case, Biorasi committed in the MSA to ensure that all its employees and any subcontractors performing trial services had the necessary skills and were trained on its own SOPs and all applicable laws and GCP guidance. This matches the industry standard expectation that a CRO will identify and assign an experienced, trained team to the project. The MSA

CONFIDENTIAL

CONFIDENTIAL

(Section 3.1) states: *"BIORASI shall ensure its employees and Subcontractors performing Services have the level of skill necessary for BIORASI to meet its obligations under this Agreement, and have been trained on BIORASI's Standard Operating Procedures and all Applicable Laws."* This reflects the FDA regulations and GCP standards that those managing and conducting the trial must be appropriately qualified and trained.

2. **Trial Plans, Monitoring, and Quality Management Plans**: The CRO with TORO must ensure adequate quality by trial plans, procedures, training and monitoring of the trial staff such that the rights and well-being of subjects are protected and the data integrity from the conduct of the trial are of sufficient quality (e.g., 21 CFR 50 (informed consent); 21 CFR 11 (e-records data); 21 CFR 312 (INDs); and ICH GCP E6 (R2) & (R3))"). Monitoring includes on-site or remote visits, reviewing data for protocol compliance, and escalating any serious protocol non-compliance including any deviations that may adversely impact consent, treatment, monitoring, data, drug disposition, safety and/or quality issues. Per GCP industry standards, such documents most commonly include a Risk Management Plan, Quality Management Plan, Communications Plan, Medical Monitoring Plan, Clinical Monitoring Plan, and Trial Master File Plan, Data Management Plan, Protocol Deviation Plan, and study procedures (e.g., the Laboratory Manual and Leukapheresis Manual, and standard operating procedures) should be in place and trained on prior to study initiation. These documents, in addition to other documents (e.g., study Protocol and Investigator Brochure, Informed Consent), identify potential risks and quality issues and delineate how issues that arise during the study are monitored, documented, processed, and escalated. Biorasi's obligations (per the Work Order's Task Ownership Matrix) included the identification, evaluation, control, communication, review, reporting of trial risks provisions, and from written Quality and Risk Management, Communications, Clinical Monitoring and Medical Monitoring Plans consistent with GCP industry standards.

3. **Blinding and Communication Controls**: In a double-blind trial, protecting and maintaining the blind to study treatment is a fundamental scientific and ethical requirement. Industry standards dictate that blinded and unblinded roles, responsibilities, procedures and designated personnel activities must be clearly defined prior to study initiation; these should be documented and separated for blinded and unblinded activities and personnel, and that data access and communication channels are controlled to prevent accidental unblinding. GCP requires that suitable prevention and mitigation strategies should be implemented to reduce the risk of inadvertent unblinding. Any planned or unplanned unblinding, including emergency or other unblinding should be documented. Any unplanned unblinding should be assessed for its impact on the trial results, and actions should be taken as appropriate (ICH E6) (R3) at 3.15.2 (d).

It is standard industry practice to implement a communication plan or matrix that safeguard the study blind. For example, a plan or matrix should direct site personnel to communicate only certain limited and specific information, such as lab results or shipment details that could potentially reveal unblinded treatment assignment, to designated unblinded contacts at the CRO or sponsor. Biorasi's own Risk and Quality Management Plans and its

CONFIDENTIAL

CONFIDENTIAL

Communication Plan, other plans, standard operating procedures (SOPs) and training should have identified and enforced these provisions in writing, in training and by additional means. The operative GCP principle is that the blind is safeguarded by prespecified written plans, processes and procedures, that engage organizational and technical measures in order to prevent inadvertent unblinding and clear steps for dealing any unplanned unblinding incidents. The industry standard for a CRO under TORO is to prepare, issue and train qualified study personnel on such written plans and training including the implementation of systems and checks (for instance, by creating separate email lists and implementing an email filter barrier) to prevent unblinding communications or events in the trial. Failing to meet GCP standards to adequately safeguard against unplanned study unblinding incidents creates a significant risk of inadvertent study unblinding, which is a serious deficiency in trial conduct and is a major protocol deviation. In accordance with FDA GCP expectations, a CRO must promptly inform the sponsor of any issue that could adversely affect subject safety or trial data integrity quality, such as an unblinding event or major protocol deviation. Indeed, Section 2.8(b) of the MSA in this case required that Biorasi "shall provide prompt written notice to [Alzamend] of any circumstance…of which BIORASI becomes aware, that Biorasi reasonably believes could adversely affect a Study or performance of the Services." This aligns with GCP and FDA expectations that sponsors are to be immediately alerted by the CRO to any significant events that could adversely affect the study or the conduct of the study so that corrective actions can be taken.

4. **Protocol Adherence and Deviation Management**: When a protocol deviation occurs or a site inquiry suggests potential deviation, industry standard practice is to promptly investigate, identify, and address the event and mitigate or resolve it promptly and appropriately. Minor protocol deviations are documented and corrected, and major deviations potentially adversely affecting safety and/or data integrity are escalated to the sponsor and often to the IRB. Erroneous management or handling of a protocol-specified blinding procedure, such as labeling and shipping an empty container for a placebo patient site, should not occur if roles, responsibilities, controls, plans, study procedure manuals, and the protocol language are implemented, understood, and adhered to by study personnel. The normal expectation is that the CRO's qualified and well-trained staff will either know the correct answer to a related question from the site or study personnel, or else they quickly escalate to an appropriate person in the CRO or sponsor who does know the correct response. Under industry standards, a site query about protocol study procedures should trigger the CRO to either provide the correct guidance per the protocol, study plans or procedures manuals, or escalate the issue to a higher medical or technical expert. In a well-run, compliant trial, any uncertainty or error at the site must be promptly resolved by the CRO, and any serious issue must be immediately communicated to the sponsor and IRB/regulators for communication and joint resolution.

5. **Sponsor–CRO Communication and Trust**: By transferring operational management and control to a CRO, involving some or all activities involved in a clinical trial, a sponsor entrusts that CRO to carry out these designated activities appropriately and in compliance

CONFIDENTIAL

CONFIDENTIAL

with FDA regulations and industry standards. The CRO must exercise a high degree of care, diligence, and good faith in executing that accountable role. Industry standard terms and conditions in such contracts are that the CRO will not withhold critical information or make unilateral decisions that could harm or terminate the study without the sponsor first being informed and allowed to review, deliberate, and provide input on such matters.

**The Relationship Between Alzamend and Biorasi**.

Biotech sponsors commonly engage CROs through a Master Services Agreement and accompanying Work Orders or Statements of Work. The Master Services Agreement is an umbrella contract establishing the governing terms of the relationship (performance standards, confidentiality, audits, reporting, and regulatory expectations), while the Work Order is the project-specific instrument that defines scope, deliverables, timelines, budgets, and a granular allocation of responsibilities. This two-tier contract structure is standard and is used precisely because clinical trials require both (i) general governance and FDA/GCP compliance expectations, and (ii) operational clarity on who does what. (MSA – Performance Standards §2.1 (17Feb2023)) (Work Order ALZ 188-1 – Task Ownership Matrix (17Feb2023)).

1. The MSA and Work Order in this case follow this standard structure. The MSA requires Biorasi to perform services in compliance with the approved protocol, applicable professional standards, applicable laws, and Biorasi SOPs, using a degree of skill, diligence, and expertise consistent with industry standards. The MSA further provides for prompt written notice to the Sponsor of circumstances that could adversely affect a study. (MSA §2.1 (Performance Standards)) (MSA §2.6 (Compliance Audits)) (MSA §2.8(b) (Reporting on Study Progress)).

2. The Work Order operationalizes these expectations by assigning Biorasi responsibility for core study plans (e.g., Communication Plan, Monitoring Plan, Data Management Plan, Medical Monitoring Plan, Safety Management Plan, and Quality Management Plan) and for study execution functions such as site selection/initiation/monitoring/close-out, ongoing site management and query resolution, protocol deviation tracking and trending, vendor management (including Cryoport logistics), and study trainings with documentation in the TMF. In practice, this is the hallmark of a small biotech outsourcing to a full-service CRO: the sponsor remains blinded and relies on the CRO to execute the operational sponsor function in accordance with industry standards. (WO at Task Ownership Matrix).

3. Alzamend was the sponsor of the ALZN002-01 trial, and it delegated many operational responsibilities to Biorasi as the contracted CRO. Under the Master Services Agreement (MSA) and initial Work Order, Biorasi was responsible for the trial's clinical operations, site monitoring and training, project management, and other day-to-day management tasks. The trial's initial clinical site was First Excellent Research Group (FERG) in Miami Florida (Principal Investigator, or "PI": Dr. Raul Carballosa). A separate site/vendor, Interventional Medicine and Imaging Center (IMIC), was engaged to perform the leukapheresis

CONFIDENTIAL

CONFIDENTIAL

procedures; IMIC thus had an unusual dual role as both a trial vendor (providing a service) and a site-like entity interfacing with subjects for the sham procedure. Additional vendors included Cryoport (for cold-chain shipping and logistics of the cell product), specialty laboratories (for example, Incyte, which handled certain sample analyses per correspondence), and imaging vendors (WCG for central MRI/PET imaging reads). These entities formed a complex vendor network for a relatively small trial. Each had to operate in a blinded manner where applicable. For instance, Cryoport shipments and tracking information had to be managed so as not to reveal which subjects were actually undergoing leukapheresis and whether they would receive active treatment or placebo/sham treatment. All of these roles and relationships were to be documented in the trial plans, processes and procedures (e.g., MSA, WO, study plans and procedures (ALZ_121281-ALZ_12133, ALZ_047217-ALZ_047261, ALZ_030961-ALZ_030981, ALZ_040979-ALZ_041022, ALZ_031057-ALZ_031071, ALZ_031072-ALZ_031091, ALZ_030474-ALZ_030510), Leukapheresis Manual (BIO_378866), and the Clinical Protocol (ALZ_136987)).

4.     Section 2.8(b) of the MSA required Biorasi to communicate candidly and promptly about issues to the sponsor. If a CRO discovers a potential safety issue or major compliance problem, the industry standard is for the CRO to immediately notify the sponsor, ensure that the institutional review board (IRB) is notified, and request that the sponsor to notify the FDA if serious, and take appropriate actions which may include collaborative pausing study enrollment, adjust personnel, procedures, and other appropriate actions needed for the trial. It goes against industry standards for the CRO to communicate to a principal investigator and/or site that there are serious protocol deviations, such as missing, lost, mislabeled, or defective study treatment (whether they are truly present, or not) and fail (intentionally or otherwise) to communicate the same such protocol breaches to the sponsor, IRB, and FDA. It is also counter to industry standards for a CRO to issue potential or actual threats, including undocumented, false and alarming statements to site personnel. Prior to contacting site personnel, including the PI, the CRO should first inform the sponsor of such instances, including identified and potential cause(s) of the breach in blind and its seriousness, potential consequences, and potential mitigation and remedies. Any safety or major protocol deviation related decision including pausing or delaying enrollment or treatment and instructing a PI and site not to dose a patient (for documented reason(s)), should be made in concert with the sponsor first being fully informed and agreeing to the content of external communications with the PI and site, and such communications must be based on verified facts.

5.     A PI is the qualified physician or, where permitted, other appropriately licensed healthcare professional who has ultimate responsibility for the conduct of a clinical trial at a given investigational site. The PI is accountable for ensuring that the study is conducted in strict accordance with the protocol, applicable regulatory requirements (including FDA regulations and ICH Good Clinical Practice), and Institutional Review Board (IRB) approvals, and for safeguarding the rights, safety, and welfare of study participants. Core responsibilities include medical oversight of subjects, supervision and delegation of trial-related tasks to adequately trained sub-investigators and site staff, accurate and complete

CONFIDENTIAL

CONFIDENTIAL

source documentation and case report form data, investigational product accountability, timely reporting of adverse events and protocol deviations, and cooperation with monitoring, auditing, and regulatory inspections. To serve as a PI, an individual must be appropriately licensed, have relevant education, training, and experience to conduct the study (including experience with the disease area and trial design), demonstrate familiarity with GCP and the investigational product, maintain sufficient time and resources to properly oversee the trial, and document qualifications through an up-to-date curriculum vitae and regulatory disclosures.

6. In the context of the ALZN002-01 study, the Principal Investigator operates pursuant to a formal Clinical Trial Agreement (CTA) executed between the investigational site and the sponsor, Alzamend Neuro, Inc., with Biorasi, LLC acting in its role as the sponsor's contracted CRO, as contemplated by the Master Services Agreement and applicable Work Orders. The CTA defines the PI's contractual obligations, including adherence to the protocol, compliance with FDA regulations and ICH GCP, protection of human subjects, proper delegation and supervision of site staff, maintenance of essential documents, and cooperation with monitoring and audits, while preserving the PI's independent medical judgment.

In summary, the governing regulations and GCP standards comprise a clear framework to ensure quality of management and execution of the clinical trial: Biorasi was expected to conduct and manage the ALZN002 trial in compliance with FDA regulations and GCP. This included providing adequately trained and experienced personnel who adhere strictly to protocol, study plans (and blinding procedures), properly monitoring the site, promptly escalating issues, and maintaining open, accurate communication with the sponsor. The MSA and Work Order incorporated these expectations, requiring industry-standard diligence and explicitly transferring critical obligations to Biorasi.

**The Unblinding Event**

For the purpose of this report I have assumed that on or around January 18, 2024, following a sham leukapheresis procedure for Subject 1005 (one of the subjects enrolled in the Trial who had been randomized to the placebo arm, in contrast to Subject 1003 who was to be given the treatment) an IMIC Coordinator (the "IMIC Coordinator") contacted a Biorasi CRA (the "Biorasi CRA") for guidance regarding the placebo shipment. The Biorasi CRA instructed her to send an email, which the IMIC Coordinator then sent to distribution lists that included blinded study personnel - revealing Subject 1005's placebo assignment (the "Unblinding Event"). In the days that followed, Biorasi's Vice President of Project Management ("Biorasi VP") initiated communications directly with the PI in which she indicated that blood samples had been missing or misplaced. The PI subsequently withdrew from the Trial on or about January 24, 2024.

CONFIDENTIAL

CONFIDENTIAL

## **OPINIONS**

A summary of my conclusions, based upon the description of events set forth above, and the evidence available to me[4] is as follows:

1. **Biorasi lacked the qualifications and failed to engage resources to properly run the ALZN002 Trial, and did not manage and conduct the ALZN002 Trial in accordance with industry standards.** Biorasi did not deploy an adequately skilled or dedicated team, and it failed to exercise the degree of skill, diligence, and expertise consistent with industry standards. This major deficiency manifested in poor planning and execution, failure to identify and mitigate foreseeable risks, and staff who were unfamiliar with required protocol, processes, plans and procedures, including leadership that was stretched thin and unprepared.

2. **Biorasi failed to train the trial staff or implement proper plans and procedures in accordance with regulatory and industry standards.** Despite being responsible for developing and delivering comprehensive training and trial plans and procedures, Biorasi did not implement proper plans and procedures, or ensure that site personnel and its own employees understood critical protocol provisions, study plans, processes, procedures (such as blinding and investigational product handling). These failures were a major contributing factor to the Unblinding Event and the ensuing confusion and protocol deviations.

3. **Biorasi's inadequate training and inadequate plans and procedures were a direct contributing factor to the Unblinding Event.** Proper communications plans and systems would have prevented the Unblinding Event. Moreover, the IMIC Coordinator and the Biorasi CRA's lack of knowledge about the sham leukapheresis shipment requirement was rooted in poor training documentation as well as deficient training procedures on this subject. The training materials, including the study plans and study processes and procedures failed to incorporate foreseeable risk factors for the trial, and there was insufficient training on these foreseeable factors. Had Biorasi provided proper training and guidance, the IMIC Coordinator and the Biorasi CRA would have had the tools needed to handle the query process correctly thereby preserving the blind.

4. **Biorasi did not handle site inquiries or protocol deviations pursuant to GCP and industry standards.** To the extent that the Biorasi CRA failed to properly answer or escalate the query of the IMIC Coordinator, or to the extent that the Biorasi VP failed to follow required prespecified escalation pathways (to the sponsor) for major issues, these actions would have failed to meet industry and GCP standards for issue management.

---

[4] I understand that discovery in this matter is ongoing. I reserve the right to supplement my expert report as necessary based on the evidentiary record, as developed.

CONFIDENTIAL

CONFIDENTIAL

5. **Biorasi's mishandling of the IMIC Coordinator's inquiry was a significant contributing factor to the Unblinding Event.** Biorasi's departures from industry standards, including inept failure of query resolution and lack of communication control, were significant factors to the blind being broken for study final drug product. But for Biorasi's actions, the trial would highly likely have continued.

6. **The ALZN002 Trial could have continued even after the Unblinding Event, had Biorasi acted in accordance with industry standards.** There were mechanisms, such as the proposed protocol waiver, IRB review, FDA notification to allow the trial to continue despite the erroneous unplanned unblinding incident. A CRO acting with appropriate diligence would have immediately involved the sponsor, communicated factually with the PI, IRB, and FDA, and kept the trial on track with corrective and preventive actions taken. Biorasi failed to do so, and instead took inappropriate actions that substantially contributed to the ultimate demise of the study.

7. **Biorasi acted outside the bounds of recognized regulatory and industry standards when raising breach of protocol concerns to the Principal Investigator.** To the extent that Biorasi communicated to the Principal Investigator that samples were missing or lost, or otherwise misidentified potential patient risk which was not based on evidence or properly investigated, this behavior is inconsistent with industry practices regarding the communication and resolution of potential or actual issues in clinical trials, where honesty, competency, accuracy and level-headed analysis and effective communications are paramount.

8. **Alzamend was left with no viable path to continue the trial after the Principal Investigator and his site's withdrawal from the study.** Once FERG and the Principal Investigator withdrew in late January 2024, the study had no active site. Given the circumstances that led to that withdrawal, Alzamend could not realistically recruit a new site and patients without essentially restarting the trial from scratch – incurring substantial cost and delay.

CONFIDENTIAL

CONFIDENTIAL

## ANALYSIS

**I.      Biorasi's Team Was Underqualified and Under-Resourced for the ALZN002 Trial**

In the CRO industry, when managing a complex trial such as a randomized, double-blind, placebo controlled trial that required leukapheresis of patients' cells in order to manufacture an autologous cell therapy using special procedures to produce the drug product, it is industry practice that the CRO assign personnel who have prior experience with similar trials and intensive training in the protocol and study procedures (e.g., leukapheresis to manufacture study drug product and placebo, neuroimaging as required by the study protocol).

Based on my review of staff resumes, training materials, and trial procedures produced in this action, Biorasi appeared to lack the qualifications, operational readiness, personnel training, and associated safeguards required to handle a trial like the ALZN002 Trial. None of the identified Biorasi personnel assigned to the core operational functions for the ALZN002 Trial (including clinical research associate (CRA)/monitoring oversight, clinical trial management (CTM), project management (PM), data-management/query governance, and medical/safety oversight) have the requisite prior experience to operate competently within the specific paradigm that the trial required, an autologous leukapheresis-based cellular immunotherapy with an interim manufacturing step and cold-chain return logistics for treatment, executed within a randomized, double-blind, placebo/sham-controlled design where sham leukapheresis and "mimicry logistics" are necessary to preserve blinding. The Biorasi CVs produced for operationally central roles (e.g., CRA/CTM/PM and medical/safety leadership) reveal that they do not have sufficient prior experience executing (i) autologous leukapheresis-dependent manufacturing (cell collection, followed by an interim manufacturing step followed by return shipment), (ii) cold-chain/custody logistics for tracking and ensuring the drug product or sham/placebo is available to the dosing site, or (iii) randomized double-blind sham-controlled execution where sham leukapheresis is used to preserve blinding of the autologous therapy vs. sham, particularly in a neurodegenerative immunotherapy program.[5]  Many of these individuals do not even have sufficient experience in Alzheimer's randomized trials.

The foreseeable and dominant failure modes in this study, sham concealment, manufacturing and cold-chain shipment/receipt documentation cues, and blind-sensitive communications and query routing, are well-known in autologous cell-therapy trials and would ordinarily be expected to be reflected in the prior work history of personnel tasked with authoring, reviewing, and enforcing the study's plan ecosystem and training.

This is further evidenced by multiple failures in execution (detailed further below). Far from having a well-trained, qualified and experienced team, Biorasi's staff did not understand critical

---

[5] *See e.g.* Juan Duany-Santos CV, BIO_123810–BIO_123814; Ginger Rappley CV, BIO_157049; Thomas Evans CV, BIO_156954; Ugur Aytac CV, BIO_156913; Daphne Sabillon CV, BIO_157092.

CONFIDENTIAL

CONFIDENTIAL

aspects of the protocol and study procedures. For instance, if the Biorasi CRA who fielded the leukapheresis sample handling, labeling and shipping site's query was not equipped to answer basic protocol and study procedure questions, this shortcoming points to a team that was underqualified to perform and meet the trial's requirements.

For purposes of this report I have assumed that during the trial, Biorasi's originally assigned Project Director left the company while the trial was ongoing. Rather than promptly providing a replacement dedicated to the study, Biorasi had the Biorasi VP take on the Project Director duties. If supported by the factual record, this is a deviation from industry best practices to oversee a trial of this complexity without a full-time project lead engaged. Moreover, I have not seen evidence that Biorasi performed sufficient additional training as needed for this personnel change based on review of the training materials provided, including training PowerPoints, training logs, and what is specified in the study protocol, study plans and procedures.

Biorasi's failure to adequately staff the project with experienced Alzheimer's trial personnel meant that the team was ill-equipped to recognize the risks, consequences and implications of the protocol's blinding procedures until it was too late. An experienced well trained and knowledgeable team in double-blind, placebo controlled trials involving an investigational cell therapy and required procedures would with reasonable certainty have anticipated the very scenario that caused the unblinding (e.g., a first-in-trial execution of a sham leukapheresis and the need to ship an empty container for placebo) and the CRO training would have made reasonably certain that IMIC site staff were crystal clear on the process and procedures. The lack of anticipation of this type of event indicates a substantial deficiency on Biorasi's side.

In summary, Biorasi did not deploy an adequately experienced or dedicated team for this trial. By failing in these respects, Biorasi set the stage for the subsequent errors that occurred.

## II.     Inadequate Training and Protocol Misunderstanding

There was a pervasive lack of training and protocol understanding among both Biorasi's personnel and the clinical site staff under Biorasi's supervision. Proper training is the cornerstone of trial quality and every individual involved must understand the protocol (including complex procedures designed to maintain blinding, safety and quality of the study) and their specific responsibilities. It is the responsibility of the CRO to develop the project plans, training materials for training ensure that all clinical trial personnel, including site staff at FERG and IMIC, are properly trained on trial plans, processes and procedures. (*See* WO at Task Ownership Matrix §§ 3., 4, 5, 7).

ALZN002-01 is, by design, a complex and blind-fragile Phase 1/2a program because it combines (i) leukapheresis for active treatment and sham leukapheresis for placebo, (ii) an interim manufacturing step for an autologous dendritic-cell product, and (iii) cold-chain logistics and shipment/receipt documentation for active product versus "mimicry" logistics for placebo, all within a randomized, double-blind, placebo-controlled framework. In such studies, industry practice is that the trial's operational documents including the protocol, manuals, and core operational plans, must expressly identify foreseeable unblinding pathways (procedural cues at

CONFIDENTIAL

CONFIDENTIAL

leukapheresis/sham; vendor/manufacturer and shipment communications; shipment/receipt documentation; and data cleaning/query content and routing) and must provide implementable, role-specific procedures to prevent, detect, document, contain, and remediate inadvertent (unplanned) unblinding. Those procedures typically include defined role segregation and "need-to-know" boundaries, a communications firewall (restricted distribution lists; prohibited recipients; mandated routing for unblinded topics), "blind-safe" query rules, contemporaneous documentation (unblinding log; protocol deviation record), escalation thresholds (including to the medical monitor and sponsor), bias-impact assessment, and corrective and preventive action ("CAPA") triggers.

Here, the evidence demonstrates multiple plan and training failures:

**Inadequate Trial Plans**: The trial plans I have reviewed do not consistently identify inadvertent/unplanned unblinding as a foreseeable operational risk, they do not contain meaningful procedures to prevent or manage inadvertent/unplanned unblinding, and they do not provide a practical incident-response playbook for inadvertent unblinding; these omissions are consistent with a failure to implement documented controls and processes commensurate with the scope, quality, and blind-integrity demands of a leukapheresis-dependent, autologous cell-therapy trial.[6]

For instance, the record reflects multiple concrete examples of this documentary failure. The Risk Management Plan does not identify blind integrity or inadvertent unblinding as a discrete, study-specific risk with defined preventive controls and response actions. The Quality Management Plan provides general quality/CAPA concepts but does not establish blind-integrity metrics or trial-specific controls for preventing/containing inadvertent unblinding. The Communication Plan contains general escalation concepts but does not implement a communications firewall, i.e., documented enforceable routing rules, restricted distribution lists, or prohibited recipients for unblinded operational topics, and it does not define inadvertent-unblinding response procedures. The Monitoring Plan and Medical Monitoring Plan address emergency/medically-necessary unblinding (including documentation and medical-monitor consultation concepts), but they do not provide stepwise preventive controls or an incident-response workflow for inadvertent unblinding during routine operations and query resolution, which is the predictable high risk failure mode in a sham + logistics-mimicry randomized double-blind trial. The Protocol Deviation Plan does not define inadvertent unblinding as a deviation category or provide classifications and handling steps tailored to blind integrity breaches. The Data Management Plan assigns Biorasi responsibility for query management but does not establish "blind-safe" query governance (e.g. content rules; routing restrictions; and controls preventing treatment-revealing information from being sent to blinded recipients), and the Data Validation Plan focuses on vendor data checks without defining

---

[6] These plans include the Risk Management Plan v1.0 (BIO 158822); Quality Management Plan v1.0 (BIO 158807); Communication Plan v1.0 (BIO 157322); Global Project Specifications Plan v1.0 (BIO 157938); Monitoring Plan v1.0 (BIO 158564); Medical Monitoring Plan v2.0 (BIO 158520); Trial Master File ("TMF") Plan v1.0 (BIO 158978); Data Management Plan v1.0 (BIO 157893); Data Validation Plan v1.0 (BIO 157868); Protocol Deviation Plan v1.0 (BIO 158621)).

CONFIDENTIAL

CONFIDENTIAL

validation steps for key blind-integrity controls (e.g., preventing leakage through listings/queries; documenting and dispositioning unblinding-related deviations; and confirming containment actions).The essential document set reviewed does not consistently identify inadvertent/unplanned unblinding as a foreseeable operational risk, and it does not provide a practical incident-response process and procedural playbook for inadvertent unblinding; that omission is consistent with a failure to implement documented controls and processes commensurate with the scope, quality, and blind-integrity demands of a leukapheresis-dependent, autologous cell-therapy trial (Risk Management Plan v1.0 (BIO 158822); Quality Management Plan v1.0 (BIO 158807); Communication Plan v1.0 (BIO 157322); Global Project Specifications Plan v1.0 (BIO 157938); Monitoring Plan v1.0 (BIO 158564); Medical Monitoring Plan v2.0 (BIO 158520); Trial Master File ("TMF") Plan v1.0 (BIO 158978); Data Management Plan v1.0 (BIO 157893); Data Validation Plan v1.0 (BIO 157868); Protocol Deviation Plan v1.0 (BIO 158621)). I found insufficient standard operating procedures listed that address this particular risk of inadvertent unblinding in any of the plans or materials reviewed.

These omissions are particularly consequential in this trial because multiple study workflows embed randomization identifiers and operational cues that are vulnerable to risk of inadvertent unblinding unless controls are engineered (e.g., sample labeling conventions incorporating randomization numbers, and logistics mimicry requirements).

**Site Personnel Not Trained on Blinding Procedure:** The protocol required that an empty Cryoport shipping container would still be sent back to the clinical site for the placebo patient, in order to maintain the blind (so that the logistics and drug supplied for treatment appear identical for placebo vs. treated patients). (*See* IP Manual v2.0 BIO_210571; Leukapheresis Manual v1.0 BIO_378866). This is a somewhat unconventional procedure that absolutely required effective subject matter training on handling, labeling and shipping of these materials. I have not seen documentation of sufficient training with respect to this process and procedure.

**Systemic Training Deficiencies:** Biorasi was responsible for creating an Investigational Product Manual describing the Cryoport procedure, and query resolution was part of their duties. The operational requirements and logic are direct and do not depend on hindsight: when unblinding risks and response procedures are not specified in the essential documents, effective protocol-specific training on those controls cannot reliably occur, because training content is necessarily derived from the governing procedures and plans. This linkage is borne out by the contemporaneous training record. Biorasi's Investigator Meeting ("IM") kickoff training (March 11–12, 2023) and associated materials reflect that unblinded vs. blinded activities were recognized at an assumed "no protocol deviation" level (i.e., certain tasks are unblinded but assumed to be segregated and no risk for unblinding blinded personnel), but the training record does not reflect structured instruction to the assembled investigators and study personnel and site staff on inadvertent-unblinding definitions, points of unblinding, how to limit unblinding, escalation pathways, mandatory documentation (unblinding log; deviation record; CAPA), or practical containment steps to prevent propagation of treatment-revealing information to blinded personnel responsible for clinical assessments, data review, and trial management. In fact, the Biorasi CRA

CONFIDENTIAL

CONFIDENTIAL

(Juan Duany-Santos) is not reflected as trained on the IM training logs, and the surrounding training record reflects gaps in protocol-specific and safety-governance training.[7]

Similarly, Biorasi's Vice President who was the acting Project Director, by her course of conduct in her interactions including communications with the clinical site and Principal Investigator was not adequately trained and clearly was not sufficiently familiar with nor sufficiently understood the protocol requirements and relevant procedures and plans for this study.

When the Project Director left and the Biorasi VP took over, the industry standard is for Biorasi to have ensured she was thoroughly up to speed on all protocol and study plans and procedures details. Instead, as noted, Biorasi did not conduct sufficient training for that personnel change based on my review of the training records and materials used for training, and study documents.

Moreover, had the Biorasi VP been familiar and knowledgeable on the study protocol and required processes and procedures, she should have known that Subject 1003's (active treatment) cell product had been manufactured weeks earlier from Subject 1003's own leukapheresis in November 2023, and that it required ~10–12 weeks to manufacture ALZN002's dendritic cell therapy, so Subject 1005's January sham procedure could not with reasonable possibility have contributed to or affected Subject 1003's product. Even if Subject 1005's leukapheresis had been real instead of sham, any drug product from it could not with any reasonable likelihood even exist until several months later; accordingly it appears that it would be practically impossible for patient 1003's drug product to be "misidentified" or mixed up with patient 1005's. If she communicated such a misidentification or mix-up to the Principal Investigator, it would indicate that she failed to understand that a leukapheresis originating manufactured drug product from a January active treatment patient could not possibly affect a product manufactured in the preceding time frame and be used or mixed up for another patient. Such a misunderstanding would be strongly indicative of poor training and lack of protocol and study comprehension at the study leadership level.

**Insufficient Follow-Up Training After Initial Mistakes:** The first leukapheresis for Subject 1003 occurred in November 2023. Standard industry practice after a first-run of a complex process is to debrief and reinforce training in preparation for the next run. I have not seen evidence that Biorasi conducted a sufficient debrief and supplemental training. Trainings are documented. Had such trainings (or any of the trainings referenced above) occurred, I would expect to see documentation supporting it.

In sum, Biorasi's training of both its own team and the site personnel was grossly below industry standards. This led directly to protocol and study procedure misunderstandings. Maintaining the blind in this trial hinged on precise procedural compliance, a nuance that Biorasi did not successfully impart to and ensure for those on the front lines. In my opinion, these training failures

---

[7] *See* IM Training Log 11 Mar 2023 (TMF57668); IM Training Log 12 Mar 2023 (TMF57672); IMIC IM training logs reflecting attendees and not listing Juan Duany-Santos (BIO 143151; BIO 143155)).

CONFIDENTIAL

CONFIDENTIAL

fall well below what any reasonable sponsor or CRO would consider acceptable. Proper training is a core component of GCP compliance; its absence was a key factor in the cascade of errors that ensued.

### III. Biorasi's Inadequate Training and Inadequate Procedures Contributed to the Unblinding Event

In a double-blind trial, maintaining the blind is critical to protect against potential bias that is operative and the scientific and medical credibility and value of the data can be severely diminished due to such potential bias. Biorasi was entrusted with protecting the blind, yet through a series of foreseeable missteps, it allowed a preventable unblinding to occur.

For purposes of this report I have assumed that on, or around, January 18, 2024, the IMIC Coordinator reached out to the Biorasi CRA for guidance by phone regarding the placebo shipment. The Biorasi CRA was unable to provide the IMIC Coordinator with appropriate guidance over the phone, and directed her to send an email instead. The IMIC Coordinator sent an email to a distribution list that contained both blinded and unblinded study personnel. This email revealed the subject's placebo assignment, breaching the study's double-blind design.

There were multiple layers of clinical operations for the ALZN002 trial in which Biorasi systematically failed to properly manage and maintain control:

**Lack of Preparation for Potential Unblinding**: The ALZN002 Trial's design made inadvertent unblinding a highly foreseeable risk (a first-in-human, sham/placebo-controlled setup with complex logistics and only two patients initially). Yet, the key study specific governing documents such as the various management plans nor any procedures listed did *not* sufficiently identify this as a major foreseeable risk factor nor did they address what various parties must do in case of accidental unblinding, or how to prevent one beyond generic cautions, if and when mentioned. This is a material systemic omission and represents a foundational breakdown in risk identification and quality planning, which materially increased the likelihood of the January 18, 2024 Unblinding Event. Furthermore, in a double-blind, placebo-controlled study, especially one involving sham invasive procedures (leukapheresis), autologous cell handling, and multiple independent parties, the risk of an inadvertent unblinding is not only foreseeable but should have been one of the top "critical to quality" risks identified and mitigated prior to and during trial startup. Industry standards (including ICH E6(R3)) call for sponsors/CROs to prospectively identify such risks and implement robust safeguards. Preserving the blind is a core quality requirement for such trials; all foreseeable threats to the blind (for example, communication errors, shipping mix-ups, unblinded personnel mishandling information) should have been identified, mitigated, documented, and trained for in advance. Biorasi's planning failed to do so.

**Communication Plan Adherence and Enforcement:** Biorasi should have known and anticipated this foreseeable type of unblinding incident risk and addressed it properly by documented plans, processes, procedures for reporting/communication, escalation and mitigation. However, as explained above, the Communication Plan contains general escalation concepts but does not

CONFIDENTIAL

CONFIDENTIAL

implement a communications firewall, i.e., documented enforceable routing rules, restricted distribution lists, or prohibited recipients for unblinded operational topics, and it does not define inadvertent-unblinding response procedures.  That is particularly problematic where, as here, the blinding model is inherently high-risk because it depends on sham procedures and logistics mimicry (including placebo workflow mimicry).

When Biorasi's actual oversight, plans, processes and procedures were put to the test, they had insufficient technical safeguards and the coordinator had the ability to email both lists simultaneously – a risk which is often mitigated by not giving sites a "both lists" option, or by having a CRA internally filter communications. Industry standard practice for this situation is to have an unblinded CRA act as a gatekeeper such that when an unblinded study person calls or emails him with a query, he knows the answer and responds, or promptly finds the answer from an appropriate person and responds directly back to the query. It is not industry standard that a CRA in this situation would not know the answer himself or who to get that answer from.

**No Firewall Redaction or Other Safeguard Actions Taken:** Industry standard practice is to have some type of access and control system in email that will not allow an unblinded person to send emails to a blinded person; this is typically done by an access controlled blinded vs. unblinded absolute partition for access and sending/receiving emails in order to ensure no blinded personnel can be contacted or communicate with unblinded study personnel. This industry standard practice was not implemented by Biorasi.

**Improper CRA Instruction and Authorization to IMIC:** A CRO should shepherd and partition (e.g., blind vs. unblind), analyze and manage communications, and not delegate that accountability back to the site in a manner that risks protocol violations. The Biorasi CRA should have been prepared to answer the IMIC site coordinator's inquiry, which was a basic question about the placebo shipment that the Biorasi CRA should have been able to answer off-hand. In the event that the Biorasi CRA was unable to answer the coordinator's question, they should have escalated the issue internally.  The Biorasi CRA should not have instructed that the IMIC site coordinator send an email, particularly where insufficient safeguards to prevent unblinding risk via email. In my professional opinion, this action – failing to properly address the site's query - by the Biorasi CRA was far below industry standards.

**Aftermath Mismanagement and Study Continuation:** In the wake of the Unblinding Event, the proper course would have been to immediately notify the sponsor and IRB, rapidly initiate a documented root cause determination and CAPA actions (also conveying these to sponsor and IRB in real time as findings are determined), determine the better courses of action for treating the already consenting patients because the PI and site and patients were still blinded to treatment vs. replacing such consenting blinded patients.  There is also no operative rationale to make unverified statements about potential missing or mixed-up samples, defective drug product risk or misidentification of drug product. It is never appropriate to alarm, panic, or threaten the PI and site—or to risk doing so.

CONFIDENTIAL

CONFIDENTIAL

From the perspective of maintaining the blind, it should be noted that after January 18, there were still only two subjects enrolled (1003 and 1005). Had the trial continued, new subjects could still be blinded in their treatment assignment. It was conceivable to treat the unblinding of the first two as an isolated incident, implement fixes (re-training, maybe separating roles more strictly), and move on with the trial.

Biorasi's failure to maintain the study blind and the additional miscommunications and mismanagement adversely impacted one of the most fundamental obligations in a blinded trial. This Unblinding Event was foreseeable and preventable, arising from human error that proper training and procedures would have averted.

### IV.   Mishandling of Site Inquiries and Protocol Deviations

Beyond the initial Unblinding Event, Biorasi's approach to handling the fallout was marked by a failure to follow standard escalation pathways that would protect and contain the blind as well as professional communications to the sponsor and interactions with the site and Principal Investigator. A competent CRO must respond to serious issues (like an unblinding or potential protocol breach) by rapidly escalating the issue to the sponsor and other relevant parties, investigating the facts, and collaboratively deciding on corrective measures.

**No Timely Escalation Disclosure to Sponsor:** If Biorasi did not provide prompt written notice to Alzamend of concerns regarding missing, lost or defective drug product, despite MSA Section 2.8(b) obligating them to do so, this would have deprived the sponsor of any opportunity to assist in managing the issue and safeguarding the trial. In industry practice, any material irregularity that could adversely affect the study must be reported to the sponsor immediately. Reporting means in writing and commonly includes verbal communication.  Biorasi's own Medical Monitoring Plan and Task Matrix echoed this, requiring escalation of major deviations or safety issues within 24 hours.

**Failure to Investigate and Verify Facts:** Biorasi should have calmly and promptly investigated whether any investigational product shipments were actually missing or misplaced. Had the Biorasi VP taken a few minutes to check the actual records (which a CRO should maintain diligently for investigational product and samples), she would have seen whether the samples were actually missing, lost or misplaced. If Biorasi failed to do this basic due diligence before reacting and miscommunicating, it would be a serious deviation from standard practice. The CRO is expected to be the problem-solver by gathering all information and responding with accurate and complete information to resolve a particular query, and especially for a critical one such as this. Biorasi effectively created a new "problem" by communicating that something might be wrong (missing, lost, defective samples) when in fact everything was in order.  While Biorasi investigated the issue, they should have been careful not to alarm the PI. To the extent any treatment needed to be paused while Biorasi investigated the facts, they should only have instructed the PI to pause treatment without elaborating as to their unverified concerns. The PI, who remained blinded, would have had no independent way to verify these concerns and would have been cornered by the CRO's alarming communications. Biorasi should have known that potentially inflammatory

CONFIDENTIAL

CONFIDENTIAL

statements may cause the PI to withdraw, thereby resulting in PI/site withdrawal and termination of the study. This type of conduct is far below the GCP industry standards for escalation and communication which expect accurate disclosure that is appropriate for the situation.

**Biorasi Failed to Properly Disclose Its Actions to Sponsor:** To the extent that Biorasi's management did not inform Alzamend of its communications to the Principal Investigator or site of missing, lost, mixed up or mislabeled study drug product, this would be a gross deviation (these are all major protocol deviations if they occurred) from industry standards expected of a CRO.

**V.     The ALZN002-01 Trial Could Have Resumed Had Biorasi Acted in Accordance With Industry Standards**

Even after the unblinding event, the trial would have been able to continue with remediation and CAPA implemented for the risk of further unblinding incidents.  In fact, Alzamend quickly tried to mitigate and continue the study by preparing a protocol waiver for Biorasi to present to the PI/site. The protocol waiver also needed to involve the Principal Investigator to allow continued treatment of the patients enrolled during the unblinding event. If this waiver had gone into effect, it would have permitted those two subjects to continue by acknowledging the unblinding but allowing blinded subject 1003 to still receive active treatment and continue safety follow-up from the blinded PI and site staff. The unblinding of two patients, while serious, would not alone have forced the entire trial to stop were it not for Biorasi's compounding conduct.

Biorasi's approach to protocol deviations and issue escalation deviated profoundly from protocol and industry standards. A competent CRO acts as a problem-solving stabilizing force during incidents and in this case, Biorasi's course of misconduct combined with its systemic failures in GCP standards led to an unfortunate premature and unwarranted cessation of the ALZN002-01 clinical trial.

## CONCLUSIONS

Based on my review of the evidence and my experience in clinical trial management and GCP compliance, I conclude to a reasonable degree of professional certainty that Biorasi's performance fell significantly below both regulatory requirements and industry standards for a CRO with the TORO obligations under the MSA and WO with Alzamend. As detailed above and summarized below:

1.  Biorasi lacked the qualifications and capabilities and failed to engage industry standard resources to properly run the ALZN002 Trial, and did not manage or conduct the ALZN002 Trial in accordance with industry standards.

2.  Biorasi failed to train the trial staff or implement proper plans and procedures in accordance with regulatory and industry standards.

3.  Biorasi's inadequate training and inadequate plans and procedures were a direct contributing factor to the Unblinding Event.

CONFIDENTIAL

CONFIDENTIAL

5. Biorasi's mishandling of the IMIC Coordinator's inquiry was a significant contributing factor to the Unblinding Event.

6. The ALZN002 trial could have continued even after the Unblinding Event, had Biorasi acted in accordance with industry standards.

7. Biorasi acted outside the bounds of recognized regulatory and industry standards when raising breach of protocol concerns to the Principal Investigator.

8. Alzamend was left with no viable path to continue the trial after the Principal Investigator and his site's withdrawal from the study.

Date: February 4, 2026

_____
Frederick Hausheer, M.D

CONFIDENTIAL

13129373-3

CONFIDENTIAL

## APPENDIX A: FREDERICK HAUSHEER, MD CV

*See* Attachment A.

CONFIDENTIAL

CONFIDENTIAL

## APPENDIX B: REFERENCES & SUPPORTING DOCUMENTS REVIEWED

| Reference Title | Citation |
|---|---|
| 21 C.F.R. Part 312 – Investigational New Drug Application (Subpart D) | https://www.ecfr.gov/current/title-21/chapter-I/subchapter-D |
| 21 C.F.R. § 312.50 – General Responsibilities of Sponsors | https://www.ecfr.gov/current/title-21/chapter-I/subchapter-D/part-312/subpart-D |
| 21 C.F.R. § 312.52 – Transfer of Obligations to a CRO | https://www.ecfr.gov/current/title-21/section-312.52 |
| 21 C.F.R. § 312.53 – Selecting Investigators and Monitoring | https://www.ecfr.gov/current/title-21/section-312.53 |
| 21 C.F.R. § 312.56 – Review of Ongoing Investigations | https://www.ecfr.gov/current/title-21/section-312.56 |
| 21 C.F.R. Part 50 – Protection of Human Subjects | https://www.ecfr.gov/current/title-21/part-50 |
| 21 C.F.R. Part 56 – Institutional Review Boards | https://www.ecfr.gov/current/title-21/part-56 |
| 21 C.F.R. Part 54 – Financial Disclosure by Clinical Investigators | https://www.ecfr.gov/current/title-21/part-54 |
| 21 C.F.R. Part 11 – Electronic Records and Electronic Signatures | https://www.ecfr.gov/current/title-21/part-11 |
| ICH E6(R3) Good Clinical Practice – Final Guideline (2025) | https://www.fda.gov/regulatory-information/search-fda-guidance-documents/e6r3-good-clinical-practice-gcp |
| ICH E6(R2) Integrated Addendum to ICH E6(R1) | https://www.fda.gov/regulatory-information/search-fda-guidance-documents/e6r2-good-clinical-practice-integrated-addendum-ich-e6r1 |
| ICH E8(R1) General Considerations for Clinical Studies | https://www.fda.gov/regulatory-information/search-fda-guidance-documents/e8r1-general-considerations-clinical-studies |

CONFIDENTIAL

CONFIDENTIAL

| | |
|---|---|
| ICH E9 Statistical Principles for Clinical Trials | https://www.fda.gov/regulatory-information/search-fda-guidance-documents/e9-statistical-principles-clinical-trials |
| ICH E9(R1) Estimands Addendum | https://www.fda.gov/regulatory-information/search-fda-guidance-documents/e9r1-statistical-principles-clinical-trials-addendum-estimands-and-sensitivity-analysis-clinical |
| ICH E10 Choice of Control Group | https://www.fda.gov/regulatory-information/search-fda-guidance-documents/e10-choice-control-group-and-related-issues-clinical-trials |
| ICH E3 Structure and Content of Clinical Study Reports | https://www.fda.gov/regulatory-information/search-fda-guidance-documents/e3-structure-and-content-clinical-study-reports |
| ALZN002-01 Clinical Protocol v1.0 (15 Dec 2022) | BIO_158645-BIO_158723 |
| ALZN002-01 Clinical Protocol Summary of Protocol Changes | ALZ_134665-ALZ_134750 |
| ALZN002-01 Clinical Protocol v2.0 (12 Apr 2023) | BIO_124693-BIO_124775 |
| ALZN002-01 Clinical Protocol v. 3.0 (5 Dec 2023) | ALZ_136987-ALZ_137072 |
| Clinical Trial Agreement (CTA) | BIO_219967-BIO_219999 |
| First Amendment To Clinical Trial Agreement | TMF11478-TMF11491 |
| Communication / Escalation Plan v1.0 | BIO_157322-BIO_157358 |
| Data Management Plan v1.0 | BIO_157893-BIO_157937 |
| Data Validation Plan v1.0 | BIO_157868-BIO_157892 |
| Global Project Specifications Plan v1.0 | BIO_157938-BIO_157960 |
| eCRF Completion Guidelines v1.0 (05 Apr 2023) | BIO_157359-BIO_157523 |

CONFIDENTIAL

CONFIDENTIAL

| | |
|---|---|
| eCRF Completion Guidelines v2.0 (10 Jul 2023) | BIO_157524-BIO_157697 |
| Imaging Charter v1.0 | BIO_159012-BIO_159036 |
| Imaging Charter v3.0 | BIO_159062-BIO_159088 |
| Informed Consent Form v1.0 | BIO_158457-BIO_158479 |
| Informed Consent Form v2.0 | BIO_159094-BIO_159117 |
| Investigator's Brochure v1.0 (Sept 2022) | BIO_231386-BIO_231513 |
| Investigator's Brochure v2.0 (Jan 2023) | BIO_287710-BIO_287811 |
| Investigational Product (IP) Manual v1.0 (10 Mar 2023) | BIO_205958-BIO_205999 |
| Investigational Product (IP) Manual v2.0 (05 Jul 2023) | BIO_210571-BIO_210626 |
| Leukapheresis Manual v1.0 (17 Aug 2023) | BIO_212296-BIO_212430 |
| Medical Monitoring Plan v 1.0 (01 March 2023) | BIO_004015-BIO_004034 |
| Medical Monitoring Plan v2.0 (05 May 2023) | BIO_222392-BIO_222412 |
| Monitoring Plan | BIO_158564-BIO_158614 |
| Master Services Agreement (MSA) – Alzamend / Biorasi (Feb 17, 2023) | BIO_213840-BIO_213871 |
| Protocol Deviation Plan v1.0 | BIO_158621-BIO_158644 |
| Quality Management Plan v1.0 | BIO_158807-BIO_158821 |
| Risk Management Plan | BIO_158822-BIO_158841 |
| SAE & Pregnancy Data Collection Forms Completion Guidance v1.0 (17 May 2023) | BIO_157105-BIO_157147 |
| SAE Report Form | BIO_157296-BIO_157302 |
| SAE Query Form v1.0 (08 Feb 2023) | BIO_157295 |

CONFIDENTIAL

CONFIDENTIAL

| | |
|---|---|
| Safety Management Plan v1.0 (23 Feb 2023) | BIO_157149-BIO_157192 |
| Safety Management Plan v2.0 (13 Apr 2023) | BIO_157193-BIO_157238 |
| Safety Management Plan v3.0 (04 May 2023) | BIO_157239-BIO_157294 |
| Safety Reportability Assessment Form | BIO_157148 |
| Site Communication Matrix v3.0 (26 Sept 2023) | BIO_141239-BIO_141243 |
| Specialty Laboratory Manual v1.0 (28 Aug 2023) | BIO_217910-BIO_217974 |
| Specialty Laboratory Manual v2.0 (12 January 2024) | BIO_168378-BIO_168448 |
| Task Ownership Matrix (WO Attachment A-1) | BIO_002941–BIO_002950 |
| Transfer of Regulatory Obligations (TORO – WO Attachment A-5) | BIO_002970–BIO_002974 |
| Trial Master File | TMF0001-TMF57870 |
| Trial Master File ("TMF") Plan v1.0 | BIO_158978-BIO_159011 |
| Work Order / Statement of Work – ALZ-188 (17 Feb 2023) | BIO_002933-BIO_002979 |
| Training Materials and Training Logs (kickoff meeting, training logs, etc.) | BIO_157105 – BIO_159117<br>BIO_202339-BIO_202352<br>BIO_275474<br>BIO_180480-BIO_180534<br>BIO_180639-BIO_180693<br>BIO_168457<br>BIO_184522<br>BIO_365429<br>BIO_365437<br>BIO_365438<br>BIO_365447-BIO_365448<br>BIO_365455<br>BIO_365456 |

CONFIDENTIAL

CONFIDENTIAL

|  | |
|---|---|
|  | BIO_365457 |
|  | BIO_365458 |
|  | BIO_365459 |
|  | TMF12051-TMF12057 |
|  | BIO_378895-BIO_378994 |
|  | BIO_223174-BIO_223243 |
|  | BIO_223172-BIO_223173 |
|  | BN 000217 – BN 000234 |
|  | TMF9744 – TMF9747 |
|  | TMF12182 – TMF12193 |
|  | TMF57660 – TMF57675 |
|  | TMF57684 – TMF57697 |
|  | BN 000217 – BN 000234 |
|  | BN 000265 – BN 000268 |
|  | BIO_143151 – BIO_143158 |
|  | TMF5738 |
|  | TMF57668 |
|  | TMF57672 |
|  | BIO 143151 |
|  | BIO 143155 |
|  | BIO_260672-BIO_260912 |
|  | BIO_262395-BIO_262398 |
|  | BIO_156903-BIO_156907 |
|  | BIO_156908-BIO_156912 |
|  | BIO_156913-BIO_156924 |
|  | BIO_156925-BIO_156933 |
|  | BIO_156934-BIO_156938 |
|  | BIO_156939-BIO_156944 |
|  | BIO_156945-BIO_156949 |
|  | BIO_156950-BIO_156953 |
|  | BIO_156954-BIO_156958 |
|  | BIO_156959-BIO_156964 |
|  | BIO_156965-BIO_156970 |
|  | BIO_156971-BIO_156976 |
|  | BIO_156977-BIO_156979 |
|  | BIO_156980-BIO_156984 |
|  | BIO_156985-BIO_156995 |
|  | BIO_156996-BIO_157006 |
|  | BIO_157007-BIO_157012 |
|  | BIO_157013-BIO_157025 |
|  | BIO_157026-BIO_157028 |
|  | BIO_157029-BIO_157038 |
|  | BIO_157039-BIO_157048 |

CONFIDENTIAL

CONFIDENTIAL

| | BIO_157049-BIO_157056 |
| --- | --- |
| | BIO_157057-BIO_157064 |
| | BIO_157065-BIO_157067 |
| | BIO_157068-BIO_157077 |
| | BIO_157078-BIO_157085 |
| | BIO_157086-BIO_157091 |
| | BIO_157092-BIO_157096 |
| Resumes | BIO_157049 |
| | BIO_123810–BIO_123814 |
| | BIO_156954 |
| | BIO_236201–BIO_236206 |
| | BIO_156913 |
| | BIO_157013 |
| | BIO_157086 |
| | BIO_156959 |
| | BIO_157068 |
| | BIO_157092 |
| | BIO_157078 |
| | BIO_156925 |
| | BIO_157065 |
| | BIO_156939 |
| | BIO_156945 |
| | BIO_156980 |
| | BIO_156971 |
| | BIO_157026 |
| Protocol Deviation Logs | BIO_120807 |
| | BN 000256 |
| Emails, Meeting Minutes, and Call Notes | ALZ_108906 |
| | ALZ_058573-ALZ_058574 |
| | ALZ_058575-ALZ_058576 |
| | ALZ_104749-ALZ_104750 |
| | BIO_139775 |
| | TMF10915-TMF10919 |
| | ALZ_061431-ALZ_061433 |
| | ALZ_108764 |
| | ALZ_128839 |
| | BIO_181659-BIO_181660 |
| | BIO_178838-BIO_178839 |
| | BIO_181680-BIO_181681 |
| | BIO_184674-BIO_184675 |
| | BIO_363012 |
| | BIO_140686-BIO_140687 |
| | ALZ_061458-ALZ_061462 |

CONFIDENTIAL

CONFIDENTIAL

|  | BIO_151669<br>BIO_144239-BIO_144241<br>BIO_139074-BIO_139082<br>BIO_137518-BIO_137526<br>BIO_002132-BIO_002140<br>BIO_003830-BIO_003839 |
|---|---|
| Linical Audit Report | BIO_138510-BIO_138517 |

CONFIDENTIAL

CONFIDENTIAL

## APPENDIX C: GLOSSARY

- **Active arm / Active treatment**
  Subjects randomized to leukapheresis and receipt of investigational product (ALZN002), per protocol/randomization.
- **Blinded personnel**
  Individuals intended to remain unaware of treatment assignment to prevent bias (often including PI/assessors and designated staff).
- **Blind integrity**
  Maintenance of masking such that treatment assignment does not influence conduct, assessments, safety characterization, or decisions.
  *See also:* **Inadvertent unblinding**, **Communication Matrix**, **Deviation**; **ICH E6/E9**.
- **CAPA (Corrective and Preventive Action)**
  Quality process to correct a nonconformance and implement preventive controls to avoid recurrence.
- **CRA (Clinical Research Associate)**
  Monitor responsible for monitoring visits, issue identification, documentation, and escalation.
- **CRO (Contract Research Organization)**
  Organization contracted to perform clinical trial services for a sponsor (e.g., monitoring, project management, data management).
- **Cryoport / Cryogenic shipper**
  Cold-chain logistics provider and shipping container system used for cell therapy material transport (or placebo-mimic "empty shipper" workflows).
- **Deviation / Protocol deviation**
  Departure from protocol/GCP expectations requiring documentation, impact assessment, and potentially CAPA depending on severity.
- **Double-blind**
  Design in which key parties (commonly subjects and investigators/assessors) are masked to treatment assignment to reduce bias.
- **Dummy shipment / Empty shipper**
  Placebo-mimic logistics step intended to prevent inference of treatment assignment from shipping activity.
- **Escalation pathway**
  Defined route for raising, documenting, and resolving issues (e.g., CRA → CTM/PM → Medical Monitor/Sponsor/IRB as appropriate).
- **IRB (Institutional Review Board)**
  Ethics committee responsible for review/approval and continuing oversight of human subject research.
- **Leukapheresis**
  Procedure collecting PBMCs for manufacturing autologous cell therapy; sham leukapheresis used as a control procedure in this trial.

CONFIDENTIAL

CONFIDENTIAL

- **Medical Monitor**
  Physician oversight role/plan for safety review, medical queries, and medical escalation.
- **Placebo arm / Sham leukapheresis**
  Control procedures intended to mimic active-arm experience without collecting cells/producing active product.
- **Sentinel subject**
  Early subject(s) in a cohort treated first to evaluate safety prior to dosing additional subjects.
- **SOP (Standard Operating Procedure)**
  Written procedure governing routine processes (CRO or site).
- **Unblinded personnel**
  Individuals permitted to know treatment assignment because operational necessity requires it (e.g., designated unblinded contacts for preparation/logistics).

CONFIDENTIAL

CONFIDENTIAL

## APPENDIX D: PUBLICATIONS AND OTHER CASES

**Below is a list of publications that I have authored in the last 10 years.**

### Publications

- M. Qiu, Y. Guo , W. Guo , W. Nian, W. Liao, Z. Xu, W. Zhang, Y. Zhang, X. Wei, L. Xue, W. Tang, Y. Wu, G. Ren, L. Wang, J. Xi, Y. Wang, M. Li, F. Hausheer, C. Hu, R. Xu, FIH phase I dose escalation and dose expansion study of anti-EGFR ADC MRG003 in patients with advanced solid tumors. Annals of Oncology Volume 32, Supplement 5 S804 September 2021
- Y. Guo, · J. Xue,· W. Peng, · L. Xue, · X. Ge, · W. Zhao, · W. Tang, · W. Nian, · Q. Li, · S. Zhang, · J. Sun, · M. Li, · F. Hausheer, · C. Hu, · J. Li, First-in-human, phase I dose escalation and expansion study of anti-HER2 ADC MRG002 in patients with HER2 positive solid tumors Volume 32, Supplement 5 S480-S481 September 2021
- Aditya Kulkarni, Aulma Parker, Kamwing Jair, Pavankumar Petluru, Xinghai Chen, Harry Kochat, Frederick H. Hausheer, Umesh Kathad, Kishor Bhatia, Kerry Barnhart, Panna Sharma. LP-300 as a potential first-in-class combination agent with tyrosine kinase inhibitors (TKIs) in non-smoker lung adenocarcinoma. Journal of Clinical Oncology 2020; 10.1200/JCO.2020.38.15_suppl.e21660.

### Abstracts and Presentations

A. Conference Abstracts/Posters

- Bee-Cheng Sim, Fan Yan, Ulrich Ernst, Frederick Hausheer and Volker Schellenberger. AMX-168, a Long-Acting, Tumor Protease-Sensitive Bispecific Precursor for the Treatment of Solid Malignancies. AACR Annual Meeting, April 1-6, 2017, Washington, DC.

B. Invited Presentations

- Hausheer, F.H. De-Risking US Market Entry. Strategic Considerations for Scientific Risk Mitigation of New Therapeutics Development in the United States. Invited Expert Presentation. International Webinar. Australian Trade and Investment Commission. April 2-3, 2025.
- Hausheer, F.H. Strategic Risk Mitigation for US Biotech Market Entry. Invited Expert Presentation. International Webinar. Netherlands Innovation Network. June 5, 2025.

### Issued Patents

- Hausheer, Frederick, H. Increasing Cancer Patient Survival Time by Administration of Dithio-containing Compounds. United States Patent 11,471,431. Issued October 18, 2022.
- Hausheer, Frederick, H., Administration of Karenitecin for the Treatment of Platinum and/or Taxane Chemotherapy-Resistant or-Refractory Advanced Ovarian Cancer. United States Patent 10,413,538. Issued September 17, 2019.

CONFIDENTIAL

CONFIDENTIAL

- Hausheer, Frederick H., Administration of Karenitecin for the Treatment of Advanced Ovarian Cancer, Including Chemotherapy-Resistant and/or the Mucinous Adenocarcinoma Sub-Types. European Patent Office; 14836702.2-1453 PCT/US2014050463, issued August 08, 2016.

**Below is a list of all other cases in which I testified as an expert at trial or by deposition in the last 4 years.**

- 2015-2016 *Amgen v. GSK (GlaxoSmithKline)* (breach of contract; denosumab trials; ICH GCP) International Swiss Court of Arbitration (expert analysis and discovery support)
- 2023-2025 *EOC Pharma (Hong Kong) Limited v. Aadi Bioscience, Inc.* (breach of contract; oncology development/approval; damages) ICC International Court of Arbitration (New York) (ICC Case No. 27107/AB/XZG) 1:24-cv-09412-JGK (United States District Court, Southern District of New York) (expert written opinions, deposition and testimony)
- 2023-2024 *Novartis Pharmaceuticals Corporation and Dana-Farber Cancer Institute, Inc. v. Lupin Inc.* 1:21-cv-01105 (United States District Court, District of Delaware) (expert written opinions and deposition)
- 2023-2024 *Novartis Pharmaceuticals Corporation and Dana-Farber Cancer Institute, Inc. v. Dr. Reddy's Laboratories, Inc.*, et al. 1:21-cv-01106 (United States District Court, District of Delaware) (expert written opinions and deposition)
- 2023-2024 *Novartis Pharmaceuticals Corporation and Dana-Farber Cancer Institute, Inc. v. Lotus Pharmaceutical Co., Ltd. and Teva Pharmaceuticals Development*, Inc.1:21-cv-01107 (United States District Court, District of Delaware) 2023-2024 (expert written opinions and deposition)
- 2023-2025 *Puma Biotechnology, Inc. and Wyeth LLC v. AstraZeneca Pharmaceuticals LP and AstraZeneca AB* 1:21-cv-01338-MFK (United States District Court, District of Delaware) Patent validity, technical assessment of commercial value (expert opinions, deposition, and in-court testimony (multiple times))
- 2023-2024 *In re Sorrento Therapeutics, Inc., et al.* (Chapter 11) Case No. 23-90085 (United States Bankruptcy Court, Southern District of Texas, Houston Division) (expert due diligence: Phase III trial results/data quality, interpretation and commercial market assessment)
- 2024 *Memorial Sloan Kettering Cancer Center and Eureka Therapeutics, Inc. v. Bristol-Myers Squibb Company, Celgene Corporation, and Juno Therapeutics, Inc.* Index No. 651548/2022 (Supreme Court of the State of New York, County of New York) (expert reports: anti-BCMA CAR-T clinical/regulatory/commercial go/no-go decision analysis)
- 2025-present *Cryo-Cell International, Inc. v. Duke University* American Arbitration Association (AAA) (Arbitration Demand filed 10/04/2024) (expert report; deposition/testimony anticipated)
- 2026-present *AnaptysBio, Inc. v. GlaxoSmithKline LLC (and Tesaro, Inc.)* C.A. No. 2025-1355-KSJM (Delaware Court of Chancery) (commercially reasonable efforts / optimum commercial return; competitor-impact analysis; inputs/gating factors for damages modelers)

CONFIDENTIAL