**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

ALZAMEND NEURO, INC.,

      Plaintiff,

v.                                  Case No. 25-cv-20481-BB

BIORASI, LLC,

      Defendant.

_____/

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

144198983.1

TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................**Error! Bookmark not defined.**

II.   STATEMENT OF UNDISPUTED FACTS .........................**Error! Bookmark not defined.**

III.    ARGUMENT...............................................................**Error! Bookmark not defined.**

  1.    Rule 56 Legal Standard.................................................................................... 2

  2.    Defendant is Entitled to Summary Judgment on Plaintiff's Remaining Claims. ............... 3

  3.    Defendant is Entitled to Summary Judgment on its Breach of Contract Counterclaim. .. 18

IV.   CONCLUSION..............................................................**Error! Bookmark not defined.**

V.   REQUEST FOR HEARING................................................**Error! Bookmark not defined.**

144198983.1

TABLE OF AUTHORITIIES

**Page(s)**

### Cases

*Alvarez v. Royal Caribbean Cruises, Ltd.*,
   905 F. Supp. 2d 1334 (S.D. Fla. 2012) ...............................................................4, 10

*Am. Mariculture, Inc. v. Syaqua Americas, Inc.*,
   2021 WL 2315003 (M.D. Fla. June 7, 2021)..............................................................4

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)...................................................................................................3

*Jaffe v. Bank of Am., N.A.*,
   667 F. Supp. 2d 1299 (S.D. Fla. 2009), *aff'd*, 395 F. App'x 583 (11th Cir.
   2010) .................................................................................................................4, 10

*Mann v. Taser Int'l, Inc.*,
   588 F.3d 1291 (11th Cir. 2009) .................................................................................2

*Ocean Bio-Chem, Inc. v. Turner Network Television, Inc.*,
   741 F. Supp. 1546 (S.D. Fla. 1990) ........................................................................14

*Peterbrooke Franchising of Am., LLC v. Miami Chocolates, LLC*,
   312 F. Supp. 3d 1325 (S.D. Fla. 2018) .....................................................................5

*Warmus v. Equifax Info. Servs., LLC*,
   No. 605CV1427ORL28KRS, 2006 WL 8439367 (M.D. Fla. Dec. 13, 2006) .........5

### Federal Rules

Federal Rule of Civil Procedure 56 .................................................................................2

Federal Rules of Civil Procedure Rule 11 ......................................................................4

Federal Rules of Evidence Rule 702...............................................................................15

### Local Rules

Local Rule 7.1.................................................................................................................19

Local Rule 56.1................................................................................................................2

Defendant Biorasi, LLC hereby moves for summary judgment on all claims remaining in this action: (1) it seeks dismissal of the remaining claims asserted by Plaintiff Alzamend Neuro, Inc.; and (2) the entry of judgment on its counterclaim for breach of contract against Alzamend.

## I.      Introduction

It was evident from the outset of this action that it is a lawsuit in search of a valid claim. Through discovery, however, it also became clear that this a lawsuit in search alternate facts which never existed. Alzamend alleged it contracted with Biorasi because it had ready-to-go clinical trial sites that it guaranteed could serve also as the leukapheresis vendor for the study. In reality, Alzamend only asked Biorasi to explore these sites' leukapheresis capacities as back up options for the leukapheresis vendor it had found and told Biorasi it intended to use. Indeed, Alzamend did not advise Biorasi that their vendor had fallen through until after the parties signed the Letter of Intent. In any event, the actual evidence shows that Biorasi made only truthful representations reflecting precisely what each possible site said about its leukapheresis capabilities. Critically, the evidence unequivocally demonstrates that Alzamend knew ***prior to signing*** the Master Services Agreement and Work Order that none of these potential sites had a leukapheresis machine and that Alzamend did not intend to use them as the leukapheresis vendor when it signed the contract. Moreover, the undisputed evidence also shows that Alzamend approved all of Biorasi's staffing throughout the trial and knew who the team was going to be, again, ***prior to signing*** the MSA and Work Order. Accordingly, none of Alzamend's misrepresentation or deceptive practices act claims find any evidentiary support because it never relied on the representations alleged, which Biorasi never made anyway.

Nor did Alzamend adduce any admissible evidence to support its allegations that Biorasi made false statements to the trial's principal investigator and threatened his medical license to induce him to quit. Further, Alzamend had alleged Biorasi's motive for committing these acts (which never actually happened) was that Biorasi lacked the financial reserves or staff needed to continue the trial. None of these allegations were true; to the contrary, it was Alzamend that as of April 2024 had only $400,000 in cash on hand.

1

144198983.1

Alzamend's breach of contract claim fares no better; neither Alzamend nor its proffered expert can point to any evidence that Biorasi breached. Instead, its expert relied entirely on assumptions provided by Alzamend's counsel as the bases for his opinions. This is because the most Alzamend could ever do in this case was make allegations which the evidence squarely refutes.[1]

Finally, Alzamend's defense to Biorasi's counterclaim for breach of contract for failure to pay the termination fees provided in the Work Order is that Biorasi breached first. Because Biorasi did not, it is entitled to summary judgment on its affirmative claim.

## II.   Statement of Undisputed Facts

Pursuant to Local Rule 56.1 Defendant files in support of this Motion for Summary Judgment a separate Statement of Material Facts. (ECF No. __.) All citations to exhibit numbers in this Motion refer to the exhibits attached to that Statement of Material Facts.

## III.   Argument

### 1.   Rule 56 Legal Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

"A court should grant summary judgment when, after an adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an essential element of that party's case." *Mann v. Taser Int'l, Inc*., 588 F.3d 1291, 1303 (11th Cir. 2009). "The mere existence

---

[1] This is further evidenced by the fact that Alzamend conspired with its "independent" auditor, Linical, to use Linical despite it being a CRO competitor of Biorasi's in violation of the MSA, to exclude Biorasi personnel from Linical's site visit to FERG, and to manipulate the content of ultimate Audit Report to contain statements that have no support in any factual record, and for which Linical never had any evidence. As noted in the Statement of Facts filed separately with this Motion, the Linical auditor recorded FERG interviewees without their consent in violation of Florida law, made defamatory comments about Biorasi to the FERG interviewees, and published false statements in the Audit Report.

144198983.1

of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

> **2.      Defendant is Entitled to Summary Judgment on Plaintiff's Remaining Claims.**

Summary judgment must be entered on Plaintiff's claims because no admissible evidence exists to support any of the claims. ***First***, Plaintiff's fraudulent inducement/negligent misrepresentation and FDUPTA claims—which are duplicative—fail as a matter of law because the evidence demonstrates that no misrepresentations were made and, even if they had been, Plaintiff knew fully of the contrary facts *before* entering into the relevant contract. ***Second***, injurious falsehood and breach of the implied covenant claims—again, duplicative—fail because there is no admissible evidence that the alleged false statements were ever made or any damages resulting from these supposed statements. ***Third***, the breach of contract claim must also be dismissed because there is no evidence of either a breach of the relevant contract documents or any damages flowing from a breach.

> **a.  Plaintiff's fraudulent inducement/negligent misrepresentation and FDUPTA claims fail as a matter of law because the evidence demonstrates Plaintiff made no misrepresentations and Plaintiff never relied on any.**

Plaintiff's claims for fraudulent inducement/negligent misrepresentation and FDUPTA arise from the same alleged misconduct—purported false statements made to induce Plaintiff to enter into a contract for CRO services with Defendant. (*Compare* ECF No. 40 at ¶ 162 "Prior to the execution of MSA and Work Order, Biorasi made a series of material false statements for the express purpose of inducing Alzamend to retain Biorasi as the CRO for the ALZN002 clinical trial." *with id*. at ¶ 157 (FDUPTA) "Alzamend was misled by Biorasi's deceptive and unfair acts, which were designed to entice Alzamend to purchase services from Biorasi.") Both must be dismissed because (1) the undisputed record evidence demonstrates not only that Biorasi never made any misrepresentations of the nature suggested by these allegations; (2) Alzamend knew

before it ever signed the MSA and Work Order there was no ready-to-go leukapheresis center; and (3) Alzamend knew who exactly Biorasi staffed on the ALZN002 trial and approved them.[2]

The Court has previously stated what Plaintiff must do to prove its claim for fraudulent inducement: (1) defendant made a false statement concerning a material fact; (2) defendant knew the representation was false; (3) defendant intended the representation to induce plaintiff's reliance; and (4) plaintiff was injured in justifiable reliance on the misrepresentation. *See Alvarez v. Royal Caribbean Cruises, Ltd.*, 905 F. Supp. 2d 1334, 1342 (S.D. Fla. 2012) (citation omitted). To the extent Plaintiff asserts a negligent misrepresentation claim, the Court must determine the following: "First, whether defendant made a  statement to [plaintiff] concerning a material fact that it believed to be true but which was in fact false; Second, whether in the exercise of reasonable care under the circumstances, defendant was negligent in making the statement because it should have known the statement was false; Third, whether in making the statement, defendant intended or expected that [plaintiff] would rely on the statement; Fourth, whether [plaintiff]  justifiably relied on the false statement, and Fifth, whether [plaintiff] suffered loss, injury or damage as a result." *Jaffe v. Bank of Am., N.A.*, 667 F. Supp. 2d 1299, 1319 (S.D. Fla. 2009), *aff'd*, 395 F. App'x 583 (11th Cir. 2010) (cleaned up) (quoting *Std. Jury Instructions–Civil Cases (No. 99–2),* 777 So.2d 378, 382 (Fla. 2000)).

And the Court also previously stated that, to prevail on its FDUTPA claim, Plaintiff must prove three elements: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Am. Mariculture, Inc. v. Syaqua Americas, Inc.*, 2021 WL 2315003, *4 (M.D. Fla. June 7, 2021) (quoting *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006)). An act is deceptive within the meaning of the FDUTPA where a party makes a "representation, omission,

---

[2] Alzamend and its counsel's pursuit of these claims and refusal to dismiss them in light of the uncontroverted evidence—which Alzamend always known before filing this action—is problematic. As with certain other allegations, it is impossible that Alzamend did not know it's allegations in the Amended Complaint in support of this claim were false. As for Alzamend's counsel, based on the undisputed factual record that exists at present, it is unclear how further pursuit of this claim does not implicate Rule 11(b) of the Federal Rules of Civil Procedure.

4

144198983.1

or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Peterbrooke Franchising of Am., LLC v. Miami Chocolates, LLC*, 312 F. Supp. 3d 1325, 1343 (S.D. Fla. 2018).

   **i.**  **Defendant never made any misrepresentations regarding having a ready-to-go leukapheresis vendor.**

Plaintiff alleges "Biorasi made affirmative representations regarding its capabilities including its ability to secure a leukapheresis center for the trial," (ECF No. 40, ¶ 155) specifically referring to a December 15, 2022 email and its attachment. (*Id*. at ¶ 24) ("On December 15, 2022, a Biorasi Manager sent an email to Alzamend falsely stating that Biorasi's top site had the capabilities to perform leukapheresis and sham leukapheresis. The email also attached a spreadsheet representing that Biorasi was able to secure other sites with the capability of performing leukapheresis.") But that email merely stated: "Also, as a pleasant surprise, our top enrolling site (2.6 patients per site per month) has officially confirmed that they can and have done sham Leukapheresis, and they will conduct it strictly on site." Exhibit 5 (BIO_047903).[3] This statement was derived directly from information received from that potential clinical site, which was Dr. Carballosa, who eventually became the principal investigator for the ALZN002 trial. Exhibit 6 (BIO_149773-79). Specifically, as shown on BIO_149778, Dr. Carballosa himself stated "Leukapheresis for PBMC extraction will be on site." Moreover, the following day, Dr. Carballosa's study coordinator sent Biorasi an email with the following direct question responses:

---

[3] The "Biorasi Manager" identified in the Amended Complaint is Ruslan Gorsky.

**From:** Milka Vina <mvina@firstexcellentresearch.com>
**Date:** Thursday, December 15, 2022 at 8:07 PM
**To:** Ruslan Gorsky <rgorsky@biorasi.com>, Raul Carballosa <rcarballosamd@firstexcellentresearch.com>
**Cc:** Nana Yakoubov <nyakoubov@biorasi.com>, Natasha Brown <natashabrown@biorasi.com>
**Subject:** RE: New Alzheimer's Disease Opportunity

This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good Morning Ruslan

Nice to meet you and thank you for considering our site.

    1. Will you be able to conduct a sham Leukapheresis procedure as well, as per the protocol design?  Yes
    2. Do you have experience conducting Leukapheresis in previous studies?  Yes

*Id.* at BIO_149776.

The attachment to Gorsky's December 15 email to Plaintiff obviously copy and pasted the precise responses Defendant received from Dr. Carballosa's team and various other potential clinical trial sites as to whether they had specific prior experiences performing leukapheresis and whether they could conduct leukapheresis for this trial. Exhibit 7 (BIO_047905). For example, in column B of the spreadsheet, Dr. Carballosa was identified. Exhibit 4 (Gorsky Trx. at 99-101), and cells B26, B27, and B28 of the spreadsheet merely reflect the precise email representations that Defendant received from Dr. Carballosa and his team regarding his ability to perform leukapheresis and his past leukapheresis experience:

| Leukapheresis Capabilities | Yes, Leukapheresis for PBMC extraction will be on site |
|---|---|
| Will you be able to conduct a sham Leukapheresis procedure as well, as per the protocol design? | Yes |
| Do you have experience conducting Leukapheresis in previous studies? | Yes |

Exhibit 7 (BIO_047905). Thus, neither the December 15 email nor its attachment could constitute knowingly false representations; both merely presented the eventual principal investigator's representation exactly as received from him.

6

144198983.1

Nor could these communications constitute negligent misrepresentations; Dr. Carballosa testified that he could have performed the leukapheresis needed for the ALZN002 trial as he could have just rented a leukapheresis machine and technician. Exhibit 45 (Carballosa Trx. at 40:15-21).[4]

> **ii.      Plaintiff did not rely on any representations as it knew Defendant did not have a ready-to-go leukapheresis vendor before entering into the MSA and Work Order.**

The undisputed evidence shows that Plaintiff intended to use its own leukapheresis vendor when it signed the LOI on January 2, 2023. Indeed, only after the LOI was signed did Plaintiff's vendor fell through. As such, it makes no sense that Plaintiff would rely on Biorasi to have a ready-to-go leukapheresis vendor. Specifically, on January 9, 2023, Plaintiff's representative, Juan Martinez, emailed Gorsky and provided the name and address of the leukapheresis vendor it *still* intended to use to support the clinical sites. Exhibit 7 (BIO_249405). In response to Gorsky's request for this information several days prior,[5] Martinez provided the following:

---

[4] To the extent Plaintiff argues that he could not have performed leukapheresis for the study because his facility did not have leukapheresis machine, it has adduced no evidence either that Defendant ever represented that Dr. Carballosa did have such a machine nor that, prior to signing the MSA and Work order, Plaintiff even asked Defendant to ascertain whether any facility specifically had a leukapheresis machine.

[5] Notably, Gorsky identified prior conversations with Martinez about using Plaintiff's leukapheresis vendor: "Lastly, we discussed that you contemplated using a mobile unit for Leukapheresis, although that it subject to change if the sites have capability to do so on site." Ex. 7 at BIO_249406.

7

**From:** Juan Martinez <juan@riopharma.com>
**Date:** Monday, January 9, 2023 at 4:13 PM
**To:** Ruslan Gorsky <rgorsky@biorasi.com>
**Subject:** RE: Biorasi LOI, Appendix and NDA

This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Ruslan,

It just dawned on me that I didn't include the info on the Leukapheresis Center (central Leukapheresis facility to support the sites).  It's still up in the air which is why I asked you to inquire if the Infusion Center you are using as one of the sites could support the other 2 sites with the procedure.  Please scroll down to your e-mail for information on the vendor in RED font we are trying to get on board for this procedure, but they have been elusive as of late.   Dr. Peter Miller left the site and a Dr. Schmidt took over.  I have not had a conversation with him.  I have been speaking with Dr. Dobri Kiprov in California.  Please pursuit the Infusion Center.

Best regards,
Juan

Juan Martinez
Clinical Project Manager
(561) 685-8667

*Id*. It was only in this email that Plaintiff first raised the prospect that its preferred leukapheresis vendor may fall through and the backup leukapheresis capabilities being explored in the initial contact with clinical trial sites therefore should be pursued. *Id*.

This was further acknowledged during a January 18, 2023 recorded meeting, when Alzamend's Dr. Eve del Rio[6] stated she was encouraged that a potential clinical trial site was willing to be the central site for performing leukapheresis because "we had a site that could do it, and, they have just, let's say, gone AOL—gone AWOL—so we are going to have to depend on that site to do the leukapheresis." Exhibit 12 (ALZ_000175), ALZN002 – Clinical Logistics for IP Recording, Jan. 18, 2023, at 22:36 – 23:00 (E. del Rio speaking). Regarding the leukapheresis capabilities of potential clinical sites, including Dr. Carballosa's, Gorsky several times stated that feasibility needed to still be conducted to evaluate the relevant capabilities. *See id*. at 21:42 – 21:49 ("The most important thing for us, I think regarding site feasibility is to determine the capabilities for leukapheresis and enrollment") (R. Gorsky speaking); 23:39 – 23:52 ("even if worst case scenario it is an issue, let's say, you know, Murphy's law applies and none of them work out for whatever reason, we also have enough wiggle room for feasibility to ascertain where there'll be

---

[6] Dr. del Rio of Del Rio Pharmaceutical Services was retained by Alzamend to be responsible for "framework and putting the protocol together" for the clinical trial and "took the lead in putting together the clinical protocol." Exhibit 1 (S. Jackman Trx. at 32:12 33:22).

done.") (R. Gorsky speaking). And Gorsky specifically corrected Dr. del Rio during this call after she stated that Dr. Carballosa "just finished conducting leukapheresis for a stem cell product for Alzheimer's," *id*. at 25:40 – 25:54 (E. del Rio speaking), stating:

> Eve, there was, in that other study, there was not leukapheresis, it was just a cell therapy study…leukapheresis was not the procedure…. But, it's a non-concern because we asked those sites about their leukapheresis capabilities and they said 'yes, we've done many studies that included this. That's the difference. So we haven't done leukapheresis with them, but they have confirmed that they have done it and other studies, but we did work with them on the previous Alzheimer's cell therapy study. So we -- you know, we're taking their answer as a positive one. And again, we're gonna flesh that out with the feasibility questionnaire anyway.

25:58 – 26:34 (R. Gorsky speaking).

Finally, prior to executing the MSA and Work Order on February 17, 2023, Plaintiff also acted in accordance with its knowledge that it would need to look beyond the potential clinical sites, including Dr. Carballosa's, to find a leukapheresis vendor with a leukapheresis machine. Project team meeting minutes for a February 8, 2023 meeting between Plaintiff and Defendant demonstrate that the parties had moved on to a potential leukapheresis site with a Dr. Reilly, Dr. del Rio recommended having a back-up leukapheresis option if Dr. Reilly's facility did not work out, and that Ruslan Gorsky had provided another possible option that same morning:

> - Dr. Reiley's site has confirmed they have NICA accreditation, the infusion facility accreditation and is being forwarded to Aisha at the University of Miami to obtain confirmation of acceptability in place of the FACT accreditation.
> - **Eve** Recommends having a back-up leukapheresis option if Dr. Reiley's site does not work out.
> - **Juan** Shares that Ruslan had provided feedback this morning that a second site was identified and is looking into this as a second option. Eve also shares that Aisha, Dr. Herskowitz, and Dr. Carballosa, and herself are also in search of a back-up leukapheresis center.

Exhibit 13 (ALZ_000501). And on February 15—two days before executing the MSA and Work Order—Plaintiff and Defendant met with that second potential leukapheresis vendor provided by

9

Gorsky, OrganaBio. *See, generally*, Exhibit 14 (video recording of meeting ALZ000_731) and Exhibit 15 (2/15/23 "ORGANABIO CAPABILITIES MEETING AGENDA" ALZ000_732).[7]

There can be no genuine dispute of material fact that, before executing the MSA and Work Order on February 17, 2023, Plaintiff knew all of the following: 1) it was not proceeding with any of the potential clinical trial sites initially identified by Defendant as the leukapheresis vendor; 2) Dr. Carballosa did not possess a leukapheresis machine; and 3) there was no leukapheresis vendor ready-to-go when it executed the contractual documents. The Court must dismiss the fraudulent inducement, negligent misrepresentation, or FDUPTA claims because not only did Defendant not make any misrepresentation that could give rise to them, but also Plaintiff could not—and actually did not—rely on any alleged representation. Thus, absent any actual, reasonable reliance, Plaintiff cannot establish causation between any action by Defendant and an injury Plaintiff suffered. *See Alvarez*, 905 F. Supp. 2d at 1342 (a fraudulent inducement claim requires evidence that plaintiff was injured in justifiable reliance on the misrepresentation); *Jaffe v. Bank of Am., N.A.*, 667 F. Supp. 2d at 1319 (proof of causation and damages necessary for negligent misrepresentation claim); *Nazario*, 2017 WL 1179917 at *5 (M.D. Fla. Mar. 30, 2017) ("Proof of actual damages is necessary to sustain a FDUTPA claim.").

### iii. Plaintiff approved all of Defendant's staff assigned to the trial.

Plaintiff further alleges Defendant made misrepresentations regarding its ability to staff the trial. But, as Plaintiff's CEO testified:

Q. Based on the information provided by the 4 Biorasi staff, did Alzamend review and then approve the Biorasi staff members to participate in the ALZN002 trial?

A. Yes.

---

[7] Plaintiff has adduced no evidence that any money was ever budgeted for Defendant's personnel to devote the hours to finding a leukapheresis vendor that would have been needed. Plaintiff may point to the Communications Plan developed for the ALZN002 trial to argue that Defendant was responsible for finding a leukapheresis vendor. Not so. The Communications Plan was dated April 2023, well after the MSA and Work Order were signed.

144198983.1

Ex. 1 at 224:3-7. Moreover, Plaintiff expressly stated after the January 17, 2023 Kick-Off Meeting that it was "pleased with the experienced Team Biorasi has assigned to our trial." Exhibit 11 at BIO_097651. As for the same reasons as in the prior sections, because Plaintiff approved, and approved of, the team Defendant assembled for the ALZN002 trial before executing the MSA and Work Order, the claims must be dismissed.

**b. Plaintiff's injurious falsehood and breach of the implied covenant claims fail as a matter of law because the evidence is insufficient to demonstrate Defendants made the alleged statements or caused any damages.**

Biorasi is entitled to summary judgment on both the implied covenant and injurious falsehood claims because: 1) they are duplicative of each other and the breach of contract claim; and 2) Alzamend has adduced no evidence that Biorasi ever made the alleged false statements at their core.

*First*, Plaintiff's claims for breach of the implied covenant of good faith and fair dealing[8] and injurious falsehood arise from the same alleged misconduct—purported false statements about missing leukapheresis samples made to by Plaintiff to Dr. Carballosa, the Principal Investigator at FERG. (*Compare* ECF No. 40 at ¶ 162 (alleging breach of the implied covenant by "issuing baseless threats to clinical site personnel, including false assertions about patient safety and potential license loss" and "making communications that caused the withdrawal of a clinical site and prevented the execution of a protocol deviation that would have allowed the study to continue") *with id*. at ¶ 146 (alleging Defendant "published falsehoods to the Principal Investigator, including but not limited to, false information about the integrity of the leukapheresis samples and false statements regarding the potential danger to the patients in the Trial."). These are the same alleged communications.

---

[8] On January 30, 2026, this Court entered an Order granting Defendant's Motion to Dismiss as to Count III, Negligence. (ECF No. 106) The Court also noted that it agreed with Defendant's Motion that two of the four alleged breaches of the implied covenant were duplicative of Plaintiff's breach of contract claim. (*Id*. at 13-14.) Defendant will not address those allegations in this section, accordingly.

This dispositively precludes the tort claim. As this Court recognized in its January 30 Order, "A breach of the implied covenant of good faith and fair dealing is not an independent cause of action, but attaches to the performance of a specific contractual obligation." (ECF No. 106 at 11) (quoting *Centurion Air Cargo, Inc. v. United Parcel Serv. Co.*, 420 F.3d 1146, 1151 (11th Cir. 2005)). Therefore, the tort claim asserted here cannot be independent from Biorasi's alleged contractual obligations. Moreover, the basis of both the instant tort claim and the breach of implied covenant claim directly overlaps with the breach of contract allegations the Court identified in its Order as follows: "Biorasi's breaches also caused false accusations regarding misplacement of the investigational product … Biorasi failed to satisfy these obligations[.]" (ECF No. 106 at 15) (referring to Am. Compl. at ¶ 122). In that Order, the Court already held the allegations in the alleging "recklessly impugning the integrity of the trial, falsely asserting that patient safety was at risk, and baselessly asserting that the medical license of the Principal Investigator was at risk if he continued the study" was duplicative of the breach of contract claim. *Id*. Thus, the injurious falsehood tort also cannot be independent, nor can the breach of the implied covenant claim. Both must be dismissed.

**Second**,[9] there also is no admissible evidence to create a genuine dispute of material fact that anyone at Biorasi ever made the alleged false statements to Dr. Carballosa that (1) samples were missing or (2) threatening his medical license should he continue with the study. The Biorasi VP alleged to have made these statements to Dr. Carballosa, Nancy Newark, testified repeatedly and unequivocally in her deposition that she never made these statements to him or his staff. Exhibit 36, N. Newark Trx. at 199:14-20; 208:19-21; 209:17-21. Further, Ms. Newark also provided a sworn declaration consistent with her deposition testimony and attesting to the following:

---

[9] Although it is dispositive that neither the injurious falsehood nor breach of the implied covenant claim are independent of the breach of contract claim, Biorasi addresses the evidentiary basis for summary judgment underlying the allegations of the false representations because it is equally applicable to these claims as well as Alzamend's same allegations regarding breach of contract.

144198983.1

4) I did not make a statement to Dr. Raul Carballosa or Milka Vina that there were missing or misplaced samples.

5) I did not make a statement to Dr. Carballosa or anyone at First Excellent Research Group that the active treatment for Subject 1003 might be defective or misidentified.

6) I did not threaten Dr. Carballosa's medical license.

7) I did not tell Dr. Carballosa or Milka Vina that administering treatment to Subject 1003 could jeopardize Dr. Carballosa's medical license.

Ex. 37 Newark Decl. 3/4/2026.

There is no evidence in the record that Newark threatened Dr. Carballosa's medical license. Neither Dr. Carballosa nor Milka Vina, the Research Coordinator at FERG testified Newark did. The only reference to it appears in notes from the Linical Auditor recapping a dinner with an Alzamend representative, and which the Linical Auditor testified she "believe[d] that [allegation] was speculation." Exhibit 40, Emily Dickinson Trx. at 194:12-22.

Dr. Carballosa's testimony also does not dispute Newark's testimony that she never called him. At his deposition, Dr. Carballosa testified that he did not recall who called him, that he does not know who Ms. Newark is, and that he does not recall Ms. Newark calling him. Exhibit 34, Dr. Carballosa Trx. at 68:10-69:1. Dr. Carballosa could not remember whether the caller regarding the misplaced was even a woman or a man. *Id.* at 64:25-65:3. His research coordinator, Milka Vina, testified that she did not think the call Dr. Carballosa received was regarding samples, but rather the unblinding incident generally. Exhibit 24, Milka Vina Vol. II Trx. at 61:2-17. Instead, she testified that it was she who called either Newark or Josanne Johnson of Biorasi to discuss a delay in shipping a blood sample from IMIC to the University of Miami that she discovered. *Id*. at 64:8-66:16. Notably, Johnson confirmed this, testifying that Vina called her after the unblinding incident and commented that IMIC had misplaced a blood sample. Exhibit 20, J. Johnson Trx. at 188:13 – 189:5. Johnson asked Vina for documentation that suggested a sample had been missing, but never received it. *Id*. at 190:19-24.

13

The sole testimony alleging that Newark called Dr. Carballosa and told him any blood samples had been missing came from Jackman, Alzamend's CEO. Jackman testified that, at some point, he stopped by FERG and met with Vina and she called Dr. Carballosa. Exhibit 1, S. Jackman Trx. at 228:13-15. According to Jackman, Vina and Dr. Carballosa told him that Newark called Dr. Carballosa reported the products went missing, stated she could not confirm that the investigational product they will receive was derived from the actual patient, and that he may potentially lose his license if the FDA does an audit. *Id*. at 228:16 – 229:7.

To be clear, neither Dr. Carballosa nor Vina testified that this visit or conversation ever happened. Alzamend's counsel never asked either of them during their deposition whether they met with Jackman or told him this. And, of course, neither of them testified that Newark made these comments at all. Jackman's statements therefore presents both hearsay as well as "inadmissible double hearsay, in that an out-of-court declarant attests to the out-of-court statements of others." *Ocean Bio-Chem, Inc. v. Turner Network Television, Inc.*, 741 F. Supp. 1546, 1559 (S.D. Fla. 1990).

The case of *Molenda v. Hoechst Celanese Corp.* is instructive here. 60 F. Supp. 2d 1294, 1303 (S.D. Fla. 1999), *aff'd*, 212 F.3d 600 (11th Cir. 2000). Plaintiff in *Molenda* brough a claim for defamation, but "failed to present any evidence, other than his own deposition testimony, that the alleged defamatory statements were in fact made." *Id*. Because plaintiff had no personal knowledge as to the statements—he only learned of the comments from others—the court stated that, "[c]learly, Plaintiff's deposition testimony constitutes double-hearsay and, as such, cannot be used to defeat summary judgment." *Id*. (citing *McMillian v. Johnson,* 88 F.3d 1573, 1583–85 (11th Cir. 1996), *aff'd,* 520 U.S. 781 (1997) and *Broadway v. City of Montgomery,* 530 F.2d 657, 661 (5th Cir.1976) (holding that the statement of one witness of what another person said they were told constitutes double hearsay)).

Just as in *Molenda*, Jackman had no personal knowledge as to the alleged statements, rather he purportedly learned about them only from others. But there is also a vital difference here—the two (second-level) declarants Jackman refers both testified in this case and did not corroborate his

14

testimony. And the first-level alleged declarant directly refuted making the alleged statement both in sworn deposition and written testimony. Because Alzamend can present not admissible evidence that Newark made any of the alleged false statements, Biorasi is entitled to summary judgment.

      **c. Defendant is entitled to summary judgment on Plaintiff's breach of contract claim because there is no evidence of breach or damages flowing from such breach.**

The remaining claim is Alzamend's breach of contract claim. As demonstrated above by its interwoven nature with Alzamend's other claims, the allegations underpinning it are ill-defined and amorphous. Regardless, discovery has not adduced any evidence sufficient for the claim to survive summary judgment.

First, Alzamend alleged that Biorasi breached its "core obligations to provide competent skilled staff, as well as train and assist clinical trial personnel under the MSA, the Work Order, and related documents". (Am. Compl. at ¶ 116.) But Alzamend can present no evidence in the record that establishes Biorasi failed to provide competent skilled staff or train and assist clinical personnel. To the extent the alleged breach ostensibly caused the unblinding event, Alzamend's theory turns on Dr. Juan Duany-Santos not being sufficiently trained or competent as to the trial protocol. But there is no evidence of this; to the contrary, Dr. Duany-Santos demonstrated he was knowledgeable about the study protocol in that he responded to the inquiry from Loyda Espinosa, the IMIC employee who sent the unblinding email, less than five minutes after she sent it, providing the correct response from the IP manual and, further providing a screenshot from the manual that directly answered her inquiry. *See* Exhibit 27, at 141:17-20; Exhibit 29, BIO_181659.[10]

---

[10] If the Court grants Biorasi's Rule 702 Motion, it is also fatal to Alzamend's claim. While it is true that a factfinder "need not be assisted in determining the reasonableness of an industry practice when the context is within the realm of common knowledge and everyday experience of a jury, but when the subject is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson then expert testimony is required." *Warmus v. Equifax Info. Servs., LLC*, No. 605CV1427ORL28KRS, 2006 WL 8439367, at *1 (M.D. Fla. Dec. 13, 2006) (quotation omitted). Here, expert testimony is required to assist the factfinder in determining whether personnel was insufficiently qualified or trained so as to constitute a breach of contract.

144198983.1

Nor can Alzamend causally connect any alleged failing to any alleged damages. Loyda Espinosa, the IMIC employee who sent the unblinding email testified that she caused the unblinding due to a mistake, Exhibit 28, at 58:20-23, and was familiar with double-blinded protocols because she had worked on at least 20 double-blind clinical trials previously. *Id*. at 18:22-24; 19:8-22; 78:14-16.

Second, Alzamend alleged that Biorasi breached its "obligations to provide management and oversight to the ALZN002 Trial" including supply management, issue resolution and escalation, and related items. (Am. Compl. at ¶ 117.) It is unclear how Alzamend believes Biorasi breached any contractual document. To the extent it relates to issue resolution, that is fully addressed in the preceding paragraph. For all other possible theories, there is no evidence to support any of them to survive summary judgment. In any event, Alzamend also has not adduced any evidence of damages resulting from any possible breach of these items,[11] nor disclosed a damages expert to provide necessary testimony to quantify such damages.[12]

Third, Alzamend alleged that Biorasi failed "to maintain control of the investigational product and maintain adequate records of the receipt, shipment, and disposition of that investigational product" (*Id*. at ¶ 118.) The Court previously found this was not a contractual allegation. (ECF No. 106 at 9.) No evidence supports the allegation in any event.

Fourth, Alzamend alleged that Biorasi breached "its duties to implement an adequate control system to control communications, resolve queries, and escalate questions about clinical

---

Even if the Rule 702 motion is denied, Dr. Hausheer failed to rely on any evidence to support his opinions that Dr. Duany-Santos was somehow unqualified; the evidence sited above therefore is undisputed.

[11] It appeared Alzamend may argue that some of the amorphous allegations it was pursuing may amount to an argument that Biorasi somehow caused a delay in the trial resulting from some facts other than Alzamend had not retained a leukapheresis vendor as quickly as it hoped. But CEO Jackman made clear that "[a]ll delays to this project was due to not having the leukapheresis capabilities [and] … screen fails by [the imaging vendor]". Ex. 1 at 109:5-13.

[12] Such an expert would be particularly needed where, as here, Alzamend had only $400,000.00 in cash in April of 2024, after Biorasi terminated the Work Order. Ex. 1 at 249:18-21. There is no evidence in the record that Alzamend could continue to fund the study in the months after the unblinding event. *See also* Section III.3, below.

16

144198983.1

trial procedures." (Am. Compl. at ¶ 119.) As shown above, there is no evidence Biorasi ever failed to resolve any queries; nor is there any that any questions about clinical trial procedures should have been, but were not, escalated. Thus, Alzamend's argument appears to be that Biorasi failed to implement an adequate control system to control communications. But this is not an obligation appearing in the MSA, CTA, or Work Order. To the extent it may appear in another project document, there is no basis to find that all project documents somehow create contractual duties. In any event, the evidence of the cause of the unblinding event is fully addressed on page 16 herein, and was caused solely by the mistake of Loyda Espinosa of IMIC.

Fifth, Alzamend alleged a breach of Section 2.8 of the MSA, which requires Biorasi to "provide prompt written notice to [Alzamend] of any circumstance, such as a delay, of which Biorasi becomes aware, and that Biorasi reasonably believes could adversely affect a Study or performance of the Services". (*Id*. at ¶¶ 86, 120.) There has been no admissible evidence adduced that Newark—the Biorasi VP—reported any concerns regarding missing blood samples to the Principal Investigator, or that Biorasi learned of any possible issue before Alzamend. This cannot provide the basis for a breach of contract claim.

Sixth, Alzamend alleged Biorasi violated Section 2.1 of the MSA by failing "to provide services that complied with applicable approved protocol, professional standards, applicable laws, and Biorasi's own standard operating procedures, as required by the MSA." (*Id*. at ¶ 121.) But, again, Alzamend has failed to adduce any admissible evidence that Biorasi failed in this regard. Even if Dr. Hausheer were permitted to testify, he does not offer any opinions where he cites to any accepted, published professional standards, laws, or Biorasi standard operating procedures that Biorasi allegedly violated. Even if he had, there is no causal nexus between such actions and any damages allegedly sustained in this case.

Accordingly, Alzamend's breach of contract claim is unsupported by the evidence in the record and must be dismissed.

17

**3.     Defendant is Entitled to Summary Judgment on its Breach of Contract Counterclaim.**

The MSA and Work Order between the Parties each contain provisions regarding payment and termination of the contractual relationship. Section 12 of the Work Order details specific payment provisions if the contractual agreement is terminated prior to the completion of the study. WO at § 12. Specifically, this section first details all the services fees and third party and pass through costs owed in the event Alzamend terminates the agreement early. Then, the final paragraph of Section 12 reads as follows: "Notwithstanding the above, SPONSOR is obligated to pay BIORASI for work completed up to the date of termination under this Section on a prorated basis plus an amount equal to three (3) months of the CRO Services monthly fees as identified in Attachment A-5." *Id*. Because this is a new paragraph, and nothing in this section otherwise limits the application of this paragraph to early termination by a specific party, it is applicable in the case of early termination by either party.

Biorasi terminated the Work Order via letter on February 13, 2024, upon forty-five days' notice from that letter as required by the MSA. Exhibit 38 (BIO_135846) The letter further identified that Alzamend had repeatedly failed to fulfill its contractual obligation to make timely payments for services Biorasi provided. For example, Biorasi was forced to pause the study in November of 2023 when Alzamend's failure to timely pay Biorasi had generated an open balance of over $367,926.93, with over $130,000 of that owed for third party and pass through costs. Exhibit 26 (BIO_138116)[13] And on March 11, 2024—after Biorasi terminated the Work Order, over $223,000 in payments were outstanding, including pass through and third-party costs in excess of $30,000. Exhibit 1, S. Jackman Trx. at 242:10 – 243:19; Exhibit 45 (BIO_161709)

Pursuant to Section 12 of the Work Order, Biorasi issued an invoice dated April 1, 2024 for the termination fees for three months of CRO services. Exhibit 39 (BIO_220852) Alzamend

---

[13] Notably, the first page of the exhibit, BIO_138115 shows that, by the end of November 2023, Biorasi had issued its 15th request for payment.

18

144198983.1

has not denied that it never paid the amount invoiced in this document. Biorasi asserted a counterclaim for breach of contract to recover these unpaid fees. ECF No. 110.

In its Answer to the counterclaim, Alzamend raises numerous affirmative defenses relating to the singular argument that Alzamend does not owe Biorasi these amounts because Biorasi materially breached the MSA, denied Alzamend its benefits under the MSA, Alzamend failed to perform its own obligations under the MSA, and otherwise has unclean hands. ECF No. 111 at 3-4. But there is no evidence in the record that Alzamend ever provided Biorasi with written notice of any alleged breach of any material obligation arising under the MSA or WO as is required by Section 8.2B of the MSA. MSA at § 8.2B; Exhibit 1, S. Jackman Trx. at 100:9-24.[14]

Thus, Alzamend's defenses are unsupported by any evidence in the factual record. Biorasi is therefore entitled to summary judgment on its counterclaim for breach of contract.

## IV.  Conclusion

Based on the foregoing and the forthcoming arguments in Biorasi's Reply Memorandum of Law, there is no genuine dispute of material facts that preclude summary judgment as a matter of law dismissing Alzamend's remaining claims, or on Biorasi's counterclaim. Biorasi respectfully requests the Court enter summary judgment on all claims accordingly.

## V.  Request for Hearing

Pursuant to Local Rule 7.1(b), Biorasi requests oral argument on this motion. There are many facts that have been produced in this case in over 60,000 documents and 11 fact witness depositions. Oral argument would assist the Court in determining that no genuine disputes of any material facts remain exist that would preclude summary judgment.

---

[14] Contrast this with Biorasi providing Alzamend with written notice of its material breach of the contract for failure to pay amounts due and owing under it via letter dated November 7, 2023. Exhibit 25 (BIO_269777)

19

Dated: April 2, 2026

Respectfully submitted,

/s/ Natalie Donis
Natalie Donis
Florida Bar No.: 1031027
**CARLTON FIELDS, P.A.**
200 South Orange Ave., Suite 1000
Orlando, FL 32801
ndonis@carltonfields.com
kcasazza@carltonfields.com

David J. Carrier, admitted *Pro Hac Vice*
**CARLTON FIELDS, P.A.**
IDS Center
80 South Eighth Street
Suite 2800
Minneapolis, MN  55402
dcarrier@carltonfields.com
skadlec@carltonfields.com

Brooke Patterson
**CARLTON FIELDS, P.A.**
700 NW 1st Avenue
Suite 1200
Miami, FL 33136
bpatterson@carltonfields.com

*Attorneys for Defendant Biorasi, LLC*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 2nd day of April, 2026, a true and correct copy of the foregoing was electronically filed with the Clerk of Court using CM/ECF, which will send notification to the registered attorney(s) of record that the documents have been filed and are available for viewing and downloading.

/

/s/ Natalie Donis
Natalie Donis

20

144198983.1