UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 25-cv-20481-BLOOM/Elfenbein

ALZAMEND NEURO, INC.,

      Plaintiff,

v.

BIORASI, LLC,

      Defendant.

_____/

### OMNIBUS ORDER ON *DAUBERT* MOTIONS AND MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon Defendant Biorasi, LLC's Motion to Exclude Testimony of Plaintiff's Expert Witness Dr. Frederick Hausheer, ECF No. [117], Defendant's Motion for Summary Judgment, ECF No. [119], and Plaintiff Alzamend Neuro, Inc's Motion to Exclude Expert Testimony of Emily Friedrich and Aimon Iftikhar, ECF No. [116]. Alzamend filed Responses in Opposition to Biorasi's Motions, ECF Nos. [138], [142]. Biorasi filed a Response in Opposition to Alzamend's Motion, ECF No. [139]. The Court has reviewed the Motions, the supporting and opposing submissions, the record, and is otherwise fully advised. For the reasons that follow, the Motions are denied.

### I.    BACKGROUND

On May 5, 2025, Alzamend filed an Amended Complaint asserting claims for (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) negligence, (4) injurious falsehood, (5) violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), and (6) fraudulent inducement/negligent misrepresentation. See ECF No. [40]. Thereafter, this Court granted Biorasi's Motion to Dismiss as to the negligence claim. ECF No.

[106]. On February 13, 2026, Biorasi filed its Answer and Affirmative Defenses, as well as a Counterclaim for breach of contract. ECF No. [109]. Biorasi now moves for summary judgment on all counts, as well as its Counterclaim, and seeks to exclude the testimony of Alzamend's expert witness, Dr. Hausheer. *See generally*, ECF Nos. [117]; [119]. Alzamend seeks to exclude the testimony of Biorasi's rebuttal experts. ECF No. [116].

## II.    UNDISPUTED FACTS

Alzamend Neuro, Inc ("Alzamend") is a clinical-stage biopharmaceutical company focused on developing treatments for Alzheimer's disease and other neurodegenerative diseases. ECF No. [118] ¶ 1; ECF No. [141] ¶ 1. To advance the development of a new treatment called ALZN002, Alzamend sought to conduct a phase I/IIA clinical trial to evaluate its safety, tolerability, and preliminary efficacy. ECF No. [118] ¶ 2; ECF No. [142] ¶ 2. Alzamend retained a team led by Dr. Eve del Rio of Del Rio Pharmaceutical Services to be responsible for "framework and putting the protocol together" for the clinical trial and "took the lead in putting together the clinical protocol." ECF No. [118] ¶ 3; ECF No. [141] ¶ 3.

Biorasi, LLC ("Biorasi") is a contract research organization or clinical research organization ("CRO") engaged in the business of providing clinical research services, clinical research professionals, and contract clinical, technical, and other related services. ECF No. [118] ¶ 4; ECF No. [141] ¶ 4. To facilitate the study, both Alzamend and Biorasi entered into a contract, or CTA, with First Excellent Research Group LLC ("FERG") and Raul Carballosa, MD for Dr. Carballosa to serve as the Principal Investigator for the ALZN002 study. ECF No. [118] ¶ 5; ECF No. [141] ¶ 5. Alzamend entered into a contract with IMIC, Inc. to perform leukapheresis services for the ALZN002 trial. ECF No. [118] ¶ 6; ECF No. [141] ¶ 6. The University of Miami manufactured the treatment, or investigation product, for the ALZN002 trial. ECF No. [118] ¶ 7; ECF No. [141] ¶ 7.

In 2022, Alzamend began looking for a CRO to partner with to conduct as Phase I/II study for its ALZN002 treatment and received quotes from three CROs, including Biorasi. ECF No. [118] ¶¶ 8, 9; ECF No. [141] ¶¶ 8, 9. Biorasi held itself out as having "significant, leading experience and expertise relating to the delivery of Alzheimer's clinical project." ECF No. [141] ¶ 132; ECF No. [151] ¶ 132. Before Alzamend and Biorasi reached any contractual agreement regarding the ALZN002 study, Ruslan Gorsky, Manager of Program Development of Biorasi provided information to Alzamend about potential clinical trial sites with principal investigators for the ALZN002 trial. ECF No. [118] ¶¶ 10, 11; ECF No. [141] ¶¶ 10, 11. Gorsky identified FERG and Dr. Carballosa as a potential clinical trial site that had worked with Biorasi on a prior Alzheimer's trial. ECF No. [118] ¶ 12; ECF No. [141] ¶ 12. Gorsky provided information regarding each potential clinical trial site's ability to perform leukapheresis for the study by giving Alzamend a spreadsheet which contained the precise responses received from those sites. ECF No. [118] ¶ 15; ECF No. [141] ¶ 15. As it relates to FERG, Gorsky told Alzamend via email on December 15, 2023: "Also, as a pleasant surprise, our top enrolling site (2.6 patients per site per month) has officially confirmed that they can and have done sham Leukapheresis, and they will conduct it strictly on site." ECF No. [118] ¶ 16; ECF No. [141] ¶ 16. Gorsky's December 15, 2022 email to Alzamend provided the precise representations made to Biorasi by Dr. Carballosa and his study coordinator, Milka Vina. ECF No. [118] ¶ 17; ECF No. [141] ¶ 17. Dr. Carballosa wrote that "Leukapheresis for PBMC extraction will be on site", and Vina responded to questions of "[w]ill you be able to conduct a sham Leukapheresis procedure as well, as per the protocol design?" and "[d]o you have experienced conducting Leukapheresis in previous studies?" with the same "Yes." ECF No. [118] ¶¶ 18, 19; [141] ¶¶ 18, 19.

On January 2, 2023, Alzamend and Biorasi executed a Letter of Intent ("LOI"). ECF No. [118] ¶ 25; ECF No. [141] ¶ 25. During a recording meeting on January 18, 2023 between Alzamend and Biorasi personnel, Dr. Eve del Rio stated she was encouraged that a potential clinical trial site was willing to be the central site for performing leukapheresis because "we had a site that could do it, and, they have just, let's say, gone AOL—gone AWOL—so we are going to have to depend on that site to do the leukapheresis." ECF No. [118] ¶ 30; ECF No. [141] ¶ 30. Gorsky stated that feasibility needed to still be conducted to evaluate the relevant leukapheresis capabilities, noting "The most important thing for us, I think regarding site feasibility is to determine the capabilities for leukapheresis and enrollment" and "even if worst case scenario it is an issue, let's say, you know, Murphy's law applies and none of them work out for whatever reason, we also have enough wiggle room for feasibility to ascertain where there'll be done.". ECF No. [118] ¶ 31; ECF No. [141] ¶ 31. Gorsky specifically corrected Dr. del Rio during this call after she stated that Dr. Carballosa "just finished conducting leukapheresis for a stem cell product for Alzheimer's." ECF No. [118] ¶ 32; ECF No. [141] ¶ 32.

At a February 8, 2023 meeting, the Parties contemplated using a site run by a Dr. Reiley. ECF No. [118] ¶ 35; ECF No. [141] ¶ 35. During the meeting, Dr. del Rio recommended having a back-up leukapheresis option if Dr. Reilly's facility did not work out and Alzamend also noted that Ruslan Gorsky had provided another possible leukapheresis vendor option that same morning. ECF No. [118] ¶¶ 36, 37; ECF No. [141] ¶¶ 36, 37. On February 15, 2023, two days prior to executing the MSA and Work Order, Alzamend and Biorasi personnel met with OrganaBio, a second potential leukapheresis vendor provided by Gorsky at the February 8, 2023 meeting. ECF No. [118] ¶¶ 38, 39; ECF No. [141] ¶¶ 38, 39.

Alzamend and Biorasi executed the MSA and Work Order ("WO") on February 17, 2023. ECF No. [118] ¶ 40; ECF No. [141] ¶ 40. The MSA required Biorasi to perform services "in compliance with this Agreement, the applicable approved Protocol, [and] applicable professional standards," using "a degree of skill, diligence and expertise consistent with industry standards," with personnel having "the level of skill necessary." ECF No. [141] ¶ 144; ECF No. [151] ¶ 144. This included ensuring employees had relevant skills and attention to detail. ECF No. [141] ¶ 145; ECF No. [151] ¶ 145. Biorasi was responsible for prompt issue escalation, site query resolution, and identification, qualification, selection, and management of an imaging vendor. ECF No. [141] ¶ 147; ECF No. [151] ¶ 147. Biorasi was responsible for developing training materials and conducting trainings, including on "study project plans" and "queries." ECF No. [141] ¶ 150; ECF No. [151] ¶ 150.

The MSA defines "Clinical Site" as meaning "the investigational facility, and its affiliates, such as but not limited to, hospitals, research institutions, and corporate site networks, where a Study is conducted." ECF No. [118] ¶ 41; ECF No. [141] ¶ 41. The MSA defines "CTA" as meaning "the clinical research agreement executed by BIORASI and/or SPONSOR, on the one hand, and a Clinical Site and/or Investigator, on the other hand, in connection with a Work Order." ECF No. [118] ¶ 41; ECF No. [141] ¶ 41. The MSA contemplates the execution of one or more Work Orders, stating, in part, that "[a]ny services provided by, or to be provided by, BIORASI that are not specifically identified in a WO are considered outside the scope of the WO." ECF No. [118] ¶ 42; ECF No. [141] ¶ 42. The MSA includes a "Limitation of Liability" section which reads in part:

> **NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR ANY SPECIAL, CONSEQUENTIAL, INCIDENTAL OR INDIRECT DAMAGES (INCLUDING LOSS OF DATA, PROFITS OR REVENUE, COST OF CAPITAL OR DOWNTIME COSTS) OR FOR ANY**

**EXEMPLARY OR PUNITIVE DAMAGES DIRECTLY RESULTING FROM, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT (OR THE TERMINATION HEREOF) OR ANY WORK ORDER, INCLUDING, WITHOUT LIMITATION, LOSS OF ANTICIPATED SALES, TO THE FULLEST EXTENT PERMITTED BY LAW, AND NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT OR ANY WORK ORDER, REGARDLESS OF WHETHER SUCH DAMAGES ARE BASED IN TORT, WARRANTY, CONTRACT OR ANY OTHER LEGAL THEORY, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.**

ECF No. [32] at 21.

The WO sets forth more specific responsibilities in connection with the trial and that Alzamend may transfer to, and Biorasi may accept receipt of, the transfer specific regulatory obligations pursuant to a Transfer or Regulatory Obligations Form ("TORO"). ECF No. [118] ¶¶ 55, 56; ECF No. [141] ¶¶ 55, 56. The final paragraph of Section 12 of the WO states: "Notwithstanding the above, SPONSOR is obligated to pay BIORASI for work completed up to the date of termination under this Section on a prorated basis plus an amount equal to three (3) months of the CRO Services monthly fees as identified in Attachment A-5." ECF No. [118] ¶ 60; ECF No. [141] ¶ 60. Attachment A-1 to the WO contains a Task Ownership Matrix which sets forth certain, specific joint or individual responsibilities under the WO, pursuant to a legend. ECF No. [118] ¶¶ 61, 62; ECF No. [141] ¶¶ 61, 62. The WO also includes a list of "Interdependencies" where Biorasi's ability to perform CRO services in accordance with the timeline requirements is dependent on timely completion of items outside of Biorasi's control. ECF No. [118] ¶ 64; ECF No. [141] ¶ 64. Number 18 on the list of Interdependencies states: "**Timely qualification and approval of Sponsor-Selected Vendors.**" SPONSOR is responsible to complete qualification and approval of SPONSOR selected vendors, including but not limited to the Leukapheresis vendor." ECF No. [118] ¶ 65; ECF No. [141] ¶ 65.

6

As Principal Investigator, Dr. Carballosa enrolled patients for the ALZN002 Trial at FERG, which served as a clinical site. ECF No. [118] ¶ 75; ECF No. [141] ¶ 75. No other Principal Investigator enrolled patients for the ALZN Trial. ECF No. [118] ¶ 76; ECF No. [141] ¶ 76. Throughout the ALZN002 Trial, Alzamend personnel would directly contact FERG personnel directly, including without including Biorasi personnel on the communications. ECF No. [118] ¶ 77; ECF No. [141] ¶ 77.

Because the Trial consisted of a double-blinded structure where certain team members were considered blinded ("Blinded")—they did not know which patient received the actual investigation product or placebo—and others were unblinded ("Unblinded"), unblinded individuals needed to be careful not to expose blinded individuals to information about a subject's treatment status. ECF No. [118] ¶ 79; ECF No. [141] ¶ 79. Biorasi created certain distribution lists containing only unblinded individuals, including Biorasi and Alzamend personnel. ECF No. [118] ¶ 80; ECF No. [141] ¶ 80. On January 18, 2024, Loyda Espinoza, an employee of IMIC and the assigned unblinded study coordinator, called Biorasi's unblinded clinical research associate, Dr. Juan Duany-Santos with an inquiry. ECF No. [118] ¶ 81; ECF No. [141] ¶ 81. Ms. Espinoza does not recall what she and Dr. Duany-Santos spoke about over the phone or the details of the call. ECF No. [118] ¶ 84; ECF No. [141] ¶ 84. Following the call with Dr. Duany-Santos, Ms. Espinoza sent an email to Dr. Duany-Santos and included a distribution email address comprised solely of blinded individuals at Biorasi and Alzamend included sensitive patient-identifying information that unblinded any blinded recipient. ECF No. [118] ¶ 85; ECF No. [141] ¶ 85. Ms. Espinoza was subsequently suspended and eventually fired from IMIC. ECF No. [118] ¶ 88; ECF No. [141] ¶ 88. In response to the unblinding event, on January 23, 2024, Alzamend prepared a protocol deviation waiver with Biorasi's input that Biorasi then provided to the principal investigator Dr.

Raul Carballosa for his review and execution. ECF No. [118] ¶ 89; ECF No. [141] ¶ 89. Biorasi admitted it had "no system in place to protect against human error" in unblinding. ECF No. [141] ¶ 180; ECF No. [151] ¶ 180.

The next day, Dr. Carballosa sent an email to the Biorasi Vice President of Project Management, Nancy Newark, advising her that he was withdrawing from the study. ECF No. [118] ¶ 90; ECF No. [141] ¶ 90. On January 30, 2024, individuals from Alzamend and Biorasi met with Dr. Carballosa and Milka Vina from FERG to discuss Dr. Carballosa's decision to withdraw. ECF No. [118] ¶ 91; ECF No. [141] ¶ 91. The meeting was audio recorded, and in the recording Dr. Carballosa can be heard discussing several reasons for wanting to withdraw, including that he received a call about samples at IMIC that were missing for some period of time but ultimately were submitted anyway. ECF No. [118] ¶ 92; ECF No. [141] ¶ 92. At no point during the January 30, 2024 meeting did Dr. Carballosa ever disclose who had called him and told him about missing samples. ECF No. [118] ¶ 93; ECF No. [141] ¶ 93. At his deposition, when asked about the call, Dr. Carballosa testified that he did not recall who called him, does not know who Ms. Newark is, does not recall Ms. Newark calling him, and that he could not remember whether the caller was a man or woman. ECF No. [118] ¶ 94; ECF No. [141] ¶ 94. Dr. Carballosa's Research Coordinator, Milka Vina, testified that prior to January 18, 2024, she called either Newark or Josanne Johnson to discuss a delay in the shipment of a box from IMIC to the University of Miami. ECF No. [118] ¶ 95; ECF No. [141] ¶ 95. Vina testified she called to discuss a delay in shipping a blood sample from IMIC to the University of Miami and was told that samples were missing and eventually found and sent to the University of Miami. ECF No. [118] ¶ 96; ECF No. [141] ¶ 96. Vina stated she told Dr. Carballosa about the sample and that he was livid. ECF No. [118] ¶ 99; ECF No. [141] ¶ 99.  Biorasi VP, Nancy Newark testified repeatedly and unequivocally in her deposition that she

never made these statements to Dr. Carballosa or his staff. ECF No. [118] ¶ 101; ECF No. [141] ¶ 101.

Pursuant to Section 8.3 of the MSA, Biorasi terminated the Work Order via letter on February 13, 2024, upon forty-five days' notice. ECF No. [118] ¶ 103; ECF No. [141] ¶ 103. Biorasi issued an invoice dated April 1, 2024 for the termination fees for three months of CRO services. ECF No. [118] ¶ 105; ECF No. [141] ¶ 105. Alzamend never paid the invoice. ECF No. [118] ¶ 106; ECF No. [141] ¶ 106.

After the unblinding event, Alzamend hired Linical to perform a "Site Audit / Investigation" and produce a report of the same. ECF No. [118] ¶ 108; ECF No. [141] ¶ 108. Linical is a CRO that, like Biorasi, contracts with sponsors to execute clinical studies, including for pharmaceutical clients. ECF No. [118] ¶ 109; ECF No. [141] ¶ 109. Alzamend was provided with the opportunity to review and edit the Audit Report before finalizing and publishing it. ECF No. [118] ¶ 123; ECF No. [141] ¶ 123.

## III.   LEGAL STANDARD

### A. Expert Testimony

Federal Rule of Evidence 702 governs the admissibility of expert testimony. When a party proffers the testimony of an expert under Rule 702 of the Federal Rules of Evidence, the party offering the expert testimony bears the burden of laying the proper foundation, and that party must demonstrate admissibility by a preponderance of the evidence. *See Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999). To determine whether expert testimony or any report prepared by an expert may be admitted, the Court engages in a three-part inquiry, which includes whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists

the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *See City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). The Eleventh Circuit refers to each of these requirements as the "qualifications," "reliability," and "helpfulness" prongs. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). While some overlap exists among these requirements, the court must individually analyze each concept. See id.

Under *Daubert,* a district court must take on the role of gatekeeper, but this role "is not intended to supplant the adversary system or the role of the jury." *Quiet Tech. DC-8, Inc. v. Hurel Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (internal quotation marks and citations omitted). Consistent with this function, the district court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). "[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech.*, 326 F.3d at 1341 (internal quotation marks and citations omitted). Thus, the district court cannot exclude an expert based on a belief that the expert lacks personal credibility. *Rink*, 400 F.3d at 1293, n.7. To the contrary, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596). "Thus, '[o]n cross-examination, the opposing counsel is given the opportunity to ferret out the opinion's weaknesses to ensure the jury properly evaluates the testimony's weight and credibility.'" *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009) (quoting *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988)). Ultimately, as noted, "a district court enjoys

'considerable leeway' in making" evidentiary determinations such as these. *Cook*, 402 F.3d at 1103 (quoting *Frazier*, 387 F.3d at 1258).

## B. Summary Judgment

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citations to materials in the record, including, among other things, depositions, documents, affidavits, or declarations. See Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." Id. (quoting *Anderson*, 477 U.S. at 247-48).

A court views the facts in the light most favorable to the non-moving party, draws "all reasonable inferences in favor of the nonmovant and may not weigh evidence or make credibility determinations, which 'are jury functions, not those of a judge.'" *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1179 (11th Cir. 2019) (quoting *Feliciano v. City of Mia. Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013)); see also *Crocker v. Beatty*, 886 F.3d 1132, 1134 (11th Cir. 2018) ("[W]e accept [the non-movant's] version of the facts as true and draw all reasonable inferences in the light most favorable to him as the non-movant."). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990).

The Court does not weigh conflicting evidence. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

Initially, the moving party bears the "responsibility of informing the ... court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); see also *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). If a movant satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs.*, LLC, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id*. (quoting *Celotex Corp.*, 477 U.S. at 322). The non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343. Yet, even where a non-movant neglects to submit any alleged material facts in dispute, a court must still be satisfied that the evidence in the record supports the uncontroverted material facts proposed by the movant before granting summary judgment. *Reese v. Herbert*, 527 F.3d 1253, 1268-69, 1272 (11th Cir. 2008); *United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave.*, Mia., Fla., 363 F.3d 1099, 1103 n.6 (11th Cir. 2004) *1319 ("One Piece of Real Prop."). Indeed, even "where the parties agree on the basic facts, but disagree about the factual

inferences that should be drawn from those facts," summary judgment may be inappropriate. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).

In resolving the issues presented under Rule 56, "the court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied." *Carlin Commc'n, Inc.*, 802 F.2d at 1356. Moreover, summary judgment is inappropriate where the Court would be required to weigh conflicting renditions of material fact or determine witness credibility. See *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993); *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) ("It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment."); *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he [or she] is ruling on a motion for summary judgment or for a directed verdict." (quoting *Anderson*, 477 U.S. at 255)); see also *Ramirez v. Nicholas*, No. 13-60820-CIV, 2013 WL 5596114, at *4 (S.D. Fla. Oct. 11, 2013) ("The Court may not make the credibility determinations needed to resolve this conflict; only the jury may do so.").

## IV.  DISCUSSION

Because the disposition of Defendant's Motion for Summary Judgment depends on the opinions of the parties' respective experts, the Court addresses the *Daubert* Motions first.

### A.  Biorasi's Motion to Exclude Dr. Frederick Hausheer

Biorasi argues Dr. Hausheer's opinions are unreliable because they are based on assumptions provided by Alzamend's counsel rather than facts, evidence, or data. ECF No. [117] at 9. Biorasi points out that Dr. Hausheer indicates his opinions are based upon his review of documents as well as his knowledge and experience but admits that he did not review everything

counsel provided to him and did not review depositions in the case. *Id*. at 10. Therefore, Biorasi contends Dr. Hausheer's report describes his various opinions only in a conclusory fashion. *Id*. at 10.

Biorasi further argues Dr. Hausheer's opinions are merely *ipse dixit* as his opinions centered around inadequate training do not clearly indicate what he believes was insufficient with the training and merely opines that some better, but undefined training should have been in place as to the unblind risk. Biorasi contends this case is analogous to *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1112 (11th Cir. 2005), in which the Eleventh Circuit held the district court properly excluded the testimony of an expert who opined the Monroe County Detention Center's suicide prevention training was inadequate but failed to articulate a generally accepted standard for suicide prevention in jails nor an explanation of how or why he believed the Monroe County Detention Center's training to be inadequate.

Biorasi also cites as an example of Dr. Hausheer's unreliable opinions his personal definition of "clinical site" used to support his contention that Biorasi owed greater duties toward IMIC. *Id*. at 16. Biorasi points out Dr. Hausheer admitted he was not relying on a definition of "clinical site" from any specific authority and further admitted he did not indicate anywhere in his report or set forth any basis for a definition of "clinical site" with any basis behind it. *Id*. at 16.

Biorasi avers that Dr. Hausheer's report will do nothing to assist the Court in its fact-finding role in this case as Dr. Hausheer fails to provide anything beyond assumptions which lack foundational support. *Id*. at 17-18.

Alzamend responds that Dr. Hausheer's report is based on his analysis of various trial documents, not merely assumptions. ECF No. [139] at 4. Alzamend points out that Dr. Hausheer's report was due nearly two weeks prior to the first deposition in this case and that Dr. Hausheer

was provided with access to Alzamend's entire document database, but the documents listed in the appendix of his report are only those documents he relied upon to prepare his report. *Id*. Alzamend argues Defendant's arguments go only to the weight and not admissibility. *Id*.

Alzamend points out that Dr. Hausheer explains that the basis of his opinion included "review of staff resumes, training materials, and trial procedures." *Id*. at 5 (quoting ECF No. [117-1] at 20. Dr. Hausheer opinions were not only based on the review of documents, but his extensive experience and the applicable Good Clinical Practice standards. *Id*. at 7. Alzamend argues Dr. Hausheer's methodology of reviewing the various trial plans and training materials and measuring them against established industry standards drawn from decades of experience is sufficiently reliable. *Id*. at 10.

To the extent Biorasi challenges Dr. Hausheer's opinions as based on assumptions, Alzamend argues those challenges go to weight and not admissibility. *Id*. 10-11. Alzamend contends it is free to present its own version of events at trial. *Id*. at 11 (citing *Middleton v. Morgan*, 2019 WL 10630840, at *3 (N.D. Fla. Nov. 1, 2019)) ("Indeed, there is nothing wrong with an expert basing his opinion on one side's version of events (although the weight of the opinion will depend on the jury accepting that version of events) . . .."). Alzamend also cites this Court's opinion in *Balthazar Mgmt., LLC v. Beale St. Blues Co., Inc.*, 2018 WL 6928698, at *4 (S.D. Fla. Oct. 30, 2018) in which this Court noted that an expert may generally set forth or explain reasonable assumptions he was asked to make by counsel in arriving at his opinion. Alzamend contends Dr. Hausheer clearly explains what factual assumptions he makes and where those assumptions factor into his conclusions and there is sufficient factual evidence to support Dr. Hausheer's assumptions. *Id*. at 13.

Alzamend contends that *Cook* is distinguishable because Dr. Hausheer has provided an extensive, detailed explanation of what training should have been provided, the Good Clinical Practice standards governing that training, and how the actual training fell short. *Id*. at 18. Alzamend avers Dr. Hausheer's opinions are more analogous to the expert in *Hotels of Deerfield, LLC v. Studio 78, LLC*, 621 F. Supp. 3d 1285 (S.D. Fla. 2022), in which the Court found reliable an expert's testimony "about the architecture industry's standard of care in south Florida and whether Defendants' work and plans met that standard based upon his peer review of Defendants' work product." 621 F. Supp. 3d at 1299.

### i.   Qualifications

Biorasi does not contest that Dr. Hausheer possesses relevant qualifications that sufficiently support his ability to testify as an expert in this case. ECF No. [117] at 9.

### ii.   Methodology

Though Biorasi argues Dr. Hausheer's opinions rely on assumptions, "an expert may generally set forth or explain reasonable assumptions he was asked to make by counsel in arriving at his opinion, and 'may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied.'" *Balthazar Mgmt., LLC v. Beale St. Blues Co., Inc.*, No. 17-CV-81214, 2018 WL 6928698, at *4 (S.D. Fla. Oct. 30, 2018) (quoting *Cordoves v. Miami-Dade Cnty.*, 104 F. Supp. 3d 1350, 1365 (S.D. Fla. 2015)). Moreover, though Biorasi contends Dr. Hausheer relies exclusively on assumptions to form his opinions, Dr. Hausheer's report cites an extensive list of references and supporting documents reviewed including training materials, training logs, resumes, protocol deviation logs, emails, meeting minutes, call notes, as well as various plans regarding protocol deviation, quality management, and risk management. ECF No. [117-1] at 31-37.

Biorasi also contends Dr. Hausheer's opinions are merely *ipse dixit*, but Dr. Hausheer explains that the conduct of the ALZN002-01 clinical trial "is guided by the International Council for Harmonisation (ICH) Good Clinical Practice (GCP) guidelines, which are universally recognized as industry standards of practice and are consistent with FDA's regulations." ECF No. [117-1] at 11. References to Good Clinical Practice standards are frequent throughout Dr. Hausheer's report as regards industry standards for qualified personnel and training, trial plans, monitoring, quality management, and blinding and communication controls. *Id*. at 12-13. Such references, in combination with Dr. Hausheer's extensive professional experience, distinguish this case from *Cook*, as the expert in *Cook* failed to articulate any generally accepted standard. As such, the Court finds Dr. Hausheer's opinions are not based on mere *ipse dixit*, but rather the result of reviewing record evidence and measuring the evidence against established industry standards in the context of his own substantial professional experience. The Court's finds Dr. Hausheer's methodology sufficiently reliable.

### iii.  Helpfulness

Helpfulness turns on whether the proffered testimony "concern[s] matters that are beyond the understanding of the average lay person." *Edwards v. Shanley*, 580 F. App'x 816, 823 (11th Cir. 2014). Biorasi argues Dr. Hausheer's opinions are not helpful for the same reasons it argues they are unreliable. ECF No. [117] at 17-18. However, the Court already finds Dr. Hausheer's opinions to be based on a reliable methodology. Moreover, the Court finds Dr. Hausheer's opinions would assist the trier of fact. As such, Biorasi's Motion, ECF No. [117] is denied.

### B.  Alzamend's Motion to Exclude Dr. Emily Friedrich and Dr. Aimon Iftikhar

Alzamend argues that Dr. Friedrich and Dr. Iftikhar are not qualified to opine on the roles and responsibilities of a CRO in a double-blinded clinical trial. ECF No. [116] at 6. Alzamend contends Dr. Friedrich has no experience conducting clinical trials as her professional experience

17

consists entirely of preclinical and clinical research. *Id*. Alzamend further contends "clinical research" is distinct from a "clinical trial" because a clinical trial is a category of clinical research with additional FDA regulations to abide by. *Id*. Alzamend points out that Dr. Friedrich admits she has no experience implementing safeguards to prevent unblinding in a blinded study. *Id*. at 7.

Alzamend avers Dr. Iftikhar's experience is similarly lacking. Alzamend points out that Dr. Iftikhar has worked on only eight clinical trials and of those eight trials, only one was double blinded. *Id*. at 9. Alzamend further points out that Dr. Iftikhar concedes that there is more to consider in a double-blinded study. *Id*. As such, Alzamend argues Dr. Iftikhar's "limited, largely review-level exposure to study plans, her lack of authorship of key project documents, and her participation in only one double-blinded trial render her unqualified to opine on CRO obligations and industry standards for double-blinded trial conduct and plan adequacy for the ALZN002 trial." *Id*. at 11. Alzamend contends that, because Dr. Friedrich and Dr. Iftikhar lack experience in double-blinded clinical trials, their experience-based industry standards analysis is unreliable. *Id*. Alzamend also argues that Dr. Friedrich and Dr. Iftikhar's testimony should be excluded to the extent it constitutes impermissible fact-finding. *Id*. at 16. Alternatively, Alzamend seeks to preclude Biorasi's experts from offering testimony that makes credibility determinations, weighs competing evidence, or renders factual conclusions about disputed events in the ALZN002 trial. *Id*.

Biorasi responds that the qualification standard for experts is not stringent and requires that experts be only minimally qualified. ECF No. [138] at 1. Biorasi argues its experts collectively have decades of clinical trial and clinical research experience, numerous degrees from top research universities, and certifications in Good Clinical Practices. *Id*. Biorasi further argues that Alzamend seeks to mischaracterize the presentation of facts and summaries of a large amount of relevant case

18

information as the actual opinions of Biorasi's experts. *Id*. at 2. Biorasi contends the citation to record evidence complies with the Rule 26(a)(2)(B) requirement that a report-producing expert provide the basis for his opinions, including any facts or data he relied upon in forming them. *Id*. Biorasi avers that its rebuttal experts do not usurp the Court's role as fact finder, but identify facts and evidence that directly rebut the unsupported assumptions made by Dr. Hausheer. *Id*.

### i. Qualifications

"The qualification standard for expert testimony is 'not stringent,' and 'so long as the expert is *minimally* qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility." *Banuchi v. City of Homestead*, 606 F. Supp. 3d 1262, 1272 (S.D. Fla. 2022) (citing *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009)) (quoting *Kilpatrick v. Breg, Inc.*, Case No. 08-10052-CIV, 2009 WL 2058384 (S.D. Fla. June 25, 2009)).

### Dr. Emily Friedrich

Dr. Friedrich is a licensed Project Management Professional certified in Good Clinical Practices, the industry standard which informs Dr. Hausheer's opinions. ECF No. [116-1]. Dr. Friedrich also holds a Bachelor of Science in Molecular Genetics and Biochemistry with a minor in Chemistry from the University of Pittsburgh granted in 2007 as well as a Master of Science and a Doctor of Philosophy in Biomedical Engineering from Carnegie Mellon University. *Id*. Dr. Friedrich completed postdoctoral training at Northwestern University Feinberg School of Medicine in the Department of Surgery and held a Research Instructor position at the University of Illinois at Chicago in the Department of Pharmacology. Dr. Friedrich also served as a Biomedical Research Program Manager at a military treatment facility. In this capacity, she served as the subject matter expert for preclinical and clinical research, responsible for oversight of a team of eight contract staff, which included clinical research coordinators and a clinical protocol

developer, worked closely with physician principal investigators and the Institutional Review Board to develop protocols and secure institutional approvals, and ensured that contracted study staff were executing studies according to study protocols and could demonstrate ongoing compliance following applicable regulations in the stringent government/military environment. *Id*. Dr. Friedrich is now a Senior Associate in Exponent's Biomedical Engineering and Sciences practice, where she is directly involved in the development, execution, and review of clinical research and human subjects protocols. *Id*.

Based on this experience, the Court finds Dr. Friedrich is qualified to provide rebuttal expert opinions in this case. Though Alzamend points out she lacks experience in double-blinded studies, such argument is ripe for cross-examination. Moreover, "[a]n expert is not necessarily unqualified simply because [her] experience does not precisely match the matter at hand." *J.G. v. Carnival Corp.*, No. 12-21089-CIV, 2013 WL 752697, at *3 (S.D. Fla. Feb. 27, 2013) (citing *Maiz v. Virani*, 253 F.3d 641, 667 (11th Cir. 2001)). Dr. Friedrich possesses substantial clinical experience and possesses certifications in the industry standards relied upon by Alzamend's expert, Dr. Hausheer.

### Dr. Aimon Iftikhar

Dr. Aimon Iftikhar is a Senior Scientist in the Biomedical Engineering and Sciences practice at Exponent, Inc. ECF No. [116-1]. He specializes in clinical research and development of medical devices with a focus on assessing clinical efficacy and accuracy in real-world settings. He has a Bachelor of Science degree in Biomedical Engineering with minors in Mathematics and Materials Science and Engineering from the University of Connecticut, a Master of Science degree in Biomedical Engineering from Carnegie Mellon University, and a Doctor of Philosophy in Bioengineering with a concentration in Tissue Engineering & Regenerative Medicine from the

University of Pittsburgh. Prior to joining Exponent, Inc., he was a Clinical Research Scientist at Machaon Diagnostics, Inc., where he contributed to the design, management, and execution of clinical trials. Dr. Iftikhar reports that he managed multi-site clinical research studies as well as authored and technically reviewed a wide range of regulatory documents, standard operating procedures, and clinical policies to ensure alignment with clinical processes as defined by ICH Good Clinical Practice and FDA regulations. *Id*. He is certified in Good Clinical Practices and has overseen and trained other consultants to ensure consistency in clinical practices and the proper alignment with regulatory standards.

Based on this experience, the Court finds Dr. Iftikhar is qualified to provide rebuttal expert opinions in this case. Though Alzamend argues Dr. Iftikhar has limited experience in double-blinded studies, he possesses substantial clinical experience and possesses certifications in the industry standards relied on by Alzamend's expert, Dr. Hausheer.

### ii. Methodology

Alzamend argues that because Biorasi's proposed experts lack experience in double-blinded trials, their methodology is unreliable. ECF No. [116] at 11. Specifically, Alzamend contends that where an expert relies primarily on experience, the expert must explain how that experience leads to the conclusion reached and why that experience is a sufficient basis for the opinion. *Id*. (citing *Payne v. C.R. Bard, Inc.*, 2014 WL 988754, at *7 (M.D. Fla. Mar. 13, 2014). However, Alzamend cites no case law or statutory authority for its contention that rebuttal experts who possess both clinical experience and certifications in the relevant industry standards should be excluded because they lack adequate double-blinded clinical experience. To the contrary, "experts and their opinions need not be perfect to be admissible." *Brashevitzky v. Reworld Holding Corp.*, 348 F.R.D. 107, 118 (S.D. Fla. 2024) (quoting *Tall v. Fed. Ins. Co.*, No. 6:20-cv-1125, 2021 WL 7629423, at *3 (M.D. Fla. May 5, 2021)). Biorasi's rebuttal experts indicated:

> We considered the documents listed in Appendix C in reaching the opinions presented in this report. We also relied on our education, general experience in the field, and knowledge acquired through years of research and consulting work in the fields of clinical research and biomedical engineering and sciences. Specific documents and materials relied upon in reaching the opinions in this report are referenced throughout the text.

ECF No. [116-1] at 14. The Court finds this methodology to be sufficiently reliable. Alzamend's assertions of lack of experience in double-blinded studies goes to the weight, not the admissibility of the testimony and may be the subject of cross-examination.

### iii. Helpfulness

Alzamend argues that the rebuttal experts' opinions are not helpful because they impermissibly usurp the role of the fact finder. ECF No. [116] at 13. Alzamend asks the Court to exclude both experts' testimony to the extent it constitutes impermissible fact finding, or at a minimum preclude the rebuttal experts from offering testimony that makes credibility determinations, weighs competing evidence, or renders factual conclusions about disputed events in the ALZN002 trial. *Id*. at 16.

As a preliminary point, the Court finds that the rebuttal experts' opinions will assist the trier of fact in this case. The rebuttal experts' assessment of the double-blinded trial, considering their substantial experience and analysis of industry standards, concerns matters that are beyond the understanding of the average lay person. *See Edwards*, 580 F. App'x at 823 (Helpfulness turns on whether the proffered testimony "concern[s] matters that are beyond the understanding of the average lay person.").

As to Alzamend's categorical objections to credibility determinations, weighing competing evidence, or rendering factual conclusions, Biorasi contends the rebuttal experts are merely pointing to evidence that contradicts the assumptions relied on by Dr. Hausheer. The Court agrees with Biorasi, and it is permissible for an expert to review facts and extrapolate opinions from those

facts based on experience and industry standards. To the extent the rebuttal experts attempt to make credibility determinations, weigh competing evidence, or render factual conclusions during their testimony at trial, Alzamend may renew its objections. Moreover, the Court notes this case is designated as a bench trial. *See* ECF No. [114]. "When the district court assumes the role of factfinder, its gatekeeping duties become less important." *Landivar v. Celebrity Cruises, Inc.*, 584 F. Supp. 3d 1150, 1158 (S.D. Fla. 2022). "There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself." *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005) As such, Alzamend's Motion, ECF No. [116] is denied.

### C. Biorasi's Motion for Summary Judgment

Biorasi moves for summary judgment on all remaining Counts of Alzamend's Amended Complaint, ECF No. [40], and seeks summary judgement on its breach of contract Counterclaim. *See generally* ECF No. [119]. The Court will address each Count in turn.

### i. Count I – Breach of Contract

Biorasi argues it is entitled to summary judgment on Alzamend's breach of contract claim because it is interwoven with Alzamend's other claims and the allegations underpinning it are ill-defined and amorphous. *Id*. at 15. Alzamend further argues that discovery has not adduced any evidence sufficient for the claim to survive summary judgment.

Alzamend lodges several theories under its breach of contract claim. First, Biorasi breached its "core obligations to provide competent skilled staff, as well as train and assist clinical trial personnel under the MSA, the Work Order, and related documents". ECF No. [40] ¶ 116. Second, Biorasi breached its "obligations to provide management and oversight to the ALZN002 Trial". ECF No. [40] ¶ 117. Third, Biorasi breached its contractual obligations "to maintain control of the investigational product and maintain adequate records of the receipt, shipment, and disposition of that investigational product". ECF No. [40] ¶ 118. Fourth, Biorasi breached "its duties to

implement an adequate control system to control communications, resolve queries, and escalate questions about clinical trial procedures." ECF No. [40] ¶ 119. Fifth, Biorasi "failed to implement effective controls to maintain the double blind and failed to provide 'prompt written notice' of circumstanced materially affecting the trial, as required under Section 2.8(b) of the MSA." ECF No. [40] ¶ 120. Sixth, Biorasi "failed to provide services that complied with applicable approved protocol, professional standards, applicable laws, and Biorasi's own standard operating procedures, as required by the MSA." ECF No. [40] at ¶ 121.

Biorasi argues Alzamend has presented no record evidence that establishes Biorasi failed to provide competent skilled staff or trained and assisted clinical personnel. ECF No. [119] at 15. However, as Alzamend points out, it is disputed as to whether Biorasi Vice President Nancy Newark admitted "our team has been sloppy", acknowledged "Biorasi had clear room to improve" displayed an "ongoing lack of attention to detail," and agreed that complaints were frequent and warranted. ECF No. [141] ¶ 164; ECF No. [151] ¶ 164. Moreover, it is disputed that FERG staff described Biorasi's performance as "a disaster" and "a hot mess," testifying Biorasi's team was inexperienced, unprepared, disorganized, and did not have "people competent enough to know what they were doing." ECF No. [141] ¶ 171; ECF No. [151] ¶ 171. It is disputed whether Loyda Espinoza, an employee of IMIC, received training on the sham shipment procedure and whether she had unresolved logistics questions that Biorasi never answered. ECF No. [141] ¶ 193; ECF No. [151] ¶ 193. It is disputed whether Alzamend's expert Dr. Hausheer has identified gaps in training on sham shipment and unblinding procedures. ECF No. [141] ¶ 194; ECF No. [151] ¶ 194.

As to Biorasi's obligations to provide management and oversight, it argues Alzamend has presented no record evidence and has not presented any evidence of damages. ECF No. [119] at 16.

Alzamend points out that it is disputed as to whether, despite being contractually responsible for site payments, Biorasi paid FERG late, frustrating FERG and forcing it to seek relief from Alzamend on multiple occasions. ECF No. [141] ¶ 168; ECF No. [151] ¶ 168. It is further disputed that Biorasi failed to timely provide required supplies to FERG, delaying delivery by months despite its contractual obligations, and routinely deflected its responsibilities onto FERG rather than executing its CRO duties. ECF No. [141] ¶ 169; ECF No. [151] ¶ 169. It is disputed as to why, after a November 2, 2023 site visit to IMIC uncovered multiple deficiencies, Biorasi waited more than two months—until January 9, 2024—to send findings to the site, a delay it admitted internally "does not look good." ECF No. [141] ¶ 170; ECF No. [151] ¶ 170. Alzamend argues its damages do not flow solely from trial delays, as Biorasi suggests. Rather, Biorasi's inadequate management and oversight caused the unblinding event and FERG's withdrawal collapsed the trial entirely. Alzamend contends these damages are "readily quantifiable by reference, for example, to payments made to Biorasi along with pass-through costs, patient recruiting and screening costs, and the cost for Alzamend to hire another CRO to complete the study." ECF No. [142] at 21.

As to Biorasi's obligation to implement an adequate system to control communications, resolve queries, and escalate questions about clinical trial procedures, Biorasi again argues that no record evidence exists to demonstrate that it breached the contract. ECF No. [119] at 17.

Alzamend points out that Loyda Espinoza testified that she had questions that she did not recall Biorasi answering and Duany Santos testified he had concerns about her comprehension but never raised them. ECF No. [141] ¶¶ 193, 196; ECF No. [151] ¶¶ 193, 196. Biorasi contends the Cryoport trainings covered sham shipments, so it is not possible that Loyda Espinoza had unresolved logistics questions. ECF No. [151] ¶ 196. Duany Santos also testified that when Loyda

Espinoza called him on the day of the unblinding event, rather than answer Espinoza's question, or seek clarity as to what she was asking, he instructed her to send an e-mail instead, despite Biorasi admitting it was important to keep e-mail traffic to a minimum. ECF No. [141] ¶¶ 198, 199; ECF No. [151] ¶¶ 198, 199.

Alzamend's contends that Biorasi breached Section 2.8 of the MSA, which requires Biorasi to "provide prompt written notice to [Alzamend] of any circumstance, such as a delay, of which Biorasi becomes aware, and that Biorasi reasonably believes could adversely affect a Study or performance of the Services". Biorasi argues in conclusory fashion that no evidence exists to support the contention that Nancy Newark—the Biorasi VP—reported any concerns regarding missing blood samples to the Principal Investigator, or that Biorasi learned of any possible issue before Alzamend. ECF No. [119] at 17.

Alzamend points out that it remains disputed whether Milka Vina was told by either Nancy Newark or Josanne Johnson that blood samples were missing. ECF No. [141] ¶¶ 203-206; ECF No. [151] ¶¶ 203-206. Moreover, it is disputed why Biorasi was delayed in providing Alzamend a site deficiency letter. ECF No. [141] ¶ 170; ECF No. [151] ¶ 170.

Finally, Biorasi contends no admissible evidence exists that it violated Section 2.1 of the MSA by failing "to provide services that complied with applicable approved protocol, professional standards, applicable laws, and Biorasi's own standard operating procedures, as required by the MSA." ECF No. [119] at 17.

Alzamend responds that Dr. Hausheer will testify that Biorasi's actions throughout the trial fell below industry standards. ECF No. [142] at 23-24. Moreover, Biorasi will call rebuttal experts to dispute Dr. Hausheer's opinions.

Under Florida law, the elements of breach of contract are: (1) the existence of a contract, (2) a breach thereof, and (3) damages flowing from the breach. *Knowles v. C. I. T. Corp.*, 346 So.2d 1042, 1043 (Fla. 1st DCA 1977). Here, Alzamend has pled several theories under which Biorasi breached existing contracts. Moreover, Alzamend has articulated a theory of damages, namely that Biorasi's inadequate management and oversight caused the unblinding event and FERG's withdrawal, collapsing the trial entirely. Alzamend's damages exist in the form of payments to Biorasi and pass-through costs, patient recruitment and screening costs, and the cost of hiring another CRO to complete the study. ECF No. [141] ¶ 212.  As referenced above, disputed material facts exist as to each of these theories. Viewing the evidence in the light most favorable to the non-moving party, Alzamend,  the Motion for Summary Judgment is denied as to Count I.

### ii.   Count II – Breach of the Implied Covenant of Good Faith and Fair Dealing and Count IV – Injurious Falsehood

Biorasi argues it is entitled to summary judgment on both Count II and Count IV because they are duplicative of each other, and Alzamend has presented no evidence that Biorasi ever made false statements. ECF No. [119] at 11. Specifically, Biorasi contends "no admissible evidence to create a genuine dispute of material fact that anyone at Biorasi ever made the alleged false statements to Dr. Carballosa that (1) samples were missing or (2) threatening his medical license should he continue with the study." *Id*. at 12.

Alzamend responds that Biorasi does not cite a single case for the proposition that claims for breach of the implied covenant of good faith and fair dealing and injurious falsehood cannot co-exist. ECF No. [142] at 16. As to the merits of the Counts, Alzamend contends substantial evidence exists. *Id*. First Alzamend points out that during a recorded conference call on January with FERG, Biorasi, and Alzamend in attendance, Dr. Carballosa explained that they were withdrawing from the study in part because of "something that happened at the leukapheresis

27

center that was leaked onto us, unofficially. Which is that they . . . misplaced blood from a patient and then found the blood several hours later and submitted the blood anyway." ECF No. [141] ¶ 202; ECF No. [151] ¶ 202. Moreover, it is disputed that during the audit, Dr. Carballosa and Milka Vina told the auditors that this undisclosed source was Nancy Newark. ECF No. [141] ¶ 203; ECF No. [151] ¶ 203. Moreover, it is disputed that FERG's research coordinator, Milka Vina, was told by either Nancy Newark or Josanne Johnson that blood samples were missing. ECF No. [141] ¶ 204; ECF No. [151] ¶ 204. Alzamend further points out that Nancy Newark acknowledged that Biorasi's head of QA raised "missing, misplaced samples" and "chain of custody" concerns in a draft protocol waiver around the same time frame. ECF No. [141] ¶ 206; ECF No. [151] ¶ 206. Ultimately, no blood samples were missing. ECF No. [141] ¶ 207; ECF No. [151] ¶ 207. Nancy Newark conceded at deposition that it was "possible" the whistleblower was "someone from Biorasi." ECF No. [141] ¶ 208; ECF No. [151] ¶ 208.

Under Florida law, every contract contains an implied covenant of good faith and fair dealing which protects "the reasonable expectations of the contracting parties in light of their express agreement." *QBE Ins. Corp. v. Chalfonte Condo. Apartment Ass'n, Inc.*, 94 So.3d 541, 548 (Fla. 2012) (quoting *Barnes v. Burger King Corp.*, 932 F.Supp. 1420, 1438 (S.D. Fla. 1996)); *Centurion Air Cargo, Inc. v. United Parcel Serv. Co.*, 420 F.3d 1146, 1151 (11th Cir. 2005). The covenant is implied as a gap-filling default rule where the terms of the contract vest a party with substantial discretion, requiring that party to act in a commercially reasonable manner and limiting its ability to act capriciously to contravene the reasonable expectations of the contract counterparty. *See Karp v. Bank of Am., N.A.*, 2013 WL 1121256, at *3 (M.D. Fla. Mar. 18, 2013); *Martorella v. Deutsche Bank Nat. Trust Co.*, 931 F.Supp.2d 1218, 1225 (S.D. Fla. 2013).

"In order to sustain a claim for injurious falsehood, Plaintiff must adequately allege: (1) a falsehood; (2) published or communicated to a third party; (3) the Defendant know that the falsehood would likely induce others not to deal with the Plaintiff; (4) the falsehood did play a material and substantial part in inducing others not to deal with the Plaintiff; and (5) special damages." *Springboard Media, LLC v. Augusta Hitech Soft Sols.*, LLC, No. 22-20191-CIV, 2022 WL 18465128, at *5 (S.D. Fla. June 14, 2022) (citing *Bothmann v. Harrington*, 458 So. 2d 1163, 1168 (Fla. 3d DCA. 1984)).

Biorasi has failed to cite case law or statutory authority for its contention that an injurious falsehood claim and a claim for breach of the implied covenant of good faith and fair dealing cannot coexist. As Alzamend points out, "[i]t is a well-settled rule of federal procedure that plaintiffs may assert alternative and contradictory theories of liability." *Adinolfe v. United Techs. Corp.*, 768 F.3d 1161, 1175 (11th Cir. 2014). Moreover, there exist disputed material facts as to essentially all communications about the missing samples. At this stage, the Court must view the facts in the light most favorable to the non-moving party, Alzamend, and the Motion for Summary Judgment is denied as to Counts II and IV.

### iii. Count V – Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") and Count VI – Fraudulent Inducement

Biorasi argues Count V and VI fail as a matter of law because the evidence demonstrates that no misrepresentations were made and, even if they had been, Plaintiff was aware of the contrary facts before entering into the relevant contract. ECF No. [119] at 3. Biorasi contends it never made any misrepresentations regarding having a ready-to-go leukapheresis vendor, Alzamend did not rely on any representations as it knew Biorasi did not have a ready-to-go leukapheresis vendor before entering into the MSA and Work Order, and Alzamend approved all of Biorasi's staff assigned to the trial. ECF No. [119] at 5-10.

Alzamend points out that on December 13, 2022, Biorasi represented it would staff ALZN002 with personnel whose Alzheimer's experience would make training "minimal," had sites "ready to go," and that on leukapheresis "the answer is yes." Biorasi disputes the meaning of these statements. ECF No. [141] ¶ 134; ECF No. [151] ¶ 134. Moreover, on December 15, 2022, Biorasi emailed that "our top enrolling site (2.6 patients per site per month) has officially confirmed that they can and have done sham Leukapheresis, and they will conduct it strictly on site," and Biorasi attached a spreadsheet of eight sites with leukapheresis capabilities. ECF No. [141] ¶ 135; ECF No. [151] ¶ 135. Alzamend further points out that Biorasi reassured that even in the "worst-case scenario" where "Murphy's law applies," Biorasi has "enough wiggle room for feasibility" to figure out where leukapheresis will be done and Biorasi also reassured Alzamend that it would continue to "flesh out" the feasibility of each site. ECF No. [141] ¶¶ 140, 141; ECF No. [151] ¶¶ 140, 141.

Biorasi disputes the meaning of those statements. It is also disputed that Biorasi did not "confirm" these sites were actually feasible and willing to participate in the study. Instead Biorasi simply asked sites if they had leukapheresis capabilities and marked them as potential sites if they said yes. ECF No. [141] ¶ 142; ECF No. [151] ¶ 142. Alzamend refers to Eve Del Rio of Rio Pharmaceutical Services' January 18, 2023 statement where she said she was "really encouraged" that Biorasi's site "has the leukapheresis capabilities and is willing to be the central site for performing the leukapheresis because . . . we had a site that could do it and they have . . . gone AWOL. So we are going to have to depend on that site to perform the leukapheresis" as further evidence of Alzamend's preference to use Biorasi's vendors. ECF No. [142] at 14. It is also disputed regarding the extent to which Alzamend reviewed and approved Biorasi's staff members. ECF No. [118] ¶ 29; ECF No. [141] ¶ 29.

To prevail on its FDUTPA claim, Alzamend must prove three elements: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Am. Mariculture, Inc. v. Syaqua Americas, Inc.*, 2021 WL 2315003, *4 (M.D. Fla. June 7, 2021) (quoting *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006)). An act is deceptive within the meaning of the FDUTPA where a party makes a "representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Peterbrooke Franchising of Am., LLC v. Miami Chocolates*, LLC, 312 F. Supp. 3d 1325, 1343 (S.D. Fla. 2018). Furthermore, "[p]roof of actual damages is necessary to sustain a FDUTPA claim." *Nazario v. Pro. Acct. Servs., Inc.*, 2017 WL 1179917, *5 (M.D. Fla. Mar. 30, 2017).

To state a claim for fraudulent inducement, a plaintiff must allege that (1) defendant made a false statement concerning a material fact; (2) defendant knew the representation was false; (3) defendant intended the representation to induce plaintiff's reliance; and (4) plaintiff was injured in justifiable reliance on the misrepresentation. *See Alvarez v. Royal Caribbean Cruises, Ltd.*, 905 F. 21 Supp. 2d 1334, 1342 (S.D. Fla. 2012) (citation omitted).

At the center of each of those claims are a series of disputed material facts about the meaning of various statements made in the early stages of establishing a clinical trial. Both Parties present evidence to support their understanding of the situation, but at this stage the Court may not weigh such evidence. The Court must view the facts in the light most favorable to the non-moving party, Alzamend, and the Motion for Summary Judgment is denied as to Counts V and VI.

### iv. Biorasi's Breach of Contract Counterclaim

Biorasi argues it is entitled to summary judgment on its breach of contract Counterclaim. ECF No. [119] at 18. Biorasi contends Alzamend has breached its agreement to pay Defendant for certain fees and costs incurred under Section 8.4 of the MSA, including but not limited to Section 8.4(b) of the MSA after notice of termination and the effective date of termination of the MSA.

ECF No. [109] ¶ 11. Though Alzamend argues Biorasi materially breached the MSA, Biorasi contends it never received written notice of an alleged breach. ECF No. [119] at 19.

Alzamend correctly points out that Section 8.2(b) of the MSA only requires written notice if Alzamend seeks to terminate the agreement. *See* ECF No. [32] at 22. Alzamend also correctly point out that "[t]o maintain an action for breach of contract, a claimant must first establish performance on the claimant's part of the contractual obligations imposed by the contract." *Calhoun v. Walden*, 2023 WL 2820076, at *10 (N.D. Fla. Feb. 8, 2023). Summary judgment was denied as to Alzamend's breach of contract claim against Biorasi. As such, whether Biorasi performed its contractual obligations also remains an issue of fact to be resolved. Therefore, the Motion for Summary Judgment is denied as to Biorasi's Counterclaim.

## V. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Biorasi's *Daubert* Motion, **ECF No. [117]**, is **DENIED**.

2. Alzamend's *Daubert* Motion, **ECF No. [116]**, is **DENIED**.

3. Biorasi's Motion for Summary Judgment, **ECF No. [119]**, is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on June 16, 2026.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record